**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:    (818) 532-6449
Email:        jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com
(*additional counsel on signature page*)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEEVE EVELLARD, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| LENDINGCLUB CORPORATION, RENAUD LAPLANCHE, and CARRIE L. DOLAN, | |
| Defendants | DEMAND FOR JURY TRIAL |

{00202475;1 }

## INTRODUCTION

1.     Plaintiff Steeve Evellard ("Plaintiff"), individually and on behalf of all the other persons similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by LendingClub Corporation ("LendingClub" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired LendingClub securities: (1) pursuant and/or traceable to LendingClub's false and misleading Registration Statement and Prospectus issued in connection with the Company's initial public offering on or about December 11, 2014 (the "IPO" or the "Offering"); and/or (2) on the open market between December 11, 2014 and May 6, 2016, both dates inclusive, seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") (the "Class").

## BACKGROUND

3.     LendingClub, together with its subsidiaries, operates as an online marketplace that connects borrowers and investors in the United States.  Its marketplace facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, super prime consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors an opportunity to invest in a range of loans based on term and credit

characteristics.  LendingClub serves investors, such as retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans, and university endowments.

4.     LendingClub was founded in 2006 and is headquartered in San Francisco, California. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LC."

5.     On December 11, 2014, LendingClub completed its IPO, selling 58 million shares at $15.00 each and raising $870 million.  On its first day of trading, LendingClub's stock price climbed as high as $25.44 per share, ultimately closing at $23.43 per share, up more than 56% from its IPO price.

6.     In connection with the IPO and throughout the Class Period, Defendants made materially false and misleading statements regarding the LendingClub's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) LendingClub's internal controls were inadequate to ensure that LendingClub's loans conformed to its customers' criteria; (ii) LendingClub's internal controls were inadequate to ensure that relevant interests in third-party transactions were fully and timely disclosed; and (iii) as a result of the foregoing, LendingClub's public statements were materially false and misleading at all relevant times.

7.     On May 9, 2016, LendingClub disclosed in an SEC filing that on May 6, 2016, the Company's board of directors had accepted the resignation of Defendant Renaud Laplanche ("Laplanche") as the Company's Chairman and Chief Executive Officer ("CEO").  The Company reported that Laplanche's resignation was precipitated by an internal review that found that the Company had sold $22 million in loans, made to consumers with low credit scores, to a single investor (later reported to be Jefferies LLC ("Jefferies")), in violation of the investor's "express instructions."

8.     In the same filing, the Company also disclosed "a failure to inform the board's Risk Committee of personal interests held in a third party fund while the Company was contemplating an

investment in the same fund." Media outlets subsequently reported that Laplanche had failed to fully disclose a personal interest he held in Cirrix Capital while the Company was contemplating investing in the fund—an investment that Laplanche had himself proposed to LendingClub's risk-management committee—and that LendingClub board member John Mack also held an undisclosed interest in Cirrix Capital.

9.      On this news, LendingClub's stock fell $2.48 per share, or nearly 35%, to close at $4.62 per share on May 9, 2016.

10.     On May 9, 2016, post-market, news outlets reported that the SEC was investigating LendingClub's disclosures.

11.     On May 10, 2016, *Bloomberg* and other news outlets reported that Goldman Sachs and Jefferies had halted their purchases of LendingClub loans. That same day, the U.S. Treasury Department issued a White Paper describing the online lending industry as "untested" and calling for more regulation.

12.     On this news, LendingClub stock fell $0.52 per share, or 11.3%, to close at $4.10 per share on May 10, 2016.

13.     LendingClub stock now trades below $3.70 per share, representing a decline of more than 75% from the IPO price, and a decline of nearly 87% from the stock's Class Period high.

14.     As a result of Defendants' false and/or misleading statements, LendingClub securities traded at inflated prices. However, after disclosure of Defendants' false and/or misleading statements, LendingClub's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged Defendant LendingClub maintains its principal executive offices in this District.

18.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiff purchased or otherwise acquired LendingClub common stock as described in the attached certification and was damaged by the revelation of the alleged corrective disclosures.

20.     Defendant LendingClub is incorporated in Delaware, and its stock trades on the NYSE under the ticker symbol "LC."  The Company's corporate headquarters are located at 71 Stevenson Street, Suite 300, San Francisco, California 94105.

