KEVIN P. MUCK  (CSB No. 120918)
kmuck@fenwick.com
MARIE C. BAFUS (CSB No. 258417)
mbafus@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, California  94104
Telephone:      (415) 875-2300
Facsimile:       (415) 281-1350

JAY L. POMERANTZ  (CSB No. 209869)
jpomerantz@fenwick.com
CARLY L. BITTMAN  (CSB No. 305513)
cbittman@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, California  94041
Telephone:      (650) 988-8500
Facsimile:       (650) 938-5200

Attorneys for Defendants LendingClub Corporation,
Daniel T. Ciporin, Jeffrey Crowe, Carrie Dolan, Rebecca
Lynn, John J. Mack, Mary Meeker, John C. (Hans) Morris,
Lawrence H. Summers and Simon Williams

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE LENDINGCLUB SECURITIES LITIGATION | Case No. 3:16-CV-02627-WHA |
| | CLASS ACTION |
| This Document Relates To: | LENDINGCLUB DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS |
| ALL ACTIONS | Hearing: |
| | Date:          March 2, 2017 |
| | Time:          8:00 a.m. |
| | Courtroom:    8 |
| | Judge:         The Honorable William H. Alsup |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................. 1

ISSUES TO BE DECIDED ................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 2

I.  INTRODUCTION .................................................................................................... 2

II.  STATEMENT OF FACTS ........................................................................................ 3

    A.  LendingClub and Its Business .................................................................... 3

    B.  The December 2014 IPO and Continued Growth of the Business.............. 4

    C.  The May-June 2016 Disclosures ................................................................ 5

    D.  Procedural History and Plaintiff's Claims ................................................. 6

III.  LEGAL STANDARDS ON A MOTION TO DISMISS............................................... 7

IV.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 ............................. 7

    A.  Plaintiff Is Unable to State a Claim Based on LendingClub's Purported
        Relationship With Cirrix ............................................................................ 8

        1.  The CC Does Not Identify Anything in the Registration
            Statement Rendered Materially Misleading By Virtue of the
            Alleged Omission ............................................................................ 8

        2.  The CC Does Not Plead That the Cirrix Relationship Was
            Material at the Time of the IPO ...................................................... 9

    B.  Plaintiff Fails to Allege That the Registration Statement Was
        Misleading With Respect to the "Transparency" or "Sophistication" of
        the Loan Approval Process ........................................................................ 10

    C.  Plaintiff Has Not Adequately Alleged That the Registration Statement
        Misrepresented the Company's Program to Protect Data Integrity and
        Security at the Time of the IPO................................................................... 12

    D.  Plaintiff Does Not Allege Internal Control Deficiencies at the Time of
        the IPO ...................................................................................................... 13

V.  THE SECTION 10(B) CLAIM MUST BE DISMISSED ............................................. 14

    A.  Statements Regarding Loan Originations and Financial Results........................ 15

    B.  Statements Regarding Credit and Liquidity Risks ................................................ 17

    C.  Statements Regarding Credit Decision and Scoring Processes............................ 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**
(Continued)

Page

D. Statements Regarding Internal Controls ................................................. 19

E. Statements Regarding Data Integrity and Security ............................... 20

F. The Relevant Facts, Considered in Their Entirety, Actually Preclude a Strong Inference of Scienter .................................................................... 21

1. Defendants' Stock Ownership Negates an Inference of Scienter ............ 22

2. The Stock Repurchase Also Negates an Inference of Scienter ................. 23

3. Plaintiff Relies on a Hodgepodge of Conclusory Allegations That Do Not Suffice to Create a Strong Inference of Fraudulent Intent Under *Tellabs* .................................................................... 24

VI. PLAINTIFF DOES NOT STATE A "CONTROL PERSON" CLAIM .......................... 25

VII. CONCLUSION ......................................................................................... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................................7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................................7

*Brodsky v. Yahoo! Inc.,*
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................................................24

*Bruce v. Suntech Power Holdings Co.,*
   2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ......................................................20

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.,*
   114 F. Supp. 2d 316 (D.N.J. 2000) ......................................................................11

*Cement Masons & Plasterers' Jt. Pension Trust v. Equinix, Inc.,*
   2013 WL 2931422 (N.D. Cal. June 12, 2013) ................................................17, 19

*City of Dearborn Hts. Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
   65 F. Supp. 3d 840 (N.D. Cal. 2014) ....................................................................21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
   2013 WL 2156358 (N.D. Cal. May 17, 2013) ......................................................16

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................22

*Druskin v. Answerthink, Inc.,*
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ................................................................17

*Garber v. Legg Mason, Inc.,*
   537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) ................10, 14

*Glazer Capital Mgmt., LP v. Magistri,*
   549 F.3d 736 (9th Cir. 2008) ................................................................................15

*Gompper v. VISX, Inc.,*
   298 F.3d 893 (9th Cir. 2002) ................................................................................21

*Higginbotham v. Baxter Int'l, Inc.,*
   495 F.3d 753 (7th Cir. 2007) ................................................................................13

*Huang v. Avalanche Biotechnologies, Inc.,*
   2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) ......................................................25

*In re China Mobile Games & Ent'mt Group Ltd. Sec. Litig.,*
   2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ........................................................16

*In re Cornerstone Propane Partners, L.P.,*
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................................24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

LENDINGCLUB DEFS.' MOTION TO DISMISS;
MPA ISO MOTION
   iii
   CASE NO. 3:16-CV-02627-WHA

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)..........................................................................22

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ...........................................................................24

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C. D. Cal. 2007) .................................................................15, 19, 25

*In re iAsia Works, Inc. Sec. Litig.*,
2002 WL 1034041 (N.D. Cal. May 15, 2002) ....................................................................11, 12

*In re Levi Strauss & Co. Sec. Litig.*,
527 F. Supp. 2d 965 (N.D. Cal. 2007) ....................................................................................15

*In re Manulife Fin. Corp. Sec. Litig.*,
276 F.R.D. 87 (S.D.N.Y. 2011) ..............................................................................................25

*In re Pixar Sec. Litig.*,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) ..................................................................................22

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)............................................................................3, 7, 8, 23

*In re Rocket Fuel, Inc. Sec. Litig.*,
2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ........................................................................12

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)......................................................................................... *passim*

*In re Tibco Software, Inc. Sec. Litig.*,
2006 WL 1469654 (N.D. Cal. May 25, 2006) .........................................................................23

*In re Velti PLC Sec. Litig.*,
2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)..............................................................................9

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)..........................................................................11

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994)....................................................................2, 11, 13, 14

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)..........................................................................................15, 17

*Luna v. Marvell Tech. Grp. Ltd*,
2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)..........................................................................24

*Madden v. Cowen & Co.*,
576 F.3d 957 (9th Cir. 2009)....................................................................................................7

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Mallen v. Alphatec Holdings, Inc.*,
 2013 WL 1294640 (S.D. Cal. Mar. 28, 2013), *aff'd*, 607 F. App'x 694
 (9th Cir. 2015) ................................................................................................................. 9

*Mathews v. Centex Telemanagement, Inc.*,
 1994 WL 269734 (N.D. Cal. June 8, 1994) ................................................................... 23

*Matrixx Initiatives, Inc. v. Siracusano*,
 131 S. Ct. 1309 (2011) ................................................................................................... 16

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ................................................................................... 4, 15

*Nathanson v. Polycom, Inc.*,
 87 F. Supp. 3d 966 (N.D. Cal. 2015) ...................................................................... 12, 18

*Navarro v. Block*,
 250 F.3d 729 (9th Cir. 2001) ........................................................................................... 7

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......................................................... 20, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 --- U.S. ---, 135 S. Ct. 1318 (2015) .................................................................... *passim*

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009) ...................... 13

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
 673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012) ........................... 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014) ................................................................................. 17, 19

*Primo v. Pacific Biosciences, Inc.*,
 940 F. Supp. 2d 1105 (N.D. Cal. 2013) ........................................................................... 9

*Pugh v. Tribune Co.*,
 521 F.3d 686 (7th Cir. 2008) ..................................................................................... 21, 24

*Rieckborn v. Jefferies LLC*,
 81 F. Supp. 3d 902 (N.D. Cal. 2015) ............................................................. 8, 10, 11, 12

*Rintel v. Wathen*,
 806 F. Supp. 1467 (C.D. Cal. 1992) ............................................................................... 15

*Rok v. Identiv, Inc.*,
 2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ......................................................... 18, 21, 25

*Romine v. Acxiom Corp.*,
 296 F.3d 701 (8th Cir. 2002) ......................................................................................... 10

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)...............................................................*passim*

*Roth v. OfficeMax, Inc.*,
527 F. Supp. 2d 791 (N.D. Ill. 2007) ..............................................................20

