ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
       – and –
DARREN J. ROBBINS (168593)
JASON A. FORGE (181542)
SCOTT H. SAHAM (188355)
MICHAEL ALBERT (301120)
CARISSA J. DOLAN (303887)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
jforge@rgrdlaw.com
scotts@rgrdlaw.com
malbert@rgrdlaw.com
cdolan@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re LENDINGCLUB SECURITIES LITIGATION | ) ) ) ) | Case No. 3:16-cv-02627-WHA CLASS ACTION |
|---|---|---|
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) ) | LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS CONSOLIDATED COMPLAINT |

DATE:          March 8, 2017
TIME:           8:00 a.m.
COURTROOM:  The Honorable William
                          Alsup, Courtroom 8,
                          19th Floor

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. STATEMENT OF FACTS ...................................................................................2

III. ARGUMENT ........................................................................................................4

    A. Relevant Legal Standards .......................................................................4

    B. The Court Decided These Issues over a Decade Ago .............................5

    C. Looking Beyond *Sipex*, the Right Outcome Remains the Same............6

        1. Lead Plaintiff's §11 Claim...........................................................6

            a. Lead Plaintiff's §11 Claim Does Not Raise Any
                Allegations of Fraud .................................................................7

            b. The Complaint Plainly Alleges LendingClub's Internal
                Control Deficiencies Existed at the Time of Its IPO ...............8

            c. Defendants' Demand that Lead Plaintiff "Establish" Its
                Case at the Pleading Stage Is Improper .................................10

            d. The Underwriter Defendants Raise a Series of Arguments
                Most Other Defendants Do Not Join .....................................11

                (1) Internal Controls Certifications Are Not
                      Inactionable Puffery..........................................................11

                (2) Internal Controls Certifications Are Not
                      Inactionable Opinions.......................................................12

             e. Defendants' Remaining Arguments Miss Their Mark..................14

                (1) A Suspect CEO Makes Internal Controls All the
                      More Material ....................................................................15

                (2) LCA's GAAP Violation......................................................15

                (3) Concealed Credit Risk and Related-Party
                      Transactions ......................................................................15

                (4) Compromised Loan-Approval Process...............................18

                (5) LendingClub's Inadequate Data Security .........................22

         2. Lead Plaintiff's §10(b) Claim ...................................................25

            a. §10(b) Standards ......................................................................25

            b. LendingClub's Deficient Internal Controls ............................26

1

2                                                                                                    **Page**

3

            c.      Cirrix Redux....................................................................29

            d.      Corrupt Loan-Approval and Packaging Processes ......................34

            e.      LCA's Deception and GAAP Violation ...................................36

            f.      DOJ and SEC Investigations................................................37

        3.      Stock-Ownership Arguments.......................................................38

    D.  Arguments Only Laplanche Asserts ........................................................39

        1.      The Complaint Is Clear and Concise ..........................................39

        2.      The PSLRA's Safe Harbor Is Inapplicable..................................40

        3.      None of the Alleged Statements Are Non-Actionable Puffery..................41

    E.  Leave to Amend.....................................................................42

IV.   CONCLUSION.................................................................................42

1

## TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................4, 16

5

6

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...................................... *passim*

7

*Brown v. China Integrated Energy, Inc.*,
  875 F. Supp. 2d 1096 (C.D. Cal. 2012) .................................33

8

9

*C.D.T.S v. UBS AG*,
  No. 12 Civ. 4924(KBF), 2013 WL 6576031
  (S.D.N.Y. Dec. 13, 2013) , *aff'd sub nom. Westchester Teamster Pension
  Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) .................................12

10

11

12

*Casella v. Webb*,
  883 F.2d 805 (9th Cir. 1989) ..........................................................41

13

*Cheung v. Keyuan Petrochemicals, Inc.*,
  No. CV 11-9495 PSG, 2012 WL 5834894
  (C.D. Cal. Nov. 1, 2012)..........................................................31, 33

14

15

16

*Cty. of Stanislaus v. Travelers Indem. Co.*,
  142 F. Supp. 3d 1065 (E.D. Cal. 2015).............................................3

17

*Durning v. First Boston Corp.*,
  815 F.2d 1265 (9th Cir. 1987) ...............................................4, 29

18

19

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).....................................................21

20

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ...........................................42

21

22

*F.T.C. v. Cyberspace.com, LLC*,
  453 F.3d 1196 (9th Cir. 2006) ...........................................19

23

24

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) .....................................4, 19, 36

25

26

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ...........................................5

27

28

1

2                                                                                    **Page**

3

4    *Garber v. Legg Mason, Inc.*,
          537 F. Supp. 2d 597 (S.D.N.Y. 2008),
5         *aff'd*, 347 F. App'x 665 (2d Cir. 2009) ...................................................................15

6    *Halperin v. eBanker USA.com, Inc.*,
          295 F.3d 352 (2d Cir. 2002) ..................................................................................5

7    *In re Aetna, Inc. Sec. Litig.*,
8         No. 07-cv-4451, 2009 WL 1619636
          (E.D. Pa. June 9, 2009), *aff'd in part*,
9         617 F.3d 272 (3d Cir. 2010) ..................................................................................31

10   *In re Bofi Holding, Inc. Sec. Litig.*,
11        No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533
          (S.D. Cal. Sept. 27, 2016) .......................................................................................21

12   *In re Bristol Myers Squibb Co. Sec. Litig.*,
13        586 F. Supp. 2d 148 (S.D.N.Y. 2008) .....................................................................37

14   *In re Charles Schwab Corp. Sec. Litig.*,
          257 F.R.D. 534 (N.D. Cal. 2009) ..............................................................................8
15

16   *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*,
          No. 14-CV-4471 (KMW), 2016 WL 922711
17        (S.D.N.Y. Mar. 7, 2016) .........................................................................................31

18   *In re Daou Sys., Inc.*,
          411 F.3d 1006 (9th Cir. 2005) ......................................................................... *passim*
19

20   *In re Donald J. Trump Casino Sec. Litig.*,
          7 F.3d 357 (3d Cir. 1993) ...............................................................................12, 13

21   *In re Gentiva Sec. Litig.*,
22        932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................37

23   *In re Gilead Scis. Sec. Litig.*,
          536 F.3d 1049 (9th Cir. 2008) ................................................................................20
24

25   *In re GlenFed, Inc. Sec. Litig.*,
          42 F.3d 1541 (9th Cir. 1994) ..................................................................................24

26   *In re Hansen Nat. Corp. Sec. Litig.*,
27        527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..................................................................37

28

OPPOSITION TO MOTION TO DISMISS - 3:16-cv-02627-WHA

**Page**

*In re Honeywell Int'l Sec. Litig.*,
    182 F. Supp. 2d 414 (D.N.J. 2002) ...................................................................40

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...........................................................23

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) .............................................................33

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015) ..............................................13, 29, 30, 33

*In re Musicmaker.com Sec. Litig.*,
    No. CV00-2018 CAS(MANX), 2001 WL 34062431
    (C.D. Cal. June 4, 2001) ...................................................................................41

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................12, 21

*In re NTL Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004)................................................................39

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)..............................................................41

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016) .....................................................................39

*In re Rocket Fuel, Inc. Sec. Litig.*,
    No. 14-cv-3998-PJH, 2015 WL 9311921
    (N.D. Cal. Dec. 23, 2015) ................................................................................22

*In re Royal Bank of Scot. Grp. plc Sec. Litig.*,
    No. 09 Civ. 300(DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012),
    *aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC*,
    540 F. App'x 33 (2d Cir. 2013) .......................................................................13

*In re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ..............................................................10, 23, 24

*In re Sipex Corp. Sec. Litig.*,
    No. 05-cv-00392 WHA, 2005 WL 3096178
    (N.D. Cal. Nov. 17, 2005)...................................................................... *passim*

Page

*In re Tyco Int'l, Ltd.*,
   No. 02-266-B, 2004 WL 2348315
   (D.N.H. Oct. 14, 2004) .......................................................................................39

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ...............................................................28

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................28

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 3:15-md-02672-CRB, 2017 WL 66281
   (N.D. Cal. Jan. 4, 2017) .....................................................................................28

*In re Wash. Mut., Inc. Sec.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009).........................................................12

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ................................................................................9

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) .............................................................38

*Lloyd v. CVB Fin. Corp.*,
   No. CV 10-06256 MMM, 2012 WL 12883517
   (C.D. Cal. Aug. 21, 2012) ..................................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...................................................................................15, 16, 31

*McDonald v. Compellent Techs., Inc.*,
   805 F. Supp. 2d 725 (D. Minn. 2011) ................................................................31

*McIntire* v. *China Mediaexpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................................37

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................41

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ......................................................................26, 29

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
   No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574
   (C.D. Cal. Sept. 25, 2009).................................................................................21

Page

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................22

*Newcal Indus. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ..........................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   __ U.S. __, 135 S. Ct. 1318 (2015).....................................................4, 7, 12, 13

*Plitcha v. SunPower Corp.*,
   790 F. Supp. 2d 1012 (N.D. Cal. 2011) ...........................................................22

*Primo v. Pac. Biosciences of Cal., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) ......................................................17, 22

*Romine v. Acxiom Corp.*,
   296 F.3d 701 (8th Cir. 2002) ............................................................................15

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..............................................................................9

*Roth v. OfficeMax, Inc.*,
   527 F. Supp. 2d 791 (N.D. Ill. 2007) ...............................................................27

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................25, 32, 33

*Scott v. ZST Digital Networks, Inc.*,
   No. CV 11-03531 GAF (JCX), 2012 WL 538279
   (C.D. Cal. Feb. 14, 2012).................................................................................29

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) .................................................................4, 36, 37

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009),
   *aff'd*, 563 U.S. 27 (2011) ............................................................................20, 26

*T.T. by & through Susan T. v. Cty. of Marin*,
   No. 12-cv-02349-WHA, 2013 WL 5497175
   (N.D. Cal. Oct. 3, 2013)...........................................................................9, 10, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).............................................................................. *passim*

1

2                                                                                    **Page**

3

*United States v. Alphas*,
   785 F.3d 775 (1st Cir. 2015) ...................................................................................38

*United States v. Castro-Cabrera*,
   534 F. Supp. 2d 1156 (C.D. Cal. 2008),
   *aff'd*, 452 F. App'x 789 (9th Cir. 2011) ...................................................................3

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................................38

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..................................................................................26

*Zucker v. Quasha*,
   891 F. Supp. 1010 (D.N.J. 1995),
   *aff'd without op.*, 82 F.3d 408 (3d Cir. 1996) .......................................................14

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k ...................................................................................................... *passim*
   §77k(a) ............................................................................................................7
   §77k(e) ............................................................................................................8
   §77z-2(b)(2)(D) .............................................................................................41
   §78j(b) .................................................................................................. *passim*
   §78u-4(b)(2)(A) .............................................................................................25
   §78u-5(b)(2)(D) .............................................................................................41

Federal Rules of Civil Procedure
   Rule 9(b) ..........................................................................................................7

Federal Rules of Evidence
   Rule 801(d)(2) ..................................................................................................3

## I.     INTRODUCTION

LendingClub Corporation ("LendingClub" or the "Company") promised investors an opportunity to get in on the ground floor of a revolutionary lending market fueled by the highest standards of honesty and integrity.  What it delivered was a marked deck that LendingClub could rig whenever necessary to perpetuate the myth that it was the next big thing in banking.  A publicly-traded company playing with a rigged deck is technically described as one that operates with "material weaknesses in internal control over financial reporting," which basically means that what investors see is very likely not what they get.  From its initial public stock offering("IPO") through the end of the class period, LendingClub operated with "material weaknesses in internal control over financial reporting."  Less than 18 months after its IPO, these material weaknesses had manifested in so many problems, including the outright defrauding of an institutional investor, LendingClub could no longer hide them.  Class members, who had paid up to $27.90 for shares of LendingClub, were left holding shares worth $4.10.

The material weaknesses that LendingClub admitted at the end of the class period were the same material weakness that existed at the time of the IPO.  Defendants, however, not only refuse to acknowledge this allegation, but they erroneously deny its existence, claiming "**Plaintiff Does Not Allege Internal Control Deficiencies at the Time of the IPO**."  Dkt. No. 139 at 13.  Defendants confuse the case they wish they were defending for the case they are defending.  They also mistakenly believe we are at the summary judgment stage.  Time and again defendants fault Lead Plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles ("Lead Plaintiff") for "failing" to foreclose potentially innocent explanations for ostensibly culpable conduct; dispute allegations that must be accepted as true; play fact finder by declaring their misleading statements to be immaterial; and paint such a rosy picture of the integrity of LendingClub's management and marketplace, one would never guess that LendingClub's corruption drove its marketplace to the brink of collapse, forced out its CEO and other senior managers (who were soon followed by its CFO), and triggered DOJ and SEC investigations.  We are at the pleading stage and defendants' defiance of the clearly established standards for motions to dismiss demonstrates that theirs are not well-taken.

## II.   STATEMENT OF FACTS

In deciding motions to dismiss, a court is to "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  In the interest of brevity, Lead Plaintiff summarizes its allegations below, but defendants' motions should be judged against the "complaint in its entirety."

LendingClub set out to disrupt the entire banking industry by creating a peer-to-peer lending market that would be more honest and efficient than what traditional banks and credit cards offered: "We really believe we can transform the entire banking industry and make it more consumer friendly and more transparent and more cost efficient."  ¶2.[1]  Because it created a purportedly ground-breaking business model, LendingClub's success depended on the integrity of its management and marketplace.  ¶3.  Both were corrupt.  LendingClub had its IPO on December 11, 2014, and less than 18 months later, the lack of integrity in both LendingClub's management and it marketplace manifested in a series of terminations, forced resignations, and revelations.   ¶5.  An internal investigation resulted in the forced resignation of defendant Renaud Laplanche ("Laplanche"), LendingClub's founder, Chairman, and CEO, as well as terminations of multiple "senior managers." ¶¶5, 115.  Less than three months later, defendant Carrie Dolan ("Dolan"), LendingClub's CFO, also stepped down.  ¶¶13, 123.

