1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
          – and –
6   DARREN J. ROBBINS (168593)
    JASON A. FORGE (181542)
7   SCOTT H. SAHAM (188355)
    MICHAEL ALBERT (301120)
8   CARISSA J. DOLAN (303887)
    655 West Broadway, Suite 1900
9   San Diego, CA  92101
    Telephone:  619/231-1058
10  619/231-7423 (fax)
    darrenr@rgrdlaw.com
11  jforge@rgrdlaw.com
    scotts@rgrdlaw.com
12  malbert@rgrdlaw.com
    cdolan@rgrdlaw.com
13
    Lead Counsel for Lead Plaintiff Water and Power Employees'
14  Retirement, Disability and Death Plan of the City of Los Angeles

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17  In re LENDINGCLUB SECURITIES          )   Case No. 3:16-cv-02627-WHA
    LITIGATION                            )
18  _____   )   CLASS ACTION
                                          )
19  This Document Relates To:             )   AMENDED CONSOLIDATED
                                          )   COMPLAINT FOR VIOLATION OF THE
20         ALL ACTIONS.                   )   FEDERAL SECURITIES LAWS
                                          )
21  _____   )   DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28

1   Lead Plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the

2   City of Los Angeles ("Lead Plaintiff"), individually and on behalf of all others similarly situated,

3   alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's

4   own acts, and upon information and belief as to all other matters based on the investigation

5   conducted by and through Lead Plaintiff's attorneys, which included, among other things, a

6   review of LendingClub Corporation's ("LendingClub" or the "Company") U.S. Securities and

7   Exchange Commission ("SEC") filings, Company releases, conference calls, public statements

8   issued by defendants, media reports, analyst reports, industry reports, and consultation with

9   persons familiar with LendingClub's business.  Lead Plaintiff believes substantial additional

10   evidentiary support will likely exist for the allegations set forth herein after a reasonable

11   opportunity for discovery.

12                              **INTRODUCTION**

13   1.   This is a securities class action on behalf of Lead Plaintiff and all purchasers of

14   LendingClub common stock between December 11, 2014 and May 6, 2016, inclusive (the "Class

15   Period"), including those who purchased LendingClub common stock traceable to the

16   registration statement and prospectus incorporated therein, issued in connection with the

17   Company's December 11, 2014 initial public stock offering ("IPO") (collectively, the

18   "Registration Statement").  This action asserts violations of the Securities Act of 1933 (the "1933

19   Act") and the Securities Exchange Act of 1934 (the "1934 Act"), as well as SEC Rule 10b-5

20   promulgated thereunder.

21   2.   With public skepticism of banks at a generational high, LendingClub portrayed

22   itself as a peer-to-peer ("P2P") disruptor, just as Uber and Airbnb were to the taxi and hotel

23   industries, respectively.  Its founder and Chief Executive Officer ("CEO") Renaud Laplanche

24   was the face and voice of this revolution: "We really believe we can transform the entire banking

25   industry and make it more consumer friendly and more transparent and more cost efficient."

26   Like other P2P leaders, LendingClub and Laplanche represented LendingClub as a ***marketplace***

27   where everyone would win: depositors (lenders) would get better returns, borrowers would get

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                                    - 1 -

1   better rates, and LendingClub would profit from matchmaking fees rather than by "investing our

2   own balance sheet and tak[ing] balance sheet risks in our loans."

3          3.     It was a great story.  If only it were true.  As one of LendingClub's original

4   directors, former U.S. Treasury Secretary Dr. Lawrence H. Summers, is fond of saying,

5   "Confidence, trust and transparency are key to sustainable growth."  LendingClub faked each of

6   these.  Defendant Laplanche brought in industry luminaries such as Dr. Summers and former

7   Morgan Stanley CEO John J. Mack to serve as members of the LendingClub Board of Directors

8   (the "Board"), to create an aura of legitimacy.  But beneath this veneer, LendingClub lacked

9   even the most basic internal controls, and this allowed its management to manipulate its

10  performance by engaging in self-dealing, altering loan applications, and misleading institutional

11  investors.

12         4.     Based on LendingClub's representations concerning its transparency, marketplace

13  neutrality, and lack of credit risk, LendingClub raised over $1 billion from investors in its

14  December 11, 2014 IPO, selling 66.7 million shares at $15 each, and its stock price climbed to

15  almost $28 per share following the IPO.

16         5.     In 2016, however, LendingClub was forced to admit that much of its success had

17  been a mirage: "material weaknesses in internal control over financial reporting" had manifested

18  in undisclosed self-dealing, sales of non-conforming loans, backdated loan applications, and such

19  a damaged reputation, that after years of proclaiming itself to be a neutral market maker that was

20  not taking on credit risk, LendingClub openly acknowledged that it had become its own best

21  prospect for new business.  This was the equivalent of Airbnb boasting about the soaring

22  popularity of its P2P rental market and then having to use company assets to buy hotels in order

23  to pad rental volume.  At the center of all this wrongdoing was Laplanche, LendingClub's

24  founder, Chairman, and CEO, as well as multiple "senior managers," all of whom were

25  terminated or forced to resign.  Because LendingClub's defective internal controls had always

26  been a part of its foundation, it was also forced to amend its Annual Report on Form 10-K for

27  2015 so as to reveal the existence of these material weaknesses, which rendered all of its prior

28  SEC filings wholly unreliable.  On this news, LendingClub's share price dropped 35% in a single

1    day, and closed at $4.10 per share the next day – an 86% drop from where LendingClub stock

2    had traded during the week of its IPO.

3        6.    The full extent of LendingClub's exploitation of its deficient internal controls is

4    not yet known, and the only assurance it has to offer regarding all of its reported results since

5    going public in December 2014 is that "there is a reasonable possibility that a material

6    misstatement of the company's annual [and] interim financial statements [was] not . . . prevented

7    or detected on a timely basis."  What this means is that shareholders do not know what they

8    bought or what they own, which explains why the vast majority of LendingClub's post-IPO

9    market value has been wiped out.

10                           **JURISDICTION AND VENUE**

11        7.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act and §22 of

12    the 1933 Act.  The claims asserted herein arise under §10(b) and §20(a) of the 1934 Act (15

13    U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) and

14    §11 and §15 of the 1933 Act (15 U.S.C. §77k and §77o).

15        8.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the

16    1933 Act as certain of the defendants reside, are headquartered, and/or maintain operations, in

17    this District.  Defendants' wrongful acts also arose in and emanated from, in part, this District,

18    including the dissemination of materially misleading statements into this District, the purchase of

19    the Company's common stock by members of the Class (defined herein) who reside in this

20    District, and the sale of the Company's common stock in this District by certain of the

21    Underwriter Defendants (defined herein).

22                                  **PARTIES**

23    **Lead Plaintiff**

24        9.    Lead Plaintiff purchased or acquired LendingClub common stock as described in

25    the certification previously submitted to the Court, and incorporated herein, and was damaged

26    thereby.

27        10.    The Los Angeles Department of Water and Power ("LADWP"), created by the

28    Los Angeles City Charter ("Charter"), serves the water and electricity needs of the City of Los

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                    - 3 -

1  Angeles.  Lead Plaintiff was created within LADWP by the Charter and is designed to promote

2  financial security for LADWP employees and help them prepare for their future through

3  programs that provide income at retirement and during times of disability; death benefits for

4  beneficiaries; and continuation of benefits for eligible survivors.

5  **Defendants**

6      **LendingClub**

7      11.    Defendant LendingClub is a Delaware corporation headquartered in San

8  Francisco, California.  The Company's shares are traded on the NYSE stock exchange under the

9  ticker symbol "LC."  The Company's headquarters are located in, and it conducts business in and

10  from, this District.

11      **The Executive Defendants**

12      12.    Defendant Renaud Laplanche ("Laplanche") is LendingClub's founder and was

13  its CEO and Chairman of the Board until May 5, 2016, when he was forced to resign.

14  Throughout the Class Period, Laplanche signed the false and misleading Registration Statement

15  and made statements in Company releases, conference calls, and other public forums as alleged

16  herein, and signed and/or certified the Company's SEC filings pursuant to the Sarbanes-Oxley

17  Act of 2002 ("SOX Certifications"), including, but not limited to, LendingClub's Reports on

18  Forms 10-Q and 10-K.

19      13.    Defendant Carrie Dolan ("Dolan") was the Company's Chief Financial Officer

20  (Principal Financial Officer and Principal Accounting Officer) ("CFO") throughout the Class

21  Period.  Dolan resigned on August 2, 2016.  Throughout the Class Period, Dolan signed the false

22  and misleading Registration Statement, made statements in Company releases and conference

23  calls, and signed and/or certified the Company's SEC filings pursuant to the Sarbanes-Oxley Act

24  of 2002, including, but not limited to, LendingClub's Reports on Forms 10-Q and 10-K.

25      14.    Laplanche and Dolan oversaw LendingClub's operations and financial controls,

26  and LendingClub could not have completed the IPO without Laplanche, Dolan, and the Director

27  Defendants (defined herein) signing or authorizing their signatures on the Registration

28  Statement.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                                    - 4 -

15.     The Complaint asserts strict liability claims under §§11 and 15 of the Securities Act against LendingClub, Laplanche, and Dolan, as well as the Director Defendants listed at ¶¶16-23 and the Underwriter Defendants listed at ¶25.

**Director Defendants**

16.     Defendant Daniel T. Ciporin ("Ciporin") has been a director of the Company at all relevant times.  Ciporin signed the false and misleading Registration Statement.

17.     Defendant Jeffrey Crowe ("Crowe") has been a director of the Company at all relevant times.  Crowe signed the false and misleading Registration Statement.

