1  Robert J. Liubicic (Bar No. 271465)
   RLiubicic@milbank.com
2  MILBANK, TWEED, HADLEY & McCLOY LLP
   2029 Century Park East, 33rd Floor
3  Los Angeles, California 90067
   Telephone: 424.386.4000
4  Facsimile: 213.892.4725

5
   *Attorneys for Defendant Renaud Laplanche*
6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10 | In re LENDINGCLUB SECURITIES        | Case No. 3:16-cv-02627-WHA
   | LITIGATION                          |
11 |                                     | CLASS ACTION
12 |                                     | **RENAUD LAPLANCHE'S**
   |                                     | **AMENDED ANSWER**
13 | This Document Relates To:           | **TO AMENDED CONSOLIDATED**
   |                                     | **COMPLAINT**
14 |     ALL ACTIONS.                    |
   |                                     | Judge:  Hon. William H. Alsup
15 |                                     | Courtroom:  8, 19th Floor

16

17

18

19

20

21

22

23

24

25

26

27

28
   DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

Defendant Renaud Laplanche, by his attorney, hereby submits this Amended Answer to the Amended Consolidated Complaint, dated June 15, 2017 (Dkt. 182) (the "Amended Complaint").

As a general matter, in responding to the allegations of the Amended Complaint, Mr. Laplanche:  (i) incorporates into each response a denial of all allegations in the Amended Complaint to the extent that they assert or suggest that the Offering Documents (defined as the Registration Statement, and all prior versions or subsequent amendments) were false or misleading in any respect; (ii) denies any allegations in the headings and subheadings of the Amended Complaint; and (iii) directs his responses exclusively to allegations made against Mr. Laplanche individually.

Mr. Laplanche further responds to the specific allegations in the Amended Complaint as follows:

> **[Unnumbered Introductory Paragraph:]** Lead Plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of LendingClub Corporation's ("LendingClub" or the "Company") U.S. Securities and Exchange Commission ("SEC") filings, Company releases, conference calls, public statements issued by defendants, media reports, analyst reports, industry reports, and consultation with persons familiar with LendingClub's business. Lead Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

> **[Answer:]**  This introductory paragraph requires no response.

> ### INTRODUCTION

> 1.      This is a securities class action on behalf of Lead Plaintiff and all purchasers of LendingClub common stock between December 11, 2014 and May 6, 2016, inclusive (the "Class Period"), including those who purchased LendingClub common stock traceable to the registration statement and prospectus incorporated therein, issued in connection with the Company's December 11, 2014 initial public stock offering ("IPO") (collectively, the "Registration Statement"). This action asserts violations of the Securities Act of 1933 (the "1933

DEF. LAPLANCHE'S AMENDED ANSWER                            CASE NO. 3:16-CV-02627-WHA

Act") and the Securities Exchange Act of 1934 (the "1934 Act"), as well as SEC Rule 10b-5 promulgated thereunder.

1.       Paragraph 1 contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations in this paragraph, except to admit that Lead Plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles ("Lead Plaintiff") purports to bring a securities class action asserting claims under the Securities Act, the Exchange Act, and SEC Rule 10b-5.  Mr. Laplanche specifically denies that this case is appropriate for class action treatment or that Lead Plaintiff has standing to sue, or to represent a putative class of similarly situated individuals or entities.

**2.**       With public skepticism of banks at a generational high, LendingClub portrayed itself as a peer-to-peer ("P2P") disruptor, just as Uber and Airbnb were to the taxi and hotel industries, respectively. Its founder and Chief Executive Officer ("CEO") Renaud Laplanche was the face and voice of this revolution: "We really believe we can transform the entire banking industry and make it more consumer friendly and more transparent and more cost efficient." Like other P2P leaders, LendingClub and Laplanche represented LendingClub as a ***marketplace*** where everyone would win: depositors (lenders) would get better returns, borrowers would get better rates, and LendingClub would profit from matchmaking fees rather than by "investing our own balance sheet and tak[ing] balance sheet risks in our loans."

2.       Mr. Laplanche admits that he is the founder of LendingClub and, until his resignation in May 2016, was its CEO and a director.  Mr. Laplanche further admits that LendingClub provides an online marketplace connecting borrowers and investors.  Mr. Laplanche otherwise denies that this paragraph reflects a fair or accurate description of LendingClub's business, operations, and/or public disclosures.

**3.**       It was a great story. If only it were true. As one of LendingClub's original directors, former U.S. Treasury Secretary Dr. Lawrence H. Summers, is fond of saying, "Confidence, trust and transparency are key to sustainable growth." LendingClub faked each of these. Defendant Laplanche brought in industry luminaries such as Dr. Summers and former Morgan Stanley CEO John J. Mack to serve as members of the LendingClub Board of Directors (the "Board"), to create an aura of legitimacy. But beneath this veneer, LendingClub lacked even the most basic internal controls, and this allowed its management to manipulate its performance by engaging in self-dealing, altering loan applications, and misleading institutional investors.

3.      Mr. Laplanche admits that former U.S. Treasury Secretary Dr. Lawrence H.

Summers and former Morgan Stanley CEO John J. Mack were LendingClub Directors, and

otherwise denies the allegations of Paragraph 3.

**4.**      Based on LendingClub's representations concerning its transparency,
marketplace neutrality, and lack of credit risk, LendingClub raised over $1 billion
from investors in its December 11, 2014 IPO, selling 66.7 million shares at $15
each, and its stock price climbed to almost $28 per share following the IPO.

4.      Mr. Laplanche admits that LendingClub sold shares of common stock to the

public in December 2014 pursuant to the Offering Documents, and respectfully refers the Court

to the Offering Documents and public market sources for an accurate record of LendingClub

common stock prices on relevant days.  Mr. Laplanche otherwise denies the allegations of

Paragraph 4.

**5.**      In 2016, however, LendingClub was forced to admit that much of its
success had been a mirage: "material weaknesses in internal control over financial
reporting" had manifested in undisclosed self-dealing, sales of non-conforming
loans, backdated loan applications, and such a damaged reputation, that after years
of proclaiming itself to be a neutral market maker that was not taking on credit
risk, LendingClub openly acknowledged that it had become its own best prospect
for new business. This was the equivalent of Airbnb boasting about the soaring
popularity of its P2P rental market and then having to use company assets to buy
hotels in order to pad rental volume. At the center of all this wrongdoing was
Laplanche, LendingClub's founder, Chairman, and CEO, as well as multiple
"senior managers," all of whom were terminated or forced to resign. Because
LendingClub's defective internal controls had always been a part of its
foundation, it was also forced to amend its Annual Report on Form 10-K for 2015
so as to reveal the existence of these material weaknesses, which rendered all of
its prior SEC filings wholly unreliable. On this news, LendingClub's share price
dropped 35% in a single day, and closed at $4.10 per share the next day – an 86%
drop from where LendingClub stock had traded during the week of its IPO.

5.      Mr. Laplanche admits that he resigned from his position as Chairman and CEO in

May 2016.  Mr. Laplanche further admits that in 2016, LendingClub amended its Form 10-K

Annual Report for 2015, and that on May 10, 2016, LendingClub's stock price closed at $4.10

per share.  The quoted material speaks for itself and requires no response.  Mr. Laplanche

otherwise denies the allegations of Paragraph 5.

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

6.    The full extent of LendingClub's exploitation of its deficient internal controls is not yet known, and the only assurance it has to offer regarding all of its reported results since going public in December 2014 is that "there is a reasonable possibility that a material misstatement of the company's annual [and] interim financial statements [was] not . . . prevented or detected on a timely basis." What this means is that shareholders do not know what they bought or what they own, which explains why the vast majority of LendingClub's post-IPO market value has been wiped out.

6.    The unsourced quoted material speaks for itself and requires no response.  Mr. Laplanche otherwise denies the allegations of Paragraph 6.

## JURISDICTION AND VENUE

7.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act and §22 of the 1933 Act. The claims asserted herein arise under §10(b) and §20(a) of the 1934 Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) and §11 and §15 of the 1933 Act (15 U.S.C. §77k and §77o).

7.    To the extent that Paragraph 7 states a legal conclusion, no response is required. To the extent a response is required, Mr. Laplanche admits that Lead Plaintiff purports to bring claims pursuant to the cited statutes, and otherwise denies the allegations of Paragraph 7.

8.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the 1933 Act as certain of the defendants reside, are headquartered, and/or maintain operations, in this District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District, the purchase of the Company's common stock by members of the Class (defined herein) who reside in this District, and the sale of the Company's common stock in this District by certain of the Underwriter Defendants (defined herein).

8.    To the extent that Paragraph 8 states a legal conclusion, no response is required. To the extent a response is required, Mr. Laplanche admits that LendingClub had a location within the Northern District of California during his tenure as CEO, and otherwise denies the allegations in Paragraph 8.

## PARTIES

**Lead Plaintiff**

**9.**     Lead Plaintiff purchased or acquired LendingClub common stock as described in the certification previously submitted to the Court, and incorporated herein, and was damaged thereby.

9.     Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9, except to admit that Lead Plaintiff filed a certification purporting to identify transactions in LendingClub common stock.

**10.**     The Los Angeles Department of Water and Power ("LADWP"), created by the Los Angeles City Charter ("Charter"), serves the water and electricity needs of the City of Los Angeles. Lead Plaintiff was created within LADWP by the Charter and is designed to promote financial security for LADWP employees and help them prepare for their future through programs that provide income at retirement and during times of disability; death benefits for beneficiaries; and continuation of benefits for eligible survivors.

10.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 10.

**Defendants**

**LendingClub**

**11.**     Defendant LendingClub is a Delaware corporation headquartered in San Francisco, California. The Company's shares are traded on the NYSE stock exchange under the ticker symbol "LC." The Company's headquarters are located in, and it conducts business in and from, this District.

11.     Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11, except to admit such allegations on information and belief as of May 2016.

**The Executive Defendants**

**12.**     Defendant Renaud Laplanche ("Laplanche") is LendingClub's founder and was its CEO and Chairman of the Board until May 5, 2016, when he was forced to resign. Throughout the Class Period, Laplanche signed the false and misleading Registration Statement and made statements in Company releases, conference calls, and other public forums as alleged herein, and signed and/or certified the Company's SEC filings pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), including, but not limited to, LendingClub's Reports on

DEF. LAPLANCHE'S AMENDED ANSWER                                    CASE NO. 3:16-CV-02627-WHA

Forms 10-Q and 10-K.

12.     Mr. Laplanche admits that he is LendingClub's Founder and, until May 2016, was its Chief Executive Officer and a LendingClub Director.  Mr. Laplanche further admits that, as CEO, Mr. Laplanche signed certain of LendingClub's filings with the SEC and made certain statements in public forums, including press releases and conference calls.  Mr. Laplanche otherwise denies the allegations of Paragraph 12.

**13.**     Defendant Carrie Dolan ("Dolan") was the Company's Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) ("CFO") throughout the Class Period. Dolan resigned on August 2, 2016. Throughout the Class Period, Dolan signed the false and misleading Registration Statement, made statements in Company releases and conference calls, and signed and/or certified the Company's SEC filings pursuant to the Sarbanes-Oxley Act of 2002, including, but not limited to, LendingClub's Reports on Forms 10-Q and 10-K.

13.     Mr. Laplanche denies the allegations of Paragraph 13, except admits that Carrie Dolan was LendingClub's Chief Financial Officer during the period December 11, 2014 to May 6, 2016, and that Ms. Dolan resigned on or about August 2, 2016.  Mr. Laplanche further admits that, as CFO, Ms. Dolan signed certain of LendingClub's filings with the SEC and made statements in press releases, conference calls, and in other public forums.  Mr. Laplanche otherwise denies the allegations in Paragraph 13.

**14.**     Laplanche and Dolan oversaw LendingClub's operations and financial controls, and LendingClub could not have completed the IPO without Laplanche, Dolan, and the Director Defendants (defined herein) signing or authorizing their signatures on the Registration Statement.

14.     Mr. Laplanche admits that he participated in overseeing certain aspects of LendingClub's operations and financial controls, and, along with Ms. Dolan and the Director Defendants, signed and/or authorized their signatures on certain documents in connection with LendingClub's IPO.  Mr. Laplanche otherwise denies the allegations of Paragraph 14.

**15.**     The Complaint asserts strict liability claims under §§11 and 15 of the Securities Act against LendingClub, Laplanche, and Dolan, as well as the Director Defendants listed at ¶¶16-23 and the Underwriter Defendants listed at ¶25.

15.    To the extent that Paragraph 15 states a legal conclusion, no response is required. To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 15.

