1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11  In re                                          No. C 16-02627 WHA
                                                   No. C 16-02670 WHA
12      LENDINGCLUB SECURITIES                      No. C 16-03072 WHA
        LITIGATION.
13  _____/           (CONSOLIDATED)

14  This Document Relates to:
                                                   **ORDER RE CLASS**
15      ALL ACTIONS.                               **CERTIFICATION**
    _____/
16

17                          **INTRODUCTION**

18          In this PSLRA action, lead plaintiff moves for class certification and to enjoin a parallel

19  state action.  Class representatives in the parallel state action move to intervene and, along with

20  defendants, oppose class certification.  For the reasons herein, lead plaintiff's motion for class

21  certification is **GRANTED.**  Lead plaintiff's motion for an injunction is **DENIED.**  State plaintiffs'

22  motion to intervene is **CONDITIONALLY GRANTED**.

23                          **STATEMENT**

24      1.      **THE FEDERAL ACTION.**

25          The background of this action has been set forth in a prior order (Dkt. No. 181).

26  In brief, a number of putative class actions were filed in our district court on behalf of investors

27  who purchased securities of defendant LendingClub Corporation in its initial public offering.

28  The actions were consolidated and an order appointed Water and Power Employees' Retirement,

*United States District Court*
For the Northern District of California

Disability and Death Plan of the City of Los Angeles ("WPERP") as lead plaintiff (Dkt. No. 90). Remaining defendants include LendingClub, Renaud Laplanche (LendingClub's founder and former CEO), Carrie Dolan (LendingClub's former CFO), LendingClub directors and former directors, and the financial firms that underwrote LendingClub's IPO (Dkt. No. 126 at 5–6).

LendingClub acted as a so-called peer-to-peer lender.  It operated an online marketplace that connected borrowers to investors.  When a borrower and investor matched, LendingClub facilitated the loan and then acted as the loan servicer, earning fees for servicing and loan origination (Dkt. No. 126 at ¶¶ 29–30).

On December 11, 2014, LendingClub completed its IPO, selling more than 66.7 million shares of common stock at $15 per share.  In connection with the IPO, it issued a registration statement, which it filed with the SEC.  That statement included representations about LendingClub's internal control procedures for financial reporting, which stated that LendingClub had evaluated its disclosure controls and procedures and concluded that they were "effective at a reasonable assurance level."  The registration statement further represented that LendingClub evaluated borrowers using "sophisticated risk assessment" processes and maintained an effective data-security program (Dkt. No. 126 ¶¶ 35, 57).

The registration statement also specified a 180-day "lock-up" period, beginning on December 11, 2014, during which only IPO shares were available to the public.  When the lock-up period ended on June 9, 2015, both IPO and non-IPO shares became available on the open market (*id.* at 35, Dkt. No. 223 at 3).

WPERP began purchasing shares of LendingClub stock on May 4, 2015, and by the time the lock-up period ended on June 9, 2015, it owned 306,620 shares.  WPERP continued thereafter to buy and sell LendingClub shares, never holding fewer than the 306,620 shares, eventually acquiring more than 1.7 million shares (Dkt. No. 231-1).

On May 9, 2016, less than eighteen months after the IPO and issuance of the registration form, LendingClub's CEO, Laplanche, resigned following "an internal review of sales of $22 million in near-prime loans to a single investor, in contravention of the investor's express instructions as to a non-credit and non-pricing element."  LendingClub also reported that it had

2

discovered that Laplanche had a financial stake in Cirrix Capital, L.P., a company formed for the sole purpose of purchasing LendingClub loans. One week later, LendingClub's quarterly report revealed that it had "identified material weakness," including a "[l]ack of transparent communication and appropriate oversight" in dealing with investors. These weaknesses resulted from "the aggregation of control deficiencies related to the Company's 'tone at the top,'" which deficiencies "also existed at the end of 2015" (*id*. ¶¶ 43, 105–06).

As these and other revelations of improprieties came to light, LendingClub's share price went into precipitous decline. Three securities actions were filed in federal court in San Francisco in June 2016. They were related to the undersigned judge, and later consolidated with WPERP appointed as lead plaintiff, and Robbins Geller Rudman & Dowd LLP as lead counsel (Dkt. Nos. 71, 90, 113). The consolidated complaint asserts claims under Section 11 and Section 15 of the Securities Act of 1933, and Section 10(b), Rule 10b–5, and Section 20(a) of the Exchange Act of 1934.

Lead plaintiff now moves for certification of a class consisting of:

> All persons and entities who purchased or otherwise acquired the common stock of LendingClub Corporation ("LendingClub" or the "Company") during the period from December 11, 2014 through May 6, 2016, inclusive (the "Class Period"), and were damaged thereby, including those who purchased LendingClub common stock traceable to the Registration Statement (collectively, the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

Defendant LendingClub and director defendants filed an opposition to the motion, which the remaining defendants join.

## 2.    THE STATE ACTION.

In February 2016, approximately three-and-a-half months before this action, a class action complaint was filed against LendingClub in the Superior Court of the State of California, County of San Mateo, alleging violations of Sections 11, 15, and 12(a)(2) of the Securities Act of 1933. *In re LendingClub Corp. Shareholder Litig*., Master File No. CIV537300 (Cal. Super. June 23, 2017). Like this action, the state action alleges LendingClub's registration statement

United States District Court
For the Northern District of California

1   contained misstatements and omissions concerning, inter alia, "material weaknesses in

2   LendingClub's internal controls," "undisclosed related–party transactions," and the assumption

3   of undisclosed but material credit and liquidity risks.  The court in the state action certified

4   a class in June 2017.  Class Notice, however, remains unsent (Dkt. No. 227 ¶ 8; Exh. C ¶ 1).

5       On September 21, the date oppositions to class certification were due in the federal

6   action, class representatives in the parallel state action moved to intervene for the limited

7   purpose of opposing class certification of Sections 11 and 15 claims.  They filed an opposition to

8   class certification as an attachment to their motion to intervene.  An order set the hearing on their

9   motions for October 12, the same date as the hearing on this motion for class certification (Dkt.

10  Nos. 222, 229).

11      All parties to both actions appeared at the October 12 hearing.  This order follows full

12  briefing and oral argument.

13                                          **ANALYSIS**

14      This order first addresses state plaintiffs' motion for intervention.  It then turns to

15  WPERP's motion for class certification, and finally addresses WPERP's motion to enjoin the

16  state action.

17      **1.     INTERVENTION.**

18      State plaintiffs move for permissive intervention, and in the alternative for intervention

19  as of right.  For the reasons herein, permissive intervention is **GRANTED** subject to certain

20  conditions.