21.     Defendant Laplanche served at all relevant times as CEO and Chairman of LendingClub until his resignation on May 6, 2016.

{00202475;1 }

22.     Defendant Carrie L. Dolan ("Dolan") has served at all relevant times as Chief Financial Officer of LendingClub.

23.     The Defendants named in ¶¶ 21-22 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24.     LendingClub, together with its subsidiaries, operates as an online marketplace that connects borrowers and investors in the United States.  Its marketplace facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, super prime consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors an opportunity to invest in a range of loans based on term and credit characteristics.  LendingClub serves investors, such as retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans, and university endowments.

25.     On or about August 27, 2014, LendingClub filed a registration statement on Form S-1 with the SEC in connection with the Company's IPO.  The registration statement was subsequently amended several times, with the final amended registration statement filed on Form S-1/A with the SEC on December 8, 2014 (collectively, the "Registration Statement").

26.     The Registration Statement contained a preliminary prospectus.  The final prospectus (the "Prospectus") was filed with the SEC on December 11, 2014.

27.     On December 11, 2014, the SEC declared the Registration Statement effective as of December 10, 2014.

{00202475;1 }

6

28.     On December 11, 2014, LendingClub completed its IPO, selling 58 million shares at $15.00 each and raising $870 million.  On its first day of trading, LendingClub's stock price climbed as high as $25.44 per share, ultimately closing at $23.43 per share, up more than 56% from its IPO price.

## The Alleged False and Misleading Statements

29.     On December 8, 2014, LendingClub filed its Prospectus with the SEC, which forms part of the Registration Statement.  In the Prospectus, the Company stated, in relevant part:

**Our Strategy for Growth**

Our historical growth rates reflect a deliberate strategy of balancing loan originations in a manner that allowed us to build and develop the various enterprise functions to support our scale, including customer support, operations, risk controls, compliance and technology. Borrower and investor demand will continue to inform our business and loan product decisions, but *we will not compromise the long-term viability of our marketplace to pursue excessive near-term growth rates that we believe would result in borrower or investor experiences below our standards.*

. . .

For consumers and small business borrowers, we leverage our cost advantages and marketplace model to provide borrowers with affordable credit. We utilize our technology to provide a better experience, offering borrowers a convenient, simple and fast online application that improves the often time-consuming and frustrating loan application process. *We design our products to be fair, transparent and borrower-friendly.* All of the loans offered through our marketplace feature fixed rates, fixed monthly payments, no hidden fees and no prepayment penalties.

For individual and institutional investors, we deliver value by providing them with the opportunity to earn attractive risk-adjusted returns through equal access to loans offered to all investors through our marketplace. *Our platform provides investors with the transparency and flexibility to quickly and easily tailor or modify their portfolio by utilizing specific investment criteria, such as credit attributes, financial data and loan characteristics.* We use proprietary credit decisioning and scoring models and extensive historical loan performance data to provide investors with tools to construct loan portfolios confidently and model targeted returns. Our platform enables broad diversification by allowing investors to invest in individual loans in increments as low as $25.

. . .

**Industry Background and Trends**

{00202475;1 }

7

There is an opportunity for the online marketplace model to transform the traditional banking system. We believe ***a transparent and open marketplace*** where borrowers and investors have access to information, complemented by technology and tools, can make credit more affordable, redirect existing pools of capital trapped inside the banking system and attract new sources of capital to a new asset class. We believe online marketplaces have the power to facilitate more efficient deployment of capital and improve the global economy.

. . .

**Benefits to Borrowers**

. . .

- *Transparency and Fairness.*  All of the loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. We utilize our rules-based engine for credit decisioning.

. . .

**Benefits to Investors**

. . .

- *Transparency.*  We provide investors with transparency and choice in building their loan portfolios. Investors can examine each loan at a granular level prior to investing in a loan and continue to monitor ongoing loan performance. We also provide access to credit profile data on each approved loan as well as all of the historical performance data for every loan ever invested in through our platform

(Emphases added.)

30.     The Prospectus also contained a Letter from Renaud Laplanche, in which Defendant Laplanche stated, in part:

I believe we can transform the current banking system into a frictionless, transparent and highly efficient online marketplace that provides affordable credit to borrowers and creates great investment opportunities for investors, helping millions of people achieve their financial goals.