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009)..........................................................................7

*Schuster v. Symmetricon, Inc.*,
2000 WL 33115909 (N.D. Cal. Aug. 1, 2000).............................................23

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)........................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................*passim*

*Tripp v. Indymac Fin. Inc.*,
2007 WL 4591930 (C.D. Cal. Nov. 29, 2007).............................................22

*Wade v. Wellpoint, Inc.*,
740 F. Supp. 2d 994 (S.D. Ind. 2010) ...................................................21, 24

*Wozniak v. Align Tech., Inc.*,
850 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................16, 18, 19

*Zack v. Allied Waste Indus., Inc.*,
2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722
(9th Cir. 2008)...............................................................................................23

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)......................................................................*passim*

*Zucker v. Quasha*,
891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996)..................13

**STATUTES & RULES**

Federal Rules of Civil Procedure
Rule 9(b) ..................................................................................................1, 7, 8
Rule 12(b)(6)................................................................................................1, 7

Private Securities Litigation Reform Act of 1995.............................................*passim*

Sarbanes–Oxley Act of 2002
Section 302.....................................................................................................24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## TABLE OF AUTHORITIES
### (Continued)

2

**Page(s)**

3
Securities Act of 1933
    Section 11, 15 U.S.C. § 77k ........................................................................................... *passim*
4
    Section 15, 15 U.S.C. § 77o ...........................................................................................1, 7

5
Securities Exchange Act of 1934
    Section 10(b), 15 U.S.C. § 78j(b) ................................................................................... *passim*
6
    Section 20(a), 15 U.S.C. § 78t(a) ...................................................................................1, 7
    Section 20D, 15 U.S.C. § 78u-4(b)(1)(B) ......................................................................15

7

8
SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1.......................................................................22

9
**OTHER AUTHORITIES**

10
Auditing Standard (AS) No. 5 (PCAOB 2007) ..................................................... 13, 14

11
FASB Accounting Standards Certification (ASC) 850-10-20(g) .................................16

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 2, 2017, at 8:00 a.m. or as soon thereafter as counsel may be heard, in the courtroom of The Honorable William H. Alsup, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California, defendants LendingClub Corporation ("LendingClub" or the "Company"), Daniel T. Ciporin, Jeffrey Crowe, Carrie Dolan, Rebecca Lynn, John J. Mack, Mary Meeker, John C. (Hans) Morris, Lawrence H. Summers and Simon Williams (collectively, the "LendingClub Defendants") will, and hereby do, move to dismiss all claims asserted against them in the Consolidated Complaint ("CC").

The LendingClub Defendants move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA") on the grounds that plaintiff fails to state a claim under Sections 11 and 15 of the Securities Act of 1933 ("1933 Act") or Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"). The LendingClub Defendants' motion is based on: this Notice of Motion and Motion to Dismiss; the accompanying Memorandum of Points and Authorities; LendingClub Defendants' Request for Judicial Notice ("RJN"), filed and served concurrently; the Declaration of Marie C. Bafus ("Bafus Decl.") and attached exhibits, filed and served concurrently; the motions to dismiss and supporting papers filed by the other defendants; the pleadings and records on file in this action; the argument of counsel; and such other matters as may be presented to the Court.

## ISSUES TO BE DECIDED

1.     Should the Section 11 claim against the LendingClub Defendants be dismissed where plaintiff fails to plead that the IPO Registration Statement contained any misrepresentation or omission of material fact at the time it was filed?

2.     Should the Section 10(b) claim against LendingClub and Ms. Dolan be dismissed where plaintiff fails to plead a statement that was materially false when made, facts sufficient to raise a strong inference of scienter, or facts establishing loss causation?

3.     Should the "control person" claims be dismissed where plaintiff fails to plead an underlying violation of the 1933 Act or the 1934 Act?

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Plaintiff relies impermissibly on hindsight in an effort to manufacture claims under the federal securities laws.  Seizing upon facts disclosed by LendingClub in May and June 2016, including the resignation of the Company's Chief Executive Officer, plaintiff argues that prior statements must have been false based on those subsequent events and disclosures.  The CC even reaches all the way back to statements made in connection with LendingClub's December 2014 initial public offering (IPO) – some *seventeen months before* disclosure of the purported facts underlying this suit – in an attempt to "reverse-engineer" claims under Section 11 of the 1933 Act and Section 10(b) of the 1934 Act.  That tactic, however, is unavailing as a matter of law.

The federal securities laws require *contemporaneous facts* showing that specific statements were materially false *when made*.  *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (plaintiff cannot use "20-20 hindsight" to plead a violation of Section 11); *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001) (Section 10(b) claim requires plaintiff to specify, *inter alia*, "facts or evidence that show why the statement was false at the time it was made").  Indeed, "Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight,'" and to make clear that claims must be founded on facts at the time challenged statements were made.  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).  The *ex post* pleading approach employed by plaintiff contravenes these principles.

Thus, as to Section 11, plaintiff disregards its obligation to plead that LendingClub's final IPO Registration Statement ("Registration Statement") misrepresented or omitted material facts existing *at the time* – in *December 2014*.  For example, plaintiff claims the Registration Statement did not disclose internal control weaknesses, but does not plead the existence of such weaknesses at the time of the IPO.  Instead, the CC relies on the May 2016 determination that weaknesses existed as of December 31, 2015, more than twelve months *after* the IPO.  Similarly, claims based on the alleged failure to disclose that data could be "altered," a supposed lack of "transparency" and "sophistication" of the Company's loan-approval process, or its relationship with a third-party fund manager, are premised on events occurring long after the IPO.  And independent of the CC's

1   improper reliance on hindsight, plaintiff is unable to satisfy its burden of pleading that any of

2   these alleged omissions were material at the time of the IPO or rendered specific portions of the

3   Registration Statement misleading.  As a result, the Section 11 claim must be dismissed.

4          Plaintiff fares no better with its Section 10(b) claim, which assails a series of statements

5   between December 2014 and February 2016.  Once more, the CC relies on *subsequent* events and

6   disclosures, and does not comply with the PSLRA by pleading particularized facts showing the

7   statements were materially false *when made*.  Nor does the CC plead "specific '*contemporaneous*

8   statements or conditions'" demonstrating that any statements were made with scienter.  *Ronconi*,

9   253 F.3d at 432 (emphasis added; citation omitted).  Plaintiff cites *no* confidential witnesses, *no*

10  internal documents, and *no* contemporaneous facts suggesting that statements were made with

11  anything other than a good faith belief in their accuracy.  Moreover, the PSLRA requires that the

12  Court consider facts negating an inference of scienter and supporting an "opposing inference of

13  nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In

14  that regard, plaintiff tellingly ignores that LendingClub's CEO and CFO (the only individuals

15  named in the Section 10(b) claim) actually *increased* their stock holdings during the class period,

16  thereby undermining any suggestion that they were involved in a fraudulent scheme to inflate the

17  stock price.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012).

18         In sum, plaintiff's reliance on hindsight, and its inability to plead contemporaneous facts

19  establishing falsity, materiality or scienter, precludes it from stating a claim under the federal

20  securities laws.  As a result, the LendingClub Defendants' motion to dismiss should be granted.

21  **II.    STATEMENT OF FACTS**

22         **A.    LendingClub and Its Business**

23         LendingClub, a Delaware corporation headquartered in San Francisco, is the world's

24  largest online marketplace for connecting borrowers and investors.  ¶¶ 11, 27;[1] Prospectus, filed

25  with the Securities and Exchange Commission ("SEC") on December 11, 2014 ("Prospectus"), at

26  1, 8.[2]  Through LendingClub's platform, borrowers can obtain personal and business loans.  ¶ 27.

---

[1] Unless otherwise specified, all paragraph references are to the CC.

[2] Excerpts of the Prospectus, which was incorporated into the final IPO Registration Statement and filed with the SEC (¶ 1), are attached as Ex. A to the accompanying Bafus Decl.  (The

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Prospective borrowers submit applications online and various data (including information from applicants and reports from third-party credit agencies) are analyzed by a computerized, rules-based engine for credit decisions.  ¶¶ 30, 45; Prospectus at 4, 94-95.  Each applicant's identity is verified, a credit report must be received from a consumer reporting agency, and (in some cases) employment or income information may be confirmed.  *Id.* at 99-100.  The Company's technology, proprietary algorithms and credit decision processes enable it to assess each borrower's risk profile, price loans accordingly, and offer generally lower interest rates than charged by traditional banks on credit cards or installment loans.  ¶ 33; Prospectus at 4-5, 95-100.