LendingClub has now admitted that it lacked even the most basic internal controls over its financial reporting, and this allowed its management to manipulate its performance by engaging in self-dealing, altering loan applications, misleading institutional investors, and abandoning responsible lending criteria, in favor of the two hallmarks of the 2008 credit crisis: "liar" loans (euphemistically referred to as "no doc" loans or "stated income" loans) and "subprime" loans. ¶¶3, 52, 54.  The internal controls that LendingClub revealed to be rife with material weaknesses in May 2016 were the same internal controls at the time of LendingClub's December 2014 IPO.  ¶¶59-60. Although signs of LendingClub's degraded lending criteria had started to surface in 2015 and early 2016 in the form of lender losses and loan write-offs (¶49), LendingClub did not acknowledge any

---

[1]   Paragraph references ("¶_" and "¶¶_") are to the Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") (Dkt. No. 127).

of its significant systemic abuses until May 2016 (¶105).  In addition to the abuses and firings described above, LendingClub also revealed that:

- it needed to continue taking "remediation steps to resolve [its] material weaknesses in internal control over financial reporting" (¶116);

- its remediation efforts would include retraining employees on code of conduct and ethics (Dkt. No. 140-1, Ex. F at 4);[2]

- it had to adjust the valuations of six private investment funds that had been valued in violation of Generally Accepted Accounting Principles ("GAAP") (¶117);

- years before the IPO, Laplanche had inappropriately taken out 32 loans for himself and his family members in order to "help increase reported platform loan volume" (¶118);

- Laplanche had not been candid with other members of LendingClub's Board of Directors (the "Board") about his awareness of other malfeasance (¶125);

- it had to engage outside consultants to support data-management changes to protect against future improprieties (¶125);

- a significant factor in all of the Company's deficiencies was the "lack of an appropriate tone at the top set by certain members of management" (¶¶111, 120); and

- its improprieties had undermined the confidence of its marketplace lenders so badly that LendingClub would have to offer inducements and/or use "greater amount[s] of its own capital to purchase loans on its own platform" (¶112).

The material weaknesses in internal controls that LendingClub admitted meant that since its inception, "there is a reasonable possibility that a material misstatement of the company's annual [and] interim financial statements [was] not . . . prevented or detected on a timely basis." ¶¶6, 111. As for LendingClub having to prop up its own marketplace, the Company had to admit that "[t]hese actions likely may have material adverse impacts on the Company's business, financial condition (including its liquidity), results of operations and ability to sustain and grow loan volume." ¶112.

---

[2]   Because this is LendingClub's own statement, it is not hearsay when used by Lead Plaintiff against LendingClub.  Fed. R. Evid. 801(d)(2).  In contrast, defendants may not use for the truth of the matter asserted any of the statements within any of the documents of which they have asked the Court to take judicial notice. *Cty. of Stanislaus v. Travelers Indem. Co.*, 142 F. Supp. 3d 1065, 1076 (E.D. Cal. 2015) ("As is clear in Rule 801(d)(2), a party 'may not offer his own statements as party admissions, as only statements offered against a party-opponent are admissible under Federal Rule of Evidence 801(d)(2).'") (quoting *United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156, 1162 (C.D. Cal. 2008), *aff'd*, 452 F. App'x 789 (9th Cir. 2011)).

1    In short, LendingClub's founder and its foundation were corrupt, and class members paid the

2    price.  When LendingClub had investors convinced that it, its management, and its marketplace were

3    trustworthy, shares of LendingClub stock traded as high as $27.90 per share (*see* ¶4), but after

4    investors learned they had been deceived, LendingClub's share price dropped to $4.10 – 86% below

5    its class-period high.  ¶5.

6    **III.    ARGUMENT**

7        **A.      Relevant Legal Standards**

8        Lead Plaintiff alleges that all defendants violated §11 of the Securities Act of 1933

9    ("Securities Act").  Lead Plaintiff also alleges that defendants Laplanche, Dolan, and LendingClub

10   (the "10(b) Defendants") violated §10(b) of the Securities Exchange Act of 1934 ("Exchange Act").

11   Both Acts require a plaintiff to allege a material misrepresentation or omission.  *In re Daou Sys.,*

12   *Inc.*, 411 F.3d 1006, 1014, 1027 (9th Cir. 2005).  "[W]hether a public statement is misleading, or

13   whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact

14   . . . only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that

15   reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'"

16   *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995).[3]  "[R]esolving an issue as a matter of law

17   is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds [could]

18   not differ.'"  *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011) (quoting *Durning v. First Boston*

19   *Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).

20       Moreover, "the court's job is not to scrutinize each allegation in isolation but to assess all the

21   allegations holistically."  *Tellabs*, 551 U.S. at 326; *Omnicare, Inc. v. Laborers Dist. Council Constr.*

22   *Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1330 (2015) ("whether an omission makes an

23   expression of opinion misleading always depends on context").  This holistic approach means that

24   the materiality of alleged omissions and misrepresentations is not determined in isolation, but rather

25   in the context of the "total mix" of information made available to investors.  *Basic Inc. v. Levinson*,

26   485 U.S. 224, 231-32 (1988); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)

27

28   _____
     [3]    Citations are omitted and emphasis is added throughout unless otherwise indicated.

1   ("[A] statement is misleading if it would give a reasonable investor the 'impression of a state of

2   affairs that differs in a material way from the one that actually exists.'"); *Halperin v. eBanker*

3   *USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether

4   isolated statements within a document were true, but whether defendants' representations or

5   omissions, considered together and in context, would affect the total mix of information and thereby

6   mislead a reasonable investor regarding the nature of the securities offered.").

7       Throughout their motions, defendants repeatedly treat the Complaint as if it were a motion

8   for summary judgment.  Rather than accepting the Complaint's factual allegations as true, as they

9   must, defendants attempt to dispute them.  Rather than acknowledging that we are at the pleading

10  stage, defendants fault Lead Plaintiff for failing to "establish" the Complaint's allegations.  And,

11  rather than analyzing the Complaint's allegations holistically, as the Supreme Court has directed,

12  defendants deconstruct each in an attempt to rewrite the law, demanding  that each allegation

13  standing on its own must sufficiently state a violation of §11 or §10(b).  Defendants' approach is

14  fatally flawed.  *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of

15  reviewing each allegation individually before reviewing them holistically risks losing the forest for

16  the trees.").

17      **B.    The Court Decided These Issues over a Decade Ago**

18      The facts and fallout here are strikingly similar those that this Court considered in *In re Sipex*

19  *Corp. Sec. Litig.*, No. 05-cv-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005),

20  where the company admitted that its reporting "should not be relied upon and would be 'restated,'"

21  along with the following remedial actions:

22      •    Termination of certain employees,

23      •    Restructuring the customer-marketing function to require that all its finance-
             related activities be performed by the finance department,

24      •    Annual ethics training for all employees,

25      •    Annual compliance confirmation for all employees,

26      •    Certification from the appropriate sales and marketing personnel, and

27      •    Staff increases to upgrade the finance function.

28

1    *Id.*  In addition, Sipex's CEO "personally orchestrated a sham 'sale' in the amount of $350,000." *Id.*

2    Regarding Sipex's remedial actions, this Court observed the following:

> This was strong medicine.  Such house-cleaning and reforms do not follow innocent mistakes.  Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.  These circumstances, combined with the announcement of the impending restatement establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question.  This seems even clearer in light of the probability that CEO Walid Maghribi's resignation was forced, coming as it did only days before the commencement of the internal legal and accounting investigation.

*Id.*

The Court's analysis in *Sipex* applies with even more force here, while the DOJ may ultimately write the final prescription for certain participants in LendingClub's corruption, its remedial actions to date closely parallel the "strong medicine" in *Sipex*.  But in several respects, *Sipex* was a less-significant fraud than LendingClub's: the centerpiece of evidence against the Sipex CEO was a one-time sham transaction, which "never hit the books and was never reflected in the published financials" (*id.*), whereas the number, and dollar value, of sham transactions with which Laplanche was involved exceeded this by an order of magnitude.  In *Sipex*, the share-price drop was alleged to be under 24% (*In re Sipex Corp. Sec. Litig.*, No. 05-cv-00392 (WHA), Consolidated Amended Complaint, ¶¶155, 185 (N.D. Cal. July 28, 2005) (Dkt. No. 53) (*see* Exhibit A to the concurrently filed Declaration of Michael Albert)), whereas here, the drop was 86%, including a single-day decline of 35% (¶5).  Finally, the victims of Sipex's deception were limited to investors, whereas LendingClub betrayed its own customers and corrupted the marketplace that was the crux of its entire business model.

### C.    Looking Beyond *Sipex*, the Right Outcome Remains the Same

Though the Court need not look beyond its reasoning and holding in *Sipex* in order to deny defendants' motions to dismiss, Lead Plaintiff will address all of defendants' arguments to demonstrate that they are not well-taken.

### 1.    Lead Plaintiff's §11 Claim

Section 11 protects purchasers of securities traceable to an IPO if any part of the registration statement "contained an untrue statement of a material fact or omitted to state a material fact

1    required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C.

2    §77k(a).

3              Section 11 thus creates two ways to hold issuers liable for the contents of a
     registration statement – one focusing on what the statement says and the other on
4    what it leaves out.  Either way, the buyer need not prove (as he must to establish
     certain other securities offenses) that the defendant acted with any intent to deceive
5    or defraud.

6    *Omnicare*, 135 S. Ct. at 1323.

7              Congress adopted §11 to ensure that issuers "tell[] the whole truth" to investors.
     H.R. Rep. No. 85, 73d Cong., 1st Sess., 2 (1933) (quoting President Roosevelt's
8    message to Congress).  For that reason, literal accuracy is not enough: An issuer must
     as well desist from misleading investors by saying one thing and holding back
9    another.

10   *Id.* at 1331.  As set forth above, in order to be actionable, omissions and misrepresentations must be

11   "material to a reasonable investor – *i.e.*, . . . 'there is a substantial likelihood that a reasonable

12   [investor] would consider it important.'"  *Id.* at 1333.

13              a.    **Lead Plaintiff's §11 Claim Does Not Raise Any
                      Allegations of Fraud**
14
15         The primary distinction between a claim under §11 of the Securities Act and a claim under

16   §10(b) of the Exchange Act is that, under §11, "the buyer need not prove (as he must to establish

17   certain other securities offenses) that the defendant acted with any intent to deceive or defraud."

18   *Omnicare*, 135 S. Ct. at 1323; *Daou*, 411 F.3d at 1027 ("'defendants will be liable for innocent or

19   negligent material misstatements or omissions'").  This scienter element is referred to as the

20   "element of fraud."  *Daou*, 411 F.3d at 1027.  Under Rule 9(b) of the Federal Rules of Civil

21   Procedure, "[i]n alleging fraud . . . , a party must state with particularity the circumstances

22   ***constituting fraud***."  Fed. R. Civ. P. 9(b).  Consistent with this rule, "[i]n a case where fraud is not

23   an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened

24   pleading requirements of Rule 9(b)."  *Daou*, 411 F.3d at 1027.  Combining these principles, the only

25   allegations of a §11 claim that must satisfy the heightened pleading requirement are allegations of

26   scienter:

27              The only consequence of a holding that Rule 9(b) is violated with respect to a §11
              claim would be that any allegations of fraud would be ***stripped from the claim***.  The
28            allegations of innocent or negligent misrepresentation, which are at the heart of a §11
              claim, would survive.

*Id.* at 1028 (emphasis in original).  Because Lead Plaintiff's §11 claim does not raise any allegations of scienter, none of Lead Plaintiff's §11 allegations are subject to the heightened pleading requirement.[4]

### b.   The Complaint Plainly Alleges LendingClub's Internal Control Deficiencies Existed at the Time of Its IPO

LendingClub's Registration Statement confirmed the adequacy of its internal controls over its financial reporting.  ¶57.  Defendants make two arguments in support of their motion to dismiss this aspect of Lead Plaintiff's case: (1) "plaintiff does not allege deficiencies *at the time of the IPO*." Dkt. No. 139 at 13 (emphasis in original); and (2) "even if controls were unchanged, a deficiency in December 2015 would *not* establish that the same controls were inadequate one year earlier." *Id.* at 14.  Neither of these arguments withstands scrutiny.

Despite appearing several times in defendants' brief, their assertion that "**Plaintiff Does Not Allege Internal Control Deficiencies at the Time of the IPO** (Dkt. No. 139 at 2, 13-14) (emphasis in original) is plainly wrong.  They repeatedly make this erroneous assertion because it fits their false narrative that the Complaint pleads fraud by hindsight – a term defendants use over a dozen times in their briefs.  Dkt. No. 139 at 2-3, 11-13, 19-20; Dkt. No. 142 at 7; Dkt. No. 148 at 6-7.  Defendants seem to believe that if they yell "hindsight" enough, they will convince the Court that any reference to their admissions of wrongdoing somehow counts against ***Lead Plaintiff***.  Nowhere is this more apparent than when defendants transition from the erroneous proposition that "plaintiff does not allege deficiencies ***at the time of the IPO***" to the resulting false corollary that "[p]laintiff's entire theory is, therefore, another impermissible attempt to plead a claim by hindsight." Dkt. No. 139 at 13 (emphasis in original).

In reality, the Complaint expressly alleges exactly what defendants repeatedly assert it does not: "LendingClub has also admitted that its internal controls had not changed over time.  Therefore, the same material weaknesses existed ***at the time of the IPO***."  ¶59.  In addition, the Complaint buttresses this allegation with chronological quotations of defendants' own unequivocal admissions

---

[4]   Likewise, "loss causation is not an element of the *prima facie* case under [§]11, [though] that provision allows a defendant to assert a lack of loss causation as an affirmative defense."  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 544 (N.D. Cal. 2009) (citing 15 U.S.C. §77k(e)).