18.     Defendant Rebecca Lynn ("Lynn") was a director of the Company from March 2009 through June 10, 2015.  Lynn signed the false and misleading Registration Statement.

19.     Defendant John J. Mack ("Mack") has been a director of the Company at all relevant times.  Mack signed the false and misleading Registration Statement.

20.     Defendant Mary Meeker ("Meeker") has been a director of the Company at all relevant times.  Meeker signed the false and misleading Registration Statement.

21.     Defendant John C. (Hans) Morris ("Morris") has been a director of the Company at all relevant times.  Morris signed the false and misleading Registration Statement.

22.     Defendant Lawrence H. Summers ("Summers") has been a director of the Company at all relevant times.  Summers signed the false and misleading Registration Statement.

23.     Defendant Simon Williams ("Williams") has been a director of the Company at all relevant times.  Williams signed the false and misleading Registration Statement.

24.     The defendants identified in ¶¶16-23 are referred to herein as the "Director Defendants."

**Underwriter Defendants**

25.     Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman, Sachs & Co. ("Goldman Sachs"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("Citigroup"), Allen & Company LLC ("Allen"), Stifel, Nicolaus & Company, Incorporated ("Stifel"), BMO Capital Markets Corp. ("BMO"), William Blair & Company, L.L.C. ("William Blair") and Wells Fargo Securities, LLC ("Wells Fargo") served as

1   underwriters of the Company's IPO, and participated in the preparation and dissemination of

2   LendingClub's false and misleading Registration Statement.

3       26.    Defendants Morgan Stanley, Goldman Sachs, Credit Suisse, Citigroup, Allen,

4   Stifel, BMO, William Blair, and Wells Fargo are referred to collectively herein as the

5   "Underwriter Defendants."

6   **BACKGROUND**

7       27.    LendingClub purports to operate as an online marketplace that "matches"

8   borrowers and investors.  LendingClub facilitates various types of loan products for consumers

9   and small businesses, including unsecured personal loans, consumer loans, unsecured education

10  and patient finance loans, and unsecured small business loans.  The Company also offers

11  investors (*i.e.*, "lenders") an opportunity to invest in loans based on term and credit

12  characteristics.

13      28.    Because LendingClub makes most of its money from origination and servicing

14  fees (on loans it originates), it repeatedly emphasized the importance of loan originations to its

15  financial results, stating:

16  > ***We believe originations are a key indicator of the adoption rate of our marketplace***, growth of our brand, scale of our business, strength of our network
17  > effect, economic competitiveness of our products and future growth.  Loan
    > originations have grown significantly over time due to increased awareness of our
18  > brand, our high borrower and investor satisfaction rates, the effectiveness of our
    > borrower acquisition channels, a strong track record of loan performance and the
19  > expansion of our capital resources.

20      29.    LendingClub described its marketplace as one in which (1) customers borrow to

21  lower the cost of their credit and enjoy a "better experience" than traditional bank lending; and

22  (2) "lenders" earn attractive risk-adjusted returns from an asset class that has generally been

23  closed to individuals and is available to institutional investors on only a limited basis.

24      30.    LendingClub's borrowers apply on its website and are then matched with a lender

25  or multiple lenders who can fund entire loans, portions of individual loans, and/or portions of

26  pools of loans.  In order to avoid state banking regulations, LendingClub then uses its primary

27  issuing bank partner, WebBank, which simultaneously originates each loan and sells it to

28  LendingClub (at a price that includes modest fees and interest).  LendingClub buys these loans

1   with the money from its "matched" lenders, and then services the loans.  For its role,

2   LendingClub receives an initial origination fee and then servicing fees on each payment

3   throughout the term of the loan.

4         31.   LendingClub and Laplanche portrayed themselves as the industry's "good guys,"

5   stating "If I had to single out one thing I am the most proud of over the last six years, it has been

6   the decision to constantly be the good guys of banking, how we have always decided in favor of

7   our customers."   Renaud Laplanche, Interview with Simon Cunningham of LendingMemo,

8   November 20, 2013.

9         32.   LendingClub also emphasized that one of its competitive advantages was its

10   transparency of reporting: "Our marketplace provides investors with the ***transparency*** and

11   flexibility to quickly and easily tailor or modify their portfolio by utilizing specific investment

12   criteria, such as credit attributes, financial data and loan characteristics."   The Company's

13   Registration Statement stated:

14         ***Benefits to Investors***

15                            *   *   *

16   *Transparency*.  We provide investors with transparency and choice in building
17   their loan portfolios.  For each standard program loan, investors can examine
    credit attributes from the borrower's credit report and borrower-reported attributes
    prior to investing in a loan and can monitor ongoing loan performance.  We also
18   provide access to credit profile data on each approved loan as well as all of the
    historical performance data for every loan ever invested in through our
19   marketplace.  We specifically indicate the information that is verified on our
    website.

20

21         33.   In a letter to investors that was included in the Registration Statement, Laplanche

22   emphasized how LendingClub had established investor confidence through its ***transparency*** with

both borrowers and loan investors, stating:

23

24       I believe LendingClub has the potential to profoundly improve people's
    financial lives over the coming decades.  Our mission of transforming the banking
25   system is both audacious and achievable.  Technology has successfully disrupted
    many industries to the benefit of society at large.

26                            *   *   *

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                                                    - 7 -

**Building Confidence**

We are not only bringing cost efficiency to the credit markets but also a more transparent and customer-friendly experience. Unlike traditional banks, we do not build confidence by establishing a branch at every street corner. Instead, we earn the trust of our customers by offering **maximum transparency into our products'** terms and performance.

\*        \*        \*

We have established investor confidence by demonstrating the effectiveness of our risk ranking technology, as well as through the accuracy, **transparency and granularity of our reporting**. We post on our platform the detailed performance of every single loan offered publicly to investors since inception, along with more aggregated performance statistics.

## IPO-RELATED ALLEGATIONS

34.     Defendants completed LendingClub's IPO, utilizing a Form S-1 registration statement, declared effective by the SEC on or about December 11, 2014, raising $1 billion from investors by selling more than 66.7 million shares of LendingClub common stock at $15 per share. The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make statements therein not materially false or misleading.

**Undisclosed Self-Dealing Masks Exposure to Credit Risks
and Exaggerates Growth of Marketplace**

35.     The Registration Statement represented that LendingClub did not assume credit risk or use the Company's own capital to invest in loans facilitated by its marketplace, stating:

> **We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material.** The capital to invest in the loans enabled through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

36.     This representation about LendingClub not participating in its marketplace made the Registration Statement's representations about LendingClub's whole loan sales and growth all the more impressive: Q3 2014 "**whole loan sales accounted for $367 million**"; and its steady loan-origination growth in 2014 had reached 47% by the end of the third quarter.

37.     One of the material weaknesses to which LendingClub has admitted was the inadequacy of its internal controls with respect to the disclosure of related-party transactions.

1   This inadequacy did not merely increase the risk of self-dealing, it actually enabled it with

2   respect to at least one family of funds (Cirrix Capital, L.P. ("Cirrix")).  Cirrix was formed in

3   2012 for the sole purpose of purchasing loans from LendingClub, with which it had a working

4   partnership.  As part of this partnership, Cirrix had access to LendingClub's Board and received

5   inside information regarding LendingClub's credit performance and underwriting.  Yet, the

6   Registration Statement contained a letter from Laplanche that falsely represented: "We are

7   continuing to earn investor confidence every day by providing equal access and with [*sic*] a level

8   playing field with the same tools, data and access for all investors, small and large, within a fair

9   and efficient marketplace."

10      38.     Ciporin has admitted that the initiation of LendingClub's relationship with Cirrix

11  was a pivotal moment for LendingClub's business.

12      39.     Mack was heavily involved with Cirrix at the time of the LendingClub IPO, and

13  his financial stake in Cirrix, together with Laplanche and LendingClub, reached over 30% during

14  the Class Period.

15      40.     Cirrix's working partnership with LendingClub led to Silicon Valley Bank

16  agreeing to lend Cirrix approximately three times the amount of capital it raised from investors.

17  This enabled Cirrix to leverage its capital such that each $1 million capital investment in Cirrix

18  allowed Cirrix to turn around and purchase approximately $4 million worth of LendingClub

19  loans.

20      41.     Because of LendingClub's working partnership with, and/or Laplanche's and

21  Mack's investments in Cirrix, Cirrix was the only LendingClub loan investor that had access to

22  all of the Company's loan programs, including private, public and small business loans.

23  Laplanche and Mack also personally benefitted from their Cirrix investments.

24      42.     By the time of the IPO, LendingClub loans represented 100% of Cirrix's assets,

25  and Cirrix's loan purchases drove LendingClub's pre-IPO results, representing 20% of

26  LendingClub's critical loan-origination growth and nearly 5% of LendingClub's ***total*** sales of

27  whole loans in the last quarter before the IPO.  LendingClub has admitted that Laplanche and

28  Mack owned 12% of Cirrix by the end of 2015, declining to reveal when their formal ownership

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                                    - 9 -

stake first began.  At least one news report indicates that it predated the IPO, and it is widely recognized that by April 1, 2016, LendingClub, Laplanche, and Mack owned a combined 31% of Cirrix that they had not disclosed to investors.  From inception, LendingClub also provided Cirrix with a credit-support agreement under which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself).  As such, LendingClub had significant influence over Cirrix and vice versa.  Although Cirrix was a related party, LendingClub's Registration Statement did not disclose this relationship or its transactions with Cirrix.[1]

43.     The undisclosed relationship and transactions with Cirrix, including LendingClub's increasing reliance on Cirrix, rendered the Registration Statement false and misleading with respect to LendingClub's loan originations, growth in loan originations, and assumption of credit risk.