**Director Defendants**

**16.**    Defendant Daniel T. Ciporin ("Ciporin") has been a director of the Company at all relevant times. Ciporin signed the false and misleading Registration Statement.

16.    Mr. Laplanche admits that Daniel T. Ciporin was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 16.

**17.**    Defendant Jeffrey Crowe ("Crowe") has been a director of the Company at all relevant times. Crowe signed the false and misleading Registration Statement.

17.    Mr. Laplanche admits that Jeffrey Crowe was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 17.

**18.**    Defendant Rebecca Lynn ("Lynn") was a director of the Company from March 2009 through June 10, 2015. Lynn signed the false and misleading Registration Statement.

18.    Mr. Laplanche admits that Rebecca Lynn was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 18.

**19.**    Defendant John J. Mack ("Mack") has been a director of the Company at all relevant times. Mack signed the false and misleading Registration Statement.

19.    Mr. Laplanche admits that John J. Mack was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 19.

**20.**    Defendant Mary Meeker ("Meeker") has been a director of the Company at all relevant times. Meeker signed the false and misleading Registration Statement.

20.    Mr. Laplanche admits that Mary Meeker was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 20.

**21.**    Defendant John C. (Hans) Morris ("Morris") has been a director of the Company at all relevant times. Morris signed the false and misleading Registration Statement.

21.     Mr. Laplanche admits that John C. (Hans) Morris was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 21.

**22.**     Defendant Lawrence H. Summers ("Summers") has been a director of the Company at all relevant times. Summers signed the false and misleading Registration Statement.

22.     Mr. Laplanche admits that Lawrence H. Summers was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 22.

**23.**     Defendant Simon Williams ("Williams") has been a director of the Company at all relevant times. Williams signed the false and misleading Registration Statement.

23.     Mr. Laplanche admits that Simon Williams was a LendingClub Director as of the time of the IPO, and otherwise denies the allegations of Paragraph 23.

**24.**     The defendants identified in ¶¶16-23 are referred to herein as the "Director Defendants."

24.     Paragraph 24 requires no response.

**Underwriter Defendants**

**25.**     Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman, Sachs & Co. ("Goldman Sachs"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("Citigroup"), Allen & Company LLC ("Allen"), Stifel, Nicolaus & Company, Incorporated ("Stifel"), BMO Capital Markets Corp. ("BMO"), William Blair & Company, L.L.C. ("William Blair") and Wells Fargo Securities, LLC ("Wells Fargo") served as underwriters of the Company's IPO, and participated in the preparation and dissemination of LendingClub's false and misleading Registration Statement.

25.     Mr. Laplanche admits that Morgan Stanley & Co. LLC, Goldman, Sachs & Co., Credit Suisse Securities USA LLC, Citigroup Global Markets Inc., Allen & Company LLC, Stifel, Nicolaus & Company, Incorporated, BMO Capital Markets Corp., William Blair & Company LLC, and Wells Fargo Securities LLC (the "Underwriter Defendants") served as underwriters of LendingClub's IPO and participated in preparing and disseminating the Registration Statement.  Mr. Laplanche otherwise denies the allegations of Paragraph 25.

**26.**      Defendants Morgan Stanley, Goldman Sachs, Credit Suisse, Citigroup,

DEF. LAPLANCHE'S AMENDED ANSWER                          CASE NO. 3:16-CV-02627-WHA

8

Allen, Stifel, BMO, William Blair, and Wells Fargo are referred to collectively herein as the "Underwriter Defendants."

26.     Paragraph 26 requires no response.

## BACKGROUND

**27.**     LendingClub purports to operate as an online marketplace that "matches" borrowers and investors. LendingClub facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors (i.e., "lenders") an opportunity to invest in loans based on term and credit characteristics.

27.     Mr. Laplanche admits that: (i) LendingClub operates an online marketplace for individuals seeking to borrow money and those seeking to invest in loans; (ii) that the LendingClub marketplace offers personal loans, consumer loans, educational loans, patient finance loans, and small business loans; and (iii) that those seeking to invest in LendingClub loans can do so based on term and credit characteristics.  Mr. Laplanche otherwise denies the allegations of Paragraph 27.

**28.**     Because LendingClub makes most of its money from origination and servicing fees (on loans it originates), it repeatedly emphasized the importance of loan originations to its financial results, stating:

> ***We believe originations are a key indicator of the adoption rate of our marketplace***, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction rates, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

28.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about whether the unsourced quotation is accurate, and for that reason denies the allegations of Paragraph 28.

**29.**     LendingClub described its marketplace as one in which (1) customers borrow to lower the cost of their credit and enjoy a "better experience" than traditional bank lending; and (2) "lenders" earn attractive risk-adjusted returns from an asset class that has generally been closed to individuals and is available

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

to institutional investors on only a limited basis.

29.     Mr. Laplanche denies that the allegations of Paragraph 29 present a fair and complete description of LendingClub's business, operations, and/or public disclosures, and respectfully refers the Court to the Offering Documents for a complete description of such matters as of the time of the IPO.

**30.**     LendingClub's borrowers apply on its website and are then matched with a lender or multiple lenders who can fund entire loans, portions of individual loans, and/or portions of pools of loans. In order to avoid state banking regulations, LendingClub then uses its primary issuing bank partner, WebBank, which simultaneously originates each loan and sells it to LendingClub (at a price that includes modest fees and interest). LendingClub buys these loans with the money from its "matched" lenders, and then services the loans. For its role, LendingClub receives an initial origination fee and then servicing fees on each payment throughout the term of the loan.

30.     Mr. Laplanche admits that potential borrowers apply on LendingClub's platform and may then be matched with a lender who may fund all or part of the requested loan.  Mr. Laplanche further admits on information and belief that WebBank originates loans facilitated through LendingClub's platform, and that LendingClub receives fees for loan originations made on its platform.  Mr. Laplanche otherwise denies the allegations in paragraph 30.

**31.**     LendingClub and Laplanche portrayed themselves as the industry's "good guys," stating "If I had to single out one thing I am the most proud of over the last six years, it has been the decision to constantly be the good guys of banking, how we have always decided in favor of our customers." Renaud Laplanche, Interview with Simon Cunningham of LendingMemo, November 20, 2013.

31.     The quoted material in Paragraph 31 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 31.

**32.**     LendingClub also emphasized that one of its competitive advantages was its transparency of reporting: "Our marketplace provides investors with the ***transparency*** and flexibility to quickly and easily tailor or modify their portfolio by utilizing specific investment criteria, such as credit attributes, financial data and loan characteristics." The Company's Registration Statement stated:

***Benefits to Investors***
                                *        *        *

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

10

*Transparency*. We provide investors with transparency and choice in building their loan portfolios. For each standard program loan, investors can examine credit attributes from the borrower's credit report and borrower-reported attributes prior to investing in a loan and can monitor ongoing loan performance. We also provide access to credit profile data on each approved loan as well as all of the historical performance data for every loan ever invested in through our marketplace. We specifically indicate the information that is verified on our website.

32.    The quoted material in Paragraph 32 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes LendingClub, Mr. Laplanche denies the allegations in Paragraph 32.

**33.**    In a letter to investors that was included in the Registration Statement, Laplanche emphasized how LendingClub had established investor confidence through its ***transparency*** with both borrowers and loan investors, stating;

I believe LendingClub has the potential to profoundly improve people's financial lives over the coming decades. Our mission of transforming the banking system is both audacious and achievable. Technology has successfully disrupted many industries to the benefit of society at large.

*        *        *

**Building Confidence**

We are not only bringing cost efficiency to the credit markets but also a more transparent and customer-friendly experience. Unlike traditional banks, we do not build confidence by establishing a branch at every street corner. Instead, we earn the trust of our customers by offering ***maximum transparency into our products'*** terms and performance.

*        *        *

We have established investor confidence by demonstrating the effectiveness of our risk ranking technology, as well as through the accuracy, ***transparency and granularity of our reporting***. We post on our platform the detailed performance of every single loan offered publicly to investors since inception, along with more aggregated performance statistics.

33.    The quoted material in Paragraph 33 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes Mr. Laplanche, he denies the allegations in Paragraph 33.

**IPO-RELATED ALLEGATIONS**

**34.** Defendants completed LendingClub's IPO, utilizing a Form S-1 registration statement, declared effective by the SEC on or about December 11, 2014, raising $1 billion from investors by selling more than 66.7 million shares of LendingClub common stock at $15 per share. The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make statements therein not materially false or misleading.

34. Mr. Laplanche admits that LendingClub completed its IPO, utilizing a Form S-1 registration statement, on or about December 11, 2014. Mr. Laplanche further admits that, through its IPO, LendingClub raised over $1 billion by selling 66.7 million shares at $15 each. Mr. Laplanche otherwise denies the allegations of Paragraph 34.

**Undisclosed Self-Dealing Masks Exposure to Credit Risks and Exaggerates Growth of Marketplace**

**35.** The Registration Statement represented that LendingClub did not assume credit risk or use the Company's own capital to invest in loans facilitated by its marketplace, stating:

> ***We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material.*** The capital to invest in the loans enabled through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

35. The quoted material in Paragraph 35 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 35.

**36.** This representation about LendingClub not participating in its marketplace made the Registration Statement's representations about LendingClub's whole loan sales and growth all the more impressive: Q3 2014 "***whole loan sales accounted for $367 million***"; and its steady loan-origination growth in 2014 had reached 47% by the end of the third quarter.

36. The quoted material in Paragraph 36 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 36.

**37.** One of the material weaknesses to which LendingClub has admitted was the inadequacy of its internal controls with respect to the disclosure of related-party transactions. This inadequacy did not merely increase the risk of self-dealing, it actually enabled it with respect to at least one family of funds (Cirrix Capital, L.P. ("Cirrix")). Cirrix was formed in 2012 for the sole purpose of purchasing loans from LendingClub, with which it had a working partnership. As part of this partnership, Cirrix had access to LendingClub's Board and received inside information regarding LendingClub's credit performance and underwriting. Yet, the Registration Statement contained a letter from Laplanche that falsely represented: "We are continuing to earn investor confidence every day by providing equal access and with [*sic*] a level playing field with the same tools, data and access for all investors, small and large, within a fair and efficient marketplace."

37. The quoted material speaks for itself and requires no response. Mr. Laplanche admits, on information and belief, that beginning in 2012, Arcadia Funds, LLC formed several special purpose investment entities ("SPEs") bearing the name "Cirrix" that primarily purchase prime consumer and small business installment loans and loan participations facilitated by LendingClub or other facilitators or originators of loan products. Mr. Laplanche otherwise denies the allegations of Paragraph 37.

**38.** Ciporin has admitted that the initiation of LendingClub's relationship with Cirrix was a pivotal moment for LendingClub's business.

38. Mr. Laplanche denies the allegations of Paragraph 38 to the extent they allege that the Offering Documents were false or misleading, and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 38.

**39.** Mack was heavily involved with Cirrix at the time of the LendingClub IPO, and his financial stake in Cirrix, together with Laplanche and LendingClub, reached over 30% during the Class Period.

39. Mr. Laplanche admits that as of the close of April 2016, Mr. Laplanche held an approximately $5 million limited partnership interest in a single Cirrix SPE that constituted an extremely small percentage of the assets under management for the Cirrix SPEs collectively, which, Mr. Laplanche further admits, on information and belief, had approximately $1.378 billion in assets under management as of May 2017. Mr. Laplanche otherwise denies or lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39.

40.   Cirrix's working partnership with LendingClub led to Silicon Valley Bank agreeing to lend Cirrix approximately three times the amount of capital it raised from investors. This enabled Cirrix to leverage its capital such that each $1 million capital investment in Cirrix allowed Cirrix to turn around and purchase approximately $4 million worth of LendingClub loans.

40.   Mr. Laplanche denies the allegations of Paragraph 40 to the extent they allege that the Offering Documents were false or misleading, and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40, and on that basis denies them.

41.   Because of LendingClub's working partnership with, and/or Laplanche's and Mack's investments in Cirrix, Cirrix was the only LendingClub loan investor that had access to all of the Company's loan programs, including private, public and small business loans. Laplanche and Mack also personally benefitted from their Cirrix investments.

41.   Mr. Laplanche admits that as of the close of April 2016, Mr. Laplanche held an approximately $5 million limited partnership interest in a single Cirrix SPE that constituted an extremely small percentage of the assets under management for the Cirrix SPEs collectively, which, Mr. Laplanche further admits, on information and belief, had approximately $1.378 billion in assets under management as of May 2017.  Mr. Laplanche otherwise denies the allegations of Paragraph 41.