21      For permissive intervention, the applicant need only show that (1) independent grounds

22  for jurisdiction exist; (2) the motion is timely; and (3) the applicant's claim or defense shares a

23  common question of law or fact with the main action.  FRCP 24(b); *In re Benny*, 791 F.2d 712,

24  721–22 (9th Cir. 1986).  Further, in exercising its discretion, the court should consider "whether

25  the intervention will unduly delay or prejudice the adjudication of the original parties' rights."

26  FRCP 24(b)(3).

27      WPERP opposes the motion to intervene only on the grounds of timeliness.

28

4

United States District Court

For the Northern District of California

### A.      Timeliness.

WPERP argues that state plaintiffs' motion is prejudicial because, by waiting to move until only three weeks before the hearing on class certification, they have denied WPERP any opportunity to take discovery that would aid WPERP in showing that it is better suited to protect the putative class (Dkt. No. 235 at 8).  State plaintiffs' delay in bringing this motion, WPERP argues, was tactical.  It forced WPERP either to respond without sufficient information, or to seek a continuance, which would have given state plaintiffs an opportunity to advance their case, including by distributing their class notice, which was approved on September 22 (but has not yet been sent).  That notice, WPERP observes, would not inform class members of the existence of the federal suit (*id.* at 8–9).

Allowing the state plaintiffs to proceed and distribute notice, WPERP contends, will prejudice absent class members for a variety of reasons, chief among them that the state action's Sections 11 and 15 claims are capped at a much lower recovery amount than the federal action — a claim that state plaintiffs dispute (*ibid.*).

Though cognizant of the limited time WPERP had to respond to state plaintiffs' motion, this order finds that intervention is appropriate because absent class members will be best served by allowing state plaintiffs, who also purport to act in the putative class's best interest, to set forth their argument for why they are the better representative.  WPERP had two weeks to prepare a response to state plaintiffs' opposition to class certification, which was adequate under these circumstances.  Therefore, state plaintiffs' motion is timely for the limited purpose for which they seek to intervene.[1]

State plaintiffs' motion to intervene is therefore **GRANTED** on the condition that they remain under this Court's jurisdiction so that the undersigned judge may coordinate their action with the federal action to avoid any prejudice to absent class members.

To a limited degree, such coordination is already underway.  At the hearing on this motion, state plaintiffs agreed they will participate in the settlement conference before

---

[1]  State plaintiffs have met the additional requirements of permissive intervention — independent grounds for jurisdiction, and common claims — which WPERP has not opposed.

Chief Magistrate Judge Joseph Spero on November 28, and have further assured the undersigned judge that they will not send class notification until this order issued.  Moreover, state plaintiffs agreed that they will not discuss settlement (except at the settlement conference) until the Supreme Court issues a decision in *Cyan, Inc. v. Beaver Cty. Employees Ret. Fund*, _U.S. _, 137 S. Ct. 2325 (2017), which decision has the potential to jeopardize their case by revoking state court jurisdiction over Securities Act claims.

Certain additional requirements to state plaintiffs' intervention are set forth below in the section addressing WPERP's motion to enjoin the state action.  Before addressing those conditions, however, this order first turns to WPERP's motion for class certification.

## 2.    CLASS CERTIFICATION.

The party seeking class certification bears the burden of first showing that it meets the four prerequisites of FRCP 23(a):  (1) numerosity; (2) common questions of law or fact; (3) typicality; and, (4) adequacy.  FRCP 23(b) sets forth three conditions under which, if the prerequisites of FRCP 23(a) are satisfied, a class action may be maintained.  Class certification is appropriate if a plaintiff meets all the prerequisites of FRCP 23(a) and at least one condition of FRCP 23(b). *Abdullah v. U.S. Sec. Assocs., Inc*., 731 F.3d 952, 956–57 (9th Cir. 2013). Under FRCP 23(b)(3), the district court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The Supreme Court has "cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); however, "[m]erits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 464–65 (2013).

United States District Court
For the Northern District of California

### A.      FRCP 23(a).

#### (1)      *Numerosity.*

Defendants do not challenge certification based on the numerosity element.  Here, plaintiff estimates that there are thousands of members in the proposed class based on the over 394 million outstanding shares of LendingClub common stock.  This is sufficient to satisfy the numerosity requirement of FRCP 23(a)(1).

#### (2)      *Commonality.*

Defendants likewise do not challenge certification under FRCP 23(a)'s commonality requirement.  To show commonality, a plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution.  So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014).  Here, WPERP's allegations that investors were defrauded by the same misleading registration statement over the same period of time, and suffered similar losses as a result are sufficient to fulfill FRCP 23(a)'s commonality requirement.

#### (3)      *Typicality.*

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  FRCP 23(a)(3).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff[ ], and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (quotations omitted).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Class certification is inappropriate, however, if a putative class representative is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

United States District Court

For the Northern District of California

Defendants argue that WPERP is atypical because it is subject to unique defenses based on its trading history. Specifically, defendants argue that WPERP cannot show that its shares are traceable to IPO purchases, a necessary element of a Section 11 claim. Defendants further argue that WPERP's Sections 10(b) and 11 claims are both subject to negative loss causation defenses that threaten to predominate over common questions and render their claims atypical. Each argument is addressed in turn.

### (a)   *Traceability.*

To prove a violation of Section 11, a plaintiff must show the securities it purchased were issued under a materially false or misleading registration statement. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). If a company issues multiple rounds of stock under different registration statements, this requires proof that the plaintiff's shares are traceable to the misleading statement and not to an innocent one. Otherwise, the plaintiff has not been damaged, and has no standing to sue. *Ibid.* "The burden of tracing shares to a particular public offering rests with plaintiffs." *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 963 (N.D. Cal. 2010).

Here, LendingClub issued approximately 295 million shares via private offering to insiders prior to its IPO. These were not traded during the lock-up period. WPERP did not acquire any of these shares, nor were they connected with the allegedly misleading registration statement (*see* Dkt. 231-10).

LendingClub then issued 67 million shares in the IPO under an allegedly false registration statement, which issuance was followed by a lock-up period from December 11, 2014, to June 8, 2015, during which only IPO shares were available for purchase. WPERP purchased IPO shares beginning in May 2016, and acquired over 300,000 shares prior to the last day of the lock-up period (Dkt. No. 223 at 3). On June 9, 2015, private shares entered the open market, and were commingled therein with IPO shares.

Therefore, only shares that were purchased in the IPO or on the open market before June 9, 2015, are traceable to the allegedly misleading disclosure statement (absent an individualized showing that post-lock-up purchases were individually traceable to the IPO).