. . .

**Building Confidence**

We are not only bringing cost efficiency to the credit markets but also a more transparent and customer-friendly experience. Unlike traditional banks, we do not build confidence by establishing a branch at every street corner. Instead, ***we earn the trust of our customers by offering maximum transparency into our products' terms and performance.***

. . .

***We have established investor confidence*** by demonstrating the effectiveness of our risk ranking technology, as well as ***through the accuracy, transparency and granularity of our reporting.*** We post on our platform the detailed performance of every single loan offered publicly to investors since inception, along with more aggregated performance statistics.

We are continuing to earn investor confidence every day by providing equal access and with a level playing field with the same tools, data and access for all investors, small and large, within a fair and efficient marketplace.

(Emphases added.)

31.     On December 18, 2014, one week after the IPO, LendingClub's stock closed at a Class Period high of $27.90 per share.

32.     On February 27, 2015, LendingClub filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, LendingClub reported a net loss of $9.04 million, or $0.07 per diluted share, on net revenue of $103.56 million, compared to net income of $2.86 million, or $0.03 per diluted share, on net revenue of $88.73 million for the same period in the prior year.   For 2014, LendingClub reported a net loss of $32.89 million, or $0.44 per diluted share, on net revenue of $211.25 million, compared to net income of $7.31 million, or zero per diluted share, on net revenue of $98.04 million for 2013.

33.     In the 2014 10-K, LendingClub stated, in part:

Online marketplaces have emerged to connect buyers and sellers across many industries to increase choice, improve quality, accelerate the speed of decision making and lower costs. ***We believe a successful online marketplace must act as a trusted intermediary providing transparency***, security, supply and demand balance and ease of use to give

marketplace participants an incentive to interact and the confidence to do business together. Initial online marketplaces connected buyers and sellers of goods and services—primarily moving demand from offline to online and making the transaction process more efficient. Online marketplaces have more recently evolved to unlock supply and demand that could not previously be matched in an efficient manner offline. The "sharing economy," a term that describes this new marketplace trend, enables a better use of resources by allowing owners of underutilized assets to offer them to people who want them while capturing an economic benefit.

**Our Solution**

We are the world's largest online marketplace connecting borrowers and investors. Our technology platform supports this innovative marketplace model to efficiently connect the supply and demand of capital. Our marketplace also substantially reduces the need for physical infrastructure and improves convenience and automation, increasing efficiency, reducing manual processes and improving the overall borrower and investor experience.

We believe that our marketplace provides the following benefits to borrowers:

. . .

- **Transparency and Fairness.** All of the installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. Our platform utilizes a computerized, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

. . .

We believe that our marketplace provides the following benefits to investors:

. . .

- **Transparency.** We provide investors with transparency and choice in building their loan portfolios.

(Emphasis added.)

34.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     On March 10, 2015, Defendant Laplanche gave an interview with the online publication *LendingMemo*, in which he assured the marketplace that the Company had not put its customers at risk in pursuit of growth:

> [Interviewer:] Lending Club continues to lead the online lending industry. Last year you hired several hundred new employees, took over four more floors in your building, and issued an incredible $4.4 billion in new loans. Growth is near a half billion dollars of new loans per month. How are you doing this?
>
> [Laplanche:] We continue to be very deliberate about our growth. . . . One thing we are acutely aware of is to make sure we don't grow too fast, causing operational mistakes. ***We are dealing with people's money, so it puts additional responsibility on us to manage growth in a way that doesn't put our customers at risk.***

(Emphasis added.)

36.     On May 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, LendingClub reported a net loss of $6.37 million, or $0.02 per diluted share, on net revenue of $81.24 million, compared to a net loss of $7.30 million, or $0.13 per diluted share, on net revenue of $38.75 million for the same period in the prior year.

37.     In the Q1 2015 10-Q, LendingClub stated, in part, that the Company's "***trusted brand***, scale and network effect drives significant borrowing and investing activity on our marketplace." (Emphasis added.)

38.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     On August 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, LendingClub reported a net loss of $4.14 million, or $0.01 per diluted

share, on net revenue of $96.92 million, compared to a net loss of $9.19 million, or $0.16 per diluted share, on net revenue of $48.24 million for the same period in the prior year.