Loans to qualified borrowers are originated by issuing third-party banks and offered to investors via the LendingClub platform.  ¶¶ 30, 37; Prospectus at 15, 52, 94.  Investors can invest in loans based on term and credit characteristics of their choice, through: (i) unsecured, borrower payment dependent notes (pursuant to a shelf registration statement filed with the SEC); (ii) certificates and investment funds; or (iii) for some institutional investors (such as banks), whole loans.  ¶ 27; Prospectus at 95-98.  Investors have access to credit profile data on each approved loan, are told what information has been verified, and can access historical performance data for every loan ever originated through the Company's marketplace.  ¶ 46; Prospectus at 4-5.

LendingClub generates revenue from transaction fees, servicing fees from investors, and management fees from investment funds and other managed accounts.  ¶¶ 28, 36; Prospectus at 2, 5.  Between 2009 and 2013, annual revenues grew from $1.4 million to $98 million.  *See id.* at 48.  Revenues more than doubled in 2014, rising to $211.1 million.  Ex. B at 8.

**B.     The December 2014 IPO and Continued Growth of the Business**

On December 11, 2014, LendingClub completed an IPO of its common stock, with shares sold through underwriters at $15.00 each.  ¶¶ 1, 4, 25, 35.  In connection with that offering, the Company filed a final Registration Statement and Prospectus with the SEC.  ¶ 1.

documents attached to the Bafus Decl. are referred to in this brief as Exs. A-L.)  As discussed in the RJN, relevant portions of the Registration Statement, Prospectus and other documents filed with the SEC may be considered on a motion to dismiss because they are (i) judicially noticeable, and/or (ii) referred to, quoted and relied upon in the CC.  *See Tellabs*, 551 U.S. at 322 (court may consider matters subject to judicial notice and documents "incorporated into the complaint by reference"); *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings properly subject to judicial notice).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Prospectus, which is part of the Registration Statement (¶ 1), included a detailed discussion of LendingClub's business, platform, strategy, products, technology, industry and regulatory dynamics, and historical financial results.  Prospectus at 1-7, 48-116.  For instance, it provided audited financial information going back to 2011 (*id*. at 11-13), and noted that loan originations had grown dramatically – from $717.9 million in 2012 to $2.1 billion in 2013, and then again to $3.0 billion for the first nine months of 2014.  *Id*. at 3.  LendingClub also described the risks facing it, including: its limited history and the challenges associated with managing rapid growth; its operating losses; the need to continue attracting new borrowers who meet applicable lending standards and investors interested in investing in these new loans; the "high number of inquiries from potential borrowers who do not meet the criteria for loan … approval"; fluctuations in interest rates; the need to maintain relationships with issuing banks; compliance with regulatory requirements; the effectiveness of proprietary credit scoring and decision models; the possibility that information from borrowers and third parties might be inaccurate; unanticipated increases in default rates; the potential discovery of material weaknesses in internal controls; and reliance on key personnel (including Renaud Laplanche, the founder and CEO).  *Id.* at 7, 14-39.

Following the IPO, LendingClub's business continued to grow.  In 2015, loan originations rose to $8.4 billion (an increase of 91% over the prior year), revenues were $429.9 million (up 103%), and the Company generated net income of about $4.6 million.  ¶ 97; Ex. C at 4, 8.  Evincing the board's belief in the Company's business and prospects, the directors authorized a $150 million stock repurchase program in February 2016.  ¶ 119.

### C.      The May-June 2016 Disclosures

On May 9, 2016, LendingClub announced the resignation of its CEO, Mr. Laplanche.  ¶¶ 105, 106; Ex. D.  The resignation followed an internal review of $22 million in loan sales to one institutional investor (in March and April 2016) that did not conform to the investor's instructions regarding a non-credit and non-pricing element.  Ex. D at 3.  In that review, LendingClub also learned of an unrelated issue: a failure to inform the board's Risk Committee of personal interests in a third-party fund while the Company was contemplating an investment in that fund, although that issue had "*no impact on financial results* for the … quarter."  *Id*. (emphasis added).

At the same time, LendingClub announced strong results for the first quarter of 2016. Despite uncertainty in global capital markets and a challenging economic environment, operating revenues for the first three months of 2016 were $151.3 million (up 87% year-over-year), loan originations were $2.75 billion (up 68% year-over-year), and GAAP net income was $4.1 million (compared to a loss in the first quarter of 2015).  Ex. D at 7.

On May 16, 2016, LendingClub filed its Form 10-Q for the first quarter.  ¶¶ 111, 112. Among other things, the Company explained that some investors had "paused their investments in loans" *after* the May 9, 2016 disclosure and, "[a]s a result, [it] may need to use its own funds to purchase … loans in the coming months."  Ex. E at 29-30.  LendingClub also disclosed that, in the second quarter of 2016, it had identified a material weakness in its internal control over financial reporting related to three primary areas (sales of near-prime loans, review of certain related-party transactions, and investor contract amendments).  Ex. E at 59-61; *see also* ¶ 112. That weakness existed as of March 31, 2016, and "at the end of 2015."  Ex. E at 59; *see also* ¶ 112.  The 10-Q also provided information regarding Cirrix Capital, L.P. ("Cirrix") (which managed a family of funds that purchased loans from the Company), including: LendingClub's $10 million investment in Cirrix on April 1, 2016 (Ex. E at 55-56); personal investments in Cirrix by Mr. Laplanche and an outside director (*id.* at 55); and a credit support agreement, pursuant to which LendingClub had pledged $3.4 million to support a contingent obligation (*id.* at 30).

### D.  Procedural History and Plaintiff's Claims

This litigation was commenced on May 16, 2016, asserting claims against the Company, its former CEO (Mr. Laplanche), and its CFO (Ms. Dolan).[3]  Another action was filed several days later.  The cases were consolidated on August 15, 2016, and the Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles ("plaintiff") was appointed lead plaintiff.  On October 28, 2016, the Court approved plaintiff's selection of lead counsel.

Plaintiff filed the CC on December 9, 2016.  That pleading adds seventeen new defendants – LendingClub's outside directors at the time of the IPO (Ms. Lynn, Ms. Meeker, and Messrs.

---

[3] Five consolidated shareholder class actions, asserting 1933 Act claims that overlap those in this litigation, are also pending in California Superior Court, San Mateo County.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Ciporin, Crowe, Mack, Morris, Summers and Williams) and the IPO underwriters.  ¶¶ 16-26.

2   Plaintiff sues the LendingClub Defendants under Section 11 of the 1933 Act (and as "control

3   persons" under Section 15), based on alleged omissions and misrepresentations in the Registration

4   Statement.  ¶¶ 136-153.  The CC also sues the Company, Mr. Laplanche and Ms. Dolan under

5   Section 10(b) of the 1934 Act (and asserts a "control person" claim against them under Section

6   20(a)), based on statements between December 11, 2014 and February 22, 2016.  ¶¶ 154-164.

7   ### III.     LEGAL STANDARDS ON A MOTION TO DISMISS

8         A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim."  *Navarro*

9   *v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The Court examines well-pleaded factual allegations

10  in their entirety, together with materials referenced in the pleading or subject to judicial notice,

11  and "determine[s] whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*,

12  556 U.S. 662, 679 (2009).  "[A] legal conclusion couched as a factual allegation" need not be

13  accepted as true when determining the sufficiency of a pleading.  *Id*. at 678 (quoting *Bell Atl.*

14  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The Court also considers any special pleading

15  requirements imposed by statute or rule, such as the particularity demanded by Rule 9(b) for

16  claims that "sound in fraud" (*Rigel*, 697 F.3d at 885) or the heightened standards applicable to

17  claims governed by the PSLRA.  *See Madden v. Cowen & Co.*, 576 F.3d 957, 964 (9th Cir. 2009).

18  ### IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11

19        To state a claim under Section 11, a plaintiff must allege that a registration statement

20  misrepresented an existing material fact at the time it became effective, or that omission of an

21  existing fact rendered specific statements materially misleading.  15 U.S.C. § 77k(a); *Rubke v.*

22  *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).  A fact is "material" only if "there is a

23  substantial likelihood that a reasonable [investor] would consider it important" when reading

24  statements "fairly and in context."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

25  *Pension Fund*, --- U.S. ---, 135 S. Ct. 1318, 1332-33 (2015) (citation and quotation omitted).

26  Alleging that material facts were omitted from a registration statement "is no small task for an

27  investor," and a claim cannot be premised "merely [on] conclusory assertions."  *Id.* at 1332.