1   that LendingClub's internal control over financial reporting did not change materially from the time

2   of its December 2014 IPO ***through*** the time defendants admitted the material weaknesses.  *Id.*  The

3   paragraph following this chronology provides further evidence of this allegation that defendants

4   repeatedly assert does not exist, as it references the lack of controls prior to the IPO.  ¶¶60-61.

5   Allowing defendants to argue reasonable inferences is one thing.  To allow them simply to ignore the

6   allegations in the Complaint is quite another.  Because defendants' argument about the internal

7   control weaknesses is irreconcilable with the plain language of the Complaint, the Court should

8   disregard it.  *Tellabs*, 551 U.S. at 322.

9           The Complaint's allegations about the existence of the internal control material weaknesses

10  at the time of the IPO, including the corroborating admissions in every LendingClub quarterly filing

11  following the IPO, distinguishes this case from all of the cases on which defendants rely.  One such

12  case is *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994), which defendants cite

13  repeatedly.  Dkt. No. 139 at 2, 11, 13.  *Worlds of Wonder* involved an appeal of a decision on

14  ***summary judgment***, and defendants' repeated reliance on it confirms that their motion erroneously

15  demands that the Complaint suffice under summary judgment standards versus pleading standards.

16  Defendants attempt to conceal this critical distinction with the following misleading parenthetical to

17  their *Worlds of Wonder* citation: "plaintiff cannot use '20-20' hindsight to plead a violation of

18  [§]11."  Dkt. No. 139 at 2.  The actual language from *Worlds of Wonder* exposes this ruse:

19          The district court disagreed: "Plaintiffs submit no admissible evidence to show that
            WOW's sales had decreased so dramatically at the time of the Debenture offering
20          that WOW's management could have known about, and thus would have had a duty
            to disclose, the impending collapse of Lazer Tag sales.  Plaintiffs cannot use the
21          benefit of 20-20 hindsight to turn management's business judgment into securities
            fraud."
22
23  35 F.3d at 1419.  In any event, the foregoing excerpt from *Worlds of Wonder* demonstrates that Lead

24  Plaintiff here has far more "evidence" that the internal control weaknesses existed at the time of the

25  IPO than was the case in *Worlds of Wonder* at the summary judgment stage.[5]

26  _____
    [5]    The other cases defendants cite are similarly distinguishable.  *See, e.g.*, Dkt. No. 139 at 2-3, 14,
27  18-21 (citing *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001) ("Plaintiffs, however, merely
    assert that the statement was false at the time it was made.  They do not specify facts or evidence that
28  show why the statement was false at the time it was made nor that defendants knew or with
    deliberate recklessness disregarded that it was false.")).  *See also* Dkt. No. 139 at 2, 15, 18-19, 22

### c. Defendants' Demand that Lead Plaintiff "Establish" Its Case at the Pleading Stage Is Improper

Recognizing that the Complaint clearly alleges that the material weaknesses existed at the time of the IPO, defendants next argue that, "even if controls were unchanged, a deficiency in December 2015 would ***not establish*** that the same controls were inadequate one year earlier, especially given the intervening growth in LendingClub's business, revenues and originations." Dkt. No. 139 at 14 (emphasis added to "establish"). Defendants ignore that we are at the pleading stage. The Court is not deciding a motion for summary judgment. The pleading stage, prior to taking any discovery, is not the time to "establish" (*i.e.*, prove) anything other than the sufficiency of Lead Plaintiff's allegations. *T.T. by & through Susan T. v. Cty. of Marin*, No. 12-cv-02349-WHA, 2013 WL 5497175, at *2 (N.D. Cal. Oct. 3, 2013) (noting prior denial of the plaintiff's motion to dismiss because it "went to the merits . . . and would be more properly raised by a motion for summary judgment"). Lead Plaintiff has alleged that LendingClub's internal controls had material weaknesses at the time of the IPO. ¶59 ("the same material weaknesses existed at the time of the IPO"). This is a factual allegation (one that LendingClub's intervening disclosures confirm), not a conclusory allegation of law: LendingClub's internal controls as of May 2016 were the same as they had been at the time of the December 2014 IPO. *Tellabs*, 551 U.S. at 322; *Daou*, 411 F.3d at 1013 (distinguishing between factual allegations that must be accepted "'as true and construe[d] . . . in the light most favorable to plaintiffs'" versus "'conclusory allegations ***of law***'").

In addition, the admitted material weaknesses in LendingClub's internal controls are not size specific. ¶58. Thus, defendants' ruminations about "the intervening growth in LendingClub's business, revenues and originations" are misplaced. Dkt. No. 139 at 14. For example, LendingClub's internal controls were inadequate to provide reasonable assurance of "compliance with the Company's Code of Conduct and Ethics Policy"; "an appropriate 'tone at the top'"; and of "the Company's loans conform[ing] to loan investors' purchase requirements." ¶58. Defendants

---

(citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) ("'[E]very sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts; allowing [the plaintiff] to go forward with a case based on general allegations of "negative internal reports" would expose all those companies to securities litigation whenever their stock prices dropped.'")).

1    cite Accounting Standard No. 5 to support their argument, but Accounting Standard No. 5 contrasts a
2    "'smaller, less complex company'" with "'a larger, more complex [one].'" Dkt. No. 139 at 14. This
3    is a far cry from the *same* company, whose revenues simply increased from one year to the next (as
4    is generally true for all successful companies). It is not as if LendingClub was operating out of
5    Laplanche's parents' garage at the time of the IPO in December 2014. It had $1.4 billion in loan
6    originations in the fourth quarter of 2014. ¶66. In any event, whether defendants have a defense (no
7    matter how implausible) to the merits of this claim is not the question now before the Court. *See*
8    *also Berson*, 527 F.3d at 986 ("While this is a conceivable interpretation of this paragraph, it is
9    hardly the only – or even the most plausible – one."). The accuracy of Lead Plaintiff's factual
10   allegations about the material weaknesses in LendingClub's internal controls at the time of the IPO
11   is fully reinforced by LendingClub's admissions. Defendants seem to ignore that we are at the
12   pleading stage of this litigation. Their motions should be denied.

### d.    The Underwriter Defendants Raise a Series of Arguments Most Other Defendants Do Not Join

13
14
15          For their part, the underwriter defendants, joined by defendant Laplanche only (and,
16   therefore, collectively referred to as the "Underwriter Defendants"), make the additional arguments
17   that LendingClub's statements regarding its internal controls were: (1) inactionable puffery;
18   (2) inactionable opinions; and (3) unaccompanied by facts "'showing that the descriptions of the
19   processes were false or misleading at the time they were included in the public statements, [or] facts
20   showing that the processes were not followed.'" Dkt. No. 148 at 6-7. Each of these arguments fails.

### (1)    Internal Controls Certifications Are Not Inactionable Puffery

21
22          The Underwriter Defendants contend that the following representation in the Registration
23   Statement is inactionable puffery: "LendingClub (1) had 'evaluat[ed]' its internal controls and (2)
24   had concluded that they were 'effective at a reasonable assurance level.'" Dkt. No. 148 at 6 (quoting
25   ¶57). In truth, LendingClub's internal controls had material weaknesses. Citing a district court case
26   from outside the Ninth Circuit, the Underwriter Defendants attempt to equate this certification with
27   statements such as: "'Our operational risk management and control systems and processes are
28   designed to help ensure that the risks associated with our activities . . . are appropriately controlled.'"

1    *C.D.T.S v. UBS AG*, No. 12 Civ. 4924(KBF), 2013 WL 6576031, at \*4-\*5 (S.D.N.Y. Dec. 13, 2013)

2    (cited in Dkt. No. 148 at 6), *aff'd sub nom. Westchester Teamster Pension Fund v. UBS AG*, 604 F.

3    App'x 5 (2d Cir. 2015).  The *C.D.T.S.* court observed and held that "[a]t the time the statements

4    regarding risk controls were made here, the banking sector had experienced enormous losses. In such

5    a context, touting good risk controls is the equivalent of positive, aspirational puffery found

6    inactionable by courts."   2013 WL 6576031, at \*5.   The court did not dismiss certifications

7    concerning the adequacy of internal controls, a very specific representation, as inactionable puffery.

8    Indeed, the court did not reference such certifications as being inactionable in any context.  Rather,

9    what the court held was that the more general comments "touting good risk controls" were

10   inactionable puffery in the specific context in which the comments were made. *Id.*  The Underwriter

11   Defendants omit this.

12          In fact, courts regularly find statements regarding internal controls to be actionable.  *See, e.g.*,

13   *In re Wash. Mut., Inc. Sec.*, 694 F. Supp. 2d 1192, 1212-13 (W.D. Wash. 2009) (finding

14   misstatements in offering documents about the adequacy of internal controls to be actionable under

15   the Securities Act); *In re New Century*, 588 F. Supp. 2d 1206, 1239 (C.D. Cal. 2008) (upholding

16   plaintiff's §11 claims, finding that the complaint adequately alleged false and misleading statements

17   with respect to internal controls).   Perhaps the clearest proof that LendingClub's statements

18   regarding its internal controls were not mere puffery is the fact that LendingClub filed SEC forms

19   acknowledging the previously undisclosed material weaknesses in its internal controls and

20   expressing its intention to amend its Form 10-K for 2015 in order to reflect these material

21   weaknesses. ¶5.

22                       **(2)     Internal Controls Certifications Are Not
                                   Inactionable Opinions**

23

24          Next, the Underwriter Defendants characterize LendingClub's internal controls certification

25   as being an inactionable expression of "LendingClub's opinion that, having evaluated its internal

     controls, it had concluded that those controls were effective at a reasonable level." Dkt. No. 148 at 6

26   (citing *Omnicare*, 135 S. Ct. at 1327, and *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368

27   (3d Cir. 1993)).   The problem with the Underwriter Defendants' argument is two-fold.  First and

28

1   foremost, LendingClub's representation of what it had "concluded" is far too certain to qualify as an

2   opinion under *Omnicare*:

> 3   [A] statement of fact ("the coffee is hot") expresses certainty about a thing, whereas
>     a statement of opinion ("I think the coffee is hot") does not. *See ibid.* ("An opinion,
> 4   in ordinary usage . . . does not imply . . . definiteness . . . or certainty"); 7 Oxford
>     English Dictionary 151 (1933) (an opinion "rests[s] on grounds insufficient for
> 5   complete demonstration").

6   135 S. Ct. at 1325.  And second, under *Omnicare*, even if a conclusion was an opinion, which it is

7   not, this conclusion would still be actionable by virtue of the facts it omitted.  As set forth in more

8   detail below, this conclusion omitted the fact that LendingClub's founder and CEO was able to

9   escape detection when he used $723,000 of improper loans to inflate loan activity back in 2009 (*see*

10  ¶60); that LendingClub's subsidiary, LendingClub Advisors ("LCA"), for which LendingClub's

11  CEO and CFO were responsible, could improperly inflate net asset values for six funds under its

12  management, in violation of GAAP (¶¶61, 122); and that related-party transactions, including a

13  multi-million-dollar assumption of credit risk, could escape disclosure in LendingClub's reporting

14  process (¶¶39, 43, 58(b)).  Because these facts "conflict with what a reasonable investor . . . would

15  take from [LendingClub's conclusion] itself, then §11's omissions clause creates liability."

16  *Omnicare*, 135 S. Ct. at 1329.

17      Last, the Underwriter Defendants contend that when challenging a defendant's disclosure

18  regarding internal controls, a plaintiff must allege facts """showing that the descriptions of the

19  processes were false or misleading at the time they were included in the public statements, [or] facts

20  showing that the processes were not followed.""" Dkt. No. 148 at 6.  For this proposition, they cite

21  *In re Royal Bank of Scot. Grp. plc Sec. Litig.*, No. 09 Civ. 300(DAB), 2012 WL 3826261, at *8

22  (S.D.N.Y. Sept. 4, 2012), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC*, 540 F.

23  App'x 33 (2d Cir. 2013).  In *Royal Bank of Scotland*, the plaintiffs pointed to the subsequent

24  subprime market collapse as evidence that RBS must have failed to follow its internal control

25  procedure. *Id*.  In contrast, the Complaint alleges that the same material weaknesses in its internal

26  controls that LendingClub admitted in May 2016 existed at the time of the IPO.  ¶¶39, 43, 58-61.

27  One of the material weaknesses LendingClub admitted was that its internal controls were inadequate

28  to provide reasonable assurance that the Company "maintained an effective control environment,

1   compliance with the Company's Code of Conduct and Ethics Policy, and set an appropriate 'tone at

2   the top.'"   This is not an inference, as in *Royal Bank of Scotland*.   Rather, it is an actual admitted

3   material weakness.

4   　　　　Likewise, *Zucker v. Quasha*, 891 F. Supp. 1010, 1017-18 (D.N.J. 1995), *aff'd without op.*, 82

5   F.3d 408 (3d Cir. 1996), is inapposite.  In that case, the plaintiff based its claim that the issuer was in

6   a "precarious" financial condition at the time of an offering on a bankruptcy reported four months

7   later.  Here, LendingClub admitted that its internal controls had not materially changed since the

8   time of the IPO.   ¶59.   Additionally, Lead Plaintiff alleges that the lack of controls from

9   LendingClub's inception is further demonstrated by LendingClub's admissions that in December

10   2009 Laplanche artificially inflated loan origination volume (¶60), and that from 2011 to 2016,

11   LendingClub improperly inflated net asset values for six funds managed by LCA, in violation of

12   GAAP (¶61).  The Underwriter Defendants ignore these allegations entirely by falsely claiming that

13   Lead Plaintiff fails to allege any specific facts showing problems with the Company's internal

14   controls at the time of the IPO.

15   　　　　　　　**e.**　　　**Defendants' Remaining Arguments Miss Their Mark**

16   　　　　Defendants' remaining arguments amount to nothing more than a misguided attempt to

17   segregate manifestations of LendingClub's deficient internal controls, and then claim that since none

18   is material in isolation, the material weaknesses LendingClub's internal controls were not material.