**False Assurances About Data Integrity and Security**

44.     The Registration Statement further emphasized that LendingClub's technology included industry-standard compliance programs that ensured the integrity and security of information stored on the LendingClub platform, including access control and continuous monitoring programs to ensure data integrity and protect loan data from manipulation:

> Key elements of our technology include:
>
> *            *            *
>
> *Data Integrity and Security*.  **We maintain an effective information security program based on well-established security standards and best practices, such as ISO2700x and NIST 800 series**.  The program establishes policies and procedures to safeguard the confidentiality, ***integrity*** and availability of borrower and investor information.  The program also addresses risk assessment, training, ***access control***, encryption, service provider oversight, an incident response program and ***continuous monitoring and review***.

---

[1]    Accounting Standards Codification 850 defines relationships that trigger related-party disclosure obligations, including the following: "Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."  ASC 850-10-20.  Regulation S-K Item 303 (17 C.F.R. §229.303) requires disclosure of, among other things, (1) related-party transactions; and (2) trends that can be reasonably expected to have a material impact on financial results.

45.    Contrary to its Registration Statement's assurances, LendingClub's data programs and preventive controls were inadequate to ensure the integrity and security of information stored on the LendingClub platform.  The Company eventually admitted in May 2016 that it "had not designed and implemented an additional level of review and approval for live database changes that impact high risk fields to provide reasonable assurance that all loans allocated comply with investor instructions."  This deficiency allowed LendingClub's senior management to alter loan information in a live database to facilitate the sale of loans.  Senior management's ability to change and manipulate information in live databases demonstrates the ineffectiveness of the Company's "Data Integrity and Security" program, and establishes that the Company's practices were not in fact "based on well-established security standards and best practices, such as ISO2700x and NIST 800 series."

46.    An effective data integrity and security program that addresses access control, continuous monitoring and review, and risk assessment, would necessarily include security controls that: (1) protect Company data from manipulation by its insiders; and (2) enable the immediate detection and review of potential data manipulation by its insiders.  Both ISO2700x and NIST 800 series best practices set forth applicable data management security controls and assessment procedures to prevent and detect the manipulation of corporate data by its insiders.  Some examples of such best practices are:

- automated controls to detect, test, and verify changes to high-risk or anomalous data fields;

- automated logging of all changes to high-risk or anomalous data fields;

- continuous monitoring and review (both automated and manual) of logs; and

- user activity anomaly detection, which would immediately detect and report changes deemed unusual based on variables such as the insider's role within the organization or the insider's previous history of making similar changes.

47.    On May 16, 2016, LendingClub admitted that the Company had "a gap in preventative controls related to data management," and described "enhancements" that it was implementing to provide basic protection against manipulation in order to correct this defect, including:

- • "Enhancing the testing of data changes prior to deployment based on the risk of the change";

- • "Reviewing change requests for key data attributes, prior to implementation, by the Internal Audit Team";

- • "Validating that change requests for key data attributes have been properly executed";

- • "Expanding the number of data fields that are logged for the changes";

- • "Monitoring logs for key changes";

- • "Refreshing training/communication on data change management processes";

- • "Enhancing the end-to-end testing framework"; and

- • "Completing a consulting engagement on data change management with a Big Four accounting firm; implementing appropriate best practices."

48.     These remedial actions confirm that at the time of the IPO, LendingClub lacked an effective information security program addressing, *inter alia*, access control, continuous monitoring and review, and risk assessment as represented in the Registration Statement.  The Company's prior absence of "[m]onitoring logs for key changes" is, by definition, incompatible with a data integrity and security program which addresses "continuous monitoring and review."  Likewise, "implementing appropriate best practices" is inconsistent with already having in place "an effective information security program based on well-established security standards and best practices."  More than that, the above "enhancements" are all rudimentary security controls set forth in both the NIST 800 and ISO2700x guidelines of best practices.

49.     As a result of these deficiencies in "Data Integrity and Security" that existed from the effective date of the IPO, senior managers were able to alter loan information in a live database.  For example, over $22 million in near prime loans were sold to an institutional investor when those loans did not meet that investor's known requirements.  In addition, an outside consultant identified hundreds of backdated whole loan applications.  Backdating was just another way LendingClub could falsify its performance, by effectively drawing from a future reporting period to inflate present period performance.

**LendingClub's Internal Controls Were Rife with Material Weaknesses**

50.     What invited LendingClub's management to falsify and manipulate its performance was LendingClub's admittedly materially deficient internal controls.   Yet, the Registration Statement incorporated the following statement from LendingClub's Q3 2014 Form 10-Q entitled "***Controls and Procedures***," which confirmed the adequacy of the LendingClub's internal controls over its financial reporting, stating:

> As required by Rule 13a-15(b) of the Exchange Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report.   Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.

51.     In May 2016, LendingClub acknowledged "material weaknesses" in its internal controls over financial reporting.   As LendingClub admitted, its internal controls were inadequate to provide reasonable assurance that:

> (a)     the Company maintained an effective control environment, compliance with the Company's Code of Conduct and Ethics Policy, and set an appropriate "tone at the top";
>
> (b)     related-party transactions were disclosed to the Company's reporting function;
>
> (c)     the Company's loans conformed to loan investors' purchase requirements; and
>
> (d)     there were full and required communications by management to LendingClub's risk and financial accounting departments, and appropriate oversight of investor contract amendments, particularly for those that could require material changes to LendingClub's financial statements.

52.     LendingClub has also admitted that its internal controls had not changed over time.   Therefore, the same material weaknesses existed at the time of the IPO.   For example:

- Q1 2015 Form 10-Q: "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the three months ended March 31, 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."

- Q2 2015 Form 10-Q: "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of

1934) was identified during the first half of 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."

- Q3 2015 Form 10-Q: "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the first nine months of 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."

53.     The lack of controls from LendingClub's inception is demonstrated by the fact that in December 2009, Laplanche artificially inflated loan origination volume by taking out 32 loans for himself and 3 of his family members, amounting to nearly 10% of LendingClub's market activity for the entire month.  The Company has admitted these loans were inappropriate and were made in order to "help increase reported platform loan volume."

54.     The lack of controls prior to the IPO is also confirmed by LendingClub's admission that, in violation of Generally Accepted Accounting Principles ("GAAP"), it improperly inflated net asset values for six private investment funds managed by LendingClub's subsidiary LendingClub Advisors ("LCA") from March 2011 through May 2016. LendingClub's Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q") states:

> The investment assets held by the Funds are essentially loans facilitated through the Company's platform and are "level 3 assets", for which no quoted market price is available and whose fair value is therefore subjective and is determined by LCA estimates and calculations.
>
>       The Company determined that adjustments were made to the valuation of the Funds' assets that were not consistent with generally accepted accounting principles.  These adjustments affected the direction and the specific returns reported in monthly statements sent to limited partners.

By inflating the value of these assets in violation of GAAP, LendingClub reported inflated economic returns of the funds and overcharged limited partners.[2]

---

[2]     ASC 820-10-35-53 requires that the level 3 "[u]nobservable inputs [that defendants used, *i.e.*, the "direction and the specific returns reported in monthly statements"] shall reflect the assumptions that market participants would use when pricing the asset . . . , including assumptions about risk."  Furthermore, "[a] [fair value] measurement that does not include an [appropriate] adjustment for risk would not represent a fair value measurement if market participants would include one when pricing the asset." ASC 820-10-35-54.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-02627-WHA
                                                                                    - 14 -

## POST-IPO ALLEGATIONS

55.     Following its IPO, LendingClub and Laplanche continued to portray themselves as the industry's "good guys," stating:

- "We are positioned as the 'good guys of banking' by being transparent from day one about fees and performance."  Renaud Laplanche, Interview with *HEC Magazine*, January 2015, available on http://www.lendingclub.com.

- "With financial services, reputation and trust is as important as just awareness.  And so we're patiently building that reputation and that trust and I think the results of that [are] already pretty visible in some of our metrics and I think will continue to unfold over time."  Renaud Laplanche, Q3 2015 LendingClub Earnings Call, October 29, 2015.

56.     LendingClub emphasized that a key feature of its business model was that the Company did *not* assume credit risk or use its own capital:

- "[I]t's all about reputation and track record.  So we don't directly take credit risks."  Renaud Laplanche, JPMorgan Global Technology, Media and Telecom Conference, May 20, 2015.

- "As the operator of a two-sided marketplace, Lending Club should remain neutral with respect to both sides of its marketplace (investors and borrowers).  Requiring Lending Club to hold loans or pieces of loans on its balance sheet could cause Lending Club's interests to be inappropriately aligned with the investors' interests, to the detriment of borrowers."  Renaud Laplanche, LendingClub's Letter to U.S. Treasury in Response to Request for Information, September 30, 2015.

- "We are very attached to the marketplace model.  We think it's a superior model than any other models.  We have no intentions as a matter of business model, to start investing our own balance sheet and take balance risks in our loans." Renaud Laplanche, Q4 2015 LendingClub Earnings Call, February 11, 2016.

57.     Likewise, LendingClub portrayed itself as disciplined in its growth, and attributed that discipline to its internal controls, as well as balanced supply and demand:

- "We believe our disciplined growth has helped us deliver a great user experience, and focus on risk management, internal controls, and IT security and scalability."  Renaud Laplanche, Q4 2014 LendingClub Corp Earnings Call, February 24, 2015.

- "We continue to be very deliberate about our growth.  Over the last three or four years we have been in this great position where we have not been either supply or demand constrained."  Renaud Laplanche, Interview with Simon Cunningham of LendingMemo, March 10, 2015.

- "While we have continued to more than double originations and revenue year-over-year, we have been disciplined about growing only as fast as we believe is responsible and compatible with solid risk management and a great user experience that contribute to building and maintaining our brand and our reputation."  Renaud Laplanche, Q1 2015 LendingClub Earnings Call, May 5, 2015.