42.   By the time of the IPO, LendingClub loans represented 100% of Cirrix's assets, and Cirrix's loan purchases drove LendingClub's pre-IPO results, representing 20% of LendingClub's critical loan-origination growth and nearly 5% of LendingClub's **total** sales of whole loans in the last quarter before the IPO. LendingClub has admitted that Laplanche and Mack owned 12% of Cirrix by the end of 2015, declining to reveal when their formal ownership stake first began. At least one news report indicates that it predated the IPO, and it is widely recognized that by April 1, 2016, LendingClub, Laplanche, and Mack owned a combined 31% of Cirrix that they had not disclosed to investors. From inception, LendingClub also provided Cirrix with a credit-support agreement under which LendingClub assumed millions of dollars of risk for the loans it sold to Cirrix (and itself). As such, LendingClub had significant influence over Cirrix and vice versa.

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

1    Although Cirrix was a related party, LendingClub's Registration Statement did
     not disclose this relationship or its transactions with Cirrix.[1]

2

3    [1] Accounting Standards Codification 850 defines relationships that trigger
     related-party disclosure obligations, including the following: "Other parties that
4    can significantly influence the management or operating policies of the
     transacting parties or that have an ownership interest in one of the transacting
5    parties and can significantly influence the other to an extent that one or more of
     the transacting parties might be prevented from fully pursuing its own separate
6    interests." ASC 850-10-20. Regulation S-K Item 303 (17 C.F.R. §229.303)
     requires disclosure of, among other things, (1) related-party transactions; and (2)
7    trends that can be reasonably expected to have a material impact on financial
     results.

8

9        42.    To the extent that Paragraph 42 (including footnote 1) states a legal conclusion,

10   no response is required.  To the extent a response is required, Mr. Laplanche admits that as of the

11   close of April 2016, Mr. Laplanche held an approximately $5 million limited partnership interest

12   in a single Cirrix SPE that constituted an extremely small percentage of the assets under

13   management for the Cirrix SPEs collectively, which, Mr. Laplanche further admits, on

14   information and belief, had approximately $1.378 billion in assets under management as of May

15   2017.  Mr. Laplanche further admits, on information and belief, that a "credit support agreement"

16   with a Cirrix SPE was disclosed at least as early as August 2014 in LendingClub's Form S-1

17   filed on August 27, 2014, in which LendingClub disclosed that it had pledged $3.4 million to an

18   investor to reimburse potential credit losses on loans.  Mr. Laplanche further admits that the

19   Cirrix SPE which was the subject of the credit support agreement was a _different_ SPE than the

20   one in which Mr. Laplanche, LendingClub, and Mr. Mack held limited partnership interests.  Mr.

21   Laplanche otherwise denies the allegations of Paragraph 42 (including footnote 1) to the extent

22   they allege that the Offering Documents were false or misleading; and denies that the allegations

23   of footnote 1 present a fair and complete description of the background and scope of the

24   accounting standards and regulations therein.

25       **43.**    The undisclosed relationship and transactions with Cirrix, including
         LendingClub's increasing reliance on Cirrix, rendered the Registration Statement
26       false and misleading with respect to LendingClub's loan originations, growth in
         loan originations, and assumption of credit risk.

27

28   DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

43.     Mr. Laplanche admits, on information and belief, that a "credit support agreement" with one of the Cirrix SPEs was disclosed at least as early as August 2014 in LendingClub's Form S-1 filed on August 27, 2014, in which LendingClub disclosed that it had pledged $3.4 million to reimburse a Cirrix SPE for potential credit losses on loans.  Mr. Laplanche further admits that the Cirrix SPE which was the subject of the credit support agreement was a <u>different</u> SPE than the one in which Mr. Laplanche, LendingClub, and Mr. Mack held limited partnership interests.  Mr. Laplanche otherwise denies the allegations of Paragraph 43.

**False Assurances About Data Integrity and Security**

44.     The Registration Statement further emphasized that LendingClub's technology included industry-standard compliance programs that ensured the integrity and security of information stored on the LendingClub platform, including access control and continuous monitoring programs to ensure data integrity and protect loan data from manipulation:

> Key elements of our technology include:
>
> *       *       *
>
> *Data Integrity and Security.* **We maintain an effective information security program based on well-established security standards and best practices, such as ISO2700x and NIST 800 series.** The program establishes policies and procedures to safeguard the confidentiality, ***integrity*** and availability of borrower and investor information. The program also addresses risk assessment, training, ***access control***, encryption, service provider oversight, an incident response program and ***continuous monitoring and review***.

44.     The quoted material in Paragraph 44 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 44.

45.     Contrary to its Registration Statement's assurances, LendingClub's data programs and preventive controls were inadequate to ensure the integrity and security of information stored on the LendingClub platform. The Company eventually admitted in May 2016 that it "had not designed and implemented an additional level of review and approval for live database changes that impact high risk fields to provide reasonable assurance that all loans allocated comply with investor instructions." This deficiency allowed LendingClub's senior management to alter loan information in a live database to facilitate the sale of

loans. Senior management's ability to change and manipulate information in live databases demonstrates the ineffectiveness of the Company's "Data Integrity and Security" program, and establishes that the Company's practices were not in fact "based on well-established security standards and best practices, such as ISO2700x and NIST 800 series."

45.    The unsourced quoted material in Paragraph 45 speaks for itself and requires no response.  Mr. Laplanche otherwise denies the allegations of Paragraph 45.

46.    An effective data integrity and security program that addresses access control, continuous monitoring and review, and risk assessment, would necessarily include security controls that: (1) protect Company data from manipulation by its insiders; and (2) enable the immediate detection and review of potential data manipulation by its insiders. Both ISO2700x and NIST 800 series best practices set forth applicable data management security controls and assessment procedures to prevent and detect the manipulation of corporate data by its insiders. Some examples of such best practices are:

- automated controls to detect, test, and verify changes to high-risk or anomalous data fields;
- automated logging of all changes to high-risk or anomalous data fields;
- continuous monitoring and review (both automated and manual) of logs; and
- user activity anomaly detection, which would immediately detect and report changes deemed unusual based on variables such as the insider's role within the organization or the insider's previous history of making similar changes.

46.    To the extent Paragraph 46 contains any factual allegations, Mr. Laplanche denies the allegations in this paragraph.

47.    On May 16, 2016, LendingClub admitted that the Company had "a gap in preventative controls related to data management," and described "enhancements" that it was implementing to provide basic protection against manipulation in order to correct this defect, including:

- "Enhancing the testing of data changes prior to deployment based on the risk of the change";
- "Reviewing change requests for key data attributes, prior to implementation, by the Internal Audit Team";
- "Validating that change requests for key data attributes have been properly executed";
- "Expanding the number of data fields that are logged for the changes";
- "Monitoring logs for key changes";

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

17

- "Refreshing training/communication on data change management processes";
- "Enhancing the end-to-end testing framework"; and
- "Completing a consulting engagement on data change management with a Big Four accounting firm; implementing appropriate best practices."

47.   The quoted material in Paragraph 47 speaks for itself and requires no response. Mr. Laplanche otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47.

**48.**   These remedial actions confirm that at the time of the IPO, LendingClub lacked an effective information security program addressing, *inter alia*, access control, continuous monitoring and review, and risk assessment as represented in the Registration Statement. The Company's prior absence of "[m]onitoring logs for key changes" is, by definition, incompatible with a data integrity and security program which addresses "continuous monitoring and review." Likewise, "implementing appropriate best practices" is inconsistent with already having in place "an effective information security program based on well-established security standards and best practices." More than that, the above "enhancements" are all rudimentary security controls set forth in both the NIST 800 and ISO2700x guidelines of best practices.

48.   Mr. Laplanche denies the allegations of Paragraph 48 to the extent they allege that the Offering Documents were false or misleading, and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48.

**49.**   As a result of these deficiencies in "Data Integrity and Security" that existed from the effective date of the IPO, senior managers were able to alter loan information in a live database. For example, over $22 million in near prime loans were sold to an institutional investor when those loans did not meet that investor's known requirements. In addition, an outside consultant identified hundreds of backdated whole loan applications. Backdating was just another way LendingClub could falsify its performance, by effectively drawing from a future reporting period to inflate present period performance.

49.   Mr. Laplanche admits that LendingClub learned in 2016 that approximately $15.1 million and $7.2 million in near-prime loans were sold to a single institutional investor in March and April 2016, respectively, and that these loans were later re-purchased from the investor and sold to another investor at par.  Mr. Laplanche denies the allegations of Paragraph 49 to the extent they allege that the Offering Documents were false or misleading, and otherwise lacks

DEF. LAPLANCHE'S AMENDED ANSWER                         CASE NO. 3:16-CV-02627-WHA

knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 49.

### LendingClub's Internal Controls Were Rife with Material Weaknesses

50.     What invited LendingClub's management to falsify and manipulate its performance was LendingClub's admittedly materially deficient internal controls. Yet, the Registration Statement incorporated the following statement from LendingClub's Q3 2014 Form 10-Q entitled "***Controls and Procedures***," which confirmed the adequacy of the LendingClub's internal controls over its financial reporting, stating:

> As required by Rule 13a-15(b) of the Exchange Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the quarter covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.

50.     The quoted material in Paragraph 50 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 50.

51.     In May 2016, LendingClub acknowledged "material weaknesses" in its internal controls over financial reporting. As LendingClub admitted, its internal controls were inadequate to provide reasonable assurance that:

> (a)     the Company maintained an effective control environment, compliance with the Company's Code of Conduct and Ethics Policy, and set an appropriate "tone at the top";

> (b)     related-party transactions were disclosed to the Company's reporting function;

> (c)     the Company's loans conformed to loan investors' purchase requirements; and

> (d)     there were full and required communications by management to LendingClub's risk and financial accounting departments, and appropriate oversight of investor contract amendments, particularly for those that could require material changes to LendingClub's financial statements.

DEF. LAPLANCHE'S AMENDED ANSWER                                    CASE NO. 3:16-CV-02627-WHA

51.     The quoted material in Paragraph 51 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 51 to the extent they allege that the Offering Documents were false or misleading, and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 51.

**52.**     LendingClub has also admitted that its internal controls had not changed over time. Therefore, the same material weaknesses existed at the time of the IPO. For example:

- Q1 2015 Form 10-Q: "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the three months ended March 31, 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."
- Q2 2015 Form 10-Q: "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the first half of 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."
- Q3 2015 Form 10-Q: "No change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) was identified during the first nine months of 2015, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting."

52.     The quoted material in Paragraph 52 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 52.

**53.**     The lack of controls from LendingClub's inception is demonstrated by the fact that in December 2009, Laplanche artificially inflated loan origination volume by taking out 32 loans for himself and 3 of his family members, amounting to nearly 10% of LendingClub's market activity for the entire month. The Company has admitted these loans were inappropriate and were made in order to "help increase reported platform loan volume."

53.     The unsourced quoted material in Paragraph 53 speaks for itself and requires no response.  Mr. Laplanche otherwise denies the allegations of Paragraph 53.

**54.**     The lack of controls prior to the IPO is also confirmed by LendingClub's admission that, in violation of Generally Accepted Accounting Principles ("GAAP"), it improperly inflated net asset values for six private investment funds managed by LendingClub's subsidiary LendingClub Advisors ("LCA") from

March 2011 through May 2016. LendingClub's Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q") states:

> The investment assets held by the Funds are essentially loans facilitated through the Company's platform and are "level 3 assets", for which no quoted market price is available and whose fair value is therefore subjective and is determined by LCA estimates and calculations.
>
> The Company determined that adjustments were made to the valuation of the Funds' assets that were not consistent with generally accepted accounting principles. These adjustments affected the direction and the specific returns reported in monthly statements sent to limited partners.

By inflating the value of these assets in violation of GAAP, LendingClub reported inflated economic returns of the funds and overcharged limited partners.[2]

[2] ASC 820-10-35-53 requires that the level 3 "[u]nobservable inputs [that defendants used, i.e., the "direction and the specific returns reported in monthly statements"] shall reflect the assumptions that market participants would use when pricing the asset . . . , including assumptions about risk." Furthermore, "[a] [fair value] measurement that does not include an [appropriate] adjustment for risk would not represent a fair value measurement if market participants would include one when pricing the asset." ASC 820-10-35-54.

54.     The quoted material in Paragraph 54 speaks for itself and requires no response. To the extent that Paragraph 54 (including footnote 2) states a legal conclusion, no responsive pleading is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 54 (including footnote 2) to the extent they allege that the Offering Documents were false or misleading, denies that the allegations of footnote 2 present a fair and complete description of the background and scope of the accounting standards therein, and otherwise denies the allegations of Paragraph 54.