United States District Court

For the Northern District of California

1    This is so because "[i]f there is a mixture of pre-registration stock and stock sold under the

2    misleading registration statement, a plaintiff must either show that he purchased his stock in the

3    initial offering or trace his later-purchased stock back to the initial offering." *Hertzberg v.*

4    *Dignity Partners, Inc*., 191 F.3d 1076, 1080 n.4 (9th Cir. 1999)

5         It is undisputed that WPERP did not purchase or own any privately issued shares during

6    the six month lock-up period from December 2014 to June 9, 2015.  At the end of the lock-up

7    period it owned 306,620 shares, and its holdings never dropped below this number (Dkt. No.

8    231-1).  It is likewise undisputed, however, that WPERP traded in the post-lock-up market.

9    In fact, it purchased and sold hundreds of thousand more shares during the post-lock-up period

10   than it had purchased in the lock-up period (*ibid*.).

11        As a result of the post-lock-up commingling, defendants argue that WPERP cannot trace

12   its current shares to the allegedly misleading registration statement and, therefore, lacks

13   standing.  They observe that our court of appeals has strictly construed the tracing requirement.

14   In *In re Century Aluminum Co. Sec. Litig*., 729 F.3d at 1106, for example, our court of appeals

15   held that where a plaintiff purchased stock in a mixed market (*i.e.,* one containing both shares

16   issued under the misleading statement and shares not alleged to be misleading) it could prove

17   traceability in only one of two ways:  (1) by showing it purchased directly in the allegedly

18   misleading issuance, or (2) by tracing chain of title from later purchased shares back to the

19   allegedly misleading issuance.  *Ibid*.  Further illustrating this strict requirement, the court in *In re*

20   *Quarterdeck Office Sys., Inc. Sec. Litig*., No. CV 92-3970-DWW(GHKX), 1993 WL 623310, at

21   *2 (C.D. Cal. Sept. 30, 1993) (Judge David Williams) held that though the plaintiff purchased

22   stock in a market containing 97 percent shares issued under the misleading statement, this was

23   not enough to show traceability because its shares could have come from the innocent three

24   percent.  Traceability, it held, is not a matter of probability, but rather is construed literally and

25   requires a showing that the shares purchased were actually the offending shares.  *Id.* at *3.

26        These decisions, though they illustrate the strict application of Section 11's traceability

27   requirement, are inapposite here.  It is uncontested that WPERP purchased shares issued under

28   the allegedly misleading registration statement before they were commingled with any other

9

United States District Court

For the Northern District of California

1    shares.  Nobody argues otherwise and, therefore, probability does not enter into the analysis.

2    The only question is whether WPERP *retained* the shares.

3          This, in turn, presents the question of which accounting treatment those shares should

4    be given.  WPERP correctly observes that if its transactions are afforded "last-in, first-out"

5    ("LIFO") treatment, all of its holdings as of June 8, 2015 would remain traceable to the lock-up

6    period (Reply at 2).  If, on the other hand, the first-in, first-out ("FIFO") method is used, WPERP

7    will be deemed to have owned no traceable shares by the corrective disclosure date.

8          Whether LIFO or FIFO applies is a matter of first impression in the Section 11

9    traceability context.  In the somewhat different context of calculating estimated losses under

10   the PSLRA, however, the majority of courts in our district have preferred the LIFO method.

11   *See Bodri v. Gopro, Inc*., No. 16-CV-00232-JST, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28,

12   2016) (Judge Jon Tigar) ("While the Ninth Circuit has declined to endorse a particular method"

13   to determine which party has the greatest financial stake, "the weight of authority puts the most

14   emphasis on the competing movants' estimated losses, using a 'last in, first out' ("LIFO")

15   methodology.") (citations and quotations omitted); *see also Nicolow v. Helwett Packard Co.*, No.

16   12-05980 CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013) (Judge Charles Breyer);

17   *Perlmutter v. Intuitive Surgical*, Inc., No. 10-CV-03451-LHK, 2011 WL 566814, at *11 (N.D.

18   Cal. Feb. 15, 2011) (Judge Lucy Koh); *Richardson v. TVIA, Inc.*, No. C 06 06304 RMW, 2007

19   WL 1129344, at *4 (N.D. Cal. Apr. 16, 2007) (Judge Ronald Whyte).

20         It would be incongruous to measure losses by one method, yet measure traceability by the

21   opposite method.  A lead plaintiff who suffered the greatest losses under a Section 10(b) claim

22   might also be deemed to lack standing under a Section 11 claim based on such an incongruity.

23   Accordingly, this order finds that the LIFO method, preferred for determining estimated loss, is

24   likewise best suited to determine the number of IPO shares retained.  Using this method, WPERP

25   has demonstrated that it retained over 300,000 shares from the end of the IPO-period until the

26   date it filed suit and, therefore, will not be subject to defendants' unique standing defense.

27

28

1

*(b)*      ***Negative Loss Causation.***

Defendants further argue that WPERP's claims are susceptible to a showing of "negative loss causation," which is an affirmative defense to both Section 11 and 10(b) claims. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

A negative causation defense "prevents recovery for losses that the defendant proves are not attributable to the alleged misrepresentation or omission in the registration statement." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013).  In general, a misrepresentation will not be deemed to have caused a loss if the shares at issue were sold before the defendant discloses its misleading statement. *See Eichenholtz v. Verifone Holdings, Inc.*, No. C07–06140MHP, 2008 WL 3925289, at *4 (N.D. Cal. Aug. 22, 2008).

Defendants point out that WPERP sold hundreds of thousands of shares prior to the corrective disclosure and, therefore, will not be able to recover for any losses sustained in those sales (Br. at 10).

This may be true, but it hardly shows that WPERP's claims are atypical of the putative class.  As an initial matter, it is undisputed that WPERP retained 1.7 million shares through the end of the class period (Dkt. No. 223 at 16).  Those shares are unaffected by defendants' anticipated negative loss causation defense.  Moreover, WPERP is not in any way uniquely vulnerable to a negative loss causation defense.  Negative loss causation will apply to any class member who sold shares prior to the corrective disclosure.

Finally, plaintiff correctly observes that our court of appeals has recognized a "leakage" damages model, under which a plaintiff may recover for interim manifestations of later-disclosed fraud that begin to "leak out" prior to the corrective disclosure. *See In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005).  Leakage may very well prove to be a viable damage model in this action — a determination that will be informed by discovery.  If so, applicable leakage damages may overcome defendants' negative loss causation theory.  This is a class question that is not unique to WPERP, and will benefit from WPERP's development as this action proceeds.

11

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

###### (4)    *Adequacy.*

To determine whether a plaintiff will adequately serve the class, courts consider two questions:  "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members [,] and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Defendants do not contend that WPERP has conflicts of interest with other class members.  Instead, they argue that WPERP has shown that it will not vigorously prosecute this action because it allegedly lacks basic knowledge about LendingClub stock and the underlying litigation (Br. at 12).