40.    In the Q2 2015 10-Q, LendingClub stated, in part, that the Company's "*trusted brand*, scale and network effect drives significant borrowing and investing activity on our marketplace." (Emphasis added.)

41.    The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.    On November 3, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, LendingClub reported net income of $0.95 million, or zero per diluted share, on net revenue of $116.24 million, compared to a net loss of $7.37 million, or $0.12 per diluted share, on net revenue of $56.12 million for the same period in the prior year.

43.    In the Q3 2015 10-Q, LendingClub stated, in part, that the Company's "*trusted brand*, scale and network effect drives significant borrowing and investing activity on our marketplace." (Emphasis added.)

44.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.    On February 22, 2016, LendingClub filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, LendingClub reported net income of $4.57 million, or $0.01 per diluted share, on net revenue of $135.54 million, compared to a net loss of $9.04 million, or $0.07 per diluted share, on net revenue of $103.56 for the same period in the prior year.  For 2015,

LendingClub reported a net loss of $5 million, or $0.01 per diluted share, on net revenue of $429.93 million, compared to a net loss of $32.89 million, or $0.44 per diluted share, on net revenue of $211.25 million for 2014.

46.     In the 2015 10-K, LendingClub stated, in part:

**Online Marketplaces Have Proliferated Throughout the Economy**

Online marketplaces have emerged to connect buyers and sellers across many industries to increase choice, improve quality, accelerate the speed of decision making and lower costs. ***We believe a successful online marketplace must act as a trusted intermediary providing transparency***, security, supply and demand balance, and ease of use to give marketplace participants an incentive to interact and the confidence to do business together. Initial online marketplaces connected buyers and sellers of goods and services – primarily moving demand from offline to online and making the transaction process more efficient. Online marketplaces have more recently evolved to unlock supply and demand that could not previously be matched in an efficient manner offline. The "sharing economy," a term that describes this new marketplace trend, enables a better use of resources by allowing owners of underutilized assets to offer them to people who want them while capturing an economic benefit.

**Our Solution**

We believe that our marketplace provides the following benefits to borrowers:

- **Transparency and Fairness.** The installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. Small business lines of credit have rates based upon the prime rate and allow borrowers to draw in increments, reducing their interest cost. Our platform utilizes an automated, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

. . .

We believe that our marketplace provides the following benefits to investors:

. . .

- **Transparency.** We provide investors with transparency and choice in building their loan portfolios.

47.    The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting

48.    The statements referenced in ¶¶ 29-30 and 32-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) LendingClub's internal controls were inadequate to ensure that the Company's loans conformed to its customers' criteria; (ii) LendingClub's internal controls were inadequate to ensure that relevant interests in third-party transactions were fully and timely disclosed; and (iii) as a result of the foregoing, LendingClub's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

49.    On May 9, 2016, LendingClub disclosed in an SEC filing that on May 6, 2016, the Company's board of directors had accepted the resignation of Defendant Laplanche as the Company's Chairman and CEO.  The Company reported that Laplanche's resignation was precipitated by an internal review that found that the Company had sold $22 million in loans, made to consumers with low credit scores, to a single investor (later reported to be Jefferies), in violation of the investor's "express instructions."

50.    In the same filing, the Company also disclosed "a failure to inform the board's Risk Committee of personal interests held in a third party fund while the Company was contemplating an investment in the same fund."  Media outlets subsequently reported that Laplanche had failed to fully disclose a personal interest he held in Cirrix Capital while the Company was contemplating investing in the fund—an investment that Laplanche had himself proposed to LendingClub's risk-management

committee—and that LendingClub board member John Mack also held an undisclosed interest in Cirrix Capital.

51.     On this news, LendingClub's stock fell $2.48 per share, or nearly 35%, to close at $4.62 per share on May 9, 2016.

52.     On May 9, 2016, post-market, news outlets reported that the SEC was investigating LendingClub's disclosures.

53.     On May 10, 2016, *Bloomberg* and other news outlets reported that Goldman Sachs and Jefferies had halted their purchases of LendingClub loans.   That same day, the U.S. Treasury Department issued a White Paper describing the online lending industry as "untested" and calling for more regulation.