28        Rule 9(b) applies to Section 11 claims grounded in fraud.  *Rigel*, 697 F.3d at 885.  Here,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the purported misstatements underlying all claims are intertwined, as they were all allegedly part of an effort to create a "mirage" of success and were supposedly revealed as false in May 2016. *See, e.g.*, ¶¶ 1-6, 35-61, 73, 105-117, 127.  Indeed, the allegations underlying the Section 11 claim are incorporated into the Section 10(b) claim (¶ 154), and *all* challenged statements (including those in the Registration Statement) were allegedly made with scienter and as part of a fraudulent scheme.  ¶¶ 155, 156.  Under these circumstances, plaintiff's bald disclaimer that its Section 11 claim is "not based on and does not sound in fraud" (¶ 137) cannot circumvent Rule 9(b).  *See Rigel*, 697 F.3d at 885-86; *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 918 (N.D. Cal. 2015).

In any event, the Section 11 claim fails regardless of whether Rule 9(b) applies.  Plaintiff alleges that the Registration Statement failed to disclose: (i) LendingClub's relationship with Cirrix (¶¶ 39-44); (ii) LendingClub's loan process was not "sophisticated and transparent" (¶¶ 45-50); (iii) issues regarding data integrity and security (¶¶ 51-56); and (iv) internal control deficiencies (¶¶ 57-61).  For each category, the CC fails to plead that, as of date of the IPO, these were "existing facts" rendering the Registration Statement materially misleading.

### A.   Plaintiff Is Unable to State a Claim Based on LendingClub's Purported Relationship With Cirrix

#### 1.   The CC Does Not Identify Anything in the Registration Statement Rendered Materially Misleading By Virtue of the Alleged Omission

Plaintiff alleges that the Registration Statement should have disclosed LendingClub's "relationship and transactions" with Cirrix – and, specifically, the "increasing reliance" on loan investments by Cirrix-managed funds.  ¶ 44.  However, it is not enough merely to posit an alleged fact and claim it was "omitted" from the Registration Statement.  "Section 11's omissions clause … is not a general disclosure requirement; it affords a cause of action *only* when an issuer's failure to include a material fact *has rendered a published statement misleading*."  *Omnicare*, 135 S. Ct. at 1332 (emphasis added).  In other words, plaintiff must establish that omitted material facts existing as of the date of the IPO were necessary to prevent a specific representation from being misleading.  *See id*.  Although plaintiff argues that statements regarding "loan originations" and "assumption of credit risk" somehow triggered an obligation to disclose information regarding Cirrix (¶ 44), the CC does not contain allegations sufficient to support either theory.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Loan originations*.  Plaintiff does not specifically challenge the accuracy of origination data reported in the Registration Statement (*see, e.g.*, Prospectus at 1, 3, 12), or claim that statements regarding the importance of that metric were false.  *See* ¶ 36.  At most, plaintiff suggests that information about Cirrix could have provided additional detail or color regarding LendingClub's business (*see, e.g.*, ¶ 43), but does not identify – as it must – a *specific statement* regarding originations that was *rendered materially misleading* in the absence of Cirrix-related information.  *See Omnicare*, 132 S. Ct. at 1332.  That pleading failure is fatal to a Section 11 claim.  *See Primo v. Pacific Biosciences, Inc.*, 940 F. Supp. 2d 1105, 1116-17 (N.D. Cal. 2013) (no claim where plaintiff failed to identify "what portions of the registration statement" were at odds with omitted information); *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at *8, 13 (S.D. Cal. Mar. 28, 2013) (no Section 11 or Section 10(b) claim where plaintiff did not allege omitted information was inconsistent with challenged statements), *aff'd*, 607 F. App'x 694 (9th Cir. 2015).

*Credit risk*.  The CC cites one statement regarding credit risk – *i.e.*, that LendingClub did not "assume credit risk or use [its] capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material" (¶ 37) – but fails to plead facts showing that it created an obligation to disclose information regarding Cirrix.  The most plaintiff can do is aver that, at some *unspecified time*, LendingClub "assumed millions of dollars of risk for the loans it sold to Cirrix."  ¶ 43.  That conclusory averment, however, is inadequate to plead that the challenged statement regarding credit risk was inaccurate *at the time of the IPO*.  *See, e.g., In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *23 (N.D. Cal. Oct. 1, 2015) (dismissing Section 11 claim based on alleged omission of problem receivables, where plaintiffs did "not allege[] that any of the receivables written off … were outstanding at or before the time of the offerings").

### 2. The CC Does Not Plead That the Cirrix Relationship Was Material at the Time of the IPO

Plaintiff also fails to plead that the purportedly omitted information regarding Cirrix was material *at the time of the IPO*.  The assertion that Cirrix loan purchases represented "20% of LendingClub's critical loan-origination growth" (¶ 43) raises far more questions than it answers – including, for instance, how that supposed statistic was derived, what "growth" it measures, or

what time period it encompasses.  Plaintiff's most specific allegation is that Cirrix accounted for "nearly 5%" of total whole loan sales "in the last quarter before the IPO."  *Id*.  However, the CC admits that "nearly 5%" of whole loan sales for the quarter in question was only about $18 million (*see* ¶ 38) – a minuscule portion of the $1.2 billion in originations during that same three-month period.  Prospectus at 1.  Put simply, plaintiff's allegations do not come close to pleading that, at the time of the IPO, the business attributable to Cirrix was substantial enough "that a reasonable [investor] would consider it important."  *Omnicare*, 135 S. Ct. at 1332-33.  *See also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (dismissing Section 11 claim where plaintiff failed to plead that an alleged omission related to amounts that were material given the company's annual revenue), *aff'd*, 347 F. App'x  665 (2d Cir. 2009); *Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2002) (claim properly dismissed where plaintiffs failed to plead that an adjustment would be material in light of the company's earnings and revenues).[4]

### B.   Plaintiff Fails to Allege That the Registration Statement Was Misleading With Respect to the "Transparency" or "Sophistication" of the Loan Approval Process

The CC also contends that statements regarding the "transparency" and "sophistication" of the loan-approval process were false.  ¶¶ 45-50.  Plaintiff's contention is premised on a litany of conclusory allegations (¶¶ 48(a)-(e), 50) that do nothing to state a Section 11 claim.

For example, plaintiff asserts – without elucidation – that "approved borrower applications contained large numbers of discrepancies and inconsistencies."  ¶ 48(a).  The CC does not allege (among other things) *how many* applications were affected, *when* these problems supposedly occurred, the *magnitude* of the issues, or *how* they impacted LendingClub's business.  Without such basic allegations, plaintiff does not begin to plead that "discrepancies and inconsistencies" in borrower applications were *material, existing facts* at the *time of the IPO* making the Registration Statement misleading.  *See, e.g., Rieckborn*, 81 F. Supp. 3d at 922-23.  Similarly inadequate are

---

[4] Plaintiff also makes a cursory argument (largely relegated to a footnote) that transactions with Cirrix should have been disclosed under rules pertaining to "related parties."  *See* ¶ 43 n.1.  That argument is based primarily on allegations of ownership interests in Cirrix *after the IPO.  See* ¶ 43 (alleging purported ownership stakes "by the end of 2015" and as of "April 1, 2016").  While plaintiff fails to plead that LendingClub and Cirrix were *ever* "related parties" (*see* Sec. V.A., *infra*), there is nothing in the CC that would even arguably support such a relationship as of December 2014.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

bare averments that an unspecified number of delinquent borrowers were offered new loans at unstated times to pay off prior obligations (¶ 48(b)), some borrowers were "induc[ed] … to split loan applications into two separate requests" (¶ 48(d)), or some loans were issued to "sub-prime borrowers" (¶ 48(e)).  The CC does not indicate the timing, duration or magnitude of these purported practices, allege that they were in effect in December 2014, or plead that they were substantial enough "that a reasonable [investor] would consider [them] important."  *Omnicare*, 135 S. Ct. at 1333 (citation and quotation omitted).  *See also Rieckborn*, 81 F. Supp. 3d at 923.

Plaintiff's allegation that "management" could "package and sell loans that fell below lenders' express guidelines" (¶ 48(c)) is an improper attempt to plead a claim based on hindsight. The CC alleges only one instance of such conduct, in March and April 2016.  ¶¶ 105, 106; Ex. E. That incident is inadequate to plead the existence of a problem (or even the risk of a problem) *fifteen months earlier*, at the time of the IPO.  *Worlds of Wonder*, 35 F.3d at 1419 (plaintiff cannot use "20-20 hindsight" to state a Section 11 claim); *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 n.5 (D.N.J. 2000) (plaintiff must plead contemporaneous facts and "*liability cannot be imposed* on the basis solely of *subsequent events*"; emphasis added).