19   At bottom, by challenging the significance of each individual symptom, defendants hope the Court

20   will ignore the disease: LendingClub's founder and foundation were corrupt.  Only half this disease,

21   a corrupt CEO, was at issue in *Sipex*.  Yet, this Court rejected the defendants' misplaced arguments

22   about the numerical insignificance of the CEO's sham transaction:

23   　　　　　　Defendants say that $350,00 has not been shown to be "material."  For a
    　　　　company of Sipex's size, with reported quarterly revenues of about $17 million,
24   　　　　defendants may ultimately be right.  A $350,000 revenue item, however, cannot be
    　　　　said to be immaterial as a matter of law at the pleading stage. . . .  Moreover, the
25   　　　　sham transaction was material in a wholly different sense: Investors would be
    　　　　interested in knowing that the company CEO, president and director was personally
26   　　　　orchestrating the phony sale alleged.  This would have raised a red flag for investors
    　　　　that top management was potentially corrupt.  This was not disclosed.  This alone
27   　　　　made the sham transaction material.

28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
CONSOLIDATED COMPLAINT - 3:16-cv-02627-WHA　　　　　　　　　　　　　　　- 14 -

1  *Sipex*, 2005 WL 3096178, at *2; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44

2  (2011) ("This contextual inquiry may reveal in some cases that reasonable investors would have

3  viewed reports of adverse events as material even though the reports did not provide statistically

4  significant evidence of a causal link.").[6]

5            **(1)      A Suspect CEO Makes Internal Controls All the**
                      **More Material**

6

7          Here, defendants whitewash the fact that LendingClub's founder and CEO had cooked the

8  books with $723,000 of improper loans back in 2009 (*see* ¶60), as if that would not have raised a red

9  flag for investors about Laplanche's potential corruptness.   As in *Sipex*, this indication of

10  Laplanche's corruptness was material in and of itself, but it made LendingClub's inadequate internal

11  controls all the more significant.   Not only was there a fox on the LendingClub farm, but the door to

12  the hen house was wide open.   Had they known about Laplanche's earlier deceit, investors would

13  have cared all the more about LendingClub's deficient internal controls.

14            **(2)      LCA's GAAP Violation**

15          Likewise, defendants attempt to trivialize the fact that beginning in March 2011 ***through***

16  May 2016, LendingClub's subsidiary, LCA, had violated GAAP so significantly with respect to its

17  valuation of assets that LendingClub would have to reimburse LCA's limited partners $1 million.

18  ¶61; Dkt. No. 139 at 14; Dkt. No. 140-1, Ex. G at 40.   These violations, which began before, and

19  continued through, the IPO (¶61), would have been yet another strong indication of the existence and

20  potential perils of LendingClub's deficient internal controls.

21            **(3)      Concealed Credit Risk and Related-Party**
                      **Transactions**

22          Similarly, defendants refuse to acknowledge Lead Plaintiff's actual allegations when they

23  erroneously assert that Lead Plaintiff "fails to plead that the purportedly omitted information

---

24    [6]   In light of the Supreme Court and this Court's rejections of bright-line numeric materiality

25  standards, defendants are mistaken to rely on outdated cases, such as *Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) ("The alleged material omission from the Prospectus of

26  $12 million in owed distribution fees accounted for only 0.4% of Legg Mason's annual revenue.
This share is simply too small to be material as a matter of law when considered in the broader

27  context of the company's revenues and expenses."), *aff'd*, 347 F. App'x 665 (2d Cir. 2009), and
*Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2002), which were both decided ***before*** the

28  Supreme Court's decision in *Matrixx*.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
CONSOLIDATED COMPLAINT - 3:16-cv-02627-WHA                - 15 -

regarding Cirrix was material *at the time of the IPO*."  Dkt. No. 139 at 9 (emphasis in original).
Defendants assert that Lead Plaintiff's allegation of Cirrix loan purchases "raises far more questions
than it answers."  *Id*.  The Complaint's Cirrix-related allegations are unambiguous, including the
*pre-IPO* timing of them.  For example:

- Cirrix was formed *in 2012* for the sole purpose of purchasing loans from LendingClub, with which it had a working partnership.  As part of this partnership, Cirrix had access to LendingClub's Board and received inside information regarding LendingClub's credit performance and underwriting.  ¶39.

- *By the time of the IPO*, LendingClub loans represented 100% of Cirrix's assets, and Cirrix's loan purchases drove LendingClub's *pre-IPO results*, representing 20% of LendingClub's critical loan-origination growth and nearly 5% of LendingClub's *total* sales of whole loans *in the last quarter before the IPO*.  *From inception*, LendingClub also provided Cirrix with a credit-support agreement under which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself).  As such, had significant influence over Cirrix and vice versa.  ¶43.

This significant undisclosed related-party relationship, *which existed at the time of the IPO*,
directly contradicted LendingClub's Registration Statement, which promised: "We are continuing to
earn investor confidence every day by providing equal access and with a level playing field with the
same tools, data and access for all investors, small and large, within a fair and efficient
marketplace." ¶39.  The natural corollary to this statement is that if LendingClub were providing a
pitched playing field with different tools, data, and access for certain investors, it would lose investor
confidence.  Such a representation takes on actual significance in the mind of a reasonable
shareholder of a techfin company because "'[w]ho would knowingly roll the dice in a crooked
crap[s] game?'"  *Basic*, 485 U.S. at 246-47.  This is exactly what the Complaint here alleges.

Likewise, LendingClub's assumption of millions of dollars of risk from this partnership
directly contradicted its Registration Statement, which stated: "We do not assume credit risk or use
our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and
in amounts that are not material."  ¶37.  As set forth above, the Complaint expressly alleges that
Cirrix was created *in 2012* for the sole purpose of purchasing LendingClub's loans; that "*in the last
quarter before the IPO*," Cirrix's loan purchases "represent[ed] 20% of LendingClub's critical loan-
origination growth and nearly 5% of LendingClub's *total* sales of whole loans *in the last quarter*

*before the IPO*"; and that "*[f]rom inception*," LendingClub "assumed millions of dollars of risk for the loans it sold to Cirrix."  ¶43.  In the face of these express allegations, defendants lose all credibility when they assert alternative facts, such as, "[t]he most plaintiff can do is aver that, at some *unspecified time*, LendingClub 'assumed millions of dollars of risk for the loans it sold Cirrix.'"  Dkt. No. 139 at 9 (emphasis in original).  The allegation that this assumption of risk existed "[f]rom inception" (2012), and thus at the time of the IPO (December 2014), is plenty specific because it establishes the falsity of LendingClub's Registration Statement.[7]

Last, the significance of the undisclosed Cirrix relationship cannot be judged in a vacuum.  Instead, it would have been yet another indication to investors that LendingClub's marketplace and the management overseeing it lacked the integrity and transparency defendants represented.  "This alone made the [Cirrix relationship] material."  *Sipex*, 2005 WL 3096178, at *2.  Moreover, this manifestation of LendingClub's deficient internal controls further confirms the significance of the material weaknesses in those controls.  ¶39 ("One of the material weaknesses to which LendingClub has admitted was the inadequacy of its internal controls with respect to the disclosure of related-party transactions.").

---

[7]  Each of these specific allegations explained how the undisclosed related-party relationship with Cirrix significantly impacted crucial performance metrics and the "fairness" of its marketplace, and to eliminate any possibility of confusion, immediately following these allegations, the Complaint alleges the following:

> The undisclosed relationship and transactions with Cirrix, including LendingClub's increasing reliance on Cirrix, rendered the Registration Statement false and misleading with respect to LendingClub's loan originations, growth in loan originations, and assumption of credit risk.

¶44.  As such, defendants' reliance on cases, such as *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1116 (N.D. Cal. 2013) (Dkt. No. 139 at 9), is misplaced.  The registration statement at issue in *Primo* was for an IPO for a company that had developed a DNA sequencing system.  940 F. Supp. 2d at 1109.  In stark contrast to LendingClub's failure to disclose its related-party relationship with Cirrix, the registration statement in *Primo* "clearly disclosed that there are two distinct types of accuracy," and "no claim was made in the registration statement about an overall accuracy rate," which meant that plaintiff's claim as to a represented 99.99% accuracy rate for one type of accuracy did not amount to a misrepresentation as to the other type.  *Id.* at 1116.  If LendingClub had disclosed that it had two distinct types of customers: arms-length and related-party (Cirrix) and what that meant in terms of LendingClub's marketplace neutrality, loan origination growth, etc., then the Complaint would not contain any Cirrix allegations.

1

**(4)      Compromised Loan-Approval Process**

2

**(i)      Arguments of All Defendants**

3      Defendants again ignore the Complaint's plain language when they challenge Lead Plaintiff's

4   allegations concerning LendingClub's compromised loan-approval process.   LendingClub's

5   Registration Statement promised that it earned customers' trust through "maximum transparency into

6   [the Company's] products' terms and performance" (¶47); "Sophisticated Risk Assessment"

7   featuring "proprietary algorithms" (¶45); and a loan-approval process in which "our verification

8   processes and teams verify an applicant's identity, income or employment by connecting to various

9   data sources, directly or through third-party service providers, or by contacting the human resources

10   department of the borrower's stated employer to ultimately approve the loan request" (*id.*).

11      Contrary to these representations, LendingClub was able to manipulate its loan-approval and

12   packaging processes to the detriment of its marketplace investors, such that, "at the time of the IPO

13   . . . LendingClub was (i) originating loans based on false and unreliable borrower information;

14   (ii) approving new loans to pay for delinquent old loans; (iii) splitting loans; and (iv) increasingly

15   'matching' lenders to subprime borrowers and stated-income applicants." ¶50(b).  LendingClub's

16   upcoming IPO was a key motivation for this manipulation.  The Complaint alleges:

17

18

19

> In the buildup to the IPO, LendingClub rushed to increase its loan volume.  In doing
> so, it shrank its review time for loan applications from 5-7 days to as quickly as
> same-day approvals.  With so little time, LendingClub could not possibly verify
> income information for all of its applicants, and these were all "no documents" loans.
> LendingClub was also issuing loans to sub-prime borrowers.

20   ¶48(e).

21      Defendants' motions completely disregard, and thus concede the sufficiency of, the

22   Complaint's detailed description of how,

23

24

25

26

27

28

> Following LendingClub's IPO, its compromised underwriting process manifested in
> lower returns to its lenders due to increased delinquencies, defaults, and write-offs.
> The poor quality of the loans LendingClub rushed to approve in the buildup to the
> December 2014 IPO did not immediately result in missed payments and write-offs,
> but by mid-2015, investors were starting to see the fallout.  For example, in July
> 2015, Cirrix saw the end of 34 consecutive months of positive returns from its
> LendingClub loans (its only assets).  In 2014, the year of the IPO, Cirrix's loan
> portfolio has been reported to have generated a 16% return, but by December 2015,
> Cirrix was losing 1%; in January 2016, its losses were 3%.  Similarly, by the end of
> the first quarter of 2016, Cirrix's in-house loan facilitator (LC Advisors) reported
> loan write-offs that were 33%-75% higher than it had forecast.

1   ¶49.  Instead, defendants again resort to revisionist tactics.

2         Defendants assert that "the Registration Statement itself disclosed that LendingClub did not

3   routinely verify income information furnished by borrowers, and only did so in some instances."

4   Dkt. No. 139 at 11 (citing Dkt. No. 140-1, Ex. A (Prospectus) at 94, 100).  This assertion itself is

5   demonstrably false and misleading.  Page 94 of the Prospectus contains only one reference to

6   LendingClub's income verifications:

7         While the loan is listed and attracting investment interest, we have verification
          processes and teams to verify an applicant's identity, income or employment.  Once
8         the verification and fraud checks are completed and sufficient investor commitments
          are received, the issuing bank issues the loan and pays us a transaction fee.
9
10  Dkt. No. 140-1, Ex. A at 94.  As can be seen, this unequivocal statement is irreconcilable with

    defendants' motion.  The Prospectus's next reference to income verifications at page 99, which
11
    defendants ignore, provides another unequivocal statement that is irreconcilable with defendants'
12
    representation in their motion:
13
14        After the borrower selects their desired loan terms and the rest of the application is
          completed, our verification processes and teams verify an applicant's identity,
15        income or employment by connecting to various data sources, directly or through
          third-party service providers, or by contacting the human resources department of the
16        borrower's stated employer to ultimately approve the loan request.

17  *Id.* at 99; ¶45.

18        After these two unequivocal representations, the Prospectus provides a slight equivocation,

19  but still nothing on the order of what defendants represent in their motion:

20        In addition to identity, we may also verify a borrower's income or employment.
          Income and employment is verified by connecting to various data sources, directly or
21        through third-party service providers, or by contacting the human resources
          department of the borrower's stated employer.

22  Dkt. No. 140-1, Ex. A at 100.  Defendants cannot use this slight variation to escape responsibility for

23  the impression created by the Registration Statement's two earlier unequivocal representations.

24  *Fecht*, 70 F.3d at 1082 ("[W]hether a statement in a public document is misleading may be

25  determined as a matter of law only when reasonable minds could not disagree as to whether the ***mix***

26  of information in the document is misleading.  Inclusion of ***some*** cautionary language is not enough

27  to support a determination as a matter of law that defendants' statements were not misleading.")

28  (emphases in original); *cf. F.T.C. v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A

1  solicitation may be likely to mislead by virtue of the net impression it creates even though the

2  solicitation also contains truthful disclosures.").  Moreover, "once defendants chose to tout" their

3  transparency and sophistication of their risk-assessment process, "they were bound to do so in a

4  manner that wouldn't mislead investors."  *Berson*, 527 F.3d at 987; *see also In re Gilead Scis. Sec.*

5  *Litig.*, 536 F.3d 1049, 1052 (9th Cir. 2008) (omitting facts known to be impacting demand when

6  "highlighting the drug's success made a true statement (that demand was strong) also a misleading

7  one").