- "At LendingClub, we've almost invented prudent growth.  Over the last few years, we really haven't grown as fast as we could.  We've grown in a very deliberate way.  In a way that we believe we can control and helps focus a lot of attention on security, on risk management, on compliance controls, all the things that could break when one grows too fast."  Renaud Laplanche, Keynote speech entitled "From Sapling to Ironwood, Marketplace Lending's Next Phase of Growth" at LendIt USA 2016 Conference, April 11, 2016.

**Increased Dependence on Cirrix**

58.    By March 2015, Cirrix had purchased nearly $200 million in loans from LendingClub.  During 2015, Cirrix purchased an additional $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub.

59.    Due to its declining returns, however, by early 2016, Cirrix required an additional capital infusion in order to continue purchasing LendingClub loans.  Laplanche and Mack infused Cirrix with cash, as Laplanche had secretly entered into arrangements whereby he could raise cash by using his LendingClub shares as collateral.  Mack also provided Cirrix with an infusion so it could continue to purchase more LendingClub loans and avoid a total collapse in LendingClub's marketplace.  Then, without disclosing their personal interests, Laplanche and Mack caused LendingClub's Board to approve a $10 million direct investment in Cirrix, so LendingClub could purchase more of its own loans.  As of close of business April 1, 2016, the Company, Laplanche, and Mack owned approximately 15%, 8%, and 8% of limited partnership interests in Cirrix, respectively, for an aggregate interest of approximately 31%.  At the same time, whole loans and interests in loans facilitated by LendingClub's platform comprised 100% of Cirrix's assets.

60.    This additional capital enabled LendingClub to continue using Cirrix to increase LendingClub's reported loan originations, revenues, and earnings per share ("EPS").  In fiscal

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-02627-WHA

1    2015, LendingClub's fees from Cirrix amounted to 5% of its reported growth in servicing fees,

2    and enabled LendingClub to double its EPS growth rate and slash its EPS losses by 50%.

3         61.     Likewise, in Q1 2016, Cirrix purchased $114.5 million in LendingClub whole

4    loans, which was equal to 6% of LendingClub's whole loan originations.  That same quarter,

5    Cirrix's loan purchases amounted to 67% of LendingClub's loan-origination growth.

6    **February 2015 False and Misleading Statements**

7         **Loan Originations**

8         62.     In addition to each of the false and misleading statements in the Registration

9    Statement, on February 24, 2015, the Company issued a release announcing LendingClub's

10   financial results for the fourth quarter and full year 2014.  The release reported "***[l]oan***

11   ***originations in the fourth quarter of 2014 were $1,415 million***."  The release also noted the

12   Company's "'strategy of fast yet disciplined growth,'" as well as its intention of "'growing

13   originations and revenue at a fast, yet deliberate pace.'"  Furthermore, for the fourth quarter of

14   2014, the release reported operating revenue of $69.6 million, adjusted EBITDA of $7.9 million,

15   and a loss per share of $0.07.

16        63.     On February 27, 2015, LendingClub filed its Annual Report on Form 10-K with

17   the SEC announcing the Company's financial and operating results for the quarter and year

18   ended December 31, 2014 (the "2014 Form 10-K").  The 2014 Form 10-K reported that in the

19   fourth quarter of 2014, LendingClub's "marketplace facilitated over ***$1.4 billion of loan***

20   ***originations***, of which approximately $0.2 billion were invested in through notes, $0.4 billion

21   were invested in through certificates and $0.8 billion were invested in through whole loan sales."

22        **Credit Risk and Internal Controls**

23        64.     The 2014 Form 10-K assured investors that the Company did not assume credit

24   risk.  It stated, in part:

25          ***We do not assume credit risk or use our own capital to invest in loans facilitated***
       ***by our marketplace, except in limited circumstances and in amounts that are***
26          ***not material***.  The capital to invest in the loans facilitated through our
       marketplace comes directly from a wide range of investors, including retail
27          investors, high-net-worth individuals and family offices, banks and finance
       companies, insurance companies, hedge funds, foundations, pension plans and

28

university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

65.     The 2014 Form 10-K also added:

As required by Rule 13a-15(b) of the 1934 Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2014. ***Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level***.

66.     The statements in ¶¶28-65 were materially false and materially misleading because:

(a)     LendingClub, Laplanche, and Dolan knew or recklessly disregarded that LendingClub's "tone at the top" was not one that emphasized best business practices or honest and complete disclosures;

(b)     LendingClub and Laplanche knew or recklessly disregarded that LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix;

(c)     LendingClub and Laplanche knew or recklessly disregarded that contrary to its stated business model, LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit-support agreement with Cirrix; and

(d)     LendingClub, Laplanche, and Dolan knew or recklessly disregarded that material weaknesses in LendingClub's internal controls meant that Laplanche and other senior managers were able to and did engage in undisclosed related-party transactions, sell non-conforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

**May 2015 False and Misleading Statements**

67.     On May 5, 2015, the Company issued a release announcing its financial results for the first quarter of 2015.  The release reported that "[l]oan originations in the first quarter of 2015 were $1,635 million, compared to $791 million in the same period last year, an increase of

1    107% year-over-year."  Furthermore, for the first quarter of 2015, the release reported a loss per

2    share of $0.02.

3        68.    Also on May 5, 2015, the Company hosted an earnings conference call with

4    investors and analysts to discuss its first quarter 2015 financial results.  Defendant Laplanche

5    discussed the Company's success in originating new loans using a growth strategy that was

6    predicated on "solid risk management," stating:

7            While we have continued to more than double originations and revenue
             year-over-year, we have been disciplined about growing only as fast as we believe
8            is responsible and compatible with solid risk management and a great user
             experience that contribute to building and maintaining our brand and our
9            reputation.

10       69.    On May 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the

11   SEC announcing the Company's financial and operating results for the quarter ended March 31,

12   2015 (the "Q1 2015 Form 10-Q").   The Q1 2015 Form 10-Q contained signed SOX

13   Certifications by the Individual Defendants, stating that the financial information contained in

14   the Q1 2015 Form 10-Q was accurate and disclosed any material changes to the Company's

15   internal control over financial reporting.

16       70.    The Q1 2015 Form 10-Q reported that in the first quarter of 2015, "our

17   marketplace facilitated $1.6 billion of loan originations, of which approximately $0.3 billion

18   were invested in through notes, $0.5 billion were invested in through certificates and $0.8 billion

19   were invested in through whole loan sales."

20       71.    The Q1 2015 Form 10-Q also stated:

21           *We believe originations are a key indicator of the adoption rate of our
             marketplace*, growth of our brand, scale of our business, strength of our network
22           effect, economic competitiveness of our products and future growth.   Loan
             originations have increased significantly over time due to the increased awareness
23           of our brand, our high borrower and investor satisfaction rates, the effectiveness
             of our borrower acquisition channels, a strong track record of loan performance
24           and the expansion of our capital sources.

25       72.    The Q1 2015 Form 10-Q also stated:

26           We do not assume credit risk or use our own capital to invest in loans facilitated
             by our marketplace, except in limited circumstances and in amounts that are not
27           material.   The capital to invest in the loans enabled through our marketplace
             comes directly from investors.

28

73.     The Q1 2015 Form 10-Q also added:

> The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of March 31, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of March 31, 2015.***

**August 2015 False and Misleading Statements**

74.     On August 4, 2015, the Company issued a release announcing its financial results for the second quarter of 2015. The release reported that the Company had "'another very strong quarter'" and that "[l]oan originations in the second quarter of 2015 were $1.91 billion, compared to $1.01 billion in the same period last year, an increase of 90% year-over-year." Furthermore, for the second quarter of 2015, the release reported operating revenue of $96.1 million, adjusted EBITDA of $13.4 million, and a loss per share of $0.03.

75.     On August 5, 2015, LendingClub filed its Report on Form 10-Q with the SEC announcing results for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"), stating, "our marketplace facilitated $1.9 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.6 billion were invested in through certificates and $1.0 billion were invested in through whole loan sales." The Company also made the same representations regarding the importance of loan originations as those set forth in ¶71.

76.     The Q2 2015 Form 10-Q made the same representations regarding the Company not assuming credit risk as those set forth ¶72.

77.     The Q2 2015 Form 10-Q also added:

> The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of June 30, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of June 30, 2015.***

**September-October 2015 False and Misleading Statements**

78.     On September 30, 2015, the Company publicly released its response to the U.S. Treasury Department's Request for Information (RFI) on Expanding Access to Credit through

1  Online Marketplace Lending.   The response made the following representation regarding the

2  Company's assumption of credit risk:

3      The Risks of Risk Retention

4          We believe there already is sufficient alignment of interest between credit
       marketplaces and investors and further alignment would be unnecessary.  In fact,
5      we believe that further alignment with investors could be counterproductive and
       contrary to borrowers' interest and the availability of affordable credit.

6
           As the operator of a two-sided marketplace, Lending Club should remain
7      neutral with respect to both sides of its marketplace (investors and borrowers).
       Requiring Lending Club to hold loans or pieces of loans on its balance sheet could
8      cause Lending Club's interests to be inappropriately aligned with the investors'
       interests, to the detriment of borrowers.  As an example, platform rates are set
9      based on expectations of future loan performance and the balance of supply and
       demand on the platform.   As investors showed strong appetite for the loans
10     originated through our marketplace, we were able to lower interest rates to
       borrowers.  Over the last three years, the risk premiums required by investors on
11     Lending Club's platform have decreased by 270 basis points.  If we invested our
       own capital and earned interest on a portion of the loans, our financial incentive
12     would be to keep interest rates artificially high irrespective of what the balance of
       supply and demand would otherwise suggest.   This situation would result in
13     making credit more costly for consumers and small business owners.