## POST-IPO ALLEGATIONS

55.     Following its IPO, LendingClub and Laplanche continued to portray themselves as the industry's "good guys," stating:

- "We are positioned as the 'good guys of banking' by being transparent from day one about fees and performance." Renaud Laplanche, Interview with *HEC Magazine*, January 2015, available on http://www.lendingclub.com.

1
2
3

- "With financial services, reputation and trust is as important as just awareness. And so we're patiently building that reputation and that trust and I think the results of that [are] already pretty visible in some of our metrics and I think will continue to unfold over time." Renaud Laplanche, Q3 2015 LendingClub Earnings Call, October 29, 2015.

4
5
6
7

55.     The quoted material in Paragraph 55 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 55.

8

56.     LendingClub emphasized that a key feature of its business model was that the Company did ***not*** assume credit risk or use its own capital:

9
10

- "[I]t's all about reputation and track record. So we don't directly take credit risks." Renaud Laplanche, JPMorgan Global Technology, Media and Telecom Conference, May 20, 2015.

11
12
13
14

- "As the operator of a two-sided marketplace, Lending Club should remain neutral with respect to both sides of its marketplace (investors and borrowers). Requiring Lending Club to hold loans or pieces of loans on its balance sheet could cause Lending Club's interests to be inappropriately aligned with the investors' interests, to the detriment of borrowers." Renaud Laplanche, LendingClub's Letter to U.S. Treasury in Response to Request for Information, September 30, 2015.

15
16
17
18

- "We are very attached to the marketplace model. We think it's a superior model than any other models. We have no intentions as a matter of business model, to start investing our own balance sheet and take balance risks in our loans." Renaud Laplanche, Q4 2015 LendingClub Earnings Call, February 11, 2016.

19
20
21

56.     The quoted material in Paragraph 56 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 56.

22
23
24

57.     Likewise, LendingClub portrayed itself as disciplined in its growth, and attributed that discipline to its internal controls, as well as balanced supply and demand:

25
26

- "We believe our disciplined growth has helped us deliver a great user experience, and focus on risk management, internal controls, and IT security and scalability." Renaud Laplanche, Q4 2014 LendingClub Corp Earnings Call, February 24, 2015.

27
28

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

1
2
3
4
5
6
7
8
9
10
11

- "We continue to be very deliberate about our growth. Over the last three or four years we have been in this great position where we have not been either supply or demand constrained." Renaud Laplanche, Interview with Simon Cunningham of LendingMemo, March 10, 2015.
- "While we have continued to more than double originations and revenue year-over-year, we have been disciplined about growing only as fast as we believe is responsible and compatible with solid risk management and a great user experience that contribute to building and maintaining our brand and our reputation." Renaud Laplanche, Q1 2015 LendingClub Earnings Call, May 5, 2015.
- "At LendingClub, we've almost invented prudent growth. Over the last few years, we really haven't grown as fast as we could. We've grown in a very deliberate way. In a way that we believe we can control and helps focus a lot of attention on security, on risk management, on compliance controls, all the things that could break when one grows too fast." Renaud Laplanche, Keynote speech entitled "From Sapling to Ironwood, Marketplace Lending's Next Phase of Growth" at LendIt USA 2016 Conference, April 11, 2016.

12
13
14

57.     The quoted material in Paragraph 57 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 57.

15
16

**Increased Dependence on Cirrix**

17
18

**58.**     By March 2015, Cirrix had purchased nearly $200 million in loans from LendingClub. During 2015, Cirrix purchased an additional $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub.

19
20
21
22

58.     Mr. Laplanche admits that, in 2015, LendingClub reported that Cirrix had purchased $139.6 million of whole loans and $34.9 million of interests in whole loans from LendingClub.  Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 58.

23
24
25
26
27

**59.**     Due to its declining returns, however, by early 2016, Cirrix required an additional capital infusion in order to continue purchasing LendingClub loans. Laplanche and Mack infused Cirrix with cash, as Laplanche had secretly entered into arrangements whereby he could raise cash by using his LendingClub shares as collateral. Mack also provided Cirrix with an infusion so it could continue to purchase more LendingClub loans and avoid a total collapse in LendingClub's marketplace. Then, without disclosing their personal interests, Laplanche and

28

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

Mack caused LendingClub's Board to approve a $10 million direct investment in Cirrix, so LendingClub could purchase more of its own loans. As of close of business April 1, 2016, the Company, Laplanche, and Mack owned approximately 15%, 8%, and 8% of limited partnership interests in Cirrix, respectively, for an aggregate interest of approximately 31%. At the same time, whole loans and interests in loans facilitated by LendingClub's platform comprised 100% of Cirrix's assets.

59.    Mr. Laplanche admits that as of close of April 2016, Mr. Laplanche held an approximately $5 million limited partnership interest in a single Cirrix SPE that constituted an extremely small percentage of the assets under management for the Cirrix SPEs collectively, which, Mr. Laplanche further admits, on information and belief, had approximately $1.378 billion in assets under management as of May 2017.  Mr. Laplanche further admits that in April 2016, LendingClub closed a $10.0 million investment in a single Cirrix SPE.  Mr. Laplanche otherwise denies the allegations of Paragraph 59.

60.    This additional capital enabled LendingClub to continue using Cirrix to increase LendingClub's reported loan originations, revenues, and earnings per share ("EPS"). In fiscal 2015, LendingClub's fees from Cirrix amounted to 5% of its reported growth in servicing fees, and enabled LendingClub to double its EPS growth rate and slash its EPS losses by 50%.

60.    Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 60.

61.    Likewise, in Q1 2016, Cirrix purchased $114.5 million in LendingClub whole loans, which was equal to 6% of LendingClub's whole loan originations. That same quarter, Cirrix's loan purchases amounted to 67% of LendingClub's loan-origination growth.

61.    Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 61.

**February 2015 False and Misleading Statements**

**Loan Originations**

62.    In addition to each of the false and misleading statements in the Registration Statement, on February 24, 2015, the Company issued a release

announcing LendingClub's financial results for the fourth quarter and full year 2014. The release reported "*[l]oan originations in the fourth quarter of 2014 were $1,415 million.*" The release also noted the Company's "'strategy of fast yet disciplined growth,'" as well as its intention of "'growing originations and revenue at a fast, yet deliberate pace.'" Furthermore, for the fourth quarter of 2014, the release reported operating revenue of $69.6 million, adjusted EBITDA of $7.9 million, and a loss per share of $0.07.

62.   The quoted material in Paragraph 62 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub issued a release concerning its financial results in February 2015, and otherwise denies the allegations of Paragraph 62.

**63.**   On February 27, 2015, LendingClub filed its Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 Form 10-K"). The 2014 Form 10-K reported that in the fourth quarter of 2014, LendingClub's "marketplace facilitated over *$1.4 billion of loan originations*, of which approximately $0.2 billion were invested in through notes, $0.4 billion were invested in through certificates and $0.8 billion were invested in through whole loan sales."

63.   The quoted material in Paragraph 63 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub filed its 2014 Form 10-K in February 2015, and otherwise denies the allegations of Paragraph 63.

**Credit Risk and Internal Controls**

**64.**   The 2014 Form 10-K assured investors that the Company did not assume credit risk. It stated, in part:

> *We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material*. The capital to invest in the loans facilitated through our marketplace comes directly from a wide range of investors, including retail investors, high-net-worth individuals and family offices, banks and finance companies, insurance companies, hedge funds, foundations, pension plans and university endowments, and through a variety of channels, such as borrower payment dependent investment securities and whole loan purchases.

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

64.     The quoted material in Paragraph 64 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 64.

**65.**     The 2014 Form 10-K also added:

> As required by Rule 13a-15(b) of the 1934 Act, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2014. ***Based on the foregoing, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level.***

65.     The quoted material in Paragraph 65 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 65.

**66.**     The statements in ¶¶28-65 were materially false and materially misleading because:

(a)     LendingClub, Laplanche, and Dolan knew or recklessly disregarded that LendingClub's "tone at the top" was not one that emphasized best business practices or honest and complete disclosures;

(b)     LendingClub and Laplanche knew or recklessly disregarded that LendingClub's reported loan originations, loan originations growth, revenues/fees, and EPS all included undisclosed related-party transactions with Cirrix;

(c)     LendingClub and Laplanche knew or recklessly disregarded that contrary to its stated business model, LendingClub assumed material credit and liquidity risks, including tens of millions of dollars in a credit support agreement with Cirrix; and

(d)     LendingClub, Laplanche, and Dolan knew or recklessly disregarded that material weaknesses in LendingClub's internal controls meant that Laplanche and other senior managers were able to and did engage in undisclosed related-party transactions, sell non-conforming loans to investors, backdate loan applications, and render inaccurate the Company's financial reporting.

66.     Mr. Laplanche denies the allegations of Paragraph 66.

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

**May 2015 False and Misleading Statements**

**67.**     On May 5, 2015, the Company issued a release announcing its financial results for the first quarter of 2015. The release reported that "[l]oan originations in the first quarter of 2015 were $1,635 million, compared to $791 million in the same period last year, an increase of 107% year-over-year." Furthermore, for the first quarter of 2015, the release reported a loss per share of $0.02.

67.     The quoted material in Paragraph 67 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub issued a release concerning its financial results in May 2015, and otherwise denies the allegations of Paragraph 67.

**68.**     Also on May 5, 2015, the Company hosted an earnings conference call with investors and analysts to discuss its first quarter 2015 financial results. Defendant Laplanche discussed the Company's success in originating new loans using a growth strategy that was predicated on "solid risk management," stating:

>           While we have continued to more than double originations and revenue year-over-year, we have been disciplined about growing only as fast as we believe is responsible and compatible with solid risk management and a great user experience that contribute to building and maintaining our brand and our reputation.

68.     The material purportedly quoted from LendingClub's earnings call speaks for itself and requires no response.  To the extent a response is required or the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 68.

**69.**     On May 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"). The Q1 2015 Form 10-Q contained signed SOX Certifications by the Individual Defendants, stating that the financial information contained in the Q1 2015 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

69.     Mr. Laplanche admits that on May 5, 2015, LendingClub filed a Form 10-Q with the SEC, which included financial and operating results for the quarter ended March 31, 2015,

DEF. LAPLANCHE'S AMENDED ANSWER                                    CASE NO. 3:16-CV-02627-WHA

1   and certifications by Mr. Laplanche and others.  Mr. Laplanche otherwise denies the allegations

2   of Paragraph 69.

3        **70.**    The Q1 2015 Form 10-Q reported that in the first quarter of 2015, "our
4        marketplace facilitated $1.6 billion of loan originations, of which approximately
         $0.3 billion were invested in through notes, $0.5 billion were invested in through
5        certificates and $0.8 billion were invested in through whole loan sales."

6        70.    The quoted material in Paragraph 70 speaks for itself and requires no response.

7   Mr. Laplanche otherwise denies the allegations of Paragraph 70.

8

9        **71.**    The Q1 2015 Form 10-Q also stated:

10           ***We believe originations are a key indicator of the adoption rate
             of our marketplace***, growth of our brand, scale of our business,
11           strength of our network effect, economic competitiveness of our
             products and future growth. Loan originations have increased
12           significantly over time due to the increased awareness of our
             brand, our high borrower and investor satisfaction rates, the
13           effectiveness of our borrower acquisition channels, a strong track
             record of loan performance and the expansion of our capital
14           sources.

15

16       71.    The quoted material in Paragraph 71 speaks for itself and requires no response.

17  Mr. Laplanche otherwise denies the allegations of Paragraph 71.

18       **72.**    The Q1 2015 Form 10-Q also stated:

19           We do not assume credit risk or use our own capital to invest in
20           loans  facilitated  by  our  marketplace,  except  in  limited
             circumstances and in amounts that are not material. The capital to
21           invest in the loans enabled through our marketplace comes directly
             from investors.
22

23       72.    The quoted material in Paragraph 72 speaks for itself and requires no response.

24  Mr. Laplanche otherwise denies the allegations of Paragraph 72.

25       **73.**    The Q1 2015 Form 10-Q also added:

26           The management of the Company, with the participation of the
27           Company's Chief Executive Officer and Chief Financial Officer,

28  DEF. LAPLANCHE'S AMENDED ANSWER                          CASE NO. 3:16-CV-02627-WHA

has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of March 31, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of March 31, 2015.***

73.     The quoted material in Paragraph 73 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 73.

### August 2015 False and Misleading Statements

**74.**     On August 4, 2015, the Company issued a release announcing its financial results for the second quarter of 2015. The release reported that the Company had "'another very strong quarter'" and that "[l]oan originations in the second quarter of 2015 were $1.91 billion, compared to $1.01 billion in the same period last year, an increase of 90% year-over-year." Furthermore, for the second quarter of 2015, the release reported operating revenue of $96.1 million, adjusted EBITDA of $13.4 million, and a loss per share of $0.03.