In support of their argument, defendants highlight portions of the deposition of WPERP chief investment officer, Jeremy Wolfson.  In particular, they note that Wolfson was not aware that WPERP had purchased LendingClub securities "until this case" and has not reviewed any of LendingClub's SEC filings (*id.* at 13; Dkt. No. 227-5 at 103:23–104:01, 96:17–24). Moreover, Wolfson was unaware that LendingClub remained one of the top ten holdings in WPERP's portfolio (making up 2.2 percent of its investments) as of July 2017 (Dkt. Nos. 227-5 at 122:12–123:14; 227-1).  Additionally, defendants observe that Wolfson could not say exactly what alleged misstatements LendingClub had made in its registration statement without looking at the complaint (Dkt. No. 227-5 at 154:15–18), and could not name each defendant in this action from memory (*id.* at 144:1–10).  Based on the foregoing, they contend that this is an attorney-driven suit, and that WPERP cannot adequately represent unnamed plaintiffs.

These arguments overstate the burdens placed upon lead plaintiffs.  To establish adequacy lead plaintiffs need only be "familiar with the basis for the suit and their responsibilities as lead plaintiffs."  *In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD, 2016 WL 7425926, at *7 (N.D. Cal. Dec. 22, 2016) (Judge Edward Davila); *see also Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("The record indicates clearly that [lead plaintiff] understands his duties and is currently willing and able to perform them.  The Rule does not require more.").  FRCP 23(a)(4)

United States District Court

For the Northern District of California

1   imposes only a modest burden, and one that WPERP has carried here.  WPERP has vigorously

2   prosecuted this action to date, and the fact that its chief investment officer had not personally

3   consulted SEC filings or memorized portions of the complaint does not undercut this.  Wolfson

4   otherwise demonstrated a basic understanding of the theory of the lawsuit, different defendants'

5   roles in the underlying schemes alleged, and WPERP's past and continuing investment in

6   LendingClub (Dkt. No. 231-3 at 149:3–21, 70:20–72:20, 138:20–139:18, 189:1–19).  No more is

7   required to show adequacy.

8         Based on the foregoing, WPERP has satisfied the elements of FRCP 23(a).  Accordingly,

9   this order now turns to the requirements of FRCP 23(b).

10           **B.**      **FRCP 23(b).**

11               *(1)*      *Predominance.*

12         FRCP 23(b)(3) requires that "questions of law or fact common to class members

13   predominate over any questions affecting only individual members."  FRCP 23(b)(3).

14   This requirement "tests whether proposed classes are sufficiently cohesive to warrant

15   adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  Class certification under

16   FRCP 23(b)(3) is proper when common questions represent a significant portion of the case

17   and can be resolved for all members of the class in a single adjudication.  *Comcast v. Behrend*,

18   569 U.S. 27 (2013).

19         Defendants argue that WPERP's Section 11 class claims fail to meet the predominance

20   standard because adjudicating these claims will require individualized assessments of class

21   members' reliance on the allegedly misleading registration statement, and knowledge of the

22   allegedly misleading conduct at the time they purchased shares of LendingClub stock.

23   Additionally, defendants argue that WPERP has failed to provide a sufficient method for

24   calculating classwide damages.

25               *(a)*      *Reliance.*

26         Generally, Section 11 claims do not require proof of reliance.  See *Hildes v. Arthur*

27   *Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) ("[U]nlike §10(b) of the Securities and [sic]

28   Exchange Act, §11 does not have a scienter or reliance requirement . . .").  There is an exception,

however, when an issuer "has made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. 77k(a)(5).

Defendants argue that Section 11 claims arising out of purchases made after February 22, 2016 — the date LendingClub issued its 2015 Form 10-K — fall within the exception set forth in Section 77k(a)(5). These claims, defendants argue, will therefore require individualized proof of reliance, and will not share common questions (Opp. at 15).[2]

This will not be an issue here, however, because for reasons described in greater detail below, this order limits WPERP's Section 11 claim to purchases made before June 9, 2015, the final day of the lock-up period. Defendants' reliance defense is therefore inapplicable.

### (b)    Knowledge.

A plaintiff who knows of a misrepresentation at the time he purchases stock is not entitled to recovery under Section 11. 15 U.S.C. § 77k (recovery available to "any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission)").

Defendants contend that certain class members invested in individual loans on the LendingClub platform prior to the IPO and were, therefore, aware of many of the facts underlying alleged misrepresentations and omissions regarding loan origination. Consequently, defendants argue, those putative class members who invested in individual loans will be unable to show they lacked knowledge of alleged misrepresentations at the time of the IPO, and will not be able to recover.

---

[2]  WPERP contends that it is entitled to a presumption of reliance for its Section 10(b) claims both under a fraud-on-the-market theory, *see Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and under the omission theory enunciated in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Defendants do not challenge the presumption of reliance under the fraud-on-the-market theory (*see* Opp. at 14). Defendants, do, however, contend that WPERP cannot prove reliance under *Affiliated Ute* because this is a mixed case, not a case of pure omission. This argument is waged in the sections of the parties' briefs otherwise devoted to FRCP 23(b) commonality. It is not, however, an issue of commonality, and is instead an argument about the merits of different causation models. The parties' dispute about causation models does not resolve any issues regarding class certification and is, therefore, not considered here.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  This argument is unavailing.  An order *dismissed* WPERP's claims related to the

2  loan-approval process, and WPERP did not seek leave to amend those claims (Dkt. No 181

3  at 16–17).  Therefore, the theory upon which defendants predicate their knowledge argument

4  is no longer in this case.  Moreover, even if certain investors were aware of LendingClub's

5  loan-approval process, this does not show that they knew of problems with LendingClub's

6  internal controls over financial reporting, Cirrix's relationship to LendingClub, problems with

7  data management, or any of the other issues raised in the consolidated amended complaint.

8  *(c)      Damages.*

9  Relying on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), defendants next argue that

10  WPERP has not provided a sufficient method for calculating damages and has, therefore, has

11  failed to prove predominance (Opp. at 17).

12  In *Comcast*, the Supreme Court reiterated the principle that under FRCP 23(b), a

13  plaintiff must establish that damages are capable of measurement on a classwide basis.  *Id.* at 34.

14  This requires plaintiffs to "show that their damages stemmed from the defendant's actions

15  that created the legal liability" and can "feasibly and efficiently be calculated once the common

16  liability questions are adjudicated."  *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir.

17  2013) (citing *Comcast*, 569 U.S. at 34).