54.     On this news, LendingClub stock fell $0.52 per share, or 11.3%, to close at $4.10 per share on May 10, 2016.

55.     LendingClub stock now trades below $3.70 per share, representing a decline of more than 75% from the IPO price, and a decline of nearly 87% from the stock's Class Period high.

56.     As a result of Defendants' false and/or misleading statements, LendingClub securities traded at inflated prices.  However, after disclosure of Defendants' false and/or misleading statements, LendingClub's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

**CLASS ACTION ALLEGATIONS**

57.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class (as defined *supra* at ¶ 2).   Excluded from the Class are Defendants and their family members, directors and officers of LendingClub and their families and affiliates.

58.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. LendingClub has more than 100 million shares of stock outstanding, owned by hundreds or thousands of persons.

59.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether the Securities Act was violated by Defendants;

(b)    Whether the Exchange Act was violated by Defendants;

(c)    Whether Defendants omitted and/or misrepresented material facts;

(d)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    Whether the price of LendingClub common stock was artificially inflated; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

60.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

61.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

62.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**NO SAFE HARBOR**

63.    LendingClub's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") were ineffective to shield those statements from liability.

64.    The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of LendingClub who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET**

65.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      (a)    Defendants made public misrepresentations or failed to disclose material facts;

      (b)    The omissions and misrepresentations were material;

      (c)    The Company's stock traded in an efficient market;

      (d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

      (e)    Plaintiff and other members of the Class purchased LendingClub common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

66.    At all relevant times, the market for LendingClub's common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, LendingClub filed periodic public reports with the SEC; and

(b) LendingClub regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services

67.    As a result of the foregoing, the market for LendingClub's securities promptly digested current information regarding LendingClub from all publicly available sources and reflected such information in LendingClub's stock price.  Under these circumstances, all purchasers of LendingClub's securities at relevant times suffered similar injury through their purchases of LendingClub's securities at artificially inflated prices, and a presumption of reliance applies.

## COUNT I
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against All Defendants

68.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.    Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase LendingClub's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

70.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LendingClub securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of LendingClub as specified herein.

72.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LendingClub's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LendingClub and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of LendingClub securities.

73.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company at all relevant times and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) each of these

Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and business projects at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's flawed manufacturing processes, thereby artificially inflating price of its securities. As demonstrated by Defendants' omissions and misstatements of the Company's business strategy, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LendingClub securities was artificially inflated. In ignorance of the fact that market prices of LendingClub's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired LendingClub securities at artificially high prices and were or will be damaged thereby.

76.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members

of the Class and the marketplace known the truth regarding the Company's flawed manufacturing processes, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LendingClub securities, or, if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

77. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

78. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

79. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. The Individual Defendants acted as controlling persons of LendingClub within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

82.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, LendingClub and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

84.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities.

85.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT III
### Violation of Section 11 of
### The Securities Act Against All Defendants

86.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

87.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

88.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

89.     LendingClub is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

90.     As issuer of the shares, LendingClub is strictly liable to Plaintiff and the Class for the misstatements and omissions.

91.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

92.     By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

93.     Plaintiff acquired LendingClub securities pursuant and/or traceable to the Registration Statement for the IPO.

94.     Plaintiff and the Class have sustained damages. The value of LendingClub securities has declined substantially subsequent to and due to the Individual Defendants' violations.

### COUNT IV
### Violation of Section 15 of
### The Securities Act Against the Individual Defendants

95.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

96.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

97.     Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of LendingClub within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause LendingClub to engage in the acts described herein.

{00202475;1 }                                   23

98.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

99.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 16, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:   (818) 532-6449
Email:        jpafiti@pomlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
Email:  jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:    (312) 377-1181
Facsimile:    (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{00202475;1 }

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _Steeve Evellard_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against LendingClub Corporation ("LendingClub" or the "Company") (NYSE: LC). and, authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire LendingClub. securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired LendingClub.  securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in LendingClub securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _5/13/16_____
                  **(Date)**

_____
                  **(Signature)**

_Steeve Evell_Avo_____
                  **(Type or Print Name)**

**LENDINGCLUB CORPORATION (LC)**                                      **Evellard, Steeve**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 02/24/2015 | Purchase | 1,500 | $23.3293 |
| 02/26/2015 | Purchase | 500 | $20.4347 |