Plaintiff further alleges that "[i]n the buildup to the IPO," LendingClub reduced the review time for loan applications and as a result "could not possibly verify income information for all … applicants."  ¶ 48(e).  That allegation is a *non sequitur*: plaintiff never establishes, as it must, how this purported fact contradicted particular statements about the "transparency" or "sophistication" of the loan-approval process.  *See, e.g., In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *11-13 (N.D. Cal. Oct. 31, 2014) (claim dismissed where plaintiffs failed to show an undisclosed fact was inconsistent with prospectus).  In any event, the Registration Statement itself disclosed that LendingClub did not routinely verify income information furnished by borrowers, and only did so in some instances.  Prospectus at 94, 100.  Accordingly, the CC does not, and cannot, plead that the alleged facts were even "omitted" from the Registration Statement.  *See, e.g., In re iAsia Works, Inc. Sec. Litig.*, 2002 WL 1034041, at *9-10 (N.D. Cal. May 15, 2002) (dismissing claims where allegations of undisclosed facts were "contradicted by the prospectuses on their face").

## C.   Plaintiff Has Not Adequately Alleged That the Registration Statement Misrepresented the Company's Program to Protect Data Integrity and Security at the Time of the IPO

Plaintiff alleges that the Registration Statement falsely described the Company's data integrity and security program when it stated:

> We maintain an effective information security program based on well-established security standards and best practices, such as ISO2700x and NIST 800 series.  The program establishes policies and procedures to safeguard the confidentiality, integrity and availability of borrower and investors information.  The program also addresses risk assessment, training, access control, encryption, service provider oversight, an incident response program and continuous monitoring and review.

¶ 51 (emphasis omitted; quoting Prospectus at 12).  The effort to plead falsity boils down to the following: in early 2016, $22 million in loans were sold to one institutional investor after application dates were "alter[ed]" by "senior management"; enhanced procedures were announced in May 2016; and, *ipso facto*, the statement was false *seventeen months earlier*.  ¶¶ 52-56.  Not only is this another hindsight-based claim, it ignores the language of the Registration Statement.

Contrary to the assumption suffusing this claim (*see* ¶¶ 52, 53), the challenged statement is plainly *not* a representation of "foolproof" procedures or a guarantee that information could never be altered.[5]  Rather, it is a statement of belief that the Company had "policies and procedures," "based on" specific protocols, standards and best practices, designed to "safeguard" data and "address[]" certain issues.  *See In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *5 (N.D. Cal. Dec. 23, 2015) ("[s]aying that a company's technology is used to 'detect click fraud' does not imply that it blocks *all* fraud"); *Rieckborn*, 81 F. Supp. 3d at 921-22 (no claim for statement that bad debt reserves were adequate where plaintiff failed to plead subjective or objective falsity at the time of the offering).  Thus, alleging that data were later "altered," or further procedures were added, does not show the Registration Statement was false in December 2014.  *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D. Cal. 2015) ("even a 'full set of supervisory

---

[5] In fact, reading the Registration Statement "fairly and in context" (*Omnicare*, 135 S. Ct. at 1332) underscores the point.  *See, e.g.,* Prospectus at 19 ("resources, technologies and fraud prevention tools may be insufficient to accurately detect and prevent fraud"); *id*. at 21 ("While we have taken steps to protect confidential information…, our security measures could be breached"); *id*. at 23 (employees could "convert or misuse … documents or data or fail to follow protocol when interacting with borrowers and investors," and the "precautions we take to detect and prevent" such activity "may not be effective in controlling unknown or unmanaged risks or losses").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

mechanisms to oversee a company' may fail to uncover misconduct or fraud") (citation omitted); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("changing … accounting protocols does not show that earlier ones were recognized as deficient").

Plaintiff's reliance on a May 16, 2016 letter to investors (*see* ¶ 54) actually refutes its claim. Far from showing that the Company lacked procedures to "prevent and detect" data manipulation (¶ 53), that document reveals the opposite: Lending Club detected the changed application dates promptly and addressed the issue *within 48 hours*; it retained an accounting firm to examine 673,000 whole loans sold to investors over the prior two years; and, based on that review, the accounting firm found that (apart from loans previously discovered by the Company to have changed application dates) *virtually all remaining loans* – 99.99% – displayed *no changes* or changes explained by the *normal course of business*. Ex. F at 4. Unable to square these facts with the *ex post* theory that the Registration Statement was false, plaintiff simply ignores them.

### D.   Plaintiff Does Not Allege Internal Control Deficiencies at the Time of the IPO

The claim that the Registration Statement did not disclose "materially deficient internal controls" (¶ 57) is fruitless, because plaintiff does not allege deficiencies *at the time of the IPO*. Instead, it relies on a May 2016 disclosure that control weaknesses existed *at the end of 2015*. ¶ 58; Ex. E at 59. The CC pleads no facts establishing that weaknesses existed prior to December 31, 2015, much less one year earlier. Plaintiff's entire theory is, therefore, another impermissible attempt to plead a claim by hindsight. *See Worlds of Wonder*, 35 F.3d at 1419.[6]

Recognizing its pleading failure, plaintiff resorts to misdirection. The CC avers that LendingClub did not materially alter its internal controls between the IPO and May 2016 (¶ 59) – suggesting that if controls were inadequate on December 31, 2015, they were deficient previously. *Id*. That argument is a red herring, because the sufficiency of internal controls requires a case-by-case analysis *at a given point in time*. *See* Auditing Standard (AS) No. 5 (PCAOB 2007) (Ex. L).

---

[6] *See also Zucker v. Quasha*, 891 F. Supp. 1010, 1017 (D.N.J. 1995) (dismissing Section 11 claim where plaintiff's allegations "relie[d] upon an inference based upon subsequent events"), *aff'd*, 82 F.3d 408 (3d Cir. 1996); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-73 (S.D.N.Y. 2008) (dismissing claim where "allegations [were] craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendants] far earlier in time, well before the confirming event occurred"), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Among other things, AS No. 5 recognizes that "[a] smaller, less complex company might achieve

2    its control objectives in a different manner from a larger, more complex [one]" (*id.* at § 42), and

3    the "nature, timing, and extent of testing of controls" should vary "from year to year to … respond

4    to changes in circumstances" (*id.* at § 61).  Thus, even if controls were unchanged, a deficiency in

5    December 2015 would *not* establish that the same controls were inadequate one year earlier,

6    especially given the intervening growth in LendingClub's business, revenues and originations.

7          Also insufficient is the allegation that Mr. Laplanche took out loans in December 2009 to

8    increase monthly "origination volume."  ¶ 60.  Even assuming that such loans are relevant to the

9    control environment *in December 2009*, they say nothing about the adequacy of controls at the

10   time of the IPO *five years later*.  Moreover, plaintiff makes no effort to plead that the December

11   2009 loans were material, either contemporaneously or – more importantly – at the time of the

12   IPO.  *See, e.g., Garber*, 537 F. Supp. 2d at 613-14.  In fact, the disclosure cited in the CC (¶ 60)

13   dispels any such notion, explaining that the loans totaled less than $723,000, were repaid in early

14   2010, and accounted for just $25,000 in revenue for the Company.  Ex. G at 41.

15         Plaintiff goes on to allege that a subsidiary, LC Advisors (LCA), reported "inflated net

16   asset values" on managed funds to the detriment of "limited partners" (¶ 61), but that allegation

17   does not plead a *material* control weakness – let alone one existing *at the time of the IPO*.  To the

18   contrary, the document on which plaintiff's averment is expressly based (the Form 10-Q for the

19   third quarter of 2016) makes clear that *all* payments to LCA investors related to that issue would

20   *total* about $1 million.  Ex. G at 40.  Given that LCA funds had aggregate assets of $888 million

21   (*id.*), plaintiff does not plead that the subsidiary's errors in calculating net asset values created a

22   *material* control deficiency for LendingClub *as of December 2014*.

23   **V.     THE SECTION 10(B) CLAIM MUST BE DISMISSED**

24         The elements of a Section 10(b) claim are: (1) a material misstatement; (2) scienter; (3)

25   purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Stoneridge*

26   *Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  These elements must be

27   pleaded in compliance with the PSLRA's stringent requirements.  *Ronconi*, 253 F.3d at 428.  For

28   example, plaintiff must identify "each statement alleged to have been misleading," specify "the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

reason or reasons why [it] is misleading," and plead facts showing it was false *when made*.  15 U.S.C. § 78u-4(b)(1)(B); *Metzler*, 540 F.3d at 1071-72.  The PSLRA also requires facts creating a "strong inference" that *each defendant* acted with scienter, a state of mind encompassing either the intent to defraud or deliberate recklessness so egregious as to be tantamount to actual intent. *Silicon Graphics,* 183 F.3d at 976-77; *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008).  Plaintiff must also "plausibly allege" loss causation – *i.e.*, that the purported fraud was disclosed to the market and caused the stock price drop for which recovery is sought. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

Here, plaintiff bases its Section 10(b) claim on statements from December 2014 through February 22, 2016 that allegedly misrepresented or omitted facts regarding: (i) loan originations and financial results; (ii) credit and liquidity risks; (iii) credit decision and scoring processes; (iv) internal controls; and (v) data integrity and security.  As discussed below, the CC fails to plead facts establishing that the statements support a claim against LendingClub or Ms. Dolan.