8         Even if the Court ignores the Registration Statement's unequivocal representations about

9  verifying borrowers' incomes and focuses solely on the equivocal representation, which it should

10  not, the Registration Statement was still misleading because it did not reveal that in LendingClub's

11  rush to boost its loan volume in the buildup to the IPO, it shrank its review time for loan applications

12  from 5-7 days to as quickly as same-day approvals, and "increasingly" approved loans to subprime

13  borrowers whose incomes it could not possibly verify.  ¶¶48(e), 50(b).  Omitting this information

14  rendered misleading LendingClub's decision to tout its lending transparency and sophisticated risk-

15  assessment process because this risky trend would ***not*** be apparent to investors, and growing loan

16  volume by increasingly depending on the riskiest borrowers with minimal review time is the ***least***

17  sophisticated way to screen borrowers.  LendingClub's misleading assurances were exactly what the

18  law prohibits.  *Berson*, 527 F.3d at 987.  Having realized the risk that in order to grow, it would

19  have to ***increasingly*** approve riskier loans with less review, LendingClub was obligated to either

20  disclose this information or refrain from touting the transparency and sophistication of its loan-

21  approval process.  *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir.

22  2009) ("Similar to *Berson*, the passage in the Form 10-Q speaks about the risks of product liability

23  claims in the abstract, with no indication that the risk 'may already have come to fruition.'"), *aff'd*,

24  563 U.S. 27 (2011).

25                    **(ii)     Arguments of the Underwriter
                              Defendants**

26

27         The Underwriter Defendants argue that LendingClub's statements regarding the

28  sophistication and transparency of LendingClub's loan approval process are "inactionable corporate

1   puffery."[8]   Dkt. No. 148 at 4 (citing ¶¶45-50).   Yet these are not the type of statements that are

2   "extremely unlikely to induce consumer reliance."  *Newcal Indus. v. Ikon Office Solution*, 513 F.3d

3   1038, 1053 (9th Cir. 2008) (explaining when a statement is mere puffery).  Instead, they are

4   strikingly similar to the misstatements upheld in the pleadings in *In re Bofi Holding, Inc. Sec. Litig.*,

5   No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533, at *8 (S.D. Cal. Sept. 27, 2016).  There, the

6   court rejected puffery arguments concerning statements that included:

7   > "We continue to maintain our conservative underwriting criteria and have not
> loosened credit quality to enhance yields or increase loan volumes . . . ."

8
9   > "Each loan, regardless of how it is originated, must meet underwriting criteria set
> forth in our lending policies and the requirements of applicable lending regulations of
> our federal regulators . . . ."

10   >                    *         *         *

11
12   > "We will appropriately manage our risk, and remain on sound regulatory footing as
> we enjoy the continued success of what we believe is the right business banking
> model for the future . . . ."

13   *Id.* at *8-*9.  The *Bofi* court concluded:

14
15   > Plaintiffs' allegations are neither aspirational nor general.  They allege that
> Defendants repeatedly represented, in a variety of forums, that it continued to adhere
> to conservative loan underwriting practices and that it had not loosened credit

16   > guidelines in order to increase loan volume, when the defendants had, in fact,
> resorted to lax lending practices. . . . Thus, because Plaintiffs' claims ring of those in

17   > *In re New Century* [, 588 F. Supp. 2d at 1225-27] as opposed to those in *Lloyd* [, 811
> F.3d at 1206-07], Defendants' argument that Plaintiffs' claims are mere puffery is

18   > unavailing.

19   *Id.* at *9.

20          The Underwriter Defendants next argue that Lead Plaintiff's alleged false and misleading

21   statements regarding LendingClub's "sophisticated" and "transparent" loan-approval process

22   somehow amount to "puzzle pleading."  Dkt. No. 148 at 4-5.  Despite the fact that Lead Plaintiff

23   
---

24   [8]    One need not look further than the Underwriter Defendants' own parentheticals of the cases they
cite to see why this argument is baseless. Dkt. No. 148 at 4 (citing *ECA & Local 134 IBEW Joint

25   Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009); *N.Y. State
Teachers' Ret. Sys. v. Fremont Gen. Corp.*, No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574, at

26   *15 (C.D. Cal. Sept. 25, 2009); *Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM (PJWx), 2012
WL 12883517, at *16 (C.D. Cal. Aug. 21, 2012)). Far from being "mere[] generalizations regarding

27   [the firm's] business practices," "vague" and "broad" statements regarding the company's
reputation, or "general statements" comparing the company's credit metrics to its peers, the

28   statements at issue here describe in great detail LendingClub's loan-approval process.  ¶¶45-47.

1    clearly explains why Lending Club's representations about LendingClub's "sophisticated" and

2    "transparent" lending practices were false and misleading (¶¶48, 50), the Underwriter Defendants

3    declare that Lead Plaintiff "fails to allege any facts to show **why** the Registration Statement's

4    description of its loan approval process as 'sophisticated' and 'transparent' was false or misleading."

5    Dkt. No. 148 at 4 (emphasis in original).   When a complaint "provides notice" regarding the

6    statements alleged to be misleading and the reasons that the statements are misleading, a "puzzle-

7    style" argument fails.  *See, e.g.*, *Plitcha v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1016-17 (N.D.

8    Cal. 2011) (rejecting puzzle-pleading arguments even where block quotes used).   Here, Lead

9    Plaintiff organizes the Registration Statement's quotes regarding LendingClub's "sophisticated" and

10   "transparent" loan-approval process into three different categories (¶¶45-47) and immediately

11   thereafter details exactly why those statements were false and misleading (¶48).  This is precisely

12   what the law requires.[9]

13                    **(5)      LendingClub's Inadequate Data Security**

14            The Registration Statement affirmatively represented that its data-security program was

15   based on "best practices, such as ISO2700x and NIST 800 series."  ¶51.  Those standards included

16   *automated* controls to prevent and detect manipulation changes to corporate data by insiders.  ¶53.

17   As Lead Plaintiff alleges, LendingClub's data-security program did *not* include these best-practice

18   protections.  Instead, it had an admitted "gap in preventative controls related to data management."

19   ¶54.[10]  The "enhancements" it announced to fill this gap were the very kind of controls over data

20

---

21   [9]     The case cited by the Underwriter Defendants is inapposite. Dkt. No. 148 at 5 (citing *Primo*, 940
22   F. Supp. 2d at 1111-13).  There, the court found the plaintiffs' complaint to be a "puzzle pleading"
     because the complaint contained "lengthy quotes and recitations of the contents of the offering
23   materials and public comments made by Defendants," either failed entirely or only partially
     connected alleged misstatements or omissions to particular statements, and left the reader guessing at
24   how the statements were rendered false and misleading.  *Primo*, 940 F. Supp. 2d at 1112.  The
     Complaint here does not suffer from any of these infirmities.

25   [10]    It is apparent that the Complaint does not allege that defendants misled investors by promising a
     "foolproof" system, as defendants contend. Dkt. No. 139 at 12 (citing *In re Rocket Fuel, Inc. Sec.*
26   *Litig.*, No. 14-cv-3998-PJH, 2015 WL 9311921, at *5 (N.D. Cal. Dec. 23, 2015), and *Nathanson v.*
     *Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D. Cal. 2015)).  Rather, unlike the cases defendants cite,
27   the Complaint plainly alleges that defendants misled investors by representing that LendingClub had
     a data-security program based on "best practices, such as ISO2700x and NIST 800 series" (¶51),
28   when, in fact, it did not have this level of data-security program (¶54).

1    changes that it would have already had place if its data-security program had been as represented.

2    ¶¶54-55.

3           In response, defendants again argue that Lead Plaintiff must **prove** at the pleading stage that

4    this gap, which LendingClub acknowledged on May 16, 2016, had existed at the time of the

5    December 11, 2014 IPO. Dkt. No. 139 at 12 (criticizing Complaint for failing to "show" gap existed

6    in December 2014). Here and throughout their briefs, defendants fail to appreciate that "'[w]ith

7    respect to SEC filings, the Court takes judicial notice only of the statements contained therein, but

8    not for the purpose of determining the truth of those statements.'" *In re LDK Solar Sec. Litig.*, 584

9    F. Supp. 2d 1230, 1254 (N.D. Cal. 2008). It simply is not plausible that LendingClub had a best-

10   practices ISO2700x and NIST-800 compliant data-security program at the time of the IPO, and then

11   secretly swapped it out for a lesser program sometime prior to May 16, 2016. This certainly is not

12   the **most** plausible inference as to how long this "gap" existed. After all, when LendingClub began

13   to address the "gap" in March 2016, it went back **two years** to test its loans. Dkt. No. 140-1, Ex. F at

14   4. This supports an extremely strong inference that this gap existed at the time of the December

15   2014 IPO. Otherwise, why would LendingClub have been testing loans from March **2014**? In any

16   event, the Complaint expressly alleges that "these deficiencies in 'Data Integrity and Security' . . .

17   existed at the time of the IPO" (¶56), and this allegation must be accepted as true.

18          The fact that these deficiencies came to light after LendingClub exploited them to defraud an

19   institutional investor in 2016 does not, as defendants assert, transform this fundamental security

20   "gap" into "another hindsight-based claim." Dkt. No. 139 at 12. The proscription defendants

21   obliquely reference is a proscription against pleading "'**fraud** by hindsight,'" and it primarily

22   prohibits the use of mere hindsight to establish a defendant's scienter, that is recklessness or

23   **knowledge** at an earlier point in time. *Daou*, 411 F.3d at 1021.[11] But it is nonsensical to suggest, as

24

25   [11]    *Silicon Graphics*, which defendants cite throughout their brief (*see* Dkt. No. 139 at 2, 15, 18-19,
        22), confirms this point:

26          As the district court pointed out, "[e]very sophisticated corporation uses some kind
             of internal reporting system reflecting earlier forecasts; allowing [the plaintiff] to go
27           forward with a case based on general allegations of 'negative internal reports' would
             expose all those companies to securities litigation whenever their stock prices
28           dropped." We conclude that Brody's general allegations regarding negative internal

1    defendants do repeatedly, that the manifestation of a problem does not support an inference that the

2    problem existed prior to its manifestation. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th

3    Cir. 1994) ("Since 'in perfect shape' and 'built on landfill' are at least arguably inconsistent, plaintiff

4    would have set forth the most central 'circumstance constituting fraud' – namely, that what

5    defendant said was false.  Notably, the statement would have been just as false when defendant

6    uttered it as when plaintiff discovered the truth.  The house was ***always*** defective because it was

7    always built on landfill.") (emphasis in original).

8         Defendants attempt to rewrite history as to one exploitation of this "gap," which resulted in

9    the backdating of hundreds of loans and the defrauding of an institutional investor.  Defendants'

10   brief implies that LendingClub's deficient data-integrity program detected this fraud, but that simply

11   is not the case, as confirmed by a review of defendants' "support" for this position.  Dkt. No. 139 at

12   13 (citing Dkt. No. 140-1, Ex. F at 4).  This document is LendingClub's May 16, 2016 Form 8-K.

13   The sentence discussing the discovery of this exploitation of LendingClub's deficient data security is

14   scarcely English: "The recent review by a sub-committee of the Board of Directors surfaced a gap in

15   preventative controls related to data management alongside other internal controls issues."  Dkt. No.

16   140-1, Ex. F at 4.  Though written in anything but plain English, what is clear from this statement is

17   that it does ***not*** reveal how the Board's sub-committee learned of this data-security gap or of

18   LendingClub's exploitation of the gap in order to defraud an institutional investor.  It certainly does

19   not reflect that LendingClub's defective data-security program detected the very fraud it had

20   enabled.

21        Moreover, defendants' attempt to downplay the materiality of this deficiency is belied by

22   LendingClub's own apology letter about it, which acknowledged that

23            ***Data integrity is an essential component of inspiring trust and confidence***
             ***in the Lending Club marketplace***.

24                              *        *        *

25   _____

26   reports and stock sales do not give rise to a strong inference of deliberate
     recklessness.

27

28   183 F.3d at 988.

1
2

> Our business thrives on data.  We use it in every aspect of our operations, from making credit decisions to hiring employees.  Data integrity has been – and will always be – critical to Lending Club.  But just as important, our business depends on trust.

3

Dkt. No. 140-1, Ex. F at 4-5.

4
5

Lead Plaintiff has alleged, and logic dictates, that the same defects in LendingClub's data

6

management program, which LendingClub acknowledged in 2016, existed at the time of its

7

December 2014 IPO, when its Registration Statement represented that its data-security program was

8

based on "best practices, such as ISO2700x and NIST 800 series."  ¶51.  As was true for

9

LendingClub's "sophisticated" risk assessment processes, once defendants chose to tout

10

LendingClub's "best practices" data-security program, "they were bound to do so in a manner that

11

wouldn't mislead investors."  *Berson*, 527 F.3d at 987.

12

### 2.      Lead Plaintiff's §10(b) Claim

13

#### a.      §10(b) Standards

14

Turning to Lead Plaintiff's §10(b) claim and the 10(b) Defendants' intent to deceive, the

15

Complaint need only "state with particularity facts giving rise to a strong inference that the

16

defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A).  A plaintiff meets his

17

burden of alleging an intent to deceive by pleading facts giving rise to a strong inference of knowing,

18

intentional, or deliberately reckless conduct.  *S. Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir.

19

2008).  A "strong inference" is one that a reasonable person would deem "cogent and at least as

20

compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at

21

324.  The question is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong

22

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

23

standard." *Id*. at 322-23 (emphasis in original).  No "smoking-gun" is necessary, nor need the

24

inference be the "'most plausible of competing inferences.'" *Id*. at 324.  In other words, ties go to

25

the plaintiff.

26

The Ninth Circuit has articulated a

27

> two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, [the court must] conduct a "holistic"

28

review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991-92 (9th Cir. 2009)).