14  (Footnote omitted.)

15      79.     On October 29, 2015, the Company issued a release announcing its financial

16  results for the third quarter of 2015.   The release reported that the Company "'had another

17  spectacular quarter'" and that "[l]oan originations in the third quarter of 2015 were $2.24 billion,

18  compared to $1.17 billion in the same period last year, an increase of 92% year-over-year."

19  Furthermore, for the third quarter of 2015, the release reported operating revenue of $115.1

20  million, adjusted EBITDA of $21.2 million, and EPS of $0.01.

21      80.     Also on October 29, 2015, the Company hosted an earnings conference call with

22  investors and analysts to discuss its third quarter 2015 financial results.   Defendant Laplanche

23  assured investors of the Company's track record at building its customers' trust.  For example, he

24  stated:

25      [I]n financial services, there's really no short cuts.   It's not like some other
       consumer products where you can really connect the dots between awareness and
26     sales.    With financial services, reputation and trust is as important as just
       awareness.   And so we're patiently building that reputation and that trust and I
27     think the results of that already pretty visible in some of our metrics and I think
       will continue to unfold over time.

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                          - 21 -

81.     During the October 29, 2015 earnings call, Laplanche made the following statement regarding the diversity and "very broad appetite" of the Company's investor base and its ability to "manage the flow of both supply and demand":

> We think, again, that's a great benefit of the model now.  That benefit will get even stronger in some different economic environments, especially as we go into the next cycle and we will show the resiliency [of] the very diverse investor database we've built very patiently over the last eight years.  I think we've ha[d] a big competitive advantage over some of the newer platforms that, for the most part, have no retail investors and considerable concentration in investor base or strong reliance on the securitization markets, which really isn't our case at all.

At the time Laplanche was boasting about the "very diverse investor database" LendingClub had built over the past eight years, his and LendingClub's years' long use of Cirrix had reached hundreds of millions of dollars of related-party purchases of LendingClub loans.

82.     On November 3, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q") reporting that in the third quarter of 2015, "our marketplace facilitated $2.2 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.7 billion were invested in through certificates and $1.2 billion were invested in through whole loan sales."  The Company also made the same representations regarding the importance of loan originations as those set forth in ¶71.

83.     The Q3 2015 Form 10-Q made the same representations regarding the Company not assuming credit risk as those set forth in ¶72.

84.     The Q3 2015 Form 10-Q also added:

> The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of September 30, 2015.  ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of September 30, 2015***.

85.     The statements in ¶¶67-84 were materially false and materially misleading because LendingClub, Laplanche, and/or Dolan knew or recklessly disregarded the facts set forth in ¶66 above.

**December 2015-February 2016 False and Misleading Statements**

86.    On December 2, 2015, Laplanche addressed investors at the Credit Suisse Technology, Media & Telecom Conference.   When asked where LendingClub's "next leg of growth" is going to come from, he responded, in part:

> We are really not in a situation where some of the specialty finance companies or banks, even where in the mortgage crisis, pre-mortgage crisis, where they decide on how much risk they are taking, but then eventually they sort of sell that off to investors.
>
> We have an immediate check with investors, a lot of transparency as to what the quality is, a lot of disclosures.

87.    On December 9, 2015, Laplanche was fielding questions at the Goldman Sachs US Financial Services Conference, when the following exchange took place:

**Unidentified Participant**

> I'm just curious, with coming out of the crisis, with regulators more and more insisting on underwriters keeping some amount of interest in their loans to make sure that they behave properly – I'm just curious, how do you have the confidence to think that you're not going to have to go to that model over a period of time?  And/or, even if you don't have to go to that model, do you worry about liability issues in the first really tough credit cycle, in terms of things coming back to bite you?

**Renaud Laplanche**

> Yes.  So, I think there were questions when we got started about – I mean, mostly from investors, feeling, okay, why as an investor should I have the confidence to invest in the platform, if you, the operator of the platform, are not eating your own dog food, in a way.
>
> *          *          *
>
> Our situation is almost the opposite of what you've seen in the mortgage space in 2008, where it was a very diffused and long chain of intermediaries touching the loans, and the brokers were different from the originators, from the rating agencies, from the investors, from the servicers.
>
> In our case, we acquire the borrowers, originate the loan, price them, and service them.  If the loan doesn't perform, it's us.  We have nobody else to point fingers to.  And that builds a tremendous amount of accountability.
>
> And when you add on top of that the transparency we're providing in the (inaudible) population, and every investor can check the exact makeup of the population, and the transparency we provide in performance, including first payment default, and 3-month and 6-month on book delinquencies, there's a very tight feedback loop with our investor base, and they are watching very carefully the quality of the origination and the quality of the servicing.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-02627-WHA

1   I think, even if we wanted to, there would be no way for us to degrade
2   either underwriting or servicing without the investors being aware and reacting to
    it.

3   88.   On February 11, 2016, the Company issued a release announcing its financial

4   results for the fourth quarter and full year 2015.  The release reported that "[l]oan originations in

5   the fourth quarter of 2015 were $2.58 billion, compared to $1.41 billion in the same period last

6   year, an increase of 82% year-over-year."   Furthermore, for the fourth quarter of 2015, the

7   release reported operating revenue of $134.5 million, adjusted EBITDA of $24.6 million, and

8   EPS of $0.01.

9   89.   Also on February 11, 2016, the Company hosted a conference call with investors

10  and analysts to discuss its fourth quarter and full year 2015 financial results.  When asked by an

11  analyst whether LendingClub "may be open to securitizing its own loans for the first time" and,

12  if so "what sort of balance sheet risk would that expose" the Company to, Laplanche responded:

13      We are very attached to the marketplace model.  We think it's a superior
14      model than any other models.  We have no intentions as a matter of business
        model, to start investing our own balance sheet and take balance sheet risks in our
        loans.
15
16      As we said in the past, we can always use our balance sheet on a
        temporary basis for test programs, but this would always be a very small.  Again,
        no change in the business model.  What's going to continue to happen, is some of
17      our investors on the platform can turn around and refinance themselves on the
        securitization [lockout] and we want to support them and do what's right for
18      them.

19  90.   On February 22, 2016, LendingClub filed an Annual Report on Form 10-K with

20  the SEC announcing the Company's financial and operating results for the quarter and year

21  ended December 31, 2015 (the "2015 Form 10-K").  The Company's 2015 Form 10-K reported

22  that "[i]n 2015, our marketplace facilitated over $8.4 billion of loan originations, of which

23  approximately $1.3 billion were invested in through notes, $2.6 billion were invested in through

24  certificates and $4.5 billion were invested in through whole loan sales."

25  91.   The 2015 Form 10-K further stated:

26      Our business model is not dependent on using our balance sheet and assuming
        credit risk for loans facilitated by our marketplace.  In order to support contractual
27      obligations (Pool B loans), regulatory commitments (direct mail), the testing of
        pilot loan programs, or customer accommodations, we may use our capital on the
28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                      - 24 -

platform from time to time on terms that are substantially similar to other investors.

92.     The 2015 Form 10-K also added:

As required by Rule 13a-15(b) of the 1934 Act, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures as of December 31, 2015.  Based on the foregoing, the Company's Chief Executive Officer and Chief Financial Officer have concluded that its disclosure controls and procedures were effective at a reasonable assurance level.

93.     Laplanche and Dolan signed SOX Certifications of LendingClub's 2014 Form 10-K, Q1-Q3 2015 Forms 10-Q and 2015 Form 10-K.  In their SOX Certifications, Laplanche and Dolan certified, among other things, that they had reviewed each report and that:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . ; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

94.     The statements in ¶¶86-92, as well as the SOX Certifications, were materially false and materially misleading when made.  The true facts which were then known to or recklessly disregarded by LendingClub, Laplanche, and/or Dolan were as described in ¶66.  In addition, Laplanche had formulated and induced the Board to approve a $150 million common

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-02627-WHA                                                                                                          - 25 -

1  stock buyback program in order to prop up the trading price of LendingClub stock and thereby

2  avoid the investor scrutiny that would result therefrom.

3  **LENDINGCLUB'S ADMISSIONS CONFIRM DEFENDANTS'**
   **FALSE AND MISLEADING STATEMENTS**

4

5  95.    On May 9, 2016, LendingClub shocked investors when it disclosed in an SEC

6  filing that its Board had accepted the resignation of its Chairman, CEO and founder, Laplanche.

7  The Company reported that Laplanche had resigned after the Board learned, among other things,

8  that LendingClub had intentionally falsified data on millions of dollars in loans, and that three

9  senior managers had been involved in a $22 million sale of loans to an investor (later identified

10 as the Jeffries Group), where the quality of loans LendingClub had provided was "in

11 contravention of the investor's express instructions" regarding loan quality (it was later revealed

12 that Laplanche had not been candid during an inquiry into this fraudulent activity).

13 96.    In the same SEC filing, the Company also disclosed another problem: that one

14 executive and one Board member (later revealed as Laplanche and Mack, respectively) had

15 concealed their personal interests in a fund (later identified as Cirrix) that Laplanche had

16 convinced LendingClub to invest in.

17 97.    The news on May 9, 2016 dealt a blow to LendingClub stock, causing its share

18 price to fall nearly 35%, to close at $4.62.  It continued to fall for the next four days, resulting in

19 a total decline of over 50%.  This price decline was significantly different from that of the NYSE

20 composite price, which increased over the same period.