74.     The quoted material in Paragraph 74 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub's Form 8-K issued on August 4, 2015 stated that LendingClub had an operating revenue of $96.1 million and an adjusted EBITDA of $13.4 million, that LendingClub issued a press release concerning its financial results in August 2015, and otherwise denies the allegations in Paragraph 74.

**75.**     On August 5, 2015, LendingClub filed its Report on Form 10-Q with the SEC announcing results for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"), stating, "our marketplace facilitated $1.9 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.6 billion were invested in through certificates and $1.0 billion were invested in through whole loan sales." The Company also made the same representations regarding the importance of loan originations as those set forth in ¶71.

75.     The quoted material in Paragraph 75 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub issued a release concerning its financial results in August 2015, and otherwise denies the allegations in Paragraph 75.

**76.**     The Q2 2015 Form 10-Q made the same representations regarding the Company not assuming credit risk as those set forth ¶72.

76.     Mr. Laplanche admits that LendingClub's Q2 2015 Form 10-Q stated: "We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material."  Mr. Laplanche otherwise denies the allegations of Paragraph 76.

**77.**     The Q2 2015 Form 10-Q also added:

> The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of June 30, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of June 30, 2015.***

77.     The quoted material in Paragraph 77 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 77.

**September-October 2015 False and Misleading Statements**

**78.**     On September 30, 2015, the Company publicly released its response to the U.S. Treasury Department's Request for Information (RFI) on Expanding Access to Credit through Online Marketplace Lending. The response made the following representation regarding the Company's assumption of credit risk:

> The Risks of Risk Retention
>
>         We believe there already is sufficient alignment of interest between credit marketplaces and investors and further alignment would be unnecessary. In fact, we believe that further alignment with investors could be counterproductive and contrary to borrowers' interest and the availability of affordable credit.
>
>         As the operator of a two-sided marketplace, Lending Club should remain neutral with respect to both sides of its marketplace (investors and borrowers). Requiring Lending Club to hold loans or pieces of loans on its balance sheet could cause Lending Club's

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

interests to be inappropriately aligned with the investors' interests, to the detriment of borrowers. As an example, platform rates are set based on expectations of future loan performance and the balance of supply and demand on the platform. As investors showed strong appetite for the loans originated through our marketplace, we were able to lower interest rates to borrowers. Over the last three years, the risk premiums required by investors on Lending Club's platform have decreased by 270 basis points. If we invested our own capital and earned interest on a portion of the loans, our financial incentive would be to keep interest rates artificially high irrespective of what the balance of supply and demand would otherwise suggest. This situation would result in making credit more costly for consumers and small business owners.

(Footnote omitted.)

78. The quoted material in Paragraph 78 speaks for itself and requires no response. To the extent a response is required or the Complaint misquotes LendingClub, Mr. Laplanche admits that LendingClub released its response to the Treasury Department's inquiries in September 2015, and otherwise denies the allegations of Paragraph 78.

**79.** On October 29, 2015, the Company issued a release announcing its financial results for the third quarter of 2015. The release reported that the Company "'had another spectacular quarter'" and that "[l]oan originations in the third quarter of 2015 were $2.24 billion, compared to $1.17 billion in the same period last year, an increase of 92% year-over-year."

79. The quoted material in Paragraph 79 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub issued a release concerning its financial results in October 2015, and otherwise denies the allegations of Paragraph 79.

**80.** Also on October 29, 2015, the Company hosted an earnings conference call with investors and analysts to discuss its third quarter 2015 financial results. Defendant Laplanche assured investors of the Company's track record at building its customers' trust. For example, he stated:

[I]n financial services, there's really no short cuts. It's not like some other consumer products where you can really connect the dots between awareness and sales. With financial services, reputation and trust is as important as just awareness. And so we're patiently building that reputation and that trust and I think the

results of that already pretty visible in some of our metrics and I think will continue to unfold over time.

80.     The quoted material in Paragraph 80 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub held a conference call concerning its financial results on October 29, 2015, and otherwise denies the allegations of Paragraph 80.

**81.**     During the October 29, 2015 earnings call, Laplanche made the following statement regarding the diversity and "very broad appetite" of the Company's investor base and its ability to "manage the flow of both supply and demand":

> We think, again, that's a great benefit of the model now. That benefit will get even stronger in some different economic environments, especially as we go into the next cycle and we will show the resiliency [of] the very diverse investor database we've built very patiently over the last eight years. I think we've ha[d] a big competitive advantage over some of the newer platforms that, for the most part, have no retail investors and considerable concentration in investor base or strong reliance on the securitization markets, which really isn't our case at all.

At the time Laplanche was boasting about the "very diverse investor database" LendingClub had built over the past eight years, his and LendingClub's years' long use of Cirrix had reached hundreds of millions of dollars of related-party purchases of LendingClub loans.

81.     The quoted material in Paragraph 81 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 81.

**82.**     On November 3, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q") reporting that in the third quarter of 2015, "our marketplace facilitated $2.2 billion of loan originations, of which approximately $0.3 billion were invested in through notes, $0.7 billion were invested in through certificates and $1.2 billion were invested in through whole loan sales." The Company also made the same representations regarding the importance of loan originations as those set forth in ¶71.

82.     The quoted material in Paragraph 82 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub filed its Q3 2015 Form 10-Q in November 2015, and otherwise denies the allegations of Paragraph 82.

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

**83.**     The Q3 2015 Form 10-Q made the same representations regarding the Company not assuming credit risk as those set forth in ¶72.

83.     The quoted material in paragraph 72 and referenced in Paragraph 83 speaks for itself and requires no response.  Mr. Laplanche otherwise denies the allegations of Paragraph 83.

**84.**     The Q3 2015 Form 10-Q also added:

> The management of the Company, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of September 30, 2015. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of September 30, 2015.***

84.     The quoted material in Paragraph 84 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 84.

**85.**     The statements in ¶¶67-84 were materially false and materially misleading because LendingClub, Laplanche, and/or Dolan knew or recklessly disregarded the facts set forth in ¶66 above.

85.     Mr. Laplanche denies the allegations of Paragraph 85.

**December 2015-February 2016 False and Misleading Statements**

**86.**     On December 2, 2015, Laplanche addressed investors at the Credit Suisse Technology, Media & Telecom Conference. When asked where LendingClub's "next leg of growth" is going to come from, he responded, in part:

> We are really not in a situation where some of the specialty finance companies or banks, even where in the mortgage crisis, pre-mortgage crisis, where they decide on how much risk they are taking, but then eventually they sort of sell that off to investors.

> We have an immediate check with investors, a lot of transparency as to what the quality is, a lot of disclosures.

1          86.     The quoted material in Paragraph 86 speaks for itself and requires no response.

2  To the extent a response is required, Mr. Laplanche admits that he spoke at the Credit Suisse

3  conference in or about December 2015.  To the extent the Complaint misquotes Mr. Laplanche,

4  he denies the allegations of Paragraph 86.

5          **87.**     On December 9, 2015, Laplanche was fielding questions at the Goldman
6     Sachs US Financial Services Conference, when the following exchange took
      place:

7
8          **Unidentified Participant**

9              I'm just curious, with coming out of the crisis, with
10         regulators more and more insisting on underwriters keeping some
           amount of interest in their loans to make sure that they behave
11         properly – I'm just curious, how do you have the confidence to
           think that you're not going to have to go to that model over a period
12         of time? And/or, even if you don't have to go to that model, do you
           worry about liability issues in the first really tough credit cycle, in
13         terms of things coming back to bite you?

14         **Renaud Laplanche**

15             Yes. So, I think there were questions when we got started
16         about – I mean, mostly from investors, feeling, okay, why as an
           investor should I have the confidence to invest in the platform, if
17         you, the operator of the platform, are not eating your own dog food,
           in a way.
18                              *       *       *
19             Our situation is almost the opposite of what you've seen in
           the mortgage space in 2008, where it was a very diffused and long
20         chain of intermediaries touching the loans, and the brokers were
           different from the originators, from the rating agencies, from the
21         investors, from the servicers.

22             In our case, we acquire the borrowers, originate the loan,
           price them, and service them. If the loan doesn't perform, it's us.
23         We have nobody else to point fingers to. And that builds a
           tremendous amount of accountability.
24
25             And when you add on top of that the transparency we're
26         providing in the (inaudible) population, and every investor can
           check the exact makeup of the population, and the transparency we
27         provide in performance, including first payment default, and 3-
           month and 6-month on book delinquencies, there's a very tight

28  DEF. LAPLANCHE'S AMENDED ANSWER                                  CASE NO. 3:16-CV-02627-WHA

feedback loop with our investor base, and they are watching very carefully the quality of the origination and the quality of the servicing.

I think, even if we wanted to, there would be no way for us to degrade either underwriting or servicing without the investors being aware and reacting to it.

87.     The quoted material in Paragraph 87 speaks for itself and requires no response. To the extent a response is required, Mr. Laplanche admits that he spoke at the Goldman Sachs conference in or about December 2015.  To the extent the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 87.

**88.**     On February 11, 2016, the Company issued a release announcing its financial results for the fourth quarter and full year 2015. The release reported that "[l]oan originations in the fourth quarter of 2015 were $2.58 billion, compared to $1.41 billion in the same period last year, an increase of 82% year-over-year." Furthermore, for the fourth quarter of 2015, the release reported operating revenue of $134.5 million, adjusted EBITDA of $24.6 million, and EPS of $0.01.

88.     The quoted material in Paragraph 88 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub issued a release concerning its financial results in February 2016, and otherwise denies the allegations of Paragraph 88.

**89.**     Also on February 11, 2016, the Company hosted a conference call with investors and analysts to discuss its fourth quarter and full year 2015 financial results. When asked by an analyst whether LendingClub "may be open to securitizing its own loans for the first time" and, if so "what sort of balance sheet risk would that expose" the Company to, Laplanche responded:

We are very attached to the marketplace model. We think it's a superior model than any other models. We have no intentions as a matter of business model, to start investing our own balance sheet and take balance sheet risks in our loans.

As we said in the past, we can always use our balance sheet on a temporary basis for test programs, but this would always be a very small. Again, no change in the business model. What's going to continue to happen, is some of our investors on the platform can turn around and refinance themselves on the securitization [lockout] and we want to support them and do what's right for them.

DEF. LAPLANCHE'S AMENDED ANSWER                                    CASE NO. 3:16-CV-02627-WHA

89.     The quoted material in Paragraph 89 speaks for itself and requires no response. To the extent a response is required, Mr. Laplanche admits that he participated in a conference call concerning LendingClub's financial results in or about February 2016.  To the extent the Complaint misquotes Mr. Laplanche, he denies the allegations of Paragraph 89.

**90.**     On February 22, 2016, LendingClub filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 Form 10-K"). The Company's 2015 Form 10-K reported that "[i]n 2015, our marketplace facilitated over $8.4 billion of loan originations, of which approximately $1.3 billion were invested in through notes, $2.6 billion were invested in through certificates and $4.5 billion were invested in through whole loan sales."

90.     The quoted material in Paragraph 90 speaks for itself and requires no response. Mr. Laplanche admits that LendingClub filed its 2015 Form 10-K in February 2016, and otherwise denies the allegations of Paragraph 90.

**91.**     The 2015 Form 10-K further stated:

Our business model is not dependent on using our balance sheet and assuming credit risk for loans facilitated by our marketplace. In order to support contractual obligations (Pool B loans), regulatory commitments (direct mail), the testing of pilot loan programs, or customer accommodations, we may use our capital on the platform from time to time on terms that are substantially similar to other investors.

91.     The quoted material in Paragraph 91 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 91.

**92.**     The 2015 Form 10-K also added:

As required by Rule 13a-15(b) of the 1934 Act, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures as of December 31, 2015. Based on the foregoing, the Company's Chief Executive Officer and Chief Financial Officer

have concluded that its disclosure controls and procedures were effective at a reasonable assurance level.

92.     The quoted material in Paragraph 92 speaks for itself and requires no response.

Mr. Laplanche otherwise denies the allegations of Paragraph 92.

**93.**     Laplanche and Dolan signed SOX Certifications of LendingClub's 2014 Form 10-K, Q1-Q3 2015 Forms 10-Q and 2015 Form 10-K. In their SOX Certifications, Laplanche and Dolan certified, among other things, that they had reviewed each report and that:

    2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.     Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

    4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . ; and

    5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

93.     Mr. Laplanche admits that he signed certain SOX certifications in connection with LendingClub's 2014 Form 10-K, Q1 - Q3 2015 Forms 10-Q and 2015 Form 10-K.  The quoted material in Paragraph 93 speaks for itself and requires no response.  Mr. Laplanche otherwise denies the allegations of Paragraph 93.