18  True, WPERP has not offered in great detail about its proposed damages model.

19  Whether plaintiff will ultimately prevail in proving damages, however, is not necessary to

20  determine at this stage.  Instead, the question for class certification is whether WPERP has

21  met its burden of establishing that damages can be proven on a class-wide basis.  *In re Diamond*

22  *Foods*, 295 F.R.D. 240, 252 (N.D. Cal. 2013).

23  Here, WPERP explained that damages can be calculated (Dkt. No. 215 at 16):

24  using an event study to determine the price inflation attributable
   to defendants' fraud . . .  Once the price inflation is determined,

25  the actual damages suffered by each individual class member
   will require nothing more than the mechanical application of

26  one of two equations under the PSLRA, depending on whether
   the individuals sold their shares within 90 days of the revelations

27  or held them beyond this period.

28

WPERP's expert, Bjorn Steinholt, further explained that (Dkt. No. 216 ¶ 14) (citations and quotations omitted):

> the impact of the alleged misrepresentations (or inflation) can be estimated, and class-wide damages quantified, based on an analysis of the market prices using an event study. This is so because the alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class, and that, therefore, the Class will prevail or fail in unison. Importantly, while the inflation per share may be different for different Class members depending on when they purchased (or sold) their shares, the methodology for quantifying the damages is the same for all Class members.

WPERP's proposed method — using an event study — is widely accepted for calculating damages of a class of stockholders. *See Diamond Foods*, 295 F.R.D. at 251. Defendants have not cited any reasons that such a method would be unworkable here. WPERP's showing is sufficient to satisfy its burden under FRCP 23(b)(3).

### *(2)    Superiority.*

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175 (citations and quotations omitted). One of the factors to be considered in determining whether a class action is superior to other available methods is the extent and nature of other litigation already commenced by members of the class. FRCP 23(b)(3)(B).

Defendants contend that WPERP does not meet the superiority requirement because Section 11 and 15 claims are better litigated in the parallel state court action. While it is true that an almost-identical action already commenced in another forum weighs against superiority, here, WPERP persuasively argues that its claims are nevertheless superior.

*First*, WPERP notes that despite state plaintiffs having filed first, the state case is scheduled for trial *after* this action. Therefore, the preference for efficient resolution of claims favors the federal action.

*Second*, WPERP points out the Supreme Court recently granted certiorari and is set to hear argument in November in *Cyan, Inc. v. Beaver Cty. Employees Ret. Fund*, 137 S. Ct. 2325 (2017). The issue certified is whether state courts lack subject-matter jurisdiction to hear securities class actions alleging only claims under the Securities Act of 1933. If the Supreme

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

Court finds that state courts lack jurisdiction over such actions, its decision will effectively end the state case, which raises only 1933 Act claims.

*Third*, WPERP observes that it has litigated more vigorously than the state representatives. Though defendants asserted similar affirmative defenses in both actions, the state plaintiffs raised no objections to those defenses while WPERP, after bringing a motion to strike, convinced defendants to drop 115 of their 154 affirmative defenses (*see* Forge Decl., Exhs. 8–12; Dkt. Nos. 193, 206). Additionally, defendants raised similar reliance-on-counsel defenses, while also asserting privilege in both actions. State plaintiffs did not object, whereas WPERP sought and obtained an order requiring defendants to either abandon their reliance-on-counsel defenses or produce the ostensibly privileged documents (Dkt. Nos. 217–218).

State plaintiffs, who intervened in this action for the sole purpose of objecting to certification, make additional arguments for why the state action is superior to this action for adjudicating Section 11 and 15 claims. Their primary argument is that the state case provides for greater recovery than this action and is, therefore, superior. For the reasons below, their argument falls short.

### *(a)*     *Extent of Available Recovery.*

The state plaintiffs contend that because WPERP no longer alleges Securities Act theories of liability based on the loan-approval process (which claims were dismissed (Dkt. No. 181 at 16–17)), it will be unable to seek as broad a recovery as the state plaintiffs, whose loan approval process claims survived the pleading stage (*see* Dkt. No. 221-1 ¶¶ 68–75, 81–89). It further points out that the state action maintains Section 11 and 15 claims based upon LendingClub's alleged failure to adequately disclose the extent to which its loans violated state usury laws, which claims are likewise absent from the federal action (Dkt. No. 222-1 at 8–9).

State plaintiffs contend that these additional Section 11 theories increase their potential recovery by at least $200 million (*id.* at 9; Dkt. No. 221-2 ¶ 17). This is so, they argue, because Section 11(e) provides that if a defendant can show that any portion of a plaintiff's claimed damages arise from something other than their claimed theory of liability, "such portion of

United States District Court

For the Northern District of California

or all such damages shall not be recoverable."  15 U.S.C. §77k(e).  Therefore, to the extent LendingClub can show that damages are a result of theories not included in the federal action, WPERP will not be able to recover those damages.

Specifically, state plaintiffs argue that they will be able to recover damages on days where LendingClub stock price dropped and the only negative news was related to the deficient loan-approval process, whereas WPERP will not (Dkt. 222-1 at 9–10).  State plaintiffs' expert, Dr. Scott Hakala, identified nine dates during which he claims price declines related to theories at issue only in the state action (*id.* at 10; Dkt. 221-2 ¶ 13).  Dr. Hakala opines that it is, therefore, likely that defendants will be able to successfully assert a negative loss causation defense against WPERP for any price drops that occurred during these nine days, reducing WPERP's damages accordingly (Dkt. 221-2 ¶ 14).

WPERP strenuously disputes Dr. Hakala's methodology.  It observes that losses that Dr. Hakala attributes to state theories only — for example, LendingClub's "8-K updating loss projections and interest rates for standard loan program" — could as easily be related, in whole or in part, to material weaknesses in internal controls or concealed assumptions of credit risk (which would be recoverable in the federal action).  Dr. Hakala, they observe, does not explain in his declaration *why* these damages could not be attributed to federal claim theories, or even appear to consider possible alternative causes.