### A.      Statements Regarding Loan Originations and Financial Results

Plaintiff assails reported loan originations, origination growth, revenues, fees and earnings (*see*, *e.g.*, ¶¶ 66, 67, 74, 75, 77, 78, 81, 82, 86, 89, 95, 97), but fails to plead facts showing those data were false.  This is not a restatement case; LendingClub never adjusted its financial results or backtracked on its accounting.  *See In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 986 (N.D. Cal. 2007) (lack of restatement undermines allegations of falsity); *Rintel v. Wathen*, 806 F. Supp. 1467, 1470 (C.D. Cal. 1992) (accurate statements of historical fact not actionable). Furthermore, plaintiff does not suggest reported originations reflected anything other than valid transactions, and does not purport to quantify inaccuracies in the data.  *See, e.g., In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C. D. Cal. 2007) (complaint failed to plead falsity where it did not quantify impact of alleged fraud on financial statements).  Instead, plaintiff argues that originations and other metrics were misleading because they reflected undisclosed "related-party transactions with Cirrix."  ¶ 73(b).  Plaintiff's argument fails for multiple reasons.

*First*, the CC does not plead facts showing that LendingClub and Cirrix were *ever* "related parties," much less *during the time* that false statements were supposedly made (December 2014 –

February 2016).[7]  Indeed, plaintiff alleges just one investment by LendingClub in Cirrix, in April 2016 (¶ 63) – *after* the last statement challenged in the CC.[8]  Nor do allegations regarding Mr. Laplanche's and Mr. Mack's purported ownership interests satisfy plaintiff's burden.  The CC does not set forth facts establishing: (i) how they were "heavily involved in Cirrix" (¶ 40) or "personally benefitted from their Cirrix investments" (¶ 42); (ii) when and in what amounts they invested in Cirrix (at most, plaintiff alleges a combined 12% interest at the end of 2015 (¶ 43)); or (iii) the nature and terms of any investments.  *See In re China Mobile Games & Ent'mt Group Ltd. Sec. Litig.*, 2016 WL 922711, at *5 (S.D.N.Y. Mar. 7, 2016) (dismissing claim for failure to allege related-party relationship with particularity).  And conclusory averments that "LendingClub had significant influence over Cirrix and vice versa," vague allusions to a "working partnership," and conjecture that Cirrix had unspecified "access" to LendingClub's board (¶¶ 39, 41, 43), do not suffice under the PSLRA.  *China Mobile*, 2016 WL 922711, at *5.  *See also Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012) (plaintiff "must 'plead evidentiary facts' sufficient to establish any allegedly false statement 'was untrue or misleading when made'").

*Second*, plaintiff does not satisfy its obligation to plead facts showing that alleged "related party" transactions rendered particular statements materially misleading.  *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011).  Nothing in the CC indicates the extent to which any reported origination, revenue, fee or earnings data were purportedly misstated by virtue of Cirrix-related transactions, or why further information was necessary to prevent reported numbers from deceiving investors.  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013) (complaint provided no basis for concluding that additional information would prevent financial statements from being misleading).

---

[7] *See* FASB Accounting Standards Certification (ASC) 850-10-20 (g) (defining "related parties" to include those "that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other").

[8] Plaintiff's conclusory assertion that Mr. Mack "caused" LendingClub's board to approve the April 2016 investment in Cirrix (¶ 63) is unsupported by any facts and is actually contradicted by the sources on which plaintiff purports to rely.  The May 16, 2016 10-Q notes that the transaction was approved by the board's risk committee, of which Mr. Mack is not, and was not, a member. *See* Ex. E at 60.  The assertion that he "concealed" his own investment (¶ 106) so that Cirrix "could continue to purchase more LendingClub loans and avoid a total collapse in LendingClub's marketplace" (¶ 63) is similarly unsupported by facts, and is thus inadequate under the PSLRA.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Third,* plaintiff's own allegations make clear that it *cannot* plead the allegedly omitted information was material.  Cirrix's alleged purchase of "nearly $200 million in loans" by March 2015 (¶ 62) is a small fraction of LendingClub's total originations ($9.3 billion) as of that date.  *See* Ex. H at 20.  Likewise, the CC concedes that Cirrix's 2015 investment of $174 million in whole loans (¶ 62) was only about 2% of LendingClub's $8.4 billion in originations for that year (¶ 97).  And while the CC refers to fees paid by Cirrix in 2015 (¶ 64), they comprised only 2.3% of the $43.8 million in total fees collected by LendingClub that year (Ex. I at 54).  Put simply, the CC actually highlights plaintiff's inability to plead that Cirrix-related transactions "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (citation omitted).  *See also Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1329-30 (S.D. Fla. 2004) (claim dismissed for failure to plead materiality of related-party transactions).

*Fourth*, scienter is lacking.  Given plaintiff's inability to show that the Cirrix transactions were material or undermined any reported results, it is hardly surprising that the CC fails to plead facts establishing a "strong inference" that defendants knew or believed any additional disclosure was required.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  This failure is especially noteworthy with respect to Ms. Dolan, who is not even alleged to have been aware of purported investments in Cirrix when the challenged statements were made.

*Fifth*, plaintiff does not plead loss causation.  The CC alleges the "truth" was "revealed" in May 2016 (¶¶ 105-107, 111-112), yet none of the putative "corrective disclosures" identified in the CC suggested that loan originations or other financial data were misleading.  Thus, any claim premised on that theory must be dismissed.  *Loos*, 762 F.3d at 889-90; *Cement Masons & Plasterers' Jt. Pension Trust v. Equinix, Inc.*, 2013 WL 2931422, at *9 (N.D. Cal. June 12, 2013).

### B.   Statements Regarding Credit and Liquidity Risks

Plaintiff fares no better with the claim that LendingClub falsely stated it did not "assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material."  *See* ¶¶ 37, 68, 79, 83, 85, 90, 96, 98.  As discussed in connection with the Registration Statement (*see* Sec. IV.A.1., *supra*), this claim is

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

based on a "credit support agreement" under which LendingClub allegedly assumed "millions of dollars of risk for the loans it sold to Cirrix." ¶¶ 43, 73(c). Yet the CC pleads no facts regarding the agreement, including: (i) its terms; (ii) when it was entered into; (iii) the nature and magnitude of any "risk"; (iv) why any risk was material; (v) the circumstances in which LendingClub would assume risk; or (vi) when those circumstances came to pass. Without such allegations, plaintiff does not adequately plead falsity. *Ronconi*, 253 F.3d at 431; *Wozniak*, 850 F. Supp. 2d at 1034.[9]

For the same reasons, plaintiff's conclusory averments do not plead scienter. There are no facts raising a "strong inference" that Ms. Dolan – or anyone else at LendingClub – knew that unspecified provisions of the "credit support agreement" rendered specific statements false when they were made. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *11 (N.D. Cal. Jan. 4, 2017) (plaintiff failed to plead facts showing that officers knew undisclosed actions would mislead investors).

Plaintiff cannot salvage its claim with citation to the May 16, 2016 announcement that the Company "may have to take loans onto its balance sheet…." ¶ 112. A post-class period disclosure that LendingClub *might* have to *start* using its own capital *in the future* (Ex. E at 30) obviously does nothing to show that *earlier statements* were false or made with scienter. *See Nathanson*, 87 F. Supp. 3d at 978; *see also Silicon Graphics*, 183 F.3d at 988.

## C.    Statements Regarding Credit Decision and Scoring Processes

Plaintiff also assails various statements regarding LendingClub's credit decision and scoring processes. *See, e.g.,* ¶¶ 45-47, 69, 70, 87, 93, 94, 99, 100. Rather than analyzing the specific statements, the CC blithely asserts they were all misleading due to supposed increases in "subprime loans" and what plaintiff calls "liar loans" (*i.e.*, where the borrower's income was not independently verified). ¶ 73(d).[10] Plaintiff's assertion is inadequate to plead falsity or scienter.

Nowhere in the CC does plaintiff allege the facts required by the PSLRA, such as the magnitude of these types of loans, when they supposedly increased, or the quantitative impact on

---

[9] The CC's silence on these subjects is no accident. Plaintiff knows that, as of March 31, 2016, only $3.4 million was pledged to support a contingent obligation under the credit support agreement, and no losses had been (or were expected to be) recorded. Ex. E at 30, 55-56.