Here, the analyses of falsity and scienter are intertwined because the falsity of defendants' statements and the materiality of their omissions are so obvious, and their significance to defendants' business was so great, they support a strong inference of knowing or reckless conduct. *See, e.g.*, *Siracusano*, 585 F.3d at 1183 ("[w]ithholding reports of adverse effects of and lawsuits concerning the product responsible for company's remarkable sales increase" such "'an extreme departure from the standards of ordinary care,'" inference that officers "withheld the information intentionally or with deliberate recklessness is at least as compelling as the inference that [they did so] innocently").

### b.       LendingClub's Deficient Internal Controls

Like Lead Plaintiff's §11 claim, the 10(b) Defendants' misrepresentations concerning the material weaknesses in LendingClub's internal controls are actionable themselves and they aggravate the other misrepresentations and omissions underlying Lead Plaintiff's §10(b) claim.  As detailed above, LendingClub's internal controls did not change materially throughout the class period.  Although Lead Plaintiff could have rested on this simple factual allegation, the Complaint goes further and proves this fact through defendants' own statements.  ¶59.  This means that the material weaknesses that LendingClub has admitted existed throughout the class period.  These material weaknesses are not mere technicalities.  LendingClub's admission of them means that "a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis." ¶111.  Defendants argue that "[t]his is not a restatement case." Dkt. No. 139 at 15.  In many ways, it is worse because the Company's admission disclaims the reliability of its prior financial statements.  Moreover, the most logical inference as to the meaning of an inappropriate tone at the top that rendered LendingClub's financial statements unreliable is that senior management explicitly or implicitly encouraged the kind of

1    activities and transactions that would paint a misleading picture of LendingClub's performance or

2    financial position.

3        Given the nature of these deficiencies, it is not just ***im***plausible that Laplanche and Dolan

4    were unaware of them.  It is impossible:

5        The identified material weakness is the result of the aggregation of control
         deficiencies related to the Company's "tone at the top," . . . .

6
                                    *        *        *
7

8        The control environment, which includes the Company's Code of Conduct and
         Ethics Policy, is the responsibility of senior management, and sets the tone of our
9        organization, influences the control consciousness of employees, and is the
         foundation for the other components of internal control over financial reporting.
10       Although each area described below involved its own deficiencies, a significant
         contributing factor to all of the deficiencies aggregating to a material weakness was
11       the Company's lack of an appropriate tone at the top set by certain members of
         senior management.

12   ¶111.  So the admitted driving force behind LendingClub's materially deficient internal controls over

13   financial reporting was an inappropriate tone at the top set by members of its senior management.

14   CEO Laplanche and CFO Dolan ***were*** LendingClub's senior management.  ¶¶12-13.  Thus, even if

15   they did not personally help set the inappropriate tone, they had to have been aware of it.  The 10(b)

16   Defendants' contrary inference is not nearly as realistic.  Ignoring that the Court may consider only

17   ***reasonable*** inferences, defendants suggest that even though the tone at the top of LendingClub was

18   so profoundly improper that it amounted to a material weakness in its internal control over financial

19   reporting, LendingClub's CFO was neither part of setting this tone nor aware of its existence.  This

20   is not a reasonable inference – and it is certainly not the ***most*** reasonable.  *Berson*, 527 F.3d at 986

21   ("While this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most

22   plausible – one.").[12]  After all, "a failure to maintain sufficient internal controls to avoid fraud is

23   _____

24   [12]   This is nothing like *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791 (N.D. Ill. 2007), which the
     10(b) defendants cite.  Dkt. No. 139 at 20.  There, the plaintiffs retained an accounting expert "'to
25   opine as to whether or not the senior management of OfficeMax, Inc. . . . should have been aware of
     the internal control weaknesses which did not detect the overstatement of income recorded relating
26   to vendor rebates and allowances.'"  *Roth*, 527 F. Supp. 2d at 801.  Here, we are not talking about a
     possible deficiency with a technical accounting internal control.  Instead, we have ***admitted material***
27   ***weaknesses*** in internal control over LendingClub's core operations – its financial reporting,
     including an ***inappropriate tone at the top***.  No expert was needed for those at the top, CEO
28   Laplanche and CFO Dolan, to identify such a glaring problem.

1   sufficiently indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232

2   (S.D.N.Y. 2006).

3        Such an innocent inference would be even more incredible as to Laplanche, whose repeated

4   acts of corruption have already been confirmed:

5       •   LendingClub determined that in December 2009, he inappropriately took out 32
6            loans for himself and family members, amounting to nearly 10% of LendingClub's
         market activity for that entire month, and that he did so in order to "help increase
7            reported platform loan volume." ¶118.  He cooked the books.  *See Sipex*, 2005 WL
         3096178, at *1 ("Many decades of experience teach that sham transactions like the
8            one alleged are not done for the fun of it – they are done to cook the books.").

9       •   He was not candid with LendingClub's Board when confronted regarding his role in
10           defrauding one of LendingClub's institutional marketplace investors and backdating
         loan applications.  ¶¶105, 125.

11      •   He convinced LendingClub's Board to approve a $150 million stock buyback
12           program, while concealing "that he had pledged his shares as collateral for a loan and
         was required to put up more money if the price of LendingClub stock declined below
13           a certain level.  ¶119.

14      •   He convinced LendingClub to invest in Cirrix while concealing his and defendant
15           John J. Mack's ("Mack") personal stakes in Cirrix.  ¶106.

16      •   He was forced to resign.  ¶125.  This was not some generic "executive departure[]",
         as defendants attempt to portray.  Dkt. No. 139 at 24.  Laplanche was forced to resign
17           after committing numerous acts of malfeasance and being uncandid with the Board.
         *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal.
18           2009) ("At the very least, the timing of Defendants' departures might suggest that the
         Company believed Defendants had been involved in wrongdoing with respect to
19           corporate finances."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, &*
         *Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 66281, at *14 (N.D. Cal.
20           Jan. 4, 2017) ("Plaintiffs have pled sufficient facts to compel the inference that the
         Volkswagen resignations, firings, and suspensions are strongly indicative of
21           scienter.").

22  In light of these facts, no inference is nearly as strong as, let alone stronger than, the inference that

23  Laplanche was aware of (and exploiting) LendingClub's materially weak internal controls over

24  financial reporting.  *Tellabs*, 551 U.S. at 324 (inference of scienter sufficient if it is "at least as

25  compelling as any opposing inference one could draw from the facts alleged").

26       Moreover, both Laplanche and Dolan repeatedly certified:

27          As required by Rule 13a-15(b) of the 1934 Act, the Company carried out an
28          evaluation, under the supervision and with the participation of the Company's

1   management, including its Chief Executive Officer and Chief Financial Officer, of
the effectiveness of the design and operation of its disclosure controls and procedures
2   as of [the end of each reporting period].  Based on the foregoing, the Company's
Chief Executive Officer and Chief Financial Officer have concluded that its
3   disclosure controls and procedures were effective at a reasonable assurance level.

4   ¶¶57, 72, 80, 84, 91, 102; *see, e.g.*, *Scott v. ZST Digital Networks, Inc.*, No. CV 11-03531 GAF

5   (JCX), 2012 WL 538279, at *9 n.2 (C.D. Cal. Feb. 14, 2012) ("Individual Defendants' signatures

6   certifying the Company's financial statements, along with the critical importance of the financial

7   information being certified, support a finding of scienter.").  What is entirely ***im***plausible is that

8   Laplanche and Dolan could have regularly personally supervised ***and participated in*** evaluations of

9   the design and operation of LendingClub's disclosure controls and procedures without being aware

10  of something as obvious as a "lack of an appropriate tone at the top set by certain members of senior

11  management" (¶111), the very group they comprised.  *Cf. In re Montage Tech. Grp. Ltd. Sec. Litig.*,

12  78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015) (related-party relationship with entity that shared office

13  space and was company's largest distributor sufficiently obvious to support inference that senior

14  officers aware of it).  At a bare minimum, they were recklessly indifferent to the existence of such a

15  glaring deficiency.  *N.M. State Inv. Council*, 641 F.3d at 1095.  Of course, once aware of senior

16  management's inappropriate tone relating to LendingClub's financial reporting, it would have been

17  doubly reckless for Laplanche and Dolan not to root out the other deficiencies in LendingClub's

18  internal controls and database security, including those that Laplanche had personally exploited

19  (¶118) and those about whose manifestation Laplanche was not forthcoming with LendingClub's

20  Board (¶125).

21              **c.    Cirrix Redux**

22          As they did in their §11 arguments, the 10(b) Defendants' arguments regarding Cirrix again

23  ignore the Complaint's allegations.  "***First***, the CC does not plead facts showing that LendingClub

24  and Cirrix were ***ever*** 'related parties'" (Dkt. No. 139 at 15 (emphasis in original)); "***[s]econd***,

25  plaintiff does not satisfy its obligation to plead facts showing that alleged 'related party' transactions

26  rendered particular statements materially misleading" (*id.* at 160 (emphasis in original)); "***[t]hird***,

27  plaintiff's own allegations make clear that it ***cannot*** plead the allegedly omitted information was

28  material" (*id.* at 17 (emphasis in original)); ***[f]ourth***, scienter is lacking" (*id.* (emphasis in original));

1   and *[f]ifth*, plaintiff does not plead loss causation" (*id.* (emphasis in original)).  The curiousness, and

2   spuriousness, of these assertions is all the more so in light of the parties' agreement that related

3   parties are those "'that can significantly influence the management or operating policies of the

4   transacting parties or that have an ownership interest in one of the transacting parties and can

5   significantly influence the other.'"  Dkt. No. 139 at 16 n.7; ¶43 n.1.

6          The Complaint alleges several specific facts to support the allegation that LendingClub and

7   Cirrix were related parties because LendingClub had significant influence over Cirrix and vice versa

8   (¶43):

9   •   Cirrix was formed in 2012 for the sole purpose of purchasing loans from
10      LendingClub, with which it had a working partnership.  ¶39.

11  •   Cirrix had access to LendingClub's Board and received inside information regarding
       LendingClub's credit performance and underwriting.  *Id.*

12  •   Cirrix was the only LendingClub loan investor that had access to all of the
13      Company's loan programs, including private, public and small business loans.  ¶42.

14  •   By the time of the IPO, LendingClub loans represented 100% of Cirrix's assets, and
15      Cirrix's loan purchases drove LendingClub's pre-IPO results, representing 20% of
       LendingClub's critical loan-origination growth and nearly 5% of LendingClub's total
16      sales of whole loans in the last quarter before the IPO.  ¶43.

17  •   Laplanche and Mack owned 12% of Cirrix by the end of 2015.  *Id.*

18  •   From inception, LendingClub also provided Cirrix with a credit-support agreement
19      under which LendingClub assumed millions of dollars of risk for the loans it sold to
       Cirrix (and itself).  *Id.*

20  •   By March 2015, Cirrix had purchased nearly $200 million in loans from
21      LendingClub.  During 2015, Cirrix purchased an additional $139.6 million of whole
       loans and $34.9 million of interests in whole loans from LendingClub.  ¶62.

22  •   In fiscal 2015, LendingClub's fees from Cirrix amounted to 5% of its reported
23      growth in servicing fees, and enabled LendingClub to double its EPS growth rate and
       slash its EPS losses by 50%.  ¶64.

24

25  •   Due to its declining returns, however, by early 2016, Cirrix required an additional
26      capital infusion in order to continue purchasing LendingClub loans.  Laplanche and
       Mack infused Cirrix with cash, as Laplanche had secretly entered into arrangements
27      whereby he could raise cash by using his LendingClub shares as collateral.  Mack
       also provided Cirrix with an infusion so it could continue to purchase more
28      LendingClub loans and avoid a total collapse in LendingClub's marketplace.  ¶63.

1
2
3

- In first quarter 2016, Cirrix purchased $114.5 million in LendingClub whole loans, which was equal to 6% of LendingClub's whole loan originations. That same quarter, Cirrix's loan purchases amounted to 67% of LendingClub's loan-origination growth. ¶65.

4
5

- Laplanche and Mack concealed their personal interests in Cirrix when Laplanche convinced LendingClub to invest in it. ¶106.

6
7
8
9
10

Disagreements over whether a jury should conclude that LendingClub and Cirrix were related parties based on these facts are a natural and healthy part of our adversarial process, but defendants' disingenuous denial that the Complaint contains such allegations is not. These allegations, which are deemed true at this stage, confirm that the Complaint's allegations support an inference that LendingClub and Cirrix could significantly influence the management of one another, and, therefore, were related parties.[13]

11
12
13
14
15
16
17
18
19
20
21
22
23

As for the materiality of this undisclosed related-party relationship, its significant impact on LendingClub's performance is equally apparent. Both the Supreme Court and this Court have recognized there are no bright-line numerical tests for materiality (*Matrixx*, 563 U.S. at 30), as that determination is inherently contextual, but information that would raise a red flag that top management is potentially corrupt is material on that basis alone. *Sipex*, 2005 WL 3096178, at *1. This concealed conflict of interest certainly qualifies as a red flag. Moreover, other courts have recognized the materiality of related-party transactions amounting to 31% and 20% of a company's sales. *Cheung v. Keyuan Petrochemicals, Inc.*, No. CV 11-9495 PSG (JCGx), 2012 WL 5834894, at *8 (C.D. Cal. Nov. 1, 2012). Here, the Cirrix transactions were of a similar magnitude vis-à-vis LendingClub's EPS growth rate (doubling it) and its loan-origination growth (up to 67%). In fact, trend or growth metrics are often the most important financial metrics to companies and investors. *See, e.g.*, *McDonald v. Compellent Techs., Inc.*, 805 F. Supp. 2d 725, 735 (D. Minn. 2011); *In re*

24
25
26
27
28

---

[13]   Having ignored these particular allegations, the 10(b) Defendants' argument that the Cirrix allegations lack particularity is not credible. Dkt. No. 139 at 16. The Complaint here, including these detailed allegations, is nothing like the complaint in *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016), where there was "no reference to facts that would support the allegation that [the defendant company's President] continued to control [the alleged related party]. In fact, the public documents in th[e] case show[ed] that [the defendant company's President] divested any ownership interest he had in [the alleged related party] when he joined [the defendant company]." *Id.* at *6.