21 98.    In response to these revelations, analysts slashed their ratings and/or price targets

22 on LendingClub stock.  In a report dated May 9, 2016, entitled "Risk Intensifies Following CEO

23 Exit/Internal Probe; Reiterate Sell, PT to $4," Compass Point Research & Trading, LLC

24 predicted that "many institutional investors will either pause in supplying capital and/or demand

25 wider spreads from LendingClub near-term" and that LendingClub's disclosures would result in

26 greater regulatory scrutiny.

27 99.    The same day, Guggenheim Securities, LLC issued a report that downgraded

28 LendingClub, noting that "LC may lack a culture of compliance," and noting that "the disclosure

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                          - 26 -

of the series of control failures underscores [LendingClub's] need to improve its oversight and compliance related to internal control issues."

100.    According to Morgan Stanley Research:

**CEO's departure likely to undermine the confidence of banks and other institutional investors**: CEO Renaud Laplanche and three unnamed executives resigned following an internal audit regarding improper allocation of $22mn of loans to an investor.  The direct impact is limited – the $22mn were bought back and resold at par – but the bigger potential impact is clearly the reputational damage, which could ultimately be detrimental to LC's institutional funding.  We've made the point in the past that LC's reputation and track record are key distinguishing attributes that would have kept it relatively insulated from the ebbs and flows of institutional demand across the broader marketplace lending industry.  This is clearly a setback to that assertion.

101.    On May 16, 2016, LendingClub filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2016 Form 10-Q") revealing that it had received a grand jury subpoena and confirming that it was under investigation by the U.S. Department of Justice ("DOJ"). LendingClub also confirmed that it had identified material weaknesses in its internal controls over financial reporting and a "[l]ack of transparent communication and appropriate oversight" of dealings with investors and, as a result, LendingClub was contemplating a dramatic shift in its business model.[3]  Specifically, addressing its internal controls, which were the same deficient controls existing at the time of the IPO, LendingClub admitted that:

The identified material weakness is the result of the aggregation of control deficiencies related to the Company's "tone at the top," which manifested in three primary areas described further below.  In addition, the Company has concluded that the material weakness identified as of March 31, 2016 also existed at the end of 2015 and therefore that its disclosure controls and procedures were ineffective and not operating at the reasonable assurance level as of December 31, 2015.

*        *        *

The control environment, which includes the Company's Code of Conduct and Ethics Policy, is the responsibility of senior management, and sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting. Although each area described below involved its own deficiencies, a significant contributing factor to all of the deficiencies aggregating to a material weakness

---

[3]    A material weakness, as defined in PCAOB Auditing Standard No. 5 ("AS 5"), is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."  AS 5.A7.

was the Company's lack of an appropriate tone at the top set by certain members of senior management.

102.    The Q1 2016 Form 10-Q also disclosed for the first time that LendingClub may have to take loans onto its balance sheet because of repurchase obligations, and that its May 9, 2016 disclosures had eroded lender confidence to the point that LendingClub would have to offer inducements and/or use an even "greater amount of its own capital to purchase loans on its own platform."   Put simply, after years of disclaiming any participation in its own marketplace, LendingClub had to admit that in order to avoid the collapse of its marketplace, it would have to sell more of its loans *to itself*.   "These actions likely may have material adverse impacts on the Company's business, financial condition (including its liquidity), results of operations and ability to sustain and grow loan volume."

103.    On May 16, 2016, *The Wall Street Journal* published an article entitled "LendingClub Discloses Justice Probe, Potential Shift in Business Model."   LendingClub reportedly received a criminal grand jury subpoena from the DOJ on May 9, 2016, *i.e.*, the same day it announced Laplanche's forced resignation.   *The Wall Street Journal* also reported that LendingClub had been contacted by the SEC.

104.    On May 18, 2016, *The Wall Street Journal* published an article entitled "New York's Financial Regulator Subpoenas LendingClub," reporting that New York's Department of Financial Services had launched an inquiry into the business practices of LendingClub going back to 2013.

105.    According to a May 25, 2016 Macquarie Research report, "LendingClub ('LC') has had a tumultuous few weeks, and investor confusion surrounding the shock resignation of its co-founder, Chairman, and CEO Renaud Laplanche due to improper loan sales and personal investment disclosures remains an overhang.   These events raise questions around LC's internal controls, its culture, and the resiliency of marketplace lending models in general."

106.    LendingClub has also revealed that the Company took, and needed to continue to take, "remediation steps to resolve the material weaknesses in internal control over financial reporting identified in the first quarter of 2016," including the termination or resignation of three

1   other senior managers.  These three senior managers who were fired or resigned were reportedly

2   involved in loan sales at the Company were (a) Jeff Bogan, who had worked at the Company

3   since April 2012 and was the Company's Head of Investor Group; (b) Adelina Grozdanova, who

4   had worked at the Company since July 2013 and was Vice President, Head of Institutional

5   Investors; and (c) Matt Wierman, who left as a Senior Vice President and no later than 2013 was

6   in charge of Product Performance at the Company.  Bogan and Grozdanova had both come from

7   Morgan Stanley and had helped prepare LendingClub for its IPO.

8          107.   On June 28, 2016, LendingClub announced that the review by the Board sub-

9   committee previously disclosed in the Q1 2016 Form 10-Q identified yet more items that

10  necessitated additional review.  First, the Company announced that adjustments that had been

11  made to the valuation of six private investment funds (the "Funds") managed by LCA were not

12  consistent with GAAP.  As a result of the additional review, the Company announced that it

13  would take certain remedial measures.

14                        **ADDITIONAL SCIENTER ALLEGATIONS**

15         108.   In addition to his conscious decision to deceive the Board regarding his ownership

16  interest in a company doing business with LendingClub and, along with other senior managers,

17  manipulating data in live databases to make loan packages appear to comply with lender

18  guidelines, Laplanche further exploited LendingClub's lack of internal controls to engage in

19  other deceptive practices.  For example, Laplanche concealed from the Board his manipulation

20  of reported loan volume prior to the IPO, when he took out 32 loans for himself and family

21  members in order to misleadingly increase LendingClub's reported platform volume by nearly

22  10%.   Loan volumes are a key metric for potential investors to gauge the potential of

23  LendingClub's marketplace.  The Company has admitted these loans were inappropriate and

24  were made in order to "help increase reported platform loan volume," confirming that Laplanche

25  had corrupted LendingClub's operations since inception.

26         109.   The SEC is further investigating Laplanche's role in LendingClub's buyback

27  plan, scrutinizing whether Laplanche advocated for LendingClub to use its cash to prop up its

28  shares without telling the Board about a possible conflict of interest.  Laplanche failed to disclose

1  to the Board prior to obtaining Board approval of the $150 million buyback in February 2016

2  that he had pledged his shares as collateral for a loan and was required to put up more money if

3  the price of LendingClub stock declined below a certain level.

4      110.    LendingClub also admitted that there were "material weaknesses" in the

5  Company's internal controls over its financial reporting.  The Company admitted that these

6  material weaknesses existed in 2015 and were the result of the aggregation of control

7  deficiencies related to LendingClub's "***tone at the top***," a term explained in the Committee of

8  Sponsoring Organizations Framework for Internal Controls ("COSO Framework") that

9  implicates the top-level of an organization's management, including the CEO and CFO – the

10  roles Laplanche and Dolan occupied at LendingClub.[4]  Moreover, the SOX Certifications

11  Laplanche and Dolan executed in 2014 and throughout 2015 stated there had been "no change"

12  in controls during the interim periods.

13      111.    In its Q1 2016 Form 10-Q, LendingClub admitted that, as of March 31, 2016, the

14  Company's internal control over financial reporting was ineffective.  The Company also

15  admitted that its internal control over financial reporting was ineffective as of December 31,

16  2015, and likewise filed statements that there had been "no change" of those controls during the

17  Class Period.  Thus, Laplanche and Dolan were aware or deliberately reckless in disregarding

18  that the SOX Certifications they signed during the Class Period, which attested to the accuracy

19  and completeness of the Company's financial statements and effective internal controls, were

20

21      [4]   The COSO Framework was developed and published in 1992 by COSO of the former

22  Treadway Commission.  The 1992 publication included a section entitled "Reporting to External
Parties," and in 1997 COSO issued an addendum to this section.  According to the COSO

23  Framework, the control environment sets the tone for the entire structure of internal control and
has a pervasive influence on all business activity.  The COSO Framework summarizes the

24  control environment as follows:

25          The control environment sets the tone of an organization, influencing the control
        consciousness of its people.  It is the foundation for all other components of

26          internal control, providing discipline and structure.  Control environment factors
        include the integrity, ethical values and competence of the entity's people;

27          management's philosophy and operating style; the way management assigns
        authority and responsibility, and organizes and develops its people; and the

28          attention and direction provided by the board of directors.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                 - 30 -

1    false, in light of the admitted material weakness in the Company's internal controls over

2    financial reporting.

3         112.   LendingClub admitted that, prior to December 31, 2015, it used LCA to purchase

4    expiring LendingClub loans, even though doing so was outside the investment guidelines LCA

5    had promised its investors.  Laplanche, Dolan, and LendingClub's General Counsel comprised

6    LCA's Investment Policy Committee and were responsible for managing LCA's portfolio of

7    loans and verifying conformity with its investment guidelines.

8         113.   On August 8, 2016, LendingClub announced that it had accepted Dolan's

9    "voluntary resignation" as the Company's CFO and Principal Accounting Officer.  The same

10   day, based on an interview of Scott Sanborn, *Bloomberg* reported that Dolan had informed

11   Sanborn earlier that year that she intended to make a move, but he asked her to postpone her

12   plans to help weather the turmoil following Laplanche's exit.  Between November 3, 2015 and

13   December 14, 2015, and while Dolan was in possession of the material non-public information

14   described above as having been withheld from investors, she sold 135,000 shares of

15   LendingClub stock for proceeds of over $1.8 million.

16        114.   In an attempt at **remediation** of the above internal control weaknesses and

17   failures, the Company has begun implementing various changes in internal control over financial

18   reporting to remediate these weaknesses, including remedial efforts to prevent the alteration of

19   information on live Company databases.