94.     The statements in ¶¶86-92, as well as the SOX Certifications, were materially false and materially misleading when made. The true facts which were then known to or recklessly disregarded by LendingClub, Laplanche, and/or Dolan were as described in ¶66. In addition, Laplanche had formulated and induced the Board to approve a $150 million common stock buyback program in order to prop up the trading price of LendingClub stock and thereby avoid the investor scrutiny that would result therefrom.

94.     Mr. Laplanche denies the allegations of Paragraph 94.

## LENDINGCLUB'S ADMISSIONS CONFIRM DEFENDANTS' FALSE AND MISLEADING STATEMENTS

95.     On May 9, 2016, LendingClub shocked investors when it disclosed in an SEC filing that its Board had accepted the resignation of its Chairman, CEO and founder, Laplanche. The Company reported that Laplanche had resigned after the Board learned, among other things, that LendingClub had intentionally falsified data on millions of dollars in loans, and that three senior managers had been involved in a $22 million sale of loans to an investor (later identified as the Jeffries Group), where the quality of loans LendingClub had provided was "in contravention of the investor's express instructions" regarding loan quality (it was later revealed that Laplanche had not been candid during an inquiry into this fraudulent activity).

95.     Mr. Laplanche admits that LendingClub's May 2016 Form 8-K stated that the Company's board of directors had accepted the resignation of Mr. Laplanche following an internal review of sales of $22 million in near-prime loans to a single investor.  Mr. Laplanche otherwise denies the remaining allegations of Paragraph 95.

96.     In the same SEC filing, the Company also disclosed another problem: that one executive and one Board member (later revealed as Laplanche and Mack, respectively) had concealed their personal interests in a fund (later identified as Cirrix) that Laplanche had convinced LendingClub to invest in.

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

96.     Mr. Laplanche denies the allegations of Paragraph 96.

**97.**     The news on May 9, 2016 dealt a blow to LendingClub stock, causing its share price to fall nearly 35%, to close at $4.62. It continued to fall for the next four days, resulting in a total decline of over 50%. This price decline was significantly different from that of the NYSE composite price, which increased over the same period.

97.     Mr. Laplanche admits that on May 9, 2016, LendingClub's stock price closed at $4.62 per share, and that LendingClub's stock price continued to fall for the next four days. Mr. Laplanche otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 97.

**98.**     In response to these revelations, analysts slashed their ratings and/or price targets on LendingClub stock. In a report dated May 9, 2016, entitled "Risk Intensifies Following CEO Exit/Internal Probe; Reiterate Sell, PT to $4," Compass Point Research & Trading, LLC predicted that "many institutional investors will either pause in supplying capital and/or demand wider spreads from LendingClub near-term" and that LendingClub's disclosures would result in greater regulatory scrutiny.

98.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 98.

**99.**     The same day, Guggenheim Securities, LLC issued a report that downgraded LendingClub, noting that "LC may lack a culture of compliance," and noting that "the disclosure of the series of control failures underscores [LendingClub's] need to improve its oversight and compliance related to internal control issues."

99.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 99.

**100.**     According to Morgan Stanley Research:

**CEO's departure likely to undermine the confidence of banks and other institutional investors**: CEO Renaud Laplanche and three unnamed executives resigned following an internal audit

regarding improper allocation of $22mn of loans to an investor. The direct impact is limited – the $22mn were bought back and resold at par – but the bigger potential impact is clearly the reputational damage, which could ultimately be detrimental to LC's institutional funding. We've made the point in the past that LC's reputation and track record are key distinguishing attributes that would have kept it relatively insulated from the ebbs and flows of institutional demand across the broader marketplace lending industry. This is clearly a setback to that assertion.

100.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 100.

**101.**     On May 16, 2016, LendingClub filed a Quarterly Report on Form 10-Q with the SEC (the "Q1 2016 Form 10-Q") revealing that it had received a grand jury subpoena and confirming that it was under investigation by the U.S. Department of Justice ("DOJ"). LendingClub also confirmed that it had identified material weaknesses in its internal controls over financial reporting and a "[l]ack of transparent communication and appropriate oversight" of dealings with investors and, as a result, LendingClub was contemplating a dramatic shift in its business model.[3] Specifically, addressing its internal controls, which were the same deficient controls existing at the time of the IPO, LendingClub admitted that:

> The identified material weakness is the result of the aggregation of control deficiencies related to the Company's "tone at the top," which manifested in three primary areas described further below. In addition, the Company has concluded that the material weakness identified as of March 31, 2016 also existed at the end of 2015 and therefore that its disclosure controls and procedures were ineffective and not operating at the reasonable assurance level as of December 31, 2015.
> *       *       *
> The control environment, which includes the Company's Code of Conduct and Ethics Policy, is the responsibility of senior management, and sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting. Although each area described below involved its own deficiencies, a significant contributing factor to all of the deficiencies aggregating to a material weakness was the Company's lack of an appropriate tone at the top set by certain members of senior management.

[3] A material weakness, as defined in PCAOB Auditing Standard No. 5 ("AS

5"), is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis." AS 5.A7.

101.    The material purportedly quoted from LendingClub's Form 10-Q requires no response.  Mr. Laplanche otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 101.

**102.**    The Q1 2016 Form 10-Q also disclosed for the first time that LendingClub may [*sic*] have to take loans onto its balance sheet because of repurchase obligations, and that its May 9, 2016 disclosures had eroded lender confidence to the point that LendingClub would have to offer inducements and/or use an even "greater amount of its own capital to purchase loans on its own platform." Put simply, after years of disclaiming any participation in its own marketplace, LendingClub had to admit that in order to avoid the collapse of its marketplace, it would have to sell more of its loans *to itself*. "These actions likely may have material adverse impacts on the Company's business, financial condition (including its liquidity), results of operations and ability to sustain and grow loan volume."

102.    The material purportedly quoted from LendingClub's Form 10-Q requires no response.  Mr. Laplanche otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 102.

**103.**    On May 16, 2016, The Wall Street Journal published an article entitled "LendingClub Discloses Justice Probe, Potential Shift in Business Model." LendingClub reportedly received a criminal grand jury subpoena from the DOJ on May 9, 2016, i.e., the same day it announced Laplanche's forced resignation. The Wall Street Journal also reported that LendingClub had been contacted by the SEC.

103.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 103.

**104.**    On May 18, 2016, The Wall Street Journal published an article entitled "New York's Financial Regulator Subpoenas LendingClub," reporting that New York's Department of Financial Services had launched an inquiry into the business practices of LendingClub going back to 2013.

DEF. LAPLANCHE'S AMENDED ANSWER                                    CASE NO. 3:16-CV-02627-WHA

104.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 104.

105.    According to a May 25, 2016 Macquarie Research report, "LendingClub ('LC') has had a tumultuous few weeks, and investor confusion surrounding the shock resignation of its co-founder, Chairman, and CEO Renaud Laplanche due to improper loan sales and personal investment disclosures remains an overhang. These events raise questions around LC's internal controls, its culture, and the resiliency of marketplace lending models in general."

105.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 105.

106.    LendingClub has also revealed that the Company took, and needed to continue to take, "remediation steps to resolve the material weaknesses in internal control over financial reporting identified in the first quarter of 2016," including the termination or resignation of three other senior managers. These three senior managers who were fired or resigned were reportedly involved in loan sales at the Company were (a) Jeff Bogan, who had worked at the Company since April 2012 and was the Company's Head of Investor Group; (b) Adelina Grozdanova, who had worked at the Company since July 2013 and was Vice President, Head of Institutional Investors; and (c) Matt Wierman, who left as a Senior Vice President and no later than 2013 was in charge of Product Performance at the Company. Bogan and Grozdanova had both come from Morgan Stanley and had helped prepare LendingClub for its IPO.

106.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the unsourced quotation.  Mr. Laplanche admits that Jeff Bogan began working at LendingClub in approximately 2012 and worked as the Head of its Institutional Group; that Adelina Grozdanova previously worked at Morgan Stanley and began working at LendingClub in approximately 2013 and worked as the Vice President of its Institutional Group; that Matt Wierman previously worked at Morgan Stanley and began working at LendingClub in approximately 2011 and worked as its Senior Vice President of Marketing; and that each departed LendingClub in approximately 2016.  Mr. Laplanche otherwise denies the allegations of Paragraph 106.

1

107.    On June 28, 2016, LendingClub announced that the review by the Board subcommittee previously disclosed in the Q1 2016 Form 10-Q identified yet more items that necessitated additional review. First, the Company announced that adjustments that had been made to the valuation of six private investment funds (the "Funds") managed by LCA were not consistent with GAAP. As a result of the additional review, the Company announced that it would take certain remedial measures.

107.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 107.

## ADDITIONAL SCIENTER ALLEGATIONS

108.    In addition to his conscious decision to deceive the Board regarding his ownership interest in a company doing business with LendingClub and, along with other senior managers, manipulating data in live databases to make loan packages appear to comply with lender guidelines, Laplanche further exploited LendingClub's lack of internal controls to engage in other deceptive practices. For example, Laplanche concealed from the Board his manipulation of reported loan volume prior to the IPO, when he took out 32 loans for himself and family members in order to misleadingly increase LendingClub's reported platform volume by nearly 10%. Loan volumes are a key metric for potential investors to gauge the potential of LendingClub's marketplace. The Company has admitted these loans were inappropriate and were made in order to "help increase reported platform loan volume," confirming that Laplanche had corrupted LendingClub's operations since inception.

108.    The quoted material in Paragraph 108 speaks for itself and requires no response. Mr. Laplanche otherwise denies the allegations of Paragraph 108.

109.    The SEC is further investigating Laplanche's role in LendingClub's buyback plan, scrutinizing whether Laplanche advocated for LendingClub to use its cash to prop up its shares without telling the Board about a possible conflict of interest. Laplanche failed to disclose to the Board prior to obtaining Board approval of the $150 million buyback in February 2016 that he had pledged his shares as collateral for a loan and was required to put up more money if the price of LendingClub stock declined below a certain level.

109.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning the subject of any government investigation.  Mr. Laplanche otherwise denies the allegations of Paragraph 109.

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

110.     LendingClub also admitted that there were "material weaknesses" in the Company's internal controls over its financial reporting. The Company admitted that these material weaknesses existed in 2015 and were the result of the aggregation of control deficiencies related to LendingClub's "***tone at the top***," a term explained in the Committee of Sponsoring Organizations Framework for Internal Controls ("COSO Framework") that implicates the top-level of an organization's management, including the CEO and CFO – the roles defendants Laplanche and Dolan occupied at LendingClub.[4]  Moreover, the SOX Certifications defendants Laplanche and Dolan executed in 2014 and throughout 2015 stated there had been "no change" in controls during the interim periods.

[4] The COSO Framework was developed and published in 1992 by COSO of the former Treadway Commission. The 1992 publication included a section entitled "Reporting to External Parties," and in 1997 COSO issued an addendum to this section. According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity. The COSO Framework summarizes the control environment as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

110.     Mr. Laplanche admits that LendingClub disclosed material weaknesses in internal controls in May 2016, and that he executed certifications pursuant to the Sarbanes-Oxley Act in 2014 and 2015.  The footnote in Paragraph 110 contains legal conclusions to which no response is required.  Mr. Laplanche otherwise denies the allegations of Paragraph 110.

111.     In its Q1 2016 Form 10-Q, LendingClub admitted that, as of March 31, 2016, the Company's internal control over financial reporting was ineffective. The Company also admitted that its internal control over financial reporting was ineffective as of December 31, 2015, and likewise filed statements that there had been "no change" of those controls during the Class Period. Thus, Laplanche and Dolan were aware or deliberately reckless in disregarding that the SOX Certifications they signed during the Class Period, which attested to the accuracy and completeness of the Company's financial statements and effective internal controls, were false, in light of the admitted material weakness in the Company's

DEF. LAPLANCHE'S AMENDED ANSWER                                   CASE NO. 3:16-CV-02627-WHA

internal controls over financial reporting.

111.    Mr. Laplanche admits that LendingClub disclosed material weaknesses in internal controls in May 2016, and that he executed certifications pursuant to the Sarbanes-Oxley Act in 2014 and 2015.  Mr. Laplanche otherwise denies the allegations of Paragraph 111.

112.    LendingClub admitted that, prior to December 31, 2015, it used LCA to purchase expiring LendingClub loans, even though doing so was outside the investment guidelines LCA had promised its investors. Laplanche, Dolan, and LendingClub's General Counsel comprised LCA's Investment Policy Committee and were responsible for managing LCA's portfolio of loans and verifying conformity with its investment guidelines.