Moreover, our plaintiff correctly notes that the burden to prove the effect these events allegedly had on LendingClub stock prices rests with *defendants*.  *See* 15 U.S.C. 77k(e).  In order for Dr. Hakala's numbers to bear out, defendants will have to prove that all of the losses Dr. Hakala allocated to problems with LendingClub's loan origination process were, in fact, caused by news related to issues with loan origination and not any of the other myriad of possible causes.  This is a tall order.  WPERP will no doubt submit its own expert report tying these losses to different events.[3]

---

[3]  WPERP also points to five decisions in the last twelve years in other districts rejecting Dr. Hakala's loss causation opinions under *Daubert* (Dkt. No. 235 at 11–12).  It argues that these are evidence that Dr. Hakala's opinions are generally unreliable, and so should be disregarded.  These other cases, however, are not evidence that Dr. Hakala has rendered an unreliable opinion in *this* action, and this argument therefore

Furthermore, even accepting Dr. Hakala's calculations, WPERP argues that it is nevertheless in a position to reap a greater recovery. This is so, it argues, because under Section 11, damages are limited to "the difference between the amount paid for the security . . . and [] the value thereof *as of the time such suit was brought . . . .*" 15 U.S.C. 77k(e) (emphasis added). The state plaintiffs' Section 11 suit was filed on February 26, 2016, when the closing price of LendingClub's stock was $8.41 per share. The day the federal suit was filed, May 16, 2016, LendingClub's stock closed at $3.94 per share. Therefore, WPERP contends, the state plaintiffs are foreclosed from pursuing $4.47 per share, which damages are available to the federal plaintiff. Using the state plaintiffs' experts' own calculations (accounting for price drops he claims are recoverable in the state court, but not here), the state plaintiffs would still recover $.39 less per share than WPERP, which amounts to approximately $26.6 million greater recovery for WPERP (*see* Dkt. No. 221-2 at 4–5).

While all parties agree that damages are capped by the date upon which suit is filed, state plaintiffs contend that the cap is not based upon the market price at that date, but instead by the true value of the stock, which should take into account any theretofore undisclosed misrepresentations. They ground this argument in the plain language of Section 11, which provides that damages shall be limited to "the difference between the amount paid for the security . . . and [] the *value thereof* as of the time such suit was brought," 15 U.S.C. 77K(e)(1), and a decision of the Court of Appeals for the Second Circuit holding that under Section 11 value *may* be distinct from price, *see McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995).

Unquestionably, the typical value used to measure Section 11 damages is the stock's price on the day a plaintiff files suit, and in an open market value is ordinarily synonymous with price. Whether a stock's "value" on the date suit is filed can be distinct from its price for the purpose of calculating Section 11 damages is a question unresolved by our court of appeals. Whether, even if value and price can diverge for the purpose of Section 11 damages, such

carries little weight.

United States District Court

For the Northern District of California

divergence is appropriate in the state plaintiffs' action is yet another unresolved question.  In any event, this presents a difficult issue (not decided here) that could seriously hamper state plaintiffs, limiting their damages to a number well below that of our plaintiff, who is no doubt entitled to a damage calculation based upon LendingClub's stock price the day WPERP filed suit.  The threat that they will be limited in ways our plaintiff will not — in combination with other advantages our plaintiff has, noted above — is enough to show that our plaintiff satisfies the superiority requirement.[4]

Accordingly, the federal class action remains the superior forum with respect to maximizing recoverable damages.

*(b)*     ***Juror Confusion Outweighed
By Efficient Disposition of Claims.***

The state plaintiffs further contend that the Section 11 claims should be separated from the Section 10(b) claims to avoid juror confusion due to the different scienter and causation standards applied to these claims (Dkt. No. 222-1 at 15).  It argues that it may be difficult for jurors to separate the requirements of these different claims, though state plaintiffs cite no case law for this proposition.

Contrary to state plaintiffs' contention, jurors are regularly called upon to resolve difficult questions involving different mental state and causation requirements.  Indeed, because of the similar conduct underlying Securities Act and Exchange Act claims, jurors are often presented with this very situation of differentiating between the requirements of Section 10(b) and Section 11.  "While there are some legal differences between the Securities Act and Exchange Act claims — such as whether defendants acted with scienter — the similarities are far greater because the claims in all cases revolve around whether [the defendant] materially

---

[4] WPERP argues that our court of appeals has held that under Section 11 the value of a stock is equivalent to its price and, therefore, state plaintiffs' interpretation is foreclosed by binding authority.  This, however, is an inaccurate characterization.  WPERP relies upon two decisions in which our court of appeals stated that damages for a Section 11 claim are measured by the "price" of the stock at the date suit is filed, but neither of those cases actually directly addressed the issue at stake here.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994); *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1204 (9th Cir. 2002).  Instead, each found that plaintiffs had failed to prove loss for reasons entirely unrelated to whether Section 11 damages were measured by stock price or some alternative value, and stated that damages can be measured by stock price on the day suit is filed only in passing.

United States District Court

For the Northern District of California

1    misrepresented its financial condition." *In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001

2    SI, 2009 WL 2905962, at *2 (N.D. Cal. Sept. 8, 2009) (Judge Susan Illston).

3         State plaintiffs' suggestion that it would be more efficient and effective to sever the

4    Section 11 claims from this action does not hold water.  WPERP has shown that moving

5    forward with its Section 11 claims as lead plaintiff in the federal forum is the superior means

6    for resolving this dispute.

7                     **C.    CLASS DEFINITION.**

8         Defendants next argue that even if this order certifies a class, it should place certain

9    limitations on the class definition.  Defendants first contend that any Section 11 Class must end

10   on June 8, 2015, since subsequent purchases cannot be traced to the IPO.  While it is possible to

11   trace later-purchased stock to the IPO through individualized proof, the practical value of this

12   limitation is persuasive.  It will head off the problem of trying to adjudicate individual claims

13   of traceability, which may prove resource intensive and time consuming, while leaving intact

14   any claims that individuals who did not purchase before June 9, but can nevertheless trace to the

15   IPO may have.  If, on the other hand, the class definition includes shareholders who purchased

16   after June 8, 2015, those who do not come forward, because they did not realize they could trace

17   back to the IPO, would have their claims extinguished.  In light of these risks, the class definition

18   is hereby amended to include only persons and entities who purchased LendingClub common

19   stock before June 9, 2015.

20        Defendants next argue that any investors who sold their securities before the May 2016

21   corrective disclosure should be excluded from the class because, under *Dura*, 544 U.S. at

22   342–43, they cannot demonstrate a loss caused by the alleged misrepresentation.  As discussed

23   above, such an exclusion is premature as WPERP may prove that some of the truth "leaked out"

24   prior to the corrective disclosures and caused injury at an earlier date.  *See In re Daou Sys.*,

25   411 F.3d at 1026.  Accordingly, this order declines to impose this limitation.

26        Defendants also argue that the class should exclude any "short sellers" (Opp. at 21).

27   Defendants do not define short sellers and their usage is ambiguous.  This order declines to

28   exclude from the class every investor who ever took a short position on LendingClub stock.