[10] Because the Company explained that it did not verify all income information from borrowers (*see* Sec. IV.B., *supra*), there can be no claim for allegedly failing to disclose that LendingClub "could not possibly verify income information for all of its applicants" (¶ 48(e)).

LendingClub's business at any point in time.  *See, e.g., Ronconi*, 253 F.3d at 432; *Wozniak*, 850 F. Supp. 2d at 1034.  Without such allegations, plaintiff does not adequately plead a true "state of affairs" at odds with the challenged statements at the time they were made (*Intuitive*, 759 F.3d at 1061), or that the financial impact of alleged changes in loan practices was substantial enough to "have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (*id.* at 1058).  *See also Hansen*, 527 F. Supp. 2d at 1161 (plaintiff failed to plead materiality where it did not quantify the impact of the alleged falsehood).

Allegations that Cirrix sustained small losses in December 2015 and January 2016, and that LCA reported increased write-offs at the end of the first quarter of 2016 (¶ 49), do not remedy the CC's pleading failures.  While plaintiff hypothesizes these losses and write-offs were due to "[t]he poor quality of the loans LendingClub rushed to approve in the buildup to the December 2014 IPO" (*id.*), it offers no facts to support that conjecture.

Even if plaintiff could allege an increase in subprime and unverified income loans, scienter is lacking.  The CC cites no allegations from confidential sources, internal reports, or other contemporaneous facts showing that Ms. Dolan (or anyone else) knew that supposed increases in such loans were inconsistent with specific challenged statements at the time they were made.  *Ronconi*, 253 F.3d at 432; *Zucco*, 552 F.3d at 990.

Moreover, the alleged "corrective disclosures" (¶¶ 105-107, 111-112) say nothing about increases in subprime or unverified income loans, or suggest that statements regarding credit decision and scoring processes were inaccurate.  Without this causal link, plaintiff fails to plead loss causation and its claim should be dismissed.  *Equinix*, 2013 WL 2931422, at *9.

**D.      Statements Regarding Internal Controls**

The CC alleges that various statements failed to disclose internal control weaknesses and deficiencies in the Company's "tone at the top."  ¶ 73(a), (g).  That claim is based on the May 2016 disclosure that control weaknesses existed *as of December 31, 2015* (¶¶ 58, 59, 120) – and, as noted above, plaintiff fails to plead such weaknesses *at any prior time*.  *See* Sec. IV.D, *supra*. Thus, the attack on statements made prior to December 31, 2015 (¶¶ 57, 72, 80, 84, 91, 103) is undeniably, and improperly, based on hindsight.  *See Silicon Graphics*, 183 F.3d at 988.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Even as to the challenged statements *after* December 2015 (¶¶ 102, 103), the CC falls far

2    short of pleading scienter.  Those statements were made in *February 2016* (*id.*), and plaintiff does

3    not plead *contemporaneous facts* demonstrating that Ms. Dolan or anyone else knew about (or

4    deliberately turned a blind eye to) control weaknesses or an improper "tone at the top."  Tacitly

5    conceding the point, plaintiff again asks the Court to infer the requisite state of mind based on

6    *subsequent* discoveries.  ¶¶ 120, 121.  But that gambit is foreclosed by the PSLRA: "[a]n

7    allegation that defendants should have known about internal control deficiencies based on nothing

8    more than later acknowledgment of such weaknesses amounts to pleading fraud by hindsight,"

9    and does not establish scienter.  *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 801 (N.D. Ill.

10   2007).  *See also Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *3 (N.D. Cal. Dec.

11   26, 2013) (allegations of later-discovered misconduct insufficient to establish that earlier

12   statements regarding controls were intentionally misleading); *Oklahoma Firefighters Pension &*

13   *Ret. Sys. v. Ixia*, 2015 WL 1775221, at *29 (C.D. Cal. Apr. 14, 2015) (control weaknesses do not

14   "give rise to a strong inference of scienter on the part of the company or its executives").[11]

15          **E.     Statements Regarding Data Integrity and Security**

16          Finally, plaintiff reprises the claim that LendingClub's description of its data integrity and

17   security program was misleading because "insiders could circumvent … controls in order to alter

18   high-risk data fields in live databases."  ¶ 73(e).  As discussed in connection with the Section 11

19   claim, plaintiff does not plead that the challenged statement – made in connection with the IPO (¶

20   51), and repeated in the 2014 Form 10-K (¶ 71) and 2015 Form 10-K (¶ 101) – was false.  *See*

21   Sec. IV.C., *supra*.  Rather, plaintiff's claim is based on *subsequent events*, in March and April

22   2016 (¶ 56), and is thus another example of improper "fraud by hindsight."  *Bruce*, 2013 WL

23   6843610, at *3.  Moreover, the subsequent events (where application dates were allegedly

24   changed to facilitate loan sales to one institutional investor) do *not* establish the falsity of the

25   earlier statement reflecting a belief that "policies and procedures" were designed to "safeguard"

26   _____

[11] The allegation that Mr. Laplanche "exploited LendingClub's lack of internal controls" in
27   December 2009 to increase loan volumes (¶ 118) is also fruitless.  Purported actions in 2009 are
     irrelevant to a defendant's state of mind *five or six years later*.  *See Ronconi*, 253 F.3d at 432
28   (requiring "specific 'contemporaneous statements or conditions' that demonstrate the intentional
     or the deliberately reckless false or misleading nature of the statements when made").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

data and "address[]" related issues. ¶ 51.  *See City of Dearborn Hts. Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 852-53 (N.D. Cal. 2014) (no contemporaneous facts showing falsity or scienter for statements regarding adequacy of goodwill impairment analysis).

The CC also fails to plead scienter.  Plaintiff cannot point to facts from which the Court could infer each defendant's awareness that the challenged statement regarding data integrity and security was inaccurate at the *time of the IPO*, at the *time of the 2014 10-K*, or at the *time of the 2015 10-K*.  *See Rok*, 2017 WL 35496, at *10 (plaintiffs must "plead with particularity" that "defendants … contemporaneously made 'false and misleading statements either intentionally or with deliberate recklessness'") (citation omitted).[12]  And remedial measures after the class period (¶ 124) are not probative of prior intent or knowledge.  *See Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008); *Wade v. Wellpoint, Inc.*, 740 F. Supp. 2d 994, 1010 (S.D. Ind. 2010).

### F.  The Relevant Facts, Considered in Their Entirety, Actually Preclude a Strong Inference of Scienter

The PSLRA's "strong inference of scienter" standard requires scrutiny of *all* relevant facts to determine whether they support a rational theory of fraud.  *Tellabs*, 551 U.S. at 314.  *See also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) ("the court must consider *all* reasonable inferences…, including inferences unfavorable to the plaintiffs").  The inference must be more than "merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  Put another way, plaintiff must proffer facts showing why it is reasonable to conclude that allegedly inaccurate statements were fraudulent, and not merely mistaken.  As discussed above, the CC is devoid of confidential witness statements, internal data, or other particularized facts demonstrating that defendants knew (or recklessly disregarded) that any statement was false when made.  *See Zucco*, 552 F.3d at 990.  Furthermore, the holistic analysis of *all* relevant facts required by *Tellabs* confirms that plaintiff cannot meet its statutory burden with respect to Ms. Dolan and LendingClub.

---

[12] Indeed, plaintiff's allegations effectively ignore Ms. Dolan altogether.  As for Mr. Laplanche, the conclusory averment that he manipulated data (¶ 118) is inadequate because: (i) it is unsupported by particularized facts; and (ii) the alleged conduct occurred after the last challenged statement, and thus cannot support an inference of scienter.  *See Ronconi*, 253 F.3d at 432.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1          **1.     Defendants' Stock Ownership Negates an Inference of Scienter**

2          Although the CC contains a perfunctory allegation that Ms. Dolan sold 135,000 shares of

3 LendingClub stock during the class period (¶ 123), plaintiff makes no effort to show there was

4 anything "unusual" or "suspicious" about those sales, or undertake any further discussion of her

5 stock ownership.  *See Silicon Graphics*, 183 F.3d at 986 (trading is "suspicious only when it is

6 'dramatically out of line with prior trading practices at times calculated to maximize the personal

7 benefit from undisclosed inside information'") (citation omitted).  The reason the CC glosses over

8 this issue is clear: plaintiff knows that the relevant facts actually *negate* any inference of scienter.