1  *Aetna, Inc. Sec. Litig.*, No. 07-cv-4451, 2009 WL 1619636, at *16 (E.D. Pa. June 9, 2009), *aff'd in*

2  *part*, 617 F.3d 272 (3d Cir. 2010).  This would certainly be true for LendingClub, whose success

3  depended on its ability to ***grow*** its new marketplace.[14]

4          Regarding Laplanche's and Dolan's scienter, given the significant impact Cirrix had on

5  LendingClub's performance, LendingClub's credit-support agreement with Cirrix, and Cirrix's

6  access to LendingClub's Board and inside information, "it would be 'absurd' to suggest that

7  [LendingClub's CEO and CFO] w[ere] without knowledge of the matter." *S. Ferry*, 542 F.3d at 786

8  (citing *Berson*, 527 F.3d at 988).  The contention that Laplanche lacked awareness of Cirrix's

9  relationship to LendingClub transcends absurdity: he was also a part owner of Cirrix and he

10 concealed his ownership interest from other LendingClub directors when he convinced LendingClub

11 to invest in Cirrix.  Nevertheless, the Court need not, and should not, assess Laplanche and Dolan's

12 scienter in a vacuum, but rather in light of all the facts, including the abundant evidence of their

13 scienter regarding LendingClub's materially weak internal controls.  *Tellabs*, 551 U.S. at 322-23

14 ("whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

15 whether any individual allegation, scrutinized in isolation, meets that standard") (emphasis in

16 original).

17          Last, the 10(b) Defendants' entire causation argument rests on the contention that

18 LendingClub's corrective disclosures did not correct its loan originations or other financial data.

19 Dkt. No. 139 at 17.  This argument misses the entire point regarding related-party transactions,

20 which is not that such transactions are numerically inaccurate, but that the numbers themselves are

---

21 [14]  Laplanche disputes that these allegations render materially false or misleading his statement
22 regarding LendingClub's "very diverse investor database" and its "big competitive advantage over
   some of the newer platforms that . . . [have] considerable concentration in investor base."  Dkt. No.
23 142 at 7; *see* ¶88.  It is unremarkable, however, to infer that relying on one investor (especially an
   undisclosed related party) for half of its EPS growth rate, and two-thirds of its loan-origination
24 growth, undermines Laplanche's reassurances that the Company does not rely on any one investor
   for it to continue flourishing or that the Company is able "to manage the flow of supply and
25 demand" (¶88) without rigging the deck.  Laplanche's request for the Court to judicially notice and
   consider the entirety of the third quarter 2015 earnings call transcript severely hurts his cause
26 because it only makes clearer that the statement (¶88) was made for the very purpose of reassuring
   shareholders that the Company has so much demand from a diverse investor base that any single one
27 investor can be "replace[d] . . . essentially overnight."  Dkt. No. 142 at 7-8; *see* Dkt. No. 143-1 at 10
   (Laplanche made statement in response to analyst's request to "speak to the relevance or lack thereof
28 of any individual lender on the platform").

highly misleading because they are not product of regular arms-length transactions and are more easily manipulated (*e.g.*, so as to pull or push sales into a desired reporting period).  After all, cases involving concealed related-party transactions typically do not involve "restatements" of financial results attributable to them, but rather acknowledgments of their existence, which implicitly places an asterisk on a company's performance.  *See, e.g.*, *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1225 (N.D. Cal. 2015); *Cheung*, 2012 WL 5834894, at *8-*9; *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1118-19 (C.D. Cal. 2012).  The revelation that transactions with a related party significantly impacted LendingClub's performance is all the "restatement" the law requires, and another serious blow to the credibility of LendingClub's management and marketplace.[15]

Regarding LendingClub's concealed credit support agreement with Cirrix, the 10(b) Defendants merely repeat their §11 arguments and append to them a rather bizarre two-sentence argument that no one at LendingClub "knew that unspecified provisions of the 'credit support agreement' rendered specific statements false when they were made."  Dkt. No. 139 at 18.  Taking a holistic view of all the facts, as required, and accepting as true all of Lead Plaintiff's factual allegations, as required, "it would be 'absurd' to suggest that [LendingClub's CEO and CFO] w[ere] without knowledge of th[is] matter."  *S. Ferry*, 542 F.3d at 786 (citing *Berson*, 527 F.3d at 988).  LendingClub's entire business was its lending marketplace, so its survival depended on the integrity of its marketplace (and thus the people running it), as it acknowledged repeatedly:

- "As the operator of a two-sided marketplace, Lending Club should remain neutral with respect to both sides of its marketplace (investors and borrowers).  Requiring Lending Club to hold loans or pieces of loans on its balance sheet could cause Lending Club's interests to be inappropriately aligned with the investors' interests, to the detriment of borrowers."  Renaud Laplanche, LendingClub's Letter to U.S. Treasury in Response to Request for Information, September 30, 2015.  ¶32.

- "If I had to single out one thing I am the most proud of over the last six years, it has been the decision to constantly be the good guys of banking, how we have always

---

[15]    Accordingly, *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 986 (N.D. Cal. 2007) (*see* Dkt. No. 139 at 15), is inapt because LendingClub's results, including the loan volume of its marketplace, were not false as much as they were ***misleading*** due to the undisclosed (and unsustainable) circumstances under which LendingClub "achieved" these results.

1    decided in favor of our customers."   Renaud Laplanche, Interview with Simon
2    Cunningham of LendingMemo, November 20, 2013.  ¶31.

3    • "[I]t's all about reputation and track record.  So we don't directly take credit risks."
     Renaud Laplanche, JPMorgan Global Technology, Media and Telecom Conference,
4    May 20, 2015.  ¶32.

5    • "[I]n financial services, there's really no short cuts.  It's not like some other
     consumer products where you can really connect the dots between awareness and
6    sales.  With financial services, reputation and trust is as important as just awareness."
     Renaud Laplanche, Q3 2015 LendingClub Earnings Call, October 29, 2015.  ¶87.
7

8        If Apple, Inc.'s CEO and CFO cooked the books for a couple quarters, investors would incur

9    some harm, but the company would still be the manufacturer of the world's most popular and

10   profitable smartphone.  Life would go on.  But if LendingClub's marketplace was corrupt or readily

11   corruptible?  These are existential threats.  As such, it is simply implausible that LendingClub's CFO

12   would not be aware of an agreement in which LendingClub compromised the integrity of its

13   marketplace by favoring Cirrix with an agreement under which LendingClub would assume millions

14   of dollars of Cirrix's credit risk.  How could LendingClub's CEO not be aware of this exposure,

15   when he was also a part owner of the beneficiary of this agreement?  How could either of

16   LendingClub's top executives not be aware of such a significant aspect of a relationship whose

17   initiation one of LendingClub's own Directors (defendant Daniel Ciporin) acknowledged was a

18   pivotal moment for LendingClub's business?  The 10(b) Defendants' demand for the actual dollar

19   amounts of exposure is another example of them missing the point.  Yes, there was undisclosed

20   exposure to financial losses that contradicted LendingClub's statements, but the more menacing risk

21   was the undisclosed corruption of its marketplace, as confirmed when LendingClub revealed the

22   potential corruption of its marketplace and management: Its May 9, 2016 disclosures had eroded

23   lender confidence to the point that LendingClub would have to offer inducements and/or use an even

24   "greater amount of its own capital to purchase loans on its own platform."  ¶112.

25       **d.    Corrupt Loan-Approval and Packaging Processes**

26       Similarly, as set forth above, LendingClub's loan-approval process was fundamentally

27   flawed at the time of, and in anticipation of, its IPO.  These deficiencies were aggravated after the

28

1  IPO, and in response, the 10(b) Defendants once again deny the existence of the Complaint's

2  detailed allegations:

- When a borrower fell behind on making loan payments, it was LendingClub's practice, as carried out by the Payment Solicitors department, to offer the borrower a new loan in order to bring current the prior delinquent loan. This enabled LendingClub to ensure borrowers could be reported as current and that loans would not be charged off. At the same time, borrowers were obligated for a longer period and with larger loan payments. In addition, the Company issued these new loans to borrowers based on borrowers' initial or original credit scores, even though, given the delinquency, the Company should have issued the new loans under terms that reflected more-recent and lower credit scores. ¶48(b).

- LendingClub had implemented a practice of inducing borrowers to split loan applications into two separate requests when a borrower failed to qualify for the original loan amount. LendingClub's practice of splitting loans hid the default and credit risk associated with these loans. One analyst estimated that as many as 30,000 loans originated on the platform were the result of this splitting practice. ¶48(d).

- LendingClub's underwriting practices were inadequate to ensure that the Company's loans conformed to its customers' stated criteria. ¶50(a).

- LendingClub's inadequate internal controls invited and allowed its management to alter application data, including backdating loans and misrepresenting loans to subprime borrowers as being loans to prime borrowers. ¶50(c).

- "We continue to be very deliberate about our growth. Over the last three or four years we have been in this great position where we have not been either supply or demand constrained." Renaud Laplanche, Interview with Simon Cunningham of LendingMemo, March 10, 2015. ¶34.

- "While we have continued to more than double originations and revenue year-over-year, we have been disciplined about growing only as fast as we believe is responsible and compatible with solid risk management and a great user experience that contribute to building and maintaining our brand and our reputation." Renaud Laplanche, Q1 2015 LendingClub Earnings Call, May 5, 2015. ¶75.

- "At LendingClub, we've almost invented prudent growth. Over the last few years, we really haven't grown as fast as we could. We've grown in a very deliberate way. In a way that we believe we can control and helps focus a lot of attention on security, on risk management, on compliance controls, all the things that could break when one grows too fast." Renaud Laplanche, Keynote speech entitled "From Sapling to Ironwood, Marketplace Lending's Next Phase of Growth" at LendIt USA 2016 Conference, April 11, 2016. ¶34.

1   Rather than acknowledge the many ways LendingClub had corrupted its own marketplace,

2   defendants literally ignore them.  Dkt. No. 139 at 18-19.[16]

3        For defendants, there is no escaping the similarity between their actions and those at issue in

4   *Todd*, where the Ninth Circuit held that "a rational trier of fact could find that [the defendant] misled

5   investors by publicly describing Gateway's growth as 'accelerated' without simultaneously

6   disclosing the unusual nature of [two one-time] transactions."  642 F.3d at 1221.  Likewise, in *Fecht*,

7   the Ninth Circuit held that the defendants' statement predicting "'overall improvement in the sales

8   trend due [in part] to the large number (24) of new Price Clubs' . . . could also reasonably be

9   considered misleading when, as alleged by plaintiffs, most of the new stores were actually losing

10  money." 70 F.3d at 1081.  Here, the 10(b) Defendants' descriptions of LendingClub's marketplace

11  neutrality and disciplined growth gave investors no reason to suspect, let alone realize, that

12  LendingClub had used a related party to not just pad, but drive, its performance, approved tens of

13  thousands of compromised loans, and was increasingly approving liar and subprime loans.

14  LendingClub, therefore, "misled investors into believing that [LendingClub] was experiencing a

15  higher rate of [arms-length and responsible growth] based on its public business model than it was

16  achieving in fact."  *Todd*, 642 F.3d at 1222.  At a minimum, the facts the 10(b) Defendants

17  concealed and misrepresented would have enabled investors to assess for themselves the reliability

18  of LendingClub's reported results and the integrity of its marketplace.  Therefore, cases such as *Todd*

19  and *Fecht* preclude dismissal of Lead Plaintiff's allegations related to Cirrix and LendingClub's

20  corrupt loan-approval practices.

21               **e.      LCA's Deception and GAAP Violation**

22        LCA was one of LendingClub's in-house investment funds, which allowed outside investors

23  to invest in pooled loans acquired in LendingClub's marketplace.  ¶61.  Laplanche, Dolan, and

24  LendingClub's General Counsel comprised LCA's Investment Policy Committee and were

25  responsible for managing LCA's portfolio of loans and verifying conformity with its investment

26  guidelines.  ¶122.  Under their guidance and direction, LendingClub used LCA to purchase expiring

27  ─────────────────────
    [16]   For his part, Laplanche does not ignore all of these statements.  As explained below, he

28  erroneously asserts that the statements in ¶¶34 and 75 are mere puffery.

1    marketplace loans, even though doing so was outside LCA's stated guidelines.  *Id.*  Also under their

2    guidance, LCA violated GAAP so significantly with respect to its valuation of assets, LendingClub

3    had to reimburse LCA's limited partners $1 million.  *Cf. Sipex*, 2005 WL 3096178, at *1 ("Many

4    decades of experience teach that sham transactions like the one alleged are not done for the fun of it-

5    they are done to cook the books."); *McIntire* v. *China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d

6    105, 126 (S.D.N.Y. 2013) ("'[C]ourts have recognized that accounting manipulations involving

7    premature revenue recognition . . . are especially indicative of conscious misbehavior since such

8    violations do not commonly occur inadvertently, but instead suggest a conscious decision to

9    improperly recognize revenue.'"); *Daou*, 411 F.3d at 1020, 1022 ("significant violations of GAAP

10   standards can provide evidence of scienter").  As part of the Court's holistic consideration,

11   Laplanche and Dolan's central role in defrauding LCA's investors weighs heavily in favor of

12   scienter.