20        115.   The senior managers identified as having been involved in this conduct, including

21   Laplanche, were **terminated** or forced to resign, by Q2 2016 and the Company hired an outside

22   consulting firm to support data change management processes in order to prevent additional

23   falsification of loan documentation.  Laplanche was forced out, in part, because when confronted

24   with his conduct by the Board, he "wasn't upfront" with directors about what he knew.

25                          **LOSS CAUSATION/ECONOMIC LOSS**

26        116.   Like other members of the Class who purchased at artificially inflated prices

27   during the Class Period, Lead Plaintiff suffered an economic loss, *i.e.*, damages, when the trading

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                    - 31 -

1    price of LendingClub common stock declined upon the disclosures correcting the alleged

2    misrepresentations.

3          117.   The timing and magnitude of LendingClub's stock price declines (*see* ¶97), as

4    well as the lack of any other plausible cause of the declines, negates any inference that the loss

5    suffered by Lead Plaintiff and other Class members was caused by changed market conditions,

6    macroeconomic or industry factors, or Company-specific facts unrelated to defendants'

7    fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other

8    members of the Class, was a direct result of defendants' scheme and misrepresentations, which

9    artificially inflated the price of LendingClub common stock and the subsequent significant

10   decline in the value of LendingClub stock as the true state of the Company's operations leaked

11   into the market, correcting the misrepresentations and/or the economic impact thereof.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

13         118.   Lead Plaintiff will exclusively rely upon the presumption of reliance established

14   by the fraud-on-the-market doctrine in that, among other things:

15         (a)    Defendants made public misrepresentations or failed to disclose material

16   facts during the Class Period;

17         (b)    The omissions and misrepresentations were material;

18   

19         (c)    The Company's common stock traded in an efficient market;

20         (d)    The misrepresentations alleged would tend to induce a reasonable investor

21   to misjudge the value of the Company's common stock; and

22         (e)    Lead Plaintiff and other members of the Class purchased LendingClub

23   common stock between the time defendants misrepresented or failed to disclose material facts

24   and the time the true facts were disclosed, without knowledge of the misrepresented or omitted

     facts.

25         119.   At all relevant times, the market for LendingClub common stock was efficient for

26   
27   the following reasons, among others:

28   

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-02627-WHA

1      (a)     Throughout the Class Period, Lending Club common stock was listed and

2  actively traded on the NYSE National Market, a highly efficient and automated market;

3      (b)     Throughout the Class Period, the average weekly trading volume of

4  LendingClub shares exceeded 2% of its total outstanding shares;

5      (c)     Throughout the Class Period, over a dozen different firms and dozens of

6  analysts covered LendingClub common stock;

7      (d)     Throughout the Class Period, LendingClub was eligible to file an SEC S-3

8  Registration Statement;

9      (e)     As a regulated issuer, LendingClub filed periodic public reports with the

10  SEC; and

11      (f)     LendingClub   regularly   communicated   with   public   investors   via

12  established market communication mechanisms, including through regular dissemination of

13  press releases on the major news wire services and through other wide-ranging public

14  disclosures, such as communications with the financial press, securities analysts and other

15  similar reporting services.

16                          **CLASS ACTION ALLEGATIONS**

17      120.    Lead Plaintiff brings this action as a class action on behalf of all those who

18  purchased LendingClub common stock during the Class Period, including those who purchased

19  LendingClub common stock traceable to the Registration Statement (collectively, the "Class").

20  Excluded from the Class are defendants and their families, the officers, directors and affiliates of

21  defendants, at all relevant times, members of their immediate families and their legal

22  representatives, heirs, successors or assigns, and any entity in which defendants have or had a

23  controlling interest.

24      121.    The members of the Class are so numerous that joinder of all members is

25  impracticable.  LendingClub stock is actively traded on the NYSE.  While the exact number of

26  Class members is unknown to Lead Plaintiff at this time and can only be ascertained through

27  appropriate discovery, Lead Plaintiff believes that there are thousands of members in the

28  proposed Class because over 381 million shares were outstanding as of May 15, 2016.  Record

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                                         - 33

1   owners and other members of the Class may be identified from records maintained by

2   LendingClub or its transfer agent and may be notified of the pendency of this action by mail,

3   using the form of notice similar to that customarily used in securities class actions.

4       122.   Lead Plaintiff's claims are typical of the claims of the members of the Class, as all

5   members of the Class are similarly affected by defendants' wrongful conduct in violation of

6   federal law as complained of herein.

7       123.   Lead Plaintiff will fairly and adequately protect the interests of the members of

8   the Class and has retained counsel competent and experienced in class and securities litigation.

9       124.   Common questions of law and fact exist as to all members of the Class and

10   predominate over any questions solely affecting individual members of the Class.  Among the

11   questions of law and fact common to the Class are:

12           (a)    whether defendants violated the 1933 Act and/or 1934 Act and Rule 10b-5

13   promulgated thereunder;

14           (b)    whether the Registration Statement contained untrue statements of

15   material fact or omitted material information required to be stated therein;

16           (c)    whether the Registration Statement omitted material facts necessary in

17   order to make the statements made therein not misleading;

18           (d)    whether defendants made false or misleading statements of material fact

19   during the Class Period;

20           (e)    whether defendants knew or recklessly disregarded that their statements

21   were false and misleading during the Class Period;

22           (f)    whether the price of LendingClub stock was artificially inflated;

23           (g)    whether the market for LendingClub common stock was efficient; and

24           (h)    the extent of damage sustained by Class members and the appropriate

25   measure of damages.

26       125.   A class action is superior to all other available methods for the fair and efficient

27   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

28   the damages suffered by individual Class members may be relatively small, the expense and

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                          - 34 -

1   burden of individual litigation make it impossible for members of the Class to individually

2   redress the wrongs done to them.  There will be no difficulty in the management of this action as

3   a class action.

4                                           **COUNT I**

5                               **For Violation of §11 of the 1933 Act**
                                        **Against All Defendants**
6

7       126.    Lead Plaintiff incorporates ¶¶1-54, 120-123, 124(a)-(c), and 125 by reference.

8       127.    The Registration Statement contained untrue statements of material fact, omitted

    to state other facts necessary to make the statements made therein not misleading and/or omitted
9
    facts required to be stated therein.
10

11      128.    Laplanche, Dolan, and the Director Defendants each signed the Registration

12  Statement and caused it to be declared effective by the SEC on or about December 11, 2014.

13      129.    LendingClub is the registrant for the IPO and as issuer of the shares, LendingClub

14  is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

15      130.    Each of the defendants named herein is responsible for and are liable for the

16  contents and dissemination of the Registration Statement.

17      131.    Laplanche, Dolan, the Director Defendants, and the Underwriter Defendants'

18  failure to conduct an adequate due diligence investigation was a substantial factor leading to the

    harm complained of herein.  As a result of their roles with LendingClub, and their contacts and
19
    communications, the Director Defendants and the Underwriter Defendants should have known of
20
    the untrue and misleading statements of material fact contained in the Registration Statement.
21
    Laplanche, Dolan, the Director Defendants, and the Underwriter Defendants caused the
22
    Registration Statement to be filed with the SEC and to be declared effective, resulting in the
23
    issuance and sale of nearly 67 million LendingClub shares, which shares were purchased by
24
    Lead Plaintiff and the Class.
25

26      132.    None of the defendants named herein made a reasonable investigation or

27  possessed reasonable grounds for the belief that the statements contained in the Registration

28

1  Statement were true and did not omit any material facts required to be stated therein or facts that

2  were necessary to make the statements made therein not false or misleading.

3      133.    By reason of the conduct herein alleged, each defendant named in this Count

4  violated §11 of the 1933 Act.

5      134.    Lead Plaintiff acquired LendingClub common stock traceable to the Registration

6  Statement.

7      135.    Lead Plaintiff and the Class have sustained damages as a result of the 1933 Act

8  violations alleged herein.

9      136.    At the time of Lead Plaintiff's purchases of LendingClub common stock, Lead

10 Plaintiff and other members of the Class were without knowledge of the facts concerning the

11 wrongful conduct alleged herein and could not have reasonably discovered those facts.

12     137.    Less than one year elapsed from the time that Lead Plaintiff discovered or

13 reasonably could have discovered the facts upon which the initial complaint filed in this action is

14 based and the time that complaint was filed.  Less than three years has elapsed between the time

15 that the securities upon which this claim is brought were offered to the public and the time the

16 original complaint and this complaint were filed.

17                                    **COUNT II**

18                    **For Violation of §15 of the 1933 Act**
                **Against Laplanche, Dolan, and the Director Defendants**
19

20     138.    Lead Plaintiff incorporates ¶¶1-54, 120-123, 124(a)-(c), and 125-137 by

   reference.
21
       139.    This Count is brought pursuant to §15 of the 1933 Act against Laplanche, Dolan,
22
   and the Director Defendants.
23
       140.    Laplanche, Dolan, and each of the Director Defendants was a control person of
24
   LendingClub by virtue of his or her position as an owner, director, and/or senior officer of
25
   LendingClub.    Laplanche and Dolan oversaw all operations and financial controls at
26
   LendingClub and LendingClub could not have completed the IPO without Laplanche, Dolan, and
27
   the Director Defendants signing or authorizing their signatures on the Registration Statement.
28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                        - 36 -

141.    The Director Defendants had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of LendingClub.  Director Defendant Ciporin was a general partner at Canaan Partners, a related entity of which, Canaan VII LP, owned 15.7% of LendingClub prior to the IPO and Director Defendant Meeker was a managing member of KPCB Holdings, Inc., which owned 4.6% of LendingClub prior to the IPO.  Together these two entities owned 20.3% of LendingClub prior to the IPO and sold 5.7 million shares in the IPO for total proceeds of $85.5 million.