112.    Mr. Laplanche admits that, during certain periods, he served on LCA's Investment Policy Committee, which oversaw LCA's investments.  Mr. Laplanche otherwise denies the allegations of Paragraph 112.

113.    On August 8, 2016, LendingClub announced that it had accepted Dolan's "voluntary resignation" as the Company's CFO and Principal Accounting Officer. The same day, based on an interview of Scott Sanborn, Bloomberg reported that Dolan had informed Sanborn earlier that year that she intended to make a move, but he asked her to postpone her plans to help weather the turmoil following Laplanche's exit. Between November 3, 2015 and December 14, 2015, and while Dolan was in possession of the material non-public information described above as having been withheld from investors, she sold 135,000 shares of LendingClub stock for proceeds of over $1.8 million.

113.    Mr. Laplanche admits, on information and belief, that Ms. Dolan indicated her willingness to resign in early 2016.  Mr. Laplanche otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 113.

114.    In an attempt at *remediation* of the above internal control weaknesses and failures, the Company has begun implementing various changes in internal control over financial reporting to remediate these weaknesses, including remedial efforts to prevent the alteration of information on live Company databases.

114.    Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 114.

DEF. LAPLANCHE'S AMENDED ANSWER                                    CASE NO. 3:16-CV-02627-WHA

115.     The senior managers identified as having been involved in this conduct, including Laplanche, were ***terminated*** or forced to resign, by Q2 2016 and the Company hired an outside consulting firm to support data change management processes in order to prevent additional falsification of loan documentation. Laplanche was forced out, in part, because when confronted with his conduct by the Board, he "wasn't upfront" with directors about what he knew.

115.     Mr. Laplanche admits that he resigned in 2016 but otherwise denies the allegations of Paragraph 115.

### LOST CAUSATION/ECONOMIC LOSS

116.     Like other members of the Class who purchased at artificially inflated prices during the Class Period, Lead Plaintiff suffered an economic loss, i.e., damages, when the trading price of LendingClub common stock declined upon the disclosures correcting the alleged misrepresentations.

116.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 116.

117.     The timing and magnitude of LendingClub's stock price declines (see ¶97), as well as the lack of any other plausible cause of the declines, negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Lead Plaintiff and other members of the Class, was a direct result of defendants' scheme and misrepresentations, which artificially inflated the price of LendingClub common stock and the subsequent significant decline in the value of LendingClub stock as the true state of the Company's operations leaked into the market, correcting the misrepresentations and/or the economic impact thereof.

117.     Mr. Laplanche denies the allegations of Paragraph 117.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

118.     Lead Plaintiff will exclusively rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

        (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Lead Plaintiff and other members of the Class purchased LendingClub common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

118.     This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 118.

**119.**     At all relevant times, the market for LendingClub common stock was efficient for the following reasons, among others:

(a)     Throughout the Class Period, Lending Club common stock was listed and actively traded on the NYSE National Market, a highly efficient and automated market;

(b)     Throughout the Class Period, the average weekly trading volume of LendingClub shares exceeded 2% of its total outstanding shares;

(c)     Throughout the Class Period, over a dozen different firms and dozens of analysts covered LendingClub common stock;

(d)     Throughout the Class Period, LendingClub was eligible to file an SEC S-3 Registration Statement;

(e)     As a regulated issuer, LendingClub filed periodic public reports with the SEC; and

(f)     LendingClub regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

119.     Mr. Laplanche lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 119.

**CLASS ACTION ALLEGATIONS**

**120.**   Lead Plaintiff brings this action as a class action on behalf of all those who purchased LendingClub common stock during the Class Period, including those who purchased LendingClub common stock traceable to the Registration Statement (collectively, the "Class"). Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

120.   To the extent that Paragraph 120 states a legal conclusion, no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 120.

**121.**   The members of the Class are so numerous that joinder of all members is impracticable. LendingClub stock is actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class because over 381 million shares were outstanding as of May 15, 2016. Record owners and other members of the Class may be identified from records maintained by LendingClub or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.   Paragraph 121 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche admits that LendingClub stock is publicly traded on the NYSE, and otherwise denies the allegations of Paragraph 121.

**122.**   Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

122.   Paragraph 122 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 122.

**123.**   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

DEF. LAPLANCHE'S AMENDED ANSWER                         CASE NO. 3:16-CV-02627-WHA

123.     Paragraph 123 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 123.

**124.**     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act and/or 1934 Act and Rule 10b-5 promulgated thereunder;

(b)     whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein;

(c)     whether the Registration Statement omitted material facts necessary in order to make the statements made therein not misleading;

(d)     whether defendants made false or misleading statements of material fact during the Class Period;

(e)     whether defendants knew or recklessly disregarded that their statements were false and misleading during the Class Period;

(f)     whether the price of LendingClub stock was artificially inflated;

(g)     whether the market for LendingClub common stock was efficient; and

(h)     the extent of damage sustained by Class members and the appropriate measure of damages.

124.     Paragraph 124 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 124.

**125.**     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

125.     Paragraph 125 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 125.

**COUNT I**
**For Violation of §11 of the 1933 Act**
**Against All Defendants**

**126.**   Lead Plaintiff incorporates ¶¶1-54, 120-123, 124(a)-(c), and 125 by reference.

126.   Mr. Laplanche repeats and re-alleges his responses set forth above as if fully set forth herein.

**127.**   The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and/or omitted facts required to be stated therein.

127.   Paragraph 127 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 127.

**128.**   Laplanche, Dolan, and the Director Defendants each signed the Registration Statement and caused it to be declared effective by the SEC on or about December 11, 2014.

128.   Mr. Laplanche admits that he signed the Registration Statement on behalf of LendingClub, and otherwise denies the allegations of Paragraph 128.

**129.**   LendingClub is the registrant for the IPO and as issuer of the shares, LendingClub is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

129.   Because the allegations of Paragraph 129 are not directed at Mr. Laplanche, no response is required.  Further, to the extent that Paragraph 129 states a legal conclusion, no response is required.  To the extent that a response is required, Mr. Laplanche admits that LendingClub was the registrant that made the IPO, and otherwise denies the allegations of Paragraph 129.

**130.**   Each of the defendants named herein is responsible for and are liable for the contents and dissemination of the Registration Statement.

DEF. LAPLANCHE'S AMENDED ANSWER                          CASE NO. 3:16-CV-02627-WHA

130.   Paragraph 130 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 130.

131.   Laplanche, Dolan, the Director Defendants, and the Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As a result of their roles with LendingClub, and their contacts and communications, the Director Defendants and the Underwriter Defendants should have known of the untrue and misleading statements of material fact contained in the Registration Statement. Laplanche, Dolan, the Director Defendants, and the Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of nearly 67 million LendingClub shares, which shares were purchased by Lead Plaintiff and the Class.

131.   Paragraph 131 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 131.

132.   None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material facts required to be stated therein or facts that were necessary to make the statements made therein not false or misleading.

132.   Paragraph 132 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 132.

133.   By reason of the conduct herein alleged, each defendant named in this Count violated §11 of the 1933 Act.

133.   Paragraph 133 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 133.

134.   Lead Plaintiff acquired LendingClub common stock traceable to the Registration Statement.

134.   Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 134.

135.   Lead Plaintiff and the Class have sustained damages as a result of the 1933

Act violations alleged herein.

135.    Paragraph 135 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 135.

**136.    At the time of Lead Plaintiff's purchases of LendingClub common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.**

136.    Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 136.

**137.    Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed. Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time the original complaint and this complaint were filed.**

137.    Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 137.

## COUNT II
### For Violation of §15 of the 1933 Act
### Against Laplanche, Dolan, and the Director Defendants

**138.    Lead Plaintiff incorporates ¶¶1-54, 120-123, 124(a)-(c), and 125-137 by reference.**

138.    Paragraph 138 requires no response.

**139.    This Count is brought pursuant to §15 of the 1933 Act against Laplanche, Dolan, and the Director Defendants.**

139.    Paragraph 139 requires no response.

**140.    Laplanche, Dolan, and each of the Director Defendants was a control person of LendingClub by virtue of his or her position as an owner, director, and/or senior officer of LendingClub. Laplanche and Dolan oversaw all operations and financial controls at LendingClub and LendingClub could not have**

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

1   completed the IPO without Laplanche, Dolan, and the Director Defendants
2   signing or authorizing their signatures on the Registration Statement.

3   140.   Paragraph 140 states legal conclusions to which no response is required.  To the

4   extent a response is required, Mr. Laplanche admits that he participated in overseeing certain

5   aspects of LendingClub's operations and financial controls, and, along with Ms. Dolan and the

6   Director Defendants, signed and/or authorized their signatures on certain documents in

7   connection with LendingClub's IPO, and otherwise denies the allegations of Paragraph 140.

8   **141.**   The Director Defendants had a series of direct and/or indirect business
9   and/or personal relationships with other directors and/or officers and/or major
    shareholders of LendingClub. Director Defendant Ciporin was a general partner
10  at Canaan Partners, a related entity of which, Canaan VII LP, owned 15.7% of
    LendingClub prior to the IPO and Director Defendant Meeker was a managing
11  member of KPCB Holdings, Inc., which owned 4.6% of LendingClub prior to the
    IPO. Together these two entities owned 20.3% of LendingClub prior to the IPO
12  and sold 5.7 million shares in the IPO for total proceeds of $85.5 million.

13  141.   Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the

14  truth of the allegations of Paragraph 141.

15
16  **142.**   Less than one year elapsed from the time that Lead Plaintiff discovered or
    reasonably could have discovered the facts upon which the initial complaint filed
17  in this action is based and the time that complaint was filed. Less than three years
    has elapsed between the time that the securities upon which this claim is brought
18  were offered to the public and the time the original complaint and this complaint
    were filed.
19

20  142.   Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the

21  truth of the allegations of Paragraph 142.

22
                                  **COUNT III**
23               **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
                     **Against LendingClub, Laplanche, and Dolan**
24

25  **143.**   Lead Plaintiff incorporates ¶¶1-43 and 50-125 by reference.

26
27  143.   Paragraph 143 requires no response.

28  DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

144.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    Mr. Laplanche denies the allegations of Paragraph 144.

145.    LendingClub, Laplanche, and Dolan violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of LendingClub stock during the Class Period.

145.    Paragraph 145 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 145.

146.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LendingClub stock. Lead Plaintiff and the Class would not have purchased LendingClub stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

146.    Mr. Laplanche lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 146.

## COUNT IV
### For Violation of §20(a) of the 1934 Act
### Against LendingClub, Laplanche, and Dolan

147.    Lead Plaintiff incorporates ¶¶1-43, 50-125, and 144-146 by reference.

147.    Paragraph 147 requires no response.

DEF. LAPLANCHE'S AMENDED ANSWER                    CASE NO. 3:16-CV-02627-WHA

148.     During their tenures as officers and/or directors of LendingClub, Laplanche, and Dolan were controlling persons of LendingClub within the meaning of §20(a) of the 1934 Act. By reason of their positions of control and authority as officers and/or directors of LendingClub, these defendants had the power and authority to cause LendingClub to engage in the conduct complained of herein. These defendants were able to, and did, control, directly and indirectly, the decision-making of LendingClub, including the content and dissemination of LendingClub's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein. LendingClub exercised control over and directed the actions of its senior managers, directors and agents, including Laplanche and Dolan. LendingClub controlled Laplanche, Dolan, and all of its employees.

148.     Paragraph 148 states legal conclusions to which no response is required. To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 148.

149.     In their capacities as senior corporate officers and/or directors of LendingClub, and as more fully described herein, Laplanche and Dolan participated in the misstatements and omissions set forth above. Indeed, these defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding LendingClub's deceptive business practices and set the "tone at the top." LendingClub, Laplanche, and Dolan had the ability to influence and direct and did so influence and direct the activities of the Company and its employees in their violations of §10(b) of the 1934 Act and Rule 10b-5.

149.     Paragraph 149 states legal conclusions to which no response is required. To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 149.

150.     As a result, LendingClub, Laplanche, and Dolan, individually and as a group, were control persons within the meaning of §20(a) of the 1934 Act.

150.     Paragraph 150 states legal conclusions to which no response is required. To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 150.

151.     As set forth above, LendingClub violated §10(b) of the 1934 Act. By virtue of their positions as controlling persons, Laplanche and Dolan are liable pursuant to §20(a) of the 1934 Act, jointly and severally with, and to the same extent as LendingClub is liable to Lead Plaintiff and the other members of the Class. LendingClub exercised control over Laplanche and Dolan and all of LendingClub's employees and, as a result of its aforementioned conduct, is liable pursuant to §20(a) of the 1934 Act, jointly and severally with, and to the same

extent as Laplanche and Dolan are liable to Lead Plaintiff and the other members of the Class.