**United States District Court**

For the Northern District of California

1    Moreover, since the proposed class definition limits the class to individuals who were damaged

2    by their acquisition of LendingClub stock, it automatically excludes any short sale profits based

3    on price declines.  It is, however, possible that a short sale could have resulted in a loss (for the

4    short seller) during the class period if, for instance, the short sale occurred during a period in

5    which their was a short-term price increase.  Given the practical difficulties of tracing the short

6    seller's loss to any alleged fraud, excluding short sellers who incurred losses from short sales

7    during the class period is a sensible limitation that is hereby incorporated into the class

8    definition.

9            Finally, WPERP and the underwriter defendants seek to include the following additional

10   language not previously in the proposed class definition (bolded language):

11           All persons and entities who purchased or otherwise acquired the
             common stock of LendingClub Corporation ("LendingClub" or the
12           "Company") during the period from December 11, 2014 through
             May 6, 2016, inclusive (the "Class Period"), and were damaged
13           thereby, including those who purchased LendingClub common
             stock traceable to the Registration Statement (collectively, the
14           "Class").  Excluded from the Class are defendants and their
             families, the officers, directors, and affiliates of defendants, at all
15           relevant times, members of their immediate families and their legal
             representatives, heirs, successors or assigns, and any entity in
16           which defendants have or had a controlling interest.
             **Notwithstanding the foregoing, the Class shall include any**
17           **investment company or pooled investment fund, including, but**
             **not limited to, mutual fund families, exchange traded funds,**
18           **fund of funds and hedge funds, in which the Underwriter**
             **Defendants, or any of them, have, has or may have a direct or**
19           **indirect interest, or as to which any Underwriter Defendant's**
             **affiliates may act as an investment advisor, but as to which any**
20           **Underwriter Defendant alone or together with any of its**
             **respective affiliates is neither a majority owner nor the holder**
21           **of a majority beneficial interest.**

22           The other defendants do not object to this modification.  This order accepts this

23   modification.  Accordingly, the class definition is modified as follows:

24           All persons and entities who purchased or otherwise acquired the
             common stock of LendingClub Corporation ("LendingClub" or the
25           "Company") during the period from December 11, 2014 through
             **June 8**, 2016, inclusive (the "Class Period"), and were damaged
26           thereby, ~~including those who purchased LendingClub common~~
             ~~stock traceable to the Registration Statement~~ (collectively, the
27           "Class").  Excluded from the Class are **short sellers who incurred**
             **losses during the class period as a result of their short sales,**
28           defendants and their families, the officers, directors, and affiliates
             of defendants, at all relevant times, members of their immediate

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest. **Notwithstanding the foregoing, the Class shall include any investment company or pooled investment fund, including, but not limited to, mutual fund families, exchange traded funds, fund of funds and hedge funds, in which the Underwriter Defendants, or any of them, have, has or may have a direct or indirect interest, or as to which any Underwriter Defendant's affiliates may act as an investment advisor, but as to which any Underwriter Defendant alone or together with any of its respective affiliates is neither a majority owner nor the holder of a majority beneficial interest**.

3.     **INJUNCTION?**

On October 10, an order granted the parties in this action an opportunity to respond to each of state plaintiffs' motions to intervene and oppose class certification (Dkt. No. 229). WPERP responded on October 5 opposing intervention, and requesting an order enjoining the state action pursuant to the All Writs Act, 28 U.S.C. 1651(a), and the Anti-Injunction Act, 28 U.S.C. 2283 (Dkt. No. 235 at 17–22).

It argues that such an order is permitted *first* because the PSLRA expressly provides district courts the authority to enjoin state actions, and *second* because allowing the state case to proceed will interfere with this Court's jurisdiction.  WPERP requests that even if the Court is not inclined to enjoin the state action, "At a minimum . . . it should enjoin the imminent dissemination of the class notice in the State Case, as it is an unnecessary expense for the class to bear **and** the notice conceals from class members the existence of this litigation and the February 26, 2016 damages cutoff in the State Case" (*ibid.*).

Each argument is addressed in turn.

**A.     The All Writs Act and Anti-Injunction Act.**

The All Writs Act provides that "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. 1651(a).  The Anti-Injunction Act, in turn, limits the power of federal courts in order to preserve comity, providing just three circumstances under which a federal court may use its delegated powers to enjoin a state court proceeding:  (1) where a federal statute expressly provides the court the power to enjoin a state proceeding; (2) where an injunction is necessary in aid of the federal court's jurisdiction; or,

23

**United States District Court**
For the Northern District of California

1    (3) where an injunction is necessary to protect or effectuate the federal court's judgments.

2    28 U.S.C. 2283; *Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 282 (1970).

3    In applying the Anti–Injunction Act, the Supreme Court has cautioned that, "any doubts as to the

4    propriety of a federal injunction against state court proceedings should be resolved in favor of

5    permitting the state courts to proceed in an orderly fashion to finally determine the controversy."

6    *Id.* at 295.

7                    **B.     No Injunction Pursuant To The "Express Authority" Exception.**

8            WPERP argues that the PSLRA confers "express authority" upon district courts to enjoin

9    state actions by making it incumbent upon them to appoint a lead plaintiff who is "most capable

10   of adequately representing the interest of class members."  15 U.S.C. 78u-4(a)(3)(B).  It

11   contends that if district courts could not enjoin state court proceedings to carry out the mandate

12   of the PSLRA, then the PSLRA could not be given its intended meaning or scope (Dkt. No. 235

13   at 18).

14           Only one court, however, has found an express right to enjoin a state court proceeding

15   based upon the PSLRA.  In *BankAmerica Corp. Sec. Litig.*, 95 F. Supp. 2d 1044, 1049–50 (E.D.

16   Mo. 2000), the court stayed a state securities suit due to the woefully inadequate representation

17   in the state action, which it found threatened the rights of the federal litigants.  There, the state

18   court had not yet certified a class, state plaintiffs had taken almost no discovery and held

19   substantially less stock than the federal plaintiffs (1/26th the number of shares), and yet the state

20   plaintiffs were engaged in negotiations to settle all class claims on behalf of all class members,

21   including members of the already certified federal class.  The court further observed that the

22   state plaintiffs' attorneys had engage in "precisely the sort of lawyer-driven machinations the

23   PSLRA was designed to prevent."  *Id.* at 1050.  They had filed numerous inadequate motions for

24   class certification, overlooked potential conflicts of interest among classes, and attempted to

25   restructure the classes, "not in the best interest of the class members, but to avoid federal courts

26   at all costs."  When this restructuring proved difficult, the attorneys pushed for settlement despite

27   the early stage of the proceedings and the fact that almost no substantive discovery had been

28

24

completed.  The court held that "under the facts of [that] case . . . an injunction [was] necessary to preserve the federal plaintiffs' rights under the PSLRA."  *Ibid*.