9          The Ninth Circuit has made clear that, under the PSLRA, stock sales by corporate insiders

10 must be examined in context.  *See Zucco*, 552 F.3d at 1005-06 (when considering the inference to

11 be drawn from stock transactions and whether they are suspicious, "plaintiffs must provide a

12 'meaningful trading history' for purposes of comparison to the stock sales within the class

13 period").  Here, Ms. Dolan's sales comprised a small portion (5%) of her total holdings.  *See* Ex.

14 J.  In other words, she *retained* 95% of her class period holdings.  That fact is fundamentally

15 inconsistent with the theory that she engaged in a fraudulent scheme to "artificially inflate[]" the

16 "prices for LendingClub stock" during the class period (¶ 157), and refutes an inference of fraud.

17 *See, e.g., Tripp v. Indymac Fin. Inc.*, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) (an

18 "inference of scienter is functionally negated" by defendants' retention of a large percentage of

19 their stock); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) ("a

20 strong inference of scienter is negated when there is an absence of stock sales or where such sales

21 are minimal"); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105-06 (N.D. Cal. 2006) (fact that

22 insiders sold only a small percentage of their holdings "undermines any inference of scienter").

23          Underscoring that conclusion is the fact that Ms. Dolan's sales were pursuant to a pre-

24 determined trading plan under SEC Rule 10b5-1 (Ex. J).  A 10b5-1 plan provides an "innocent,

25 alternative explanation for the stock sales [that] negates an inference of scienter."  *City of Royal*

26 *Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).

27          Also of critical importance is the absence of stock sales by Mr. Laplanche during the class

28 period (Ex. K).  Not only does that undermine any inference of fraudulent intent on *his* part

(*Rigel*, 697 F.3d at 884-85), it is another fact negating scienter *as to Ms. Dolan* and *the Company*. *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654, at *20 (N.D. Cal. May 25, 2006) (the fact that only "one of two Individual Defendants [sold] his stock during the class period actually *negates* a finding that the Defendants were engaged in fraud").

Indeed, as the following table illustrates, both Ms. Dolan and Mr. Laplanche *purchased LendingClub stock* during the class period, and *increased their total holdings* over that time:

|  | Shares | Options That Vested | Purchases | Shares Sold | Equity at Period End | % Sold | % Retained |
|---|---|---|---|---|---|---|---|
| Laplanche | 8,415,492 | 7,489,267 | 110,000 | 0 | 16,014,759 | 0 | 100% |
| Dolan | 1,969,845 | 759,486 | 7,500 | 135,000 | 2,601,831 | 5% | 95% |
| Total | **10,385,337** | **8,248,753** | **117,500** | **135,000** | **18,616,590** | **0.7%** | **99.3%** |

*See* Exs. J, K.  These data further belie any belief that the stock price was artificially inflated, and "instead give[] rise to an inference of good faith."  *Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).

Additionally, both Mr. Laplanche and Ms. Dolan *received option grants* (1,759,414 and 351,883 shares, respectively) on February 26, 2016, at an exercise price of $8.41 per share.  *See* Exs. J, K.  "[N]ew stock options … keyed to prices that plaintiff alleges were artificially inflated … negate[] any reasonable inference of scienter."  *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000).

### 2.    The Stock Repurchase Also Negates an Inference of Scienter

Contrary to plaintiff's assertion (¶ 119), the February 2016 stock repurchase plan negates an inference of scienter, because it demonstrates a good faith belief in the Company's future and rebuts any notion that the price was believed to be "inflated."  *See, e.g.*, *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009) ("stock repurchase programs actually negate a finding of scienter") (citation omitted), *aff'd*, 679 F.3d 952 (7th Cir. 2012).  That is especially true here, where plaintiff admits the plan was approved by directors who are not accused of having violated Section 10(b) (*see* ¶ 119).  *See Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase [the] stock if defendants knew the prices to be inflated").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2

**3.     Plaintiff Relies on a Hodgepodge of Conclusory Allegations That Do Not Suffice to Create a Strong Inference of Fraudulent Intent Under *Tellabs***

3       By contrast to the facts supporting an inference of "nonfraudulent intent" (*Tellabs*, 551

4   U.S. at 314), plaintiff relies on a handful of conclusory assertions that do not satisfy its pleading

5   burden.  For example, the CC points to certifications by Mr. Laplanche and Ms. Dolan under

6   Section 302 of the Sarbanes-Oxley Act (¶ 121), but those certifications "are not enough to create a

7   strong inference of scienter and do not make [plaintiff's] otherwise insufficient allegations more

8   compelling." *Zucco*, 552 F.3d at 1004.  Equally ineffectual are allegations of internal control

9   weaknesses or a deficient "tone at the top" (¶¶ 120, 121) where, as here, those averments are

10  unsupported by facts showing defendants' knowledge of deficiencies.  *Ixia*, 2015 WL 1775221, at

11  *29.  And post-class period remedial measures (¶ 124) are not probative of intent or knowledge

12  during the class period.  *Pugh*, 521 F.3d at 695; *Wade*, 740 F. Supp. 2d at 1010.

13      The CC also contends LendingClub "used LCA to purchase expiring loans … outside the

14  investment guidelines."  ¶ 122.  However, plaintiff does not satisfy its pleading burden by setting

15  forth facts showing what role (if any) that Ms. Dolan or others played in such purchases, or their

16  awareness of any impropriety.  Moreover, merely alleging defendants' positions as members of

17  LCA's Investment Policy Committee (*id.*) is inadequate to plead scienter under the PSLRA.  *See*

18  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113 (N.D. Cal. 2009).

19      Plaintiff fares no better with allegations related to executive departures (¶¶ 123, 125),

20  which "are not in and of themselves evidence of scienter."  *In re Cornerstone Propane Partners,*

21  *L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005).  A departure may provide evidence of scienter

22  only if it is accompanied by particularized facts connecting it to the "purported wrongdoing or

23  fraudulent activity."  *See In re Downey Sec. Litig.*, 2009 WL 736802, at *11 (C.D. Cal. Mar. 18,

24  2009).  The requisite facts are not alleged here; to the contrary, as to Ms. Dolan, the CC refers to

25  news reports indicating that she intended to leave LendingClub earlier in 2016, but was persuaded

26  by the new CEO to stay for an additional period.  ¶ 123.  The only reasonable inference is that her

27  departure was "prompted by personal or business reasons unrelated to the [alleged] fraud."  *Luna*

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   *v. Marvell Tech. Grp. Ltd*, 2016 WL 5930655, at *13 (N.D. Cal. Oct. 12, 2016).[13]

2        Nor does reference to government subpoenas and investigations (¶¶ 111, 113, 114)

3   "support any inferences of wrongdoing or fraudulent scienter on the part of [the] company or its

4   senior management." *Hansen*, 527 F. Supp. 2d at 1162 (discussing loss causation).  "Securities

5   regulators are obligated to examine the behavior of public corporations, and the fact that a

6   regulator is fulfilling this role cannot be sufficient to allege scienter."  *In re Manulife Fin. Corp.*

7   *Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011).

8        In short, plaintiff fails to show that the totality of *contemporaneous facts* supports a

9   "strong inference" that allegedly inaccurate statements made between December 2014 and

10   February 2016 were the result of *fraud*, rather than being the product of honest mistakes, good-

11   faith disagreements, or even negligence. *See Tellabs*, 551 U.S. at 314.  That conclusion requires

12   dismissal of the Section 10(b) claim as to Ms. Dolan and LendingClub.

13   **VI.    PLAINTIFF DOES NOT STATE A "CONTROL PERSON" CLAIM**

14        Because the CC does not plead an underlying violation of the 1933 Act or 1934 Act, there

15   can be no control person liability. *Huang v. Avalanche Biotechnologies, Inc.*, 2016 WL 6524401,

16   at *9 (N.D. Cal. Nov. 3, 2016).  Consequently, the second and fourth claims should be dismissed.

17   **VII.  CONCLUSION**

18        For the foregoing reasons, the CC should be dismissed as to the LendingClub Defendants.

19   Dated:  January 20, 2017           FENWICK & WEST LLP

21          By       /s/ *Kevin P. Muck*
                        Kevin P. Muck

22          Attorneys for Defendants LendingClub Corporation,
23          Daniel T. Ciporin, Jeffrey Crowe, Carrie Dolan,
                 Rebecca Lynn, John J. Mack, Mary Meeker,
24          John C. (Hans) Morris, Lawrence H. Summers and
                 Simon Williams

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

---

[13] Plaintiff is also unable to show that Mr. Laplanche's departure raises a strong inference of scienter, especially given the facts (discussed above) supporting an opposite inference. *See Rok*, 2017 WL 35496, at *16 ("Even where a defendant resigns upon revelation of misconduct, that is 'minimal, non-dispositive supporting evidence of scienter.'") (citation omitted).