### f.      DOJ and SEC Investigations

14          Defendants continue to demand piecemeal, rather than holistic, consideration of Lead

15   Plaintiff's scienter allegations when they claim that the DOJ's criminal investigation and the SEC's

16   investigation do not support "'any inferences of wrongdoing or fraudulent scienter.'"  Dkt. No. 139

17   at 25.  Defendants are wrong.  In fact, they cite *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d

18   1142 (C.D. Cal. 2007), but fail to acknowledge that in this case "the SEC letter specifically stated

19   that the request for documents 'should not be construed as an indication by the SEC or its staff of

20   any violations of law have occurred.'"  *Id.* at 1162.  There is no indication of such a disclaimer here

21   as to either the DOJ or SEC investigations – at least not at the pleading stage, if ever.  Courts take a

22   much more pragmatic approach and recognize that under circumstances in which there is other

23   evidence of wrongdoing, as is the situation here, government investigations are relevant to analyzing

24   scienter.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("Certainly,

25   courts have considered a governmental investigation as one piece of the puzzle when taking a

26   'holistic' view of the purported facts as they relate to scienter.  The Court agrees that while the

27   existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling

28   inference of scienter, it may be considered by the Court as part of its analysis."); *In re Bristol Myers*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
CONSOLIDATED COMPLAINT - 3:16-cv-02627-WHA                                          - 37 -

1    *Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (including an investigation by the

2    DOJ as one of the elements in the scienter analysis).  There is simply way too much smoke here to

3    deny the strong inference of scienter, and the government investigations contribute to this inference.

4    In other words, "the government investigation can be seen as one more piece of the puzzle, a series

5    of circumstances that add up to a strong inference of scienter."  *Washtenaw Cty. Emps. Ret. Sys. v.*

6    *Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014).

7               **3.      Stock-Ownership Arguments**

8           The 10(b) Defendants' lone argument to negate the overwhelming evidence of scienter

9    concerns Laplanche and Dolan's stock ownership.  In short, the 10(b) Defendants contend that if

10   Laplanche and Dolan had believed LendingClub's share price was artificially inflated, they would

11   have dumped their shares.  Therefore, because Laplanche and Dolan did not dump their shares, they

12   could not have been aware that LendingClub's share price was artificially inflated.  There are several

13   fundamental flaws in this faulty syllogism.

14          First, it assumes that so-called white-collar criminals expect to get caught, which we know is

15   untrue.  *See, e.g.*, *United States v. Alphas*, 785 F.3d 775, 783 (1st Cir. 2015) ("Fraudsters do not

16   expect to be found out but, rather, expect to reap the benefits of their contrivance."); *Kyung Cho v.*

17   *UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012) ("courts have refused to

18   hold that stock purchases were inconsistent with fraud where the defendants could have believed

19   they could have continued to hide the fraud").  Because Laplanche and Dolan thought they could

20   "get away with it," there was no reason for them to sell their shares, the price of which they likely

21   expected to be able to inflate still further.

22          Second, it directly contradicts the allegations of the Complaint, which must be accepted as

23   true.  Selling their shares would have trigged precisely the kind of investor scrutiny Laplanche was

24   trying to avoid (¶104) and it would have undermined his inducement of the Board to approve a

25   $150 million stock buyback program, which was intended to prop up the trading price of

26   LendingClub stock to avoid such scrutiny (*id.*) and to avoid him having to put up more collateral for

27   a loan he had secured with a pledge of his shares (¶119).

28

1    Third, Laplanche could not sell his shares that he had pledged as collateral for a loan. *See*

2    ¶119.

3    Fourth, Dolan **did** sell 135,000 shares for nearly $2 million.  ¶123.

4    And fifth, because LendingClub shares traded in an efficient market, the market could have

5    swiftly reacted to the news of Laplanche and Dolan trying to sell theirs and potentially removing the

6    inflation before they could cash in.  ¶129; *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 372 (S.D.N.Y.

7    2016) ("it is difficult for the Court to accept that, in a reasonably efficient market, a company's stock

8    price would not decline upon reports [of bad news, *e.g.*,] that it faces billions of dollars in losses").

9    Considering the foregoing facts, and the overwhelming direct evidence of Laplanche's

10   scienter, his lack of stock sales offers no circumstantial evidence to negate his scienter.  The

11   evidence of Dolan's scienter is not as overwhelming as with Laplanche, but it is still strong and

12   certainly not **undermined** by the reality that she did, in fact, sell 135,000 shares for nearly

13   $2 million.

14   **D.    Arguments Only Laplanche Asserts**

15   **1.    The Complaint Is Clear and Concise**

16   Laplanche argues that the Complaint is unreasonable because eight of thirteen paragraphs

17   that allege false statements attributed to him refer back to the same two paragraphs to explain why

18   they are false.  Dkt. No. 142 at 4-6.  Despite accusing Lead Plaintiff of puzzle-pleading for providing

19   a clearly cross-referenced explanation as to why his statements were false and misleading, Laplanche

20   provides no explanation whatsoever as to why such a structure is improper.  This is because the

21   Complaint's pleading style is clear and proper, which is why LendingClub, its Directors, and Dolan

22   do not complain of any confusion.  In fact, even if the Complaint was difficult to understand, which

23   it is not, its use of clear cross-references would not render it inadequate.  *See, e.g.*, *In re Tyco Int'l,*

24   *Ltd.*, No. 02-266-B, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004) ("After identifying each

25   specific misleading statement, the complaint refers readers to other sections that list multiple reasons

26   why the statement is misleading.  This is a reasonable way to address a complicated securities fraud

27   case.   It does not violate the PSLRA merely because it makes the complaint difficult to

28   understand."); *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 23 n.28 (S.D.N.Y. 2004) ("The fact

1   that these allegations [of falsity] refer back to earlier paragraphs of the complaint for factual support

2   does not render them insufficient.").

3         Laplanche asserts that is "impossible to discern the basis for Plaintiff's allegations of falsity."

4   Dkt. No. 142 at 5.  Not only is it quite possible to discern the bases for the allegations of falsity, they

5   are virtually unavoidable.  For example, the statements in ¶32 in which "LendingClub emphasized

6   that a key feature of its business model was that the Company did not assume credit risk or use its

7   own capital" are misleading because "LendingClub also provided Cirrix with a credit-support

8   agreement *under which LendingClub assumed millions of dollars of risk for the loans it sold to*

9   *Cirrix* (and itself)" (¶43); and "[t]he undisclosed relationship and transactions with Cirrix, including

10   LendingClub's increasing reliance on Cirrix, *rendered the Registration Statement false and*

11   *misleading with respect to LendingClub's . . . assumption of credit risk*" (¶44).  Similarly, "[t]he

12   2014 Form 10-K assured investors that the Company did not assume credit risk" (¶68), which was

13   misleading because "contrary to its stated business model, LendingClub assumed material credit and

14   liquidity risks, including tens of millions of dollars in a credit support agreement with Cirrix"

15   (¶73(c)).  If the Complaint is a puzzle, "it is meant for a child and can be assembled readily."  *In re*

16   *Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 416 (D.N.J. 2002).

17         **2.**      **The PSLRA's Safe Harbor Is Inapplicable**

18         Laplanche argues that the statements in his IPO Letter are "protected under the first prong of

19   the PSLRA's safe-harbor."  Dkt. No. 142 at 8-9 (citing ¶47).  The problem for Laplanche is that his

20   entire argument is limited to the first 23 words of his three-paragraph statement, and these 23 words

21   are not among the two portions of his statement that the Complaint highlights.  *Compare* Dkt. No.

22   142 at 9 *with* ¶47.  These highlighted statements are plainly not forward-looking:

23         Instead, we earn [present tense] the trust of our customers by offering *maximum*

24   *transparency into our products'* terms and performance.

           *    *    *

25         We have established [past tense] investor confidence by demonstrating the

26   effectiveness of our risk ranking technology, as well as through the accuracy,

      *transparency and granularity of our reporting*.

27

28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
CONSOLIDATED COMPLAINT - 3:16-cv-02627-WHA

¶47 (emphasis in Complaint).  In any event, Laplanche's bigger problem is that he is wrong as a matter of law inasmuch as "[u]nder both [the Securities and Exchange] Acts, however, the safe harbor does not apply to forward-looking statements "'made in connection with an initial public offering.'"  *In re Musicmaker.com Sec. Litig.*, No. CV00-2018 CAS(MANX), 2001 WL 34062431, at *2 (C.D. Cal. June 4, 2001) (quoting 15 U.S.C. §§77z-2(b)(2)(D), 78u-5(b)(2)(D)).

### 3.    None of the Alleged Statements Are Non-Actionable Puffery

Laplanche argues that post-IPO alleged false statements concerning the Company's reputation and growth strategy are non-actionable puffery. Dkt. No. 142 at 10-11 (citing ¶¶31, 34, 75, 87, 93).  This argument fails because

> the Court may not assess the statements listed in the [Complaint] in a vacuum [as Laplanche does], "plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery," but rather will examine the entire statement and its circumstances to determine if it is actionable.

*Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").  The Complaint, when read as a whole, clearly alleges that LendingClub's entire business model was based on the integrity of its management and the marketplace that they oversaw, including LendingClub's market neutrality and conservative growth strategies.  *See, e.g.*, ¶¶2-5, 32-33, 73, 92 (which statements Laplanche does not challenge even though they provide the context for the statements he does challenge).  *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements regarding transparency and integrity are not "mere puffery" because the "statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, [and therefore] a reasonable investor could rely on them as reflective of the true state of affairs at the Company").  In fact, the very statements Laplanche claims are puffery explain why they would be material to investors and alter the total mix of information in a way that reflected favorably on LendingClub.  *See* ¶¶31, 87 (the financial services industry puts a premium on reputation and trust); ¶34 (deliberate growth "control[s] and helps focus a lot of attention on security, on risk management, on compliance

1    controls, all the things that could break when one grows too fast"); ¶75 (touting LendingClub's

2    ability to double loan originations and revenue while being "disciplined" and maintaining "solid risk

3    management"); ¶93 (the Company's transparency serves to prevent it from assuming credit risk).

4    **E.      Leave to Amend**

5       Lead Plaintiff maintains the sufficiency of the Complaint, but if the Court finds otherwise,

6   Lead Plaintiff requests leave to amend. *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d

7   1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "'with extreme liberality,'"

8   especially in securities fraud cases).

9   **IV.      CONCLUSION**

10      For the reasons stated above, Lead Plaintiff respectfully requests that the Court deny

11   defendants' motions to dismiss the Complaint.

12   DATED:  February 10, 2017         Respectfully submitted,

13                          ROBBINS GELLER RUDMAN
                            & DOWD LLP

14                          DARREN J. ROBBINS
                         JASON A. FORGE

15                          SCOTT H. SAHAM
                         MICHAEL ALBERT

16                          CARISSA J. DOLAN

17

18                                 *s/ JASON A. FORGE*
                              JASON A. FORGE

19

20                          655 West Broadway, Suite 1900
                         San Diego, CA  92101

21                          Telephone:  619/231-1058
                         619/231-7423 (fax)

22                          ROBBINS GELLER RUDMAN
                            & DOWD LLP

23                          SHAWN A. WILLIAMS
                         Post Montgomery Center

24                          One Montgomery Street, Suite 1800
                         San Francisco, CA  94104

25                          Telephone:  415/288-4545
                         415/288-4534 (fax)

26

27                          Lead Counsel for Lead Plaintiff

28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
CONSOLIDATED COMPLAINT - 3:16-cv-02627-WHA        - 42

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 10, 2017.

<u>    s/ JASON A. FORGE                       </u>
JASON A. FORGE

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  JForge@rgrdlaw.com

1233181_2

**Mailing Information for a Case 3:16-cv-02627-WHA In re LENDINGCLUB SECURITIES LITIGATION**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Marie Caroline Bafus**
  mbafus@fenwick.com,vsheehan@fenwick.com,pnichols@fenwick.com,dsheppard@fenwick.com

- **Carly Lee Bittman**
  cbittman@fenwick.com

- **Lee S. E. Brand**
  lee.brand@stblaw.com,nanderson@stblaw.com

- **Nair Diana Chang**
  dchang@fenwick.com

- **Brittany Nicole DeJong**
  dejong@whafh.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com,scotts@rgrdlaw.com,malbert@rgrdlaw.com

- **Robert J. Gralewski , Jr**
  bgralewski@kmllp.com,fbrizuela@kmllp.com

- **Richard Martin Heimann**
  rheimann@lchb.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.com

- **Sebastian Elan Kaplan**
  skaplan@fenwick.com,sellenburg@fenwick.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com

- **Robert John Liubicic**
  RLIUBICIC@MILBANK.COM,SRothenberg@milbank.com,AFee@milbank.com

- **Marisa C. Livesay**
  livesay@whafh.com,boyles@whafh.com

- **Betsy Carol Manifold**
  manifold@whafh.com,tuazon@whafh.com,cabrera@whafh.com,boyles@whafh.com,loritsch@whafh.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Kevin Peter Muck**
  kmuck@fenwick.com,kayoung@fenwick.com,lkelleybourne@fenwick.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,james.napier@lacity.org,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Blair Allen Nicholas**
  blairn@blbglaw.com,denab@blbglaw.com,ashley.lee@blbglaw.com,Scott.Foglietta@blbglaw.com,AdamW@blbglaw.com,amyn@blbglaw.com,lisa.napoleon@blbglaw

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Thomas Harry Peters**
  thom.peters@lacity.org

- **Jay L. Pomerantz**
  jpomerantz@fenwick.com,slim@fenwick.com

- **Rachele R. Rickert**
  rickert@whafh.com,tuazon@whafh.com,cabrera@whafh.com,boyles@whafh.com,loritsch@whafh.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Sarah L. Rothenberg**
  srothenberg@milbank.com

- **Scott H. Saham**
  scotts@rgrdlaw.com

- **Simona Gurevich Strauss**
  sstrauss@stblaw.com,lsoboleva@stblaw.com,sblake@stblaw.com,jason.herrera@stblaw.com

- **Jacob Allen Walker**
  jake@blockesq.com,pacer-blockleviton-9062@ecf.pacerpro.com

- **Lesley Elizabeth Weaver**
  Lweaver@bfalaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Jonathan K. Youngwood**
  ManagingClerk@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`