142.    Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed.  Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time the original complaint and this complaint were filed.

### COUNT III

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against LendingClub, Laplanche, and Dolan**

143.    Lead Plaintiff incorporates ¶¶1-43 and 50-125 by reference.

144.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

145.    LendingClub, Laplanche, and Dolan violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

1      (c)      engaged in acts, practices, and a course of business that operated as a

2  fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their

3  purchases of LendingClub stock during the Class Period.

4      146.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the

5  integrity of the market, they paid artificially inflated prices for LendingClub stock.   Lead

6  Plaintiff and the Class would not have purchased LendingClub stock at the prices they paid, or at

7  all, if they had been aware that the market prices had been artificially and falsely inflated by

8  defendants' misleading statements.

9                                    **COUNT IV**

10                         **For Violation of §20(a) of the 1934 Act**
                          **Against LendingClub, Laplanche, and Dolan**
11

12      147.    Lead Plaintiff incorporates ¶¶1-43, 50-125, and 144-146 by reference.

      148.    During their tenures as officers and/or directors of LendingClub, Laplanche, and
13
   Dolan were controlling persons of LendingClub within the meaning of §20(a) of the 1934 Act.
14
   By reason of their positions of control and authority as officers and/or directors of LendingClub,
15
   these defendants had the power and authority to cause LendingClub to engage in the conduct
16
   complained of herein.   These defendants were able to, and did, control, directly and indirectly,
17
   the decision-making of LendingClub, including the content and dissemination of LendingClub's
18
   public statements and filings described herein, thereby causing the dissemination of the
19
   materially false and misleading statements and omissions as alleged herein.   LendingClub
20
   exercised control over and directed the actions of its senior managers, directors and agents,
21
   including Laplanche and Dolan.   LendingClub controlled Laplanche, Dolan, and all of its
22
   employees.
23
      149.    In their capacities as senior corporate officers and/or directors of LendingClub,
24
   and as more fully described herein, Laplanche and Dolan participated in the misstatements and
25
   omissions set forth above.   Indeed, these defendants had direct and supervisory involvement in
26
   the day-to-day operations of the Company, and had access to non-public information regarding
27
   LendingClub's deceptive business practices and set the "tone at the top."   LendingClub,
28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA                                                                         - 38 -

1   Laplanche, and Dolan had the ability to influence and direct and did so influence and direct the

2   activities of the Company and its employees in their violations of §10(b) of the 1934 Act and

3   Rule 10b-5.

4       150.    As a result, LendingClub, Laplanche, and Dolan, individually and as a group,

5   were control persons within the meaning of §20(a) of the 1934 Act.

6       151.    As set forth above, LendingClub violated §10(b) of the 1934 Act.  By virtue of

7   their positions as controlling persons, Laplanche and Dolan are liable pursuant to §20(a) of the

8   1934 Act, jointly and severally with, and to the same extent as LendingClub is liable to Lead

9   Plaintiff and the other members of the Class.  LendingClub exercised control over Laplanche and

10  Dolan and all of LendingClub's employees and, as a result of its aforementioned conduct, is

11  liable pursuant to §20(a) of the 1934 Act, jointly and severally with, and to the same extent as

12  Laplanche and Dolan are liable to Lead Plaintiff and the other members of the Class.

13      152.    This claim is brought within the applicable statute of limitations.

14      153.    By reason of the foregoing, LendingClub, Laplanche, and Dolan violated §20(a)

15  of the 1934 Act, 15 U.S.C. §78(a).

16                          **PRAYER FOR RELIEF**

17      WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

18      A.      Determining that this action is a proper class action, certifying Lead Plaintiff as

19  the Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appointing

20  Lead Plaintiff's counsel Class Counsel;

21      B.      Declaring that defendants are liable pursuant to the 1933 Act and/or 1934 Act;

22      C.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class

23  members against all defendants, jointly and severally, for all damages sustained as a result of

24  defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

25      D.      Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as

26  well as reasonable attorneys' costs and expenses incurred in this action; and

27      E.      Awarding such other relief as the Court may deem just and proper.

28

1

**JURY DEMAND**

2

    Lead Plaintiff demands a trial by jury.

3
DATED:  June 15, 2017

ROBBINS GELLER RUDMAN
  & DOWD LLP

4
DARREN J. ROBBINS
JASON A. FORGE

5
SCOTT H. SAHAM
MICHAEL ALBERT

6
CARISSA J. DOLAN

7

8
              s/ JASON A. FORGE

9
              JASON A. FORGE

10
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058

11
619/231-7423 (fax)

12
ROBBINS GELLER RUDMAN
  & DOWD LLP

13
SHAWN A. WILLIAMS
Post Montgomery Center

14
One Montgomery Street, Suite 1800
San Francisco, CA  94104

15
Telephone:  415/288-4545
415/288-4534 (fax)

16
Lead Counsel for Lead Plaintiff Water and Power

17
Employees' Retirement, Disability and Death
Plan of the City of Los Angeles

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:16-cv-
02627-WHA

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on June 15, 2017, I authorized the electronic filing of the foregoing

3   with the Clerk of the Court using the CM/ECF system which will send notification of such filing

4   to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify

5   that I caused to be mailed the foregoing document or paper via the United States Postal Service

6   to the non-CM/ECF participants indicated on the attached Manual Notice List.

7       I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on June 15, 2017.

9                                   s/ JASON A. FORGE
                                   JASON A. FORGE

10

11                                  ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                   655 West Broadway, Suite 1900
12                                  San Diego, CA  92101-8498
                                   Telephone:  619/231-1058
13                                  619/231-7423 (fax)

14                                  E-mail:  JForge@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:16-cv-02627-WHA In re LENDINGCLUB SECURITIES LITIGATION

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Kyle Kenneth Batter**
  kylebatter@gmail.com, kylebatter@quinnemanuel.com

- **Lee S. E. Brand**
  lee.brand@stblaw.com, nanderson@stblaw.com

- **Brittany Nicole DeJong**
  dejong@whafh.com

- **Carissa Jasmine Dolan**
  cdolan@rgrdlaw.com, e_file_sd@rgrdlaw.com

- **Diane M. Doolittle**
  dianedoolittle@quinnemanuel.com, sandramorones@quinnemanuel.com

- **Jason A. Forge**
  jforge@rgrdlaw.com, e_file_sd@rgrdlaw.com, susanw@rgrdlaw.com, scotts@rgrdlaw.com, malbert@rgrdlaw.com

- **David Michael Grable**
  davegrable@quinnemanuel.com

- **Robert J. Gralewski , Jr**
  bgralewski@kmllp.com, fbrizuela@kmllp.com

- **Richard Martin Heimann**
  rheimann@lchb.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com, rmcgraw@scott-scott.com, efile@scott-scott.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com, paralegal@johnsonandweaver.com, michaelf@johnsonandweaver.com, ceciliar@johnsonandweaver.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com, disaacson@pomlaw.com, abarbosa@pomlaw.com, lpvega@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com

- **Robert John Liubicic**
  RLIUBICIC@MILBANK.COM, SRothenberg@milbank.com, SPayne@milbank.com, AFee@milbank.com

- **Marisa C. Livesay**
  livesay@whafh.com, boyles@whafh.com

- **Betsy Carol Manifold**
  manifold@whafh.com, tuazon@whafh.com, cabrera@whafh.com, boyles@whafh.com, loritsch@whafh.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com, james.napier@lacity.org, e_file_sd@rgrdlaw.com, e_file_sf@rgrdlaw.com

- **Blair Allen Nicholas**
  blairn@blbglaw.com, Benjamin.Riesenberg@blbglaw.com, denab@blbglaw.com, ashley.lee@blbglaw.com, Scott.Foglietta@blbglaw.com, AdamW@blbglaw.com, Avi@b

- **Jennifer Pafiti**
  jpafiti@pomlaw.com, kmsaletto@pomlaw.com, disaacson@pomlaw.com, abarbosa@pomlaw.com

- **Victoria Blohm Parker**
  vickiblohm@quinnemanuel.com, robinramirez@quinnemanuel.com, vickiparker@quinnemanuel.com, calendar@quinnemanuel.com

- **Thomas Harry Peters**
  thom.peters@lacity.org

- **John Mark Potter**
  johnpotter@quinnemanuel.com, amberburns@quinnemanuel.com, amber-burns-quinn-emanuel-1787@ecf.pacerpro.com, calendar@quinnemanuel.com

- **Susan Diane Resley**
  sresley@morganlewis.com, nhermez@orrick.com, yandrada@morganlewis.com

- **Rachele R. Rickert**
  rickert@whafh.com, tuazon@whafh.com, cabrera@whafh.com, boyles@whafh.com, loritsch@whafh.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Sarah L. Rothenberg**
  srothenberg@milbank.com

- **Scott H. Saham**
  scotts@rgrdlaw.com

- **Joseph Caldwell Sarles**
  josephsarles@quinnemanuel.com,shawnaallison@quinnemanuel.com,calendar@quinnemanuel.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

- **Simona Gurevich Strauss**
  sstrauss@stblaw.com,lsoboleva@stblaw.com,sblake@stblaw.com,jason.herrera@stblaw.com

- **Jacob Allen Walker**
  jake@blockesq.com,4836372420@filings.docketbird.com

- **Lucy Han Wang**
  lucy.wang@morganlewis.com

- **Lesley Elizabeth Weaver**
  lweaver@bfalaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Jonathan K. Youngwood**
  ManagingClerk@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)