151.    Paragraph 151 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 151.

**152.**    This claim is brought within the applicable statute of limitations.

152.    Paragraph 152 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 152.

**153.**    By reason of the foregoing, LendingClub, Laplanche, and Dolan violated §20(a) of the 1934 Act, 15 U.S.C. §78(a).

153.    Paragraph 153 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Laplanche denies the allegations of Paragraph 153.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

**A.**    Determining that this action is a proper class action, certifying Lead Plaintiff as the Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Plaintiff's counsel Class Counsel;

**B.**    Declaring that defendants are liable pursuant to the 1933 Act and/or 1934 Act;

**C.**    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

**D.**    Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' costs and expenses incurred in this action; and

**E.**    Awarding such other relief as the Court may deem just and proper.

**[Answer:]** Mr. Laplanche denies that Lead Plaintiff and the putative class are entitled to any of the relief sought and respectfully requests that the Court dismiss all the claims

against them with prejudice and order such further relief as the Court deems just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

**[Answer:]** No response is required.

## RENAUD LAPLANCHE'S AFFIRMATIVE DEFENSES

Subject to Mr. Laplanche's responses above, he alleges and asserts the following defenses in response to the allegations in the Complaint.  In doing so, Mr. Laplanche assumes only those burdens of proof, persuasion, or production that are imposed on him by the legal standards governing Lead Plaintiff's claims.  Mr. Laplanche further reserves the right to allege additional affirmative defenses that become known to him through the course of discovery or other investigation as this action proceeds.

## AFFIRMATIVE DEFENSE NO. 1:  DUE DILIGENCE

1.      Lead Plaintiff's and the putative class's claims are barred, in whole or in part, because Mr. Laplanche exercised due diligence.  As contemplated in Section 11(b)(3) of the Securities Act, at all times, and with respect to all matters contained herein, Mr. Laplanche acted in good faith and had no knowledge, was not reckless in not knowing, and in the exercise of reasonable care could not have known of any alleged misstatements or omissions of material fact in the Offering Documents.  At all relevant times, Mr. Laplanche conducted a reasonable and diligent investigation and had reasonable grounds to believe, and did believe at the time the Offering Documents became effective, that the statements in the Offering Documents were true and that there were no omissions of material fact.

2.      This reasonable and diligent investigation included Mr. Laplanche's participation in and awareness of LendingClub's extensive review of its business and business practices, including a review of numerous LendingClub financial, business, and operational documents; communications with LendingClub employees regarding the business; the use of experts and consultants to advise Mr. Laplanche in connection with the IPO; and a review of other available information regarding LendingClub's business and operations.  With respect to portions of the Offering Documents purporting to be made on the authority of accounting, financial, or other experts retained to assist in preparing the Offering Documents, Mr. Laplanche had no reasonable grounds to believe,

DEF. LAPLANCHE'S AMENDED ANSWER                                CASE NO. 3:16-CV-02627-WHA

1  and did not believe that such statements were untrue or that there was any omission of

2  material fact necessary to make the statements therein not misleading, or that such part of

3  the Offering Documents did not fairly represent the statement of the expert.

4  **AFFIRMATIVE DEFENSE NO. 2:  GOOD FAITH**

5       3.     Lead Plaintiff's and the putative class's claims are barred, in whole or in part,

6  because Mr. Laplanche did not knowingly, recklessly, or negligently make any misleading

7  statement or misleading, actionable omission.  Mr. Laplanche acted, at all times, in good faith,

8  exercised reasonable care, undertook reasonable investigation, and did not know, and in the

9  exercise of reasonable care could not have known, and held a reasonable, good faith belief in the

10  accuracy of the purported misstatements and/or omissions alleged in the Complaint.  Mr.

11  Laplanche had no knowledge of or reasonable ground to believe in the existence of the purported

12  facts by reason of which the liability of any defendant is alleged to exist, and acted in good faith

13  and did not directly or indirectly induce any acts which are purported to establish the liability of

14  any defendant.

15  **AFFIRMATIVE DEFENSE NO. 3:  REASONABLE RELIANCE ON PROFESSIONALS**

16       4.     On information and belief, there were numerous professionals involved in

17  preparing the Offering Documents, and in preparing subsequent public statements and

18  disclosures attributed to Mr. Laplanche and to LendingClub, including those alleged in the

19  Complaint to be misstatements and/or omissions.  As discussed above, Mr. Laplanche and

20  LendingClub used experts and consultants to advise LendingClub in connection with the IPO

21  and subsequent matters alleged in the Complaint.  Lead Plaintiff's and the putative class's claims

22  are barred, in whole or in part, because Mr. Laplanche reasonably relied in good faith on the

23  relevant professional judgments, opinions, and advice of such professionals, including legal and

24  finance professionals, as well as auditors.

25  **AFFIRMATIVE DEFENSE NO. 4:  PLAINTIFF'S KNOWLEDGE & RELIANCE**

26       5.     Lead Plaintiff and the putative class are not entitled to any recovery from Mr.

27  Laplanche to the extent that they purchased LendingClub stock with actual or constructive

28  DEF. LAPLANCHE'S AMENDED ANSWER           CASE NO. 3:16-CV-02627-WHA

1    knowledge of the facts that they allege were misrepresented or omitted in the Amended

2    Complaint.  For example, certain putative class members were employed by LendingClub or

3    were investors on or otherwise had knowledge of the LendingClub platform or business.  In

4    addition, the complaint filed on February 26, 2016, in *Geller v. LendingClub Corp., et al.*, Case

5    No. CIV-537300 ("*Geller*"), alleged misstatements relating to credit risk in connection with

6    loans and the transparency between LendingClub and platform participants, *see, e.g.*, *Geller*

7    Complaint ¶¶ 49, 54, 57, which allegations the Amended Complaint also makes.  *See, e.g.*,

8    Amended Complaint ¶¶ 33, 35.  Putative class members who purchased LendingClub stock with

9    knowledge of the facts they allege were misrepresented or omitted assumed the risk that the

10   value of those securities would decline.

11          6.      In addition, Lead Plaintiff and the putative class at all relevant times had a duty to

12   take reasonable action to minimize any damages allegedly sustained as a result of the facts

13   alleged in the Complaint.  Lead Plaintiff and the putative class are not entitled to any recovery

14   from Mr. Laplanche to the extent that they failed to comply with that duty and are therefore

15   barred from recovering any damages that might reasonably have been avoided, including by the

16   sale (or earlier sale) of LendingClub securities following actual or constructive knowledge of the

17   facts that they now allege were misrepresented, based on information that was publicly disclosed

18   or available, such as the allegations in the *Geller* action, or because specific putative class

19   members were privy to information regarding LendingClub's business or platform through

20   employment by LendingClub, investment on or participation in the platform, or otherwise.

21   **AFFIRMATIVE DEFENSE NO. 5:  FORWARD LOOKING STATEMENTS**

22          7.      Lead Plaintiff's and the putative class's claims are barred, in whole or in part,

23   because certain alleged misstatements, including in the Offering Documents, were forward-

24   looking statements, were identified as such, and were accompanied by meaningful cautionary

25   statements identifying important factors that could cause actual results to differ materially from

26   the content of the forward-looking statements, and are thus non-actionable under the bespeaks

27   caution doctrine, as well as, for any alleged misstatements that were not issued in connection

28   DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA

with the IPO, under the Public Securities Law Reform Act's safe harbor provision, 15 U.S.C. §
78u-5(c).  The Registration Statement makes clear on page 37 that it includes "forward-looking
statements" and that "[t]he words 'believe,' 'may,' 'will,' 'potentially,' 'estimate,' 'continue,'
'anticipate,' 'intend,' 'could,' 'would,' 'predict,' 'plan' and 'expect,' and similar expressions that
convey uncertainty of future events or outcomes, are intended to identify forward-looking
statements."  The Registration Statement also identifies factors that could cause actual results to
differ from the contents of such statements, such as its reference on page 12 to "navigating
complex and evolving regulatory and competitive environments."

### AFFIRMATIVE DEFENSE NO. 6:  NEGATIVE CAUSATION

8.      Lead Plaintiff's and the putative class's claims are barred, in whole or in part,
because the damages for which Plaintiff claims Mr. Laplanche is responsible arise from a decline
in share price that was not caused or contributed to by the disclosure of any material
misrepresentation or actionable omission by Mr. Laplanche and were otherwise caused or
contributed to by (a) persons or entities for whom Mr. Laplanche is not responsible and for
whom Mr. Laplanche is not liable, or (b) factors other than any alleged misrepresentations or
omissions for which Mr. Laplanche may be responsible.  Mr. Laplanche intends to present expert
testimony regarding other plausible causes of the depreciation in value of LendingClub
securities, including but not limited to market forces and unrelated developments in
LendingClub's industry and business

### AFFIRMATIVE DEFENSE NO. 7:  DAMAGES UNDER SECTION 11

9.      Lead Plaintiff's and the putative class's claims are barred, in whole or in
part, because Mr. Laplanche is not liable under Section 11(e) of the Securities Act for
alleged damages in excess of the total price at which the securities were offered to the
public.

### AFFIRMATIVE DEFENSE NO. 8:  STATUTE OF LIMITATIONS

10.     Section 13 of the Securities Act requires an action to be brought within one
year "after the discovery of the untrue statement or the omission, or after such discovery

should have been made by the exercise of reasonable diligence."  Lead Plaintiff's  and the putative class's Securities Act claims are therefore barred to the extent that the purported misstatements or omissions alleged in the Complaint were discovered, or should have been discovered by the exercise of reasonable diligence, before May 16, 2015, one year before Mr. Laplanche was first named as a defendant in this action, including because of information that had previously been publicly disclosed or was otherwise in the public domain, or because specific putative class members were privy to the LendingClub information that Lead Plaintiff contends was misrepresented or omitted through employment by LendingClub or through investment on or other knowledge of the LendingClub platform.

11.     Lead Plaintiff's and the putative class's claims under the Securities Exchange Act and Rule 10b-5 are barred pursuant to 28 U.S.C. § 1658(b) to the extent that the purported misstatements or omissions alleged in the Complaint were discovered, or should have been discovered by the exercise of reasonable diligence, before May 16, 2014, two years before Mr. Laplanche was first named as a defendant in this action, including because of information that had previously been publicly disclosed or was otherwise in the public domain, or because specific putative class members were privy to the LendingClub information that Lead Plaintiff contends was misrepresented or omitted through employment by LendingClub, or investment on or through or other knowledge of the LendingClub platform.  28 U.S.C. § 1658(b) requires an action to be brought no later than two years after "the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first," *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010).  28 U.S.C. § 1658(b).

### AFFIRMATIVE DEFENSE NO. 9:  TRUTH ON THE MARKET

12.     Lead Plaintiff's and the putative class's claims are barred, in whole or in part, because the matters alleged in the Complaint to be the subject of misrepresentation and omissions, including but not limited to alleged misstatements and omissions in Paragraphs 31-37, 43-45, and 49-50 of the Complaint, were publicly disclosed or were in the public domain,

including, but not limited to, via allegations in the complaint filed in California Superior Court on February 26, 2016 in *Geller v. LendingClub Corp., et al.*, Case No. CIV-537300 alleging misstatements based on credit risk in connection with loans and the transparency between LendingClub and platform participants, (*see, e.g.*, Geller Compl. at ¶¶ 54, 49, 57), subjects that the Complaint also alleges were the basis for purported misstatements (*see, e.g.*, Compl. ¶¶ 33, 35, 56, 66), and, as such, were available to Lead Plaintiff and other alleged members of the purported class and were at all times reflected in the price of LendingClub securities. Accordingly, those who purchased or otherwise acquired LendingClub securities did not do so at artificially inflated prices.

## AFFIRMATIVE DEFENSE NO. 10:  PROPORTIONATE LIABILITY

13.     Any recovery to which Lead Plaintiff or the putative class may be entitled from Mr. Laplanche is limited to the percentage of responsibility of Mr. Laplanche in proportion to the total fault of all covered persons, pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(f).

DATED: July 27, 2017                              Respectfully Submitted,

                                                  MILBANK, TWEED, HADLEY &
                                                  McCLOY LLP


                                          By:     /s/ Robert J. Liubicic
                                                  Robert J. Liubicic
                                                  *Attorneys for Defendant Renaud Laplanche*

DEF. LAPLANCHE'S AMENDED ANSWER                              CASE NO. 3:16-CV-02627-WHA