We have a vastly different scenario before us.  Here, the state court has certified a class, the state plaintiffs are advanced in discovery, and there is no intimation of the improprieties that were afoot in *BankAmerica*.  Moreover, at the present no party has raised the specter of a settlement, certainly not a settlement that threatens to dispose of all claims on behalf of all class members.  Given these critical distinctions, the state action does not so threaten the integrity of the PSLRA that failing to enjoin it would amount to an abrogation of a Congressional mandate.

### C.    Injunction In Aid Of Jurisdiction Not Yet Necessary.

Even where a federal statute does not expressly provide federal courts the power to enjoin state proceedings, injunctive relief may nevertheless be necessary "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."  The mere existence of a parallel action in state court, however, "does not rise to the level of interference with federal jurisdiction necessary to permit injunctive relief under the 'necessary in aid of' exception."  *Lou v. Belzberg*, 834 F.2d 730, 740 (9th Cir. 1987).  Rather, courts have applied this doctrine sparingly.  Generally, an injunction "is justified only where a parallel state action threatens to render the exercise of the federal court's jurisdiction nugatory."  *Sandpiper Vill. Condo. Ass'n., Inc. v. Louisiana-Pac. Corp*., 428 F.3d 831, 843 (9th Cir. 2005).

WPERP argues that an injunction is necessary here to prevent the usurpation of this Court's jurisdiction.  It points in particular to the impending class notice, which the state court has approved, and which it argues will hinder absent class members' right to recover what they are entitled to.  That is so, it argues, because the notice does not inform them that (1) there is an ongoing federal action, (2) the potential recovery in the federal action is substantially greater than the state action, and (3) an unfavorable decision in *Cyan, Inc. v. Beaver Cty. Employees Ret. Fund*, _U.S. _, 137 S. Ct. 2325 (2017), set to be argued next month, could end the state court suit.  It further observes that, unlike the state plaintiffs, federal plaintiff underwent the PSLRA's

**United States District Court**
For the Northern District of California

1  rigorous standards for appointing lead plaintiffs, has the largest financial stake of any party,

2  and is better positioned to act on behalf of absent class members (Dkt. No. 235 at 18–21).

3          Enjoining the state court proceedings at this juncture, under these circumstances, is

4  unnecessary.  The only circumstance in which federal courts typically enjoin their state

5  counterparts on jurisdictional grounds is when a final disposition of a complex litigation is

6  imminent, and injunction of the state action is necessary to effectuate the settlement or judgment.

7  *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *In re Baldwin-United*

8  *Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 333 (2d Cir. 1985); *In re*

9  *Vioxx Prod. Liab. Litig.*, 869 F. Supp. 2d 719, 726 (E.D. La. 2012) ("Circuit Courts have been

10  most willing to uphold an injunction pursuant to the "in aid of jurisdiction" exception in the

11  MDL or complex litigation context when settlement is complete or imminent in the federal court,

12  and often after preliminary or final certification of a class").  No such circumstances are present

13  here.

14          Nevertheless, concerns remain regarding the current form of state plaintiffs' class notice,

15  which fails to notify class members of the parallel federal action, the pendency of *Cyan* and its

16  potential effect on their case, or the potential that the filing date of their suit could substantially

17  limit damages.

18          In order to address those concerns and others that may arise from these parallel

19  proceedings, the undersigned conditionally granted state plaintiffs' motion to intervene, with

20  the condition being that state plaintiffs remain subject to this Court's jurisdiction for the purpose

21  of coordinating its Section 11 class with WPERP so as to assure that absent class members are

22  protected.  To that end, state plaintiffs shall reform (and federal plaintiffs shall prepare) their

23  class notices to inform class members of the parallel actions, the important differences between

24  those actions, and their right to opt out of either, both, or neither action (which, in the latter

25  event, will bind them to whichever action should reach judgment first).  Specifically, the notices

26  must inform class members of the following:  (1) There are two lawsuits proceeding in parallel,

27  one in state and one in federal court, which overlap in certain respects and not in others;

28  (2) Some important differences between these suits include:  (a) the state action maintains

certain theories of liability under which the class may be granted relief including as a result of LendingClub's allegedly usurious loan rates, and alleged problems with LendingClub's loan application procedures. The federal action does not contain these theories of liability and, therefore, risks a lower recovery depending upon whether defendants can successfully show that damages should be attributed to the state theories; (b) class members in the federal action are potentially entitled to a greater recovery based upon the date federal lead plaintiff filed its action. Whether the state class members are entitled to this recovery remains uncertain; and, (c) the state action may be subject to dismissal depending upon the outcome of *Cyan, Inc. v. Beaver Cty. Employees Ret. Fund*, _U.S. _, 137 S. Ct. 2325 (2017), a case currently pending before the United States Supreme Court, which challenges state courts' jurisdiction over the claims that state plaintiffs have asserted in this action; and, (3) Class members will be notified of any settlement in either action, at which point they will have an opportunity to opt out of the settlement if they elect to do so.

The undersigned judge is mindful of potential comity concerns, and does not seek to intrude upon his California colleague, Judge Marie Weiner. Accordingly, state plaintiffs shall notify Judge Weiner of this order, and present the amended notice to her for approval. They shall also please ask Judge Weiner to require all parties in her case to participate in the mediation before Judge Spero.

As stated above, no injunction is necessary at this juncture and therefore WPERP's motion to enjoin the state action is **DENIED**. Nevertheless, given the stage of proceedings and various uncertainties and contingencies described above, this order is without prejudice to the future imposition of an injunction or stay of either the state or federal action should it become necessary.

## CONCLUSION

For the reasons stated above, state plaintiffs' motion to intervene is **CONDITIONALLY GRANTED**. WPERP's motion for class certification is **GRANTED** and the above-quoted class is hereby certified. Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles shall serve as lead plaintiff, and Robbins Geller Rudman & Dowd LLP is

United States District Court
For the Northern District of California

appointed as class counsel.  WPERP's motion for an injunction is **DENIED WITHOUT PREJUDICE** to renewal.

Within **TWENTY-ONE CALENDAR DAYS** of the date of entry of this order, all parties to both the state and federal actions shall submit jointly an agreed-upon form of notice, which must incorporate the information set forth above regarding the parallel actions.  WPERP along with defendants must also submit a joint proposal for dissemination of the notice, and the timeline for opting out of the action.  Plaintiff must bear the costs of the notice, which shall include mailing by first-class mail.

Furthermore, all parties (including intervenors) are hereby **ORDERED TO APPEAR** before Chief Magistrate Judge Spero for the November 28 settlement conference.  Defendants **SHALL NOT** negotiate a settlement with state plaintiffs on any claims that are not in that action.

**IT IS SO ORDERED.**

Dated:  October 20, 2017.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE