EXHIBIT 1

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
       – and –
DARREN J. ROBBINS (168593)
JASON A. FORGE (181542)
SCOTT H. SAHAM (188355)
RACHEL L. JENSEN (211456)
MICHAEL ALBERT (301120)
CARISSA J. DOLAN (303887)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
jforge@rgrdlaw.com
scotts@rgrdlaw.com
rachelj@rgrdlaw.com
malbert@rgrdlaw.com
cdolan@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LENDINGCLUB SECURITIES LITIGATION | Case No. 3:16-cv-02627-WHA |
| | CLASS ACTION |
| This Document Relates To: | LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT GOLDMAN SACHS & CO. |
| ALL ACTIONS. | |

1303198_1

1    Pursuant to Federal Rules of Civil Procedure 26 and 34, Civil Local Rule 34, and this Court's

2    Supplemental Order to Order Setting Initial Case Management Conference in Civil Cases ("Standing

3    Order"), ¶¶14-18, Lead Plaintiff Water and Power Employees' Retirement, Disability and Death

4    Plan of the City of Los Angeles ("Lead Plaintiff" or "WPERP") requests that defendant Goldman

5    Sachs & Co. ("Goldman Sachs") respond to and produce for inspection and copying the documents

6    designated under the heading "Documents Requested" by September 29, 2017, to the offices of

7    Robbins Geller Rudman & Dowd LLP, Post Montgomery Center, One Montgomery Street, Suite

8    1800, San Francisco, California 94104, or at such other time and place as the parties mutually agree.

9    The responding party is required to produce all requested documents that are in their actual or

10   constructive possession, custody, or control, or in the actual or constructive possession, custody, or

11   control of their officers, employees, agents, or representatives. The responding party shall produce

12   said documents as they are kept in the usual course of business and shall organize and label them to

13   correspond with the categories in the request.

## I.   PRODUCTION OF HARD COPY DOCUMENTS – FORMAT

15   Hard copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images

16   with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat). The database

17   load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME" and

18   "CUSTODIAN." The documents should be logically unitized (*i.e.*, distinct documents shall not be

19   merged into a single record, and single documents shall not be split into multiple records) and be

20   produced in the order in which they are kept in the usual course of business. If an original document

21   contains color to understand the meaning or content of the document, the document shall be

22   produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to

23   not degrade the original image. Multi-page OCR text for each document should also be provided.

24   The OCR software shall maximize text quality over process speed. Settings such as "auto-skewing"

25   and "auto-rotation" should be turned on during the OCR process.

## II.   PRODUCTION OF ESI

27   1.   ***Format***: Electronically stored information ("ESI") should be produced in single-page,

28   black and white, TIFF Group IV, 300 DPI TIFF images with the exception of spreadsheet type files,

1303198_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA                                    - 1 -

1  source code, audio and video files, which should be produced in native format. TIFFs should show

2  any and all text and images which would be visible to the reader using the native software that

3  created the document. For example, TIFFs of e-mail messages should include the BCC line.

4  PowerPoint documents shall be processed with hidden slides and all speaker notes unhidden, and

5  shall be processed to show both the slide and the speaker's notes on the TIFF image. If an original

6  document contains color, the document should be produced as single-page, 300 DPI JPG images

7  with JPG compression and a high quality setting as to not degrade the original image. Parties are

8  under no obligation to enhance an image beyond how it was kept in the usual course of business.

9         2.     ***Format – Native Files***: If a document is produced in native, a single-page Bates

10  stamped image slip sheet stating the document has been produced in native format should also be

11  provided. Each native file should be named according to the Bates number it has been assigned, and

12  should be linked directly to its corresponding record in the load file using the NATIVELINK field.

13  To the extent that either party believes that specific documents or classes of documents, not already

14  identified within this protocol, should be produced in native format, the parties should meet and

15  confer in good faith.

16         3.     ***De-Duplication***: Each party shall remove exact duplicate documents based on MD5

17  or SHA-1 hash values, at the family level. Attachments should not be eliminated as duplicates for

18  purposes of production, unless the parent e-mail and all attachments are also duplicates. An e-mail

19  that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an

20  e-mail that does not include content in the content in those fields, even if all remaining content in the

21  e-mail is identical. Removal of near-duplicate documents and e-mail thread suppression is not

22  acceptable. De-duplication should be done across the entire collection (global de-duplication) and

23  the CUSTODIAN field should list each custodian, separated by a semi-colon, who was a source of

24  that document. Should the CUSTODIAN metadata field produced become outdated due to rolling

25  productions, an overlay file providing all the custodians for the affected documents should be

26  produced prior to substantial completion of the document production.

27         4.     ***Technology Assisted Review***: Predictive coding/technology-assisted-review shall not

28  be used for the purpose of culling the documents to be reviewed or produced without notifying the

1  requesting party prior to use and with ample time to meet and confer in good faith regarding a
2  mutually agreeable protocol for the use of such technologies.

3      5.      ***Metadata***: All ESI shall be produced with a delimited, database load file that contains
4  the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the
5  correct encoding to enable preservation of the documents' original language.

6      6.      ***Embedded Objects***: The parties should meet and confer over the inclusion or
7  exclusion of embedded files from the production.

8      7.      ***Compressed Files Types***: Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should
9  be decompressed so that the lowest level document or file is extracted.

10     8.      ***Structured Data***: To the extent a response to discovery requires production of
11 electronic information stored in a database, the parties should discuss methods of production best
12 providing all relevant information, including, but not limited to, duplication of databases or limited
13 access for the purpose of generating reports.  Parties shall consider whether all relevant information
14 may be provided by querying the database for discoverable information and generating a report in a
15 reasonably usable and exportable electronic file.  A document reference sheet shall be provided to
16 describe the purpose of the database and meaning of all tables and column headers produced.

17     9.      ***Exception Report***: The producing party shall compile an exception report
18 enumerating any unprocessed or unprocessable documents, their file type and the file location.

19     10.     ***Encryption***: To maximize the security of information in transit, any media on which
20 documents are produced may be encrypted.  In such cases, the producing party shall transmit the
21 encryption key or password to the receiving party, under separate cover, contemporaneously with
22 sending the encrypted media.

23     11.     ***Redactions***: If documents that the parties have agreed to produce in native format
24 need to be redacted, the parties should meet and confer regarding how to implement redactions while
25 ensuring that proper formatting and usability are maintained.

26 **III.   RELEVANT TIME PERIOD**

27     Unless otherwise specifically indicated, the requests herein refer to the period from January
28 1, 2014 to the present (the "Relevant Period"), and shall include documents and information that

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA

1   relate to such period, even though prepared or published outside of the Relevant Period.  If a

2   document prepared before this period is necessary for a correct or complete understanding of any

3   document covered by a request, you must produce the earlier document as well.  If any document is

4   undated and the date of its preparation cannot be determined, the document shall be produced if

5   otherwise responsive to the request.

6   **IV.     DOCUMENTS REQUESTED**

7   <u>REQUEST FOR PRODUCTION NO. 1</u>:

8           Documents and communications concerning the First Defense asserted in the Underwriter

9   Defendants' Amended Answer ("Underwriters' Answer") to the Amended Consolidated Complaint

10  for Violation of the Federal Securities Laws ("Complaint"), including, but not limited to:

11          (a)     Documents and communications to, from, copying, or relating to all

12  "accounting, financial, or other experts retained to assist in preparing the Offering Documents"; and

13          (b)     Documents and communications reflecting or relating to "the use of experts

14  and consultants to advise the Underwriter Defendants in connection with the IPO."

15  <u>REQUEST FOR PRODUCTION NO. 2</u>:

16          Documents identified in the Underwriter Defendants' Initial Disclosures that Goldman Sachs

17  may use to support its claims or defenses, including documents and communications in the following

18  categories identified in the Underwriter Defendants' Initial Disclosures:

19          (a)     "[D]ocuments relating to the underwriting of the IPO";

20          (b)     "[D]ocuments relating to due diligence investigations performed by the

21  Underwriter Defendants in connection with their participation in the underwriting of the IPO";

22          (c)     "[D]ocuments relating to the sale of shares in the IPO";

23          (d)     "[D]ocuments relating to communications with other parties involved in the

24  IPO";

25          (e)     "[D]ocuments relating to general and industry-specific conditions that may

26  have impacted the value and performance of the shares in the IPO during the purported Class Period

27  defined in the Complaint"; and

28

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA                                      - 4 -

1    (f)    "[D]ocuments produced to plaintiffs in *In re LendingClub Corporation*

2  *Shareholder Litigation* (Case No. CIV 537300, San Mateo County Superior Court)."

3  REQUEST FOR PRODUCTION NO. 3:

4    Documents and communications concerning the following subject matter:

5    (a)    LendingClub's[1] related-party transactions (actual or contemplated);

6    (b)    Deficiencies or material weaknesses or deficiencies in LendingClub's

7  financial reporting;

8    (c)    Deficiencies or material weaknesses in LendingClub's internal controls;

9    (d)    The investigations of LendingClub's Board of Directors ("Board"), or any of

10  the Board's committees in connection with LendingClub's IPO;

11    (e)    The investigations of Deloitte & Touche LLP, KPMG LLP, Arnold & Porter

12  Kaye Scholer LLP, Sidley Austin LLP, or any other entity conducting an investigation or review in

13  connection with the LendingClub IPO and/or any subsequent matters alleged in the Complaint;

14    (f)    Loans made by LendingClub in December 2009 to defendant Renaud

15  Laplanche and three of his family members;

16    (g)    All suspected or confirmed violations of Generally Accepted Accounting

17  Principles ("GAAP") by LendingClub, including all related investigations and the results of such

18  investigations;

19    (h)    LendingClub's internal controls over financial reporting, including all reviews

20  of their effectiveness and the results of such reviews;

21    (i)    All suspected or confirmed acts of dishonesty (including a lack of candor) or

22  self-dealing by Renaud Laplanche, John Mack or Carrie Dolan, including any inquiries related to

23  such acts and the results of such inquiries;

24

25

---

26  [1]    "LendingClub" refers to LendingClub Corporation and any of its predecessors, successors,
affiliates, subsidiaries, divisions, partnerships, branches, any individual or entity under their
27  direction or control, including, but expressly not limited to, LC Advisors ("LCA"), and any present
and former officers, directors, employees, agents, members of boards of directors, investigators,
28  accountants, advisors, and all other persons acting or purporting to act on their behalf.

1303198_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA                    - 5 -

1          (j)     LendingClub's data integrity and security protocols, including any reviews of

2 their adequacy and the results of such reviews;

3          (k)     Any defendant's relationship, including transactions, agreements, and

4 investments, with Cirrix[2], including all investigations related to Cirrix and the results of such

5 investigations;

6          (l)     Internal investigations into weaknesses in LendingClub's internal controls

7 over financial reporting, including the results of such investigations;

8          (m)     External investigations into LendingClub's operations and/or financial

9 reporting by governmental or regulatory agencies and departments;

10          (n)     Each denial in the Underwriters' Answer; and

11          (o)     Each defense asserted in the Underwriters' Answer.

12 REQUEST FOR PRODUCTION NO. 4:

13        Documents that Goldman Sachs has produced to the U.S. Securities and Exchange

14 Commission ("SEC"), U.S. Department of Justice ("DOJ"), or any other federal, state, or regulatory

15 agency or entity, in response to any investigation, formal or informal inquiry, or request for

16 information related to Cirrix, any potential self-dealing by any defendant, LendingClub's IPO, the

17 Board Review (*see* LendingClub's Form 10-Q for the quarterly period ended March 31, 2016 ("we

18 conducted a review under the supervision of an independent sub-committee of the board of directors

19 and with the assistance of independent outside counsel and other advisors"), material weaknesses in

20 LendingClub's financial reporting, its internal controls, its improper "tone at the top," its data

21 integrity practices, or its related-party transactions.  This Request includes any third-party documents

22 related to such investigations, and communications relating thereto, including, but not limited to, any

23 subpoenas or *Wells* Notices received.

24

25

---

26 [2]     "Cirrix" refers to Cirrix Capital L.P. and any of its affiliated entities and any principals or
employees thereof, including: Cirrix Management GP, LLC; Cirrix Investments, LLC; Cirrix Capital
27 LLC; Cirrix Capital II LLC; Cirrix Capital III LLC; Mt. Whitney Securities LLC; Arcadia Funds,
LLC; Andrew Hallowell; Brent Clark; Douglas Goodman; Jonathan Green; and Anson Stookey.
28

1303198_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA        - 6 -

**REQUEST FOR PRODUCTION NO. 5:**

Documents and communications concerning any testimony or interview given to the SEC, DOJ, or any other federal, state, or regulatory agency or entity, including, but not limited to, deposition transcripts or interview statements, in response to any investigation, formal or informal inquiry, or request for information related to related to Cirrix, any potential self-dealing by any defendant, LendingClub's IPO, the Board Review, material weaknesses in LendingClub's financial reporting, its internal controls, its improper "tone at the top," its data integrity practices, or its related-party transactions.

**REQUEST FOR PRODUCTION NO. 6:**

Documents and communications concerning LendingClub's monthly and quarterly financial results, including all draft and final versions thereof.

**REQUEST FOR PRODUCTION NO. 7:**

Documents and communications, including any due diligence undertaken, concerning LendingClub's IPO.

**REQUEST FOR PRODUCTION NO. 8:**

Documents and communications, including any due diligence undertaken, concerning any other securitizations or securities offerings (actual or contemplated), involving any of the LendingClub Defendants, defendant Renaud Laplanche, defendant Carrie Dolan, or Cirrix.

**REQUEST FOR PRODUCTION NO. 9:**

Any comfort letters prepared or received by Goldman Sachs concerning LendingClub or Cirrix.

**REQUEST FOR PRODUCTION NO. 10:**

Documents and communications concerning any meetings, conference calls, symposiums, or conferences at which LendingClub or Cirrix was discussed, including, but not limited to, any LendingClub Board meetings or LendingClub's Board's committee meetings. Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

1303198_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA - 7 -

1   REQUEST FOR PRODUCTION NO. 11:

2      Documents and communications relating to presentations and reports Goldman Sachs gave to

3   or received from LendingClub or Cirrix.

4   REQUEST FOR PRODUCTION NO. 12:

5      Documents concerning any communication, presentation, or meeting (including any scripts,

6   transcripts, tapes, or videos prepared in connection with or as a result of) with any potential

7   purchasers of LendingClub securities, securities analysts, financial analysts, institutional investors,

8   financial investors, news media, journalists, investment bankers, brokerage firms, market makers,

9   money managers, commercial banks, rating agencies (such as Moody's Investors Service, Inc.), or

10   stock markets or securities exchanges concerning LendingClub or Cirrix, including, but not limited

11   to, roadshow presentations.

12   REQUEST FOR PRODUCTION NO. 13:

13      Documents and communications concerning any press release, published article, financial

14   analysts' report and/or rating agencies' report relating to or concerning LendingClub.

15   REQUEST FOR PRODUCTION NO. 14:

16      Documents that identify the personnel involved in the LendingClub IPO, whether contained

17   in a "Working Group List" or any similar list, from any or all of the following entities: LendingClub,

18   Deloitte & Touche LLP; the Underwriter Defendants; and any other entities or consultants involved

19   in the offerings.

20   REQUEST FOR PRODUCTION NO. 15:

21      Documents and communications concerning fees, expenses, reimbursements, costs,

22   compensation, or other remuneration received by Goldman Sachs for services rendered relating to

23   the IPO and/or any other services provided to or on behalf of LendingClub or Cirrix.

24   REQUEST FOR PRODUCTION NO. 16:

25      Documents and communications concerning any investors in or purchasers of LendingClub's

26   securities, including, but not limited to, any lists, trading records, or trade runs in Goldman Sachs'

27   possession, custody, or control, and documents identifying any person or entity that purchased

28   LendingClub's securities in the IPO.

1303198_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA      - 8 -

REQUEST FOR PRODUCTION NO. 17:

Documents and communications concerning any actual or contemplated financial services (including, but not limited to, providing lines of credit or lending lines), investment banking services, or consulting services performed for or on behalf of LendingClub, any LendingClub Defendant, defendant Renaud Laplanche, defendant Carrie Dolan, or Cirrix.

REQUEST FOR PRODUCTION NO. 18:

Documents and communications concerning any Underwriter Defendant's ownership or investment in LendingClub or Cirrix.

REQUEST FOR PRODUCTION NO. 19:

Documents concerning the location and preservation of documents relevant to this litigation.

REQUEST FOR PRODUCTION NO. 20:

Documents and communications concerning Goldman Sachs' document destruction policies and document retention policies, including documents concerning any deviations therefrom or violations thereof.

REQUEST FOR PRODUCTION NO. 21:

Documents concerning, or constituting, any insurance policies, indemnification agreements, hold-harmless agreements, or by-laws under which Goldman Sachs or any other Underwriter Defendant may claim coverage to satisfy part or all of any possible liabilities as a result of any of the claims asserted in this litigation.

1  REQUEST FOR PRODUCTION NO. 22:

2          All discovery (including privilege logs) produced or transmitted by Goldman Sachs to any

3  party (including to other defendants) in the litigation pending in the Superior Court of the State of

4  California, County of San Mateo, captioned *In re LendingClub Corporation Shareholder Litigation*,

5  No. CIV537300.

6  DATED:  August 30, 2017              ROBBINS GELLER RUDMAN
                                          & DOWD LLP
7                                       DARREN J. ROBBINS
                                        JASON A. FORGE
8                                       SCOTT H. SAHAM
                                        RACHEL L. JENSEN
9                                       MICHAEL ALBERT
                                        CARISSA J. DOLAN
10

11                                                    *Mike Albert*

12                                               MICHAEL ALBERT

13                                      655 West Broadway, Suite 1900
                                        San Diego, CA  92101
14                                      Telephone:  619/231-1058
                                        619/231-7423 (fax)
15
                                        ROBBINS GELLER RUDMAN
16                                        & DOWD LLP
                                        SHAWN A. WILLIAMS
17                                      Post Montgomery Center
                                        One Montgomery Street, Suite 1800
18                                      San Francisco, CA  94104
                                        Telephone:  415/288-4545
19                                      415/288-4534 (fax)

20                                      Lead Counsel for Lead Plaintiff

21

22

23

24

25

26

27

28

1303198_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA                              - 10 -

1

**DECLARATION OF SERVICE BY E-MAIL**

2
3
I, SUSAN M. WILLIAMS, not a party to the within action, hereby declare that on August 30, 2017, I served the attached LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT GOLDMAN SACHS & CO. on the parties in the within action by e-mail addressed as follows:

4

**COUNSEL FOR PLAINTIFFS:**

5
6
7
8

| NAME | FIRM | E-MAIL |
|---|---|---|
| Jason A. Forge<br>Scott H. Saham<br>Rachel L. Jensen<br>Michael Albert<br>Carissa Dolan | Robbins Geller Rudman & Dowd LLP<br><br>*Lead Counsel for Lead Plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles* | jforge@rgrdlaw.com<br>scotts@rgrdlaw.com<br>rachelj@rgrdlaw.com<br>malbert@rgrdlaw.com<br>cdolan@rgrdlaw.com |

9

**COUNSEL FOR DEFENDANTS:**

10
11
12
13
14
15
16
17
18
19
20
21

| NAME | FIRM | E-MAIL |
|---|---|---|
| Diane M. Doolittle<br>John Potter<br>David M. Grable<br>Joseph C. Sarles<br>Kyle Batter | Quinn Emanuel Urquhart & Sullivan, LLP<br><br>*Attorneys for the LendingClub Defendants* | dianedoolittle@quinnemanuel.com<br>johnpotter@quinnemanuel.com<br>davegrable@quinnemanuel.com<br>josephsarles@quinnemanuel.com<br>kylebatter@quinnemanuel.com |
| Simona G. Strauss<br>Lee Brand<br>Jonathan K. Youngwood | Simpson Thacher & Bartlett LLP<br><br>*Attorneys for the Underwriter Defendants* | sstrauss@stblaw.com<br>lee.brand@stblaw.com<br>jyoungwood@stblaw.com |
| Charlene S. Shimada<br>Susan D. Resley<br>Lucy Wang | Morgan, Lewis & Bockius LLP<br><br>*Attorneys for Defendant Carrie Dolan* | charlene.shimada@morganlewis.com<br>susan.resley@morganlewis.com<br>lucy.wang@morganlewis.com |
| Robert J. Liubicic | Milbank Tweed, Hadley & McCloy LLP<br><br>*Attorneys for Defendant Renaud Laplanche* | RLiubicic@milbank.com |

22
23
I declare under penalty of perjury that the foregoing is true and correct. Executed on August 30, 2017, at San Diego, California.

24
25
*Susan M. Williams*
SUSAN M. WILLIAMS

26
27
28

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT GOLDMAN SACHS & CO. - 3:16-cv-02627-WHA

- 11 -

**TABLE 1: METADATA FIELDS**

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD or Hard Drive. |
| RECORDTYPE | Options: eMail, Attachment, Scanned Doc, eFile | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the e-mail or calendar entry was sent. |
| SENTTIME | HH:MM | The time the e-mail or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry |
| MEETING START TIME | HH:MM | Start time of calendar entry |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry |
| MEETING END TIME | HH:MM | End time of calendar entry |
| FILEPATH | i.e. ./JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both e-mail and e-files. |
| FILEPATH-DUP | i.e. ./JSmith.pst/Inbox<br>/Network Share/Accounting/…<br>/TJohnsonPC/Users/TJohnson/My Documents/… | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both e-mail and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and e-mail address of the author of an e-mail/calendar item. An e-mail address should always be provided. |
| TO | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail address of the recipient(s) of an e-mail/calendar item. An e-mail address should always be provided for every e-mail if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail of the copyee(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail of the blind copyee(s) of an e-mail or calendar item. An e-mail address should always be provided for every e-mail if a blind copyee existed. |
| SUBJECT | | The subject line of the e-mail/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | E-mail Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe: Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together e-mail threads. |
| REDACTED | YES or Blank | If a document contains a redaction, this field will display 'YES'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in. **NOTE:** This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding bates numbers.  **Note**: E-mails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

Updated: 3/2/2017

# EXHIBIT 2

ROBBINS GELLER RUDMAN
    & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
        – and –
DARREN J. ROBBINS (168593)
JASON A. FORGE (181542)
SCOTT H. SAHAM (188355)
RACHEL L. JENSEN (211456)
MICHAEL ALBERT (301120)
CARISSA J. DOLAN (303887)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
jforge@rgrdlaw.com
scotts@rgrdlaw.com
rachelj@rgrdlaw.com
malbert@rgrdlaw.com
cdolan@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LENDINGCLUB SECURITIES LITIGATION | Case No. 3:16-cv-02627-WHA |
| | CLASS ACTION |
| This Document Relates To: | LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT WELLS FARGO SECURITIES, LLC |
| ALL ACTIONS. | |

1303243_1

1    Pursuant to Federal Rules of Civil Procedure 26 and 34, Civil Local Rule 34, and this Court's

2    Supplemental Order to Order Setting Initial Case Management Conference in Civil Cases ("Standing

3    Order"), ¶¶14-18, Lead Plaintiff Water and Power Employees' Retirement, Disability and Death

4    Plan of the City of Los Angeles ("Lead Plaintiff" or "WPERP") requests that defendant Wells Fargo

5    Securities, LLC ("Wells Fargo") respond to and produce for inspection and copying the documents

6    designated under the heading "Documents Requested" by September 29, 2017, to the offices of

7    Robbins Geller Rudman & Dowd LLP, Post Montgomery Center, One Montgomery Street, Suite

8    1800, San Francisco, California 94104, or at such other time and place as the parties mutually agree.

9    The responding party is required to produce all requested documents that are in their actual or

10   constructive possession, custody, or control, or in the actual or constructive possession, custody, or

11   control of their officers, employees, agents, or representatives.  The responding party shall produce

12   said documents as they are kept in the usual course of business and shall organize and label them to

13   correspond with the categories in the request.

14   **I.    PRODUCTION OF HARD COPY DOCUMENTS – FORMAT**

15   Hard copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images

16   with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat).  The database

17   load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME" and

18   "CUSTODIAN."  The documents should be logically unitized (*i.e.*, distinct documents shall not be

19   merged into a single record, and single documents shall not be split into multiple records) and be

20   produced in the order in which they are kept in the usual course of business.  If an original document

21   contains color to understand the meaning or content of the document, the document shall be

22   produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to

23   not degrade the original image.  Multi-page OCR text for each document should also be provided.

24   The OCR software shall maximize text quality over process speed.  Settings such as "auto-skewing"

25   and "auto-rotation" should be turned on during the OCR process.

26   **II.    PRODUCTION OF ESI**

27   1.    ***Format***: Electronically stored information ("ESI") should be produced in single-page,

28   black and white, TIFF Group IV, 300 DPI TIFF images with the exception of spreadsheet type files,

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA                    - 1 -

source code, audio and video files, which should be produced in native format. TIFFs should show any and all text and images which would be visible to the reader using the native software that created the document. For example, TIFFs of e-mail messages should include the BCC line. PowerPoint documents shall be processed with hidden slides and all speaker notes unhidden, and shall be processed to show both the slide and the speaker's notes on the TIFF image. If an original document contains color, the document should be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. Parties are under no obligation to enhance an image beyond how it was kept in the usual course of business.

2. ***Format – Native Files***: If a document is produced in native, a single-page Bates stamped image slip sheet stating the document has been produced in native format should also be provided. Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field. To the extent that either party believes that specific documents or classes of documents, not already identified within this protocol, should be produced in native format, the parties should meet and confer in good faith.

3. ***De-Duplication***: Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level. Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates. An e-mail that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an e-mail that does not include content in the content in those fields, even if all remaining content in the e-mail is identical. Removal of near-duplicate documents and e-mail thread suppression is not acceptable. De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN field should list each custodian, separated by a semi-colon, who was a source of that document. Should the CUSTODIAN metadata field produced become outdated due to rolling productions, an overlay file providing all the custodians for the affected documents should be produced prior to substantial completion of the document production.

4. ***Technology Assisted Review***: Predictive coding/technology-assisted-review shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the

requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

5.   ***Metadata***: All ESI shall be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the correct encoding to enable preservation of the documents' original language.

6.   ***Embedded Objects***: The parties should meet and confer over the inclusion or exclusion of embedded files from the production.

7.   ***Compressed Files Types***: Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

8.   ***Structured Data***: To the extent a response to discovery requires production of electronic information stored in a database, the parties should discuss methods of production best providing all relevant information, including, but not limited to, duplication of databases or limited access for the purpose of generating reports.  Parties shall consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.  A document reference sheet shall be provided to describe the purpose of the database and meaning of all tables and column headers produced.

9.   ***Exception Report***: The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

10.   ***Encryption***: To maximize the security of information in transit, any media on which documents are produced may be encrypted.  In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

11.   ***Redactions***: If documents that the parties have agreed to produce in native format need to be redacted, the parties should meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.

## III.   RELEVANT TIME PERIOD

Unless otherwise specifically indicated, the requests herein refer to the period from January 1, 2014 to the present (the "Relevant Period"), and shall include documents and information that

1   relate to such period, even though prepared or published outside of the Relevant Period.  If a

2   document prepared before this period is necessary for a correct or complete understanding of any

3   document covered by a request, you must produce the earlier document as well.  If any document is

4   undated and the date of its preparation cannot be determined, the document shall be produced if

5   otherwise responsive to the request.

6   **IV.      DOCUMENTS REQUESTED**

7   <u>REQUEST FOR PRODUCTION NO. 1</u>:

8           Documents and communications concerning the First Defense asserted in the Underwriter

9   Defendants' Amended Answer ("Underwriters' Answer") to the Amended Consolidated Complaint

10  for Violation of the Federal Securities Laws ("Complaint"), including, but not limited to:

11          (a)      Documents and communications to, from, copying, or relating to all

12  "accounting, financial, or other experts retained to assist in preparing the Offering Documents"; and

13          (b)      Documents and communications reflecting or relating to "the use of experts

14  and consultants to advise the Underwriter Defendants in connection with the IPO."

15  <u>REQUEST FOR PRODUCTION NO. 2</u>:

16          Documents identified in the Underwriter Defendants' Initial Disclosures that Wells Fargo

17  may use to support its claims or defenses, including documents and communications in the following

18  categories identified in the Underwriter Defendants' Initial Disclosures:

19          (a)      "[D]ocuments relating to the underwriting of the IPO";

20          (b)      "[D]ocuments relating to due diligence investigations performed by the

21  Underwriter Defendants in connection with their participation in the underwriting of the IPO";

22          (c)      "[D]ocuments relating to the sale of shares in the IPO";

23          (d)      "[D]ocuments relating to communications with other parties involved in the

24  IPO";

25          (e)      "[D]ocuments relating to general and industry-specific conditions that may

26  have impacted the value and performance of the shares in the IPO during the purported Class Period

27  defined in the Complaint"; and

28

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA            - 4 -

1    (f)    "[D]ocuments produced to plaintiffs in *In re LendingClub Corporation*

2    *Shareholder Litigation* (Case No. CIV 537300, San Mateo County Superior Court)."

3    REQUEST FOR PRODUCTION NO. 3:

4         Documents and communications concerning the following subject matter:

5         (a)    LendingClub's[1] related-party transactions (actual or contemplated);

6         (b)    Deficiencies or material weaknesses or deficiencies in LendingClub's

7    financial reporting;

8         (c)    Deficiencies or material weaknesses in LendingClub's internal controls;

9         (d)    The investigations of LendingClub's Board of Directors ("Board"), or any of

10   the Board's committees in connection with LendingClub's IPO;

11        (e)    The investigations of Deloitte & Touche LLP, KPMG LLP, Arnold & Porter

12   Kaye Scholer LLP, Sidley Austin LLP, or any other entity conducting an investigation or review in

13   connection with the LendingClub IPO and/or any subsequent matters alleged in the Complaint;

14        (f)    Loans made by LendingClub in December 2009 to defendant Renaud

15   Laplanche and three of his family members;

16        (g)    All suspected or confirmed violations of Generally Accepted Accounting

17   Principles ("GAAP") by LendingClub, including all related investigations and the results of such

18   investigations;

19        (h)    LendingClub's internal controls over financial reporting, including all reviews

20   of their effectiveness and the results of such reviews;

21        (i)    All suspected or confirmed acts of dishonesty (including a lack of candor) or

22   self-dealing by Renaud Laplanche, John Mack or Carrie Dolan, including any inquiries related to

23   such acts and the results of such inquiries;

24

25

---

26   [1]    "LendingClub" refers to LendingClub Corporation and any of its predecessors, successors,
     affiliates, subsidiaries, divisions, partnerships, branches, any individual or entity under their
     direction or control, including, but expressly not limited to, LC Advisors ("LCA"), and any present
27   and former officers, directors, employees, agents, members of boards of directors, investigators,
     accountants, advisors, and all other persons acting or purporting to act on their behalf.
28

1303243_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA        - 5 -

1         (j)     LendingClub's data integrity and security protocols, including any reviews of

2  their adequacy and the results of such reviews;

3         (k)     Any defendant's relationship, including transactions, agreements, and

4  investments, with Cirrix[2], including all investigations related to Cirrix and the results of such

5  investigations;

6         (l)     Internal investigations into weaknesses in LendingClub's internal controls

7  over financial reporting, including the results of such investigations;

8         (m)     External investigations into LendingClub's operations and/or financial

9  reporting by governmental or regulatory agencies and departments;

10         (n)     Each denial in the Underwriters' Answer; and

11         (o)     Each defense asserted in the Underwriters' Answer.

12  <u>REQUEST FOR PRODUCTION NO. 4</u>:

13       Documents that Wells Fargo has produced to the U.S. Securities and Exchange Commission

14  ("SEC"), U.S. Department of Justice ("DOJ"), or any other federal, state, or regulatory agency or

15  entity, in response to any investigation, formal or informal inquiry, or request for information related

16  to Cirrix, any potential self-dealing by any defendant, LendingClub's IPO, the Board Review (*see*

17  LendingClub's Form 10-Q for the quarterly period ended March 31, 2016 ("we conducted a review

18  under the supervision of an independent sub-committee of the board of directors and with the

19  assistance of independent outside counsel and other advisors"), material weaknesses in

20  LendingClub's financial reporting, its internal controls, its improper "tone at the top," its data

21  integrity practices, or its related-party transactions.  This Request includes any third-party documents

22  related to such investigations, and communications relating thereto, including, but not limited to, any

23  subpoenas or *Wells* Notices received.

24

25

---

26  [2]    "Cirrix" refers to Cirrix Capital L.P. and any of its affiliated entities and any principals or
employees thereof, including: Cirrix Management GP, LLC; Cirrix Investments, LLC; Cirrix Capital

27  LLC; Cirrix Capital II LLC; Cirrix Capital III LLC; Mt. Whitney Securities LLC; Arcadia Funds,
LLC; Andrew Hallowell; Brent Clark; Douglas Goodman; Jonathan Green; and Anson Stookey.

28

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA       - 6 -

REQUEST FOR PRODUCTION NO. 5:

Documents and communications concerning any testimony or interview given to the SEC, DOJ, or any other federal, state, or regulatory agency or entity, including, but not limited to, deposition transcripts or interview statements, in response to any investigation, formal or informal inquiry, or request for information related to related to Cirrix, any potential self-dealing by any defendant, LendingClub's IPO, the Board Review, material weaknesses in LendingClub's financial reporting, its internal controls, its improper "tone at the top," its data integrity practices, or its related-party transactions.

REQUEST FOR PRODUCTION NO. 6:

Documents and communications concerning LendingClub's monthly and quarterly financial results, including all draft and final versions thereof.

REQUEST FOR PRODUCTION NO. 7:

Documents and communications, including any due diligence undertaken, concerning LendingClub's IPO.

REQUEST FOR PRODUCTION NO. 8:

Documents and communications, including any due diligence undertaken, concerning any other securitizations or securities offerings (actual or contemplated), involving any of the LendingClub Defendants, defendant Renaud Laplanche, defendant Carrie Dolan, or Cirrix.

REQUEST FOR PRODUCTION NO. 9:

Any comfort letters prepared or received by Wells Fargo concerning LendingClub or Cirrix.

REQUEST FOR PRODUCTION NO. 10:

Documents and communications concerning any meetings, conference calls, symposiums, or conferences at which LendingClub or Cirrix was discussed, including, but not limited to, any LendingClub Board meetings or LendingClub's Board's committee meetings.   Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

1303243_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA                                   - 7 -

REQUEST FOR PRODUCTION NO. 11:

Documents and communications relating to presentations and reports Wells Fargo gave to or received from LendingClub or Cirrix.

REQUEST FOR PRODUCTION NO. 12:

Documents concerning any communication, presentation, or meeting (including any scripts, transcripts, tapes, or videos prepared in connection with or as a result of) with any potential purchasers of LendingClub securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investors Service, Inc.), or stock markets or securities exchanges concerning LendingClub or Cirrix, including, but not limited to, roadshow presentations.

REQUEST FOR PRODUCTION NO. 13:

Documents and communications concerning any press release, published article, financial analysts' report and/or rating agencies' report relating to or concerning LendingClub.

REQUEST FOR PRODUCTION NO. 14:

Documents that identify the personnel involved in the LendingClub IPO, whether contained in a "Working Group List" or any similar list, from any or all of the following entities: LendingClub, Deloitte & Touche LLP; the Underwriter Defendants; and any other entities or consultants involved in the offerings.

REQUEST FOR PRODUCTION NO. 15:

Documents and communications concerning fees, expenses, reimbursements, costs, compensation, or other remuneration received by Wells Fargo for services rendered relating to the IPO and/or any other services provided to or on behalf of LendingClub or Cirrix.

REQUEST FOR PRODUCTION NO. 16:

Documents and communications concerning any investors in or purchasers of LendingClub's securities, including, but not limited to, any lists, trading records, or trade runs in Wells Fargo's possession, custody, or control, and documents identifying any person or entity that purchased LendingClub's securities in the IPO.

1303243_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA                - 8 -

REQUEST FOR PRODUCTION NO. 17:

Documents and communications concerning any actual or contemplated financial services (including, but not limited to, providing lines of credit or lending lines), investment banking services, or consulting services performed for or on behalf of LendingClub, any LendingClub Defendant, defendant Renaud Laplanche, defendant Carrie Dolan, or Cirrix.

REQUEST FOR PRODUCTION NO. 18:

Documents and communications concerning any Underwriter Defendant's ownership or investment in LendingClub or Cirrix.

REQUEST FOR PRODUCTION NO. 19:

Documents concerning the location and preservation of documents relevant to this litigation.

REQUEST FOR PRODUCTION NO. 20:

Documents and communications concerning Wells Fargo's document destruction policies and document retention policies, including documents concerning any deviations therefrom or violations thereof.

REQUEST FOR PRODUCTION NO. 21:

Documents concerning, or constituting, any insurance policies, indemnification agreements, hold-harmless agreements, or by-laws under which Wells Fargo or any other Underwriter Defendant may claim coverage to satisfy part or all of any possible liabilities as a result of any of the claims asserted in this litigation.

REQUEST FOR PRODUCTION NO. 22:

All discovery (including privilege logs) produced or transmitted by Wells Fargo to any party (including to other defendants) in the litigation pending in the Superior Court of the State of California, County of San Mateo, captioned *In re LendingClub Corporation Shareholder Litigation*, No. CIV537300.

REQUEST FOR PRODUCTION NO. 23:

Documents and communications regarding the credit facility Wells Fargo provided to Cirrix, including, but specifically not limited to: (i) documents and communications reflecting the due diligence conducted in connection with the credit facility; (ii) documents and communications

1303243_1

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA                    - 9 -

1  reflecting Wells Fargo's decision to provide Cirrix with a credit facility; and (iii) documents and

2  communications regarding the credit facility referring or relating to LendingClub or Renaud

3  Laplanche.  *See* LC_FEDERAL_441177.

4  DATED:  August 30, 2017                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
5                                            DARREN J. ROBBINS
                                             JASON A. FORGE
6                                            SCOTT H. SAHAM
                                             RACHEL L. JENSEN
7                                            MICHAEL ALBERT
                                             CARISSA J. DOLAN
8

9                                                    *Mike cAlbert*

10                                           _____
                                                    MICHAEL ALBERT

11                                           655 West Broadway, Suite 1900
                                             San Diego, CA  92101
12                                           Telephone:  619/231-1058
                                             619/231-7423 (fax)
13
                                             ROBBINS GELLER RUDMAN
14                                             & DOWD LLP
                                             SHAWN A. WILLIAMS
15                                           Post Montgomery Center
                                             One Montgomery Street, Suite 1800
16                                           San Francisco, CA  94104
                                             Telephone:  415/288-4545
17                                           415/288-4534 (fax)

18                                           Lead Counsel for Lead Plaintiff

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT WELLS FARGO SECURITIES, LLC - 3:16-cv-02627-WHA                - 10 -

## DECLARATION OF SERVICE BY E-MAIL

I, SUSAN M. WILLIAMS, not a party to the within action, hereby declare that on August 30, 2017, I served the attached LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT WELLS FARGO SECURITIES, LLC on the parties in the within action by e-mail addressed as follows:

**COUNSEL FOR PLAINTIFFS:**

| NAME | FIRM | E-MAIL |
|------|------|--------|
| Jason A. Forge<br>Scott H. Saham<br>Rachel L. Jensen<br>Michael Albert<br>Carissa Dolan | Robbins Geller Rudman & Dowd LLP<br><br>*Lead Counsel for Lead Plaintiff Water and*<br>*Power Employees' Retirement, Disability*<br>*and Death Plan of the City of Los Angeles* | jforge@rgrdlaw.com<br>scotts@rgrdlaw.com<br>rachelj@rgrdlaw.com<br>malbert@rgrdlaw.com<br>cdolan@rgrdlaw.com |

**COUNSEL FOR DEFENDANTS:**

| NAME | FIRM | E-MAIL |
|------|------|--------|
| Diane M. Doolittle<br>John Potter<br>David M. Grable<br>Joseph C. Sarles<br>Kyle Batter | Quinn Emanuel Urquhart &<br>Sullivan, LLP<br><br>*Attorneys for the LendingClub*<br>*Defendants* | dianedoolittle@quinnemanuel.com<br>johnpotter@quinnemanuel.com<br>davegrable@quinnemanuel.com<br>josephsarles@quinnemanuel.com<br>kylebatter@quinnemanuel.com |
| Simona G. Strauss<br>Lee Brand<br>Jonathan K.<br>Youngwood | Simpson Thacher & Bartlett<br>LLP<br><br>*Attorneys for the Underwriter*<br>*Defendants* | sstrauss@stblaw.com<br>lee.brand@stblaw.com<br>jyoungwood@stblaw.com |
| Charlene S. Shimada<br>Susan D. Resley<br>Lucy Wang | Morgan, Lewis & Bockius LLP<br><br>*Attorneys for Defendant Carrie*<br>*Dolan* | charlene.shimada@morganlewis.com<br>susan.resley@morganlewis.com<br>lucy.wang@morganlewis.com |
| Robert J. Liubicic | Milbank Tweed, Hadley &<br>McCloy LLP<br><br>*Attorneys for Defendant Renaud*<br>*Laplanche* | RLiubicic@milbank.com |

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 30, 2017, at San Diego, California.

*Susan M. Williams*

SUSAN M. WILLIAMS

**TABLE 1: METADATA FIELDS**

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD or Hard Drive. |
| RECORDTYPE | Options: eMail, Attachment, Scanned Doc, eFile | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the e-mail or calendar entry was sent. |
| SENTTIME | HH:MM | The time the e-mail or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry |
| MEETING START TIME | HH:MM | Start time of calendar entry |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry |
| MEETING END TIME | HH:MM | End time of calendar entry |
| FILEPATH | i.e. /JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both e-mail and e-files. |
| FILEPATH-DUP | i.e. ./JSmith.pst/Inbox<br>/Network Share/Accounting/…<br>/TJohnsonPC/Users/TJohnson/My Documents/… | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both e-mail and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and e-mail address of the author of an e-mail/calendar item.<br>An e-mail address should always be provided. |
| TO | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail address of the recipient(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail of the copyee(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail of the blind copyee(s) of an e-mail or calendar item. An e-mail address should always be provided for every e-mail if a blind copyee existed. |
| SUBJECT | | The subject line of the e-mail/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | E-mail Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe: Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together e-mail threads. |
| REDACTED | YES or Blank | If a document contains a redaction, this field will display 'YES'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in. **NOTE:** This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC0000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding bates numbers.  **Note:** E-mails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

EXHIBIT 3

SIMONA G. STRAUSS (Bar No. 203062)
sstrauss@stblaw.com
LEE BRAND (Bar No. 287110)
lee.brand@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone:    (650) 251-5000
Facsimile:    (650) 251-5002

JONATHAN K. YOUNGWOOD (*pro hac vice*)
jyoungwood@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502

*Attorneys for the Underwriter Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LENDINGCLUB SECURITIES LITIGATION | Case No. 3:16-cv-02627-WHA |
| | CLASS ACTION |
| This Document Relates To: | **UNDERWRITER DEFENDANTS' RESPONSES AND OBJECTIONS TO LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| ALL ACTIONS. | |
| | Judge:  Hon. William H. Alsup |
| | Courtroom:  8, 19th Floor |

**PROPOUNDING PARTY:**     Lead Plaintiff

**RESPONDING PARTY:**     Underwriter Defendants

**SET NO.:**     One

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC (formerly known as Goldman, Sachs & Co.), Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Allen & Company LLC, Stifel, Nicolaus & Company, Incorporated, BMO Capital Markets Corp., William Blair & Company, L.L.C., and Wells Fargo Securities, LLC ("Wells Fargo" and, collectively, the "Underwriter Defendants") respond as follows to Lead Plaintiff's[1] First Set of Requests for Production of Documents to each Underwriter Defendant, dated August 30, 2017 (the "Requests").[2]

## **RESERVATION OF RIGHTS**

The responses provided herein are set forth without prejudice to the Underwriter Defendants' right to amend, correct, or supplement these responses (i) as the Underwriter Defendants complete their review and analysis of information and governing law, (ii) as the Underwriter Defendants access new or additional documents, or (iii) in the event of mistake. The Underwriter Defendants' investigation is ongoing. These responses or any subsequent agreement to conduct a diligent search for responsive documents shall not be construed as an admission that any such requested document exists or is relevant to this matter.

The Underwriter Defendants reserve their right to develop and use, at trial or any pre-trial proceeding, any subsequently discovered or acquired documents, including documents known to the Underwriter Defendants but whose relevance or applicability to the subject matter of this action is not yet known or ascertained. The Underwriter Defendants further reserve all objections as to the admissibility in evidence of any documents produced in response to the Requests (or any further responses to the Requests or their subject matter), including on the grounds of relevance.

---

[1] All references to "Lead Plaintiff" include Lead Plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles and its counsel in this action.

[2] Because 22 of the Requests are identical as to each Underwriter Defendant, the Underwriter Defendants provide herein a single set of responses and objections. Morgan Stanley and Wells Fargo separately respond and object to the additional Requests served on them.

1    Any production in response to the Requests is made without waiver of or prejudice to the

2    Underwriter Defendants' objections, all of which are hereby expressly preserved.

3    **GENERAL OBJECTIONS**

4    The Underwriter Defendants incorporate each of the following General Objections into

5    each and every specific response to the Requests below.  The assertion of the same, similar, or

6    additional objections in response to specific document requests does not waive, limit, or modify

7    any of the Underwriter Defendants' General Objections to the Requests.

8    1.    The Underwriter Defendants object to Lead Plaintiff's definitions, instructions, and

9    Requests to the extent they improperly attempt to expand, alter, or modify the scope of permissible

10   discovery under, or impose a duty or obligation that is inconsistent with, in excess of, or not

11   authorized by, the Federal Rules of Civil Procedure ("FRCP"), the Local Rules of the U.S. District

12   Court for the Northern District of California (the "Local Rules"), or any other applicable law

13   (collectively, "Applicable Law").  In responding to these Requests, the Underwriter Defendants

14   shall follow the FRCP, the Local Rules, and any orders entered by the Court rather than any of

15   Lead Plaintiff's instructions that go beyond or contradict those legal requirements.  The

16   Underwriter Defendants further object to the requested production date of September 29, 2017 as

17   unreasonable and unduly burdensome.  The Underwriter Defendants are willing to meet and

18   confer with Lead Plaintiff regarding an appropriate time for production.

19   2.    The Underwriter Defendants object to each Request to the extent that it calls for

20   documents obtained pursuant to confidentiality obligations; confidential business, financial, or

21   other proprietary information of a third-party; and/or documents protected from disclosure by law,

22   court order, or any agreement with respect to confidentiality or nondisclosure.  The Underwriter

23   Defendants further object to each Request to the extent that it purports to require disclosure of any

24   information prohibited from disclosure by any laws or regulations of any state, the United States,

25   or any other country.

26   3.    The Underwriter Defendants object to each Request to the extent that it seeks

27   documents protected by the attorney-client privilege, the attorney work-product doctrine, the joint

28   defense or common-interest doctrine, and/or any other constitutional, statutory, regulatory, or

2

common law privilege, doctrine, immunity, rule of confidentiality, or protection from disclosure that may attach to the information requested.  By responding to the Requests, the Underwriter Defendants do not waive, and intend to preserve, all applicable privileges.  If any privileged or other protected document is inadvertently produced, such disclosure is inadvertent and shall not constitute a waiver of the Underwriter Defendants' claims to such privilege or doctrine with respect to that information, and any failure to assert a privilege as to one document or communication shall not be deemed to constitute a waiver of the privilege as to any other document or communication so protected.  Additionally, in the event that any privileged or protected document is disclosed by the Underwriter Defendants, the Underwriter Defendants reserve the right to demand that the recipient return to them any such document and all copies thereof, and to demand that the recipient destroy any materials that contain information derived from any such document.  These requirements supplement, without superseding, any applicable orders regarding confidential information.

4.      The Underwriter Defendants object to each Request to the extent that it requires the disclosure of information that would violate any constitutional, statutory, regulatory, common law, and/or other judicially recognized privacy interest, protection, or privilege of any current or former employee or representative of the Underwriter Defendants or of any third party.

5.      The Underwriter Defendants object to each Request to the extent that it seeks all documents in response to the Request on the grounds that such requirements are overly broad and unduly burdensome and impose burdens different from or in addition to those permitted under Applicable Law.  The Underwriter Defendants further object to each Request to the extent that it seeks production of documents without a limitation on custodians and appropriately targeted search terms.

6.      The Underwriter Defendants object to each Request to the extent it seeks documents outside of their possession, custody, or control, or that are not known or reasonably available to the Underwriter Defendants.

7.      The Underwriter Defendants object to each Request to the extent that it is overly broad, duplicative, oppressive, unduly burdensome, and/or calls for documents that are obtainable

3

from some other source that is more convenient, less burdensome, or less expensive, including documents that can and should be readily obtained directly from LendingClub or the Individual Defendants.

8.     The Underwriter Defendants object to each Request to the extent it seeks documents that are equally accessible to Lead Plaintiff.

9.     The Underwriter Defendants object to each Request to the extent that it seeks documents or information already in the possession of Lead Plaintiff, that have already been produced in this action, or that are available to Lead Plaintiff through public sources or records, on the ground that it subjects the Underwriter Defendants to unreasonable and undue burden and expense.

10.     The Underwriter Defendants object to each Request to the extent that it is vague, ambiguous, or unintelligible; fails to describe the documents sought with sufficient particularity to allow for a meaningful response; and/or requires the Underwriter Defendants to speculate as to the nature or scope of the documents sought.  Notwithstanding this objection, when possible, the Underwriter Defendants have endeavored to respond based upon a reasonable interpretation of each such Request.

11.     The Underwriter Defendants object to each Request to the extent that it seeks documents that are not relevant to the claims or defenses of any party, not proportional to the needs of the case, or whose relevance is outweighed by the burden imposed on the Underwriter Defendants to search for and produce such documents.

12.     The Underwriter Defendants object to the "Relevant Period" as overbroad and unduly burdensome to the extent that it requests documents prior to April 1, 2014 or after December 31, 2014 given the nature of the claim against the Underwriter Defendants.

## OBJECTIONS TO DEFINITIONS

1.     The Underwriter Defendants object to the definition of the term "LendingClub" as defined in Request No. 3 as overbroad and unduly burdensome to the extent it seeks information from inaccessible or unknown parties and to the extent it seeks information that is not reasonably known or obtainable by the Underwriter Defendants.  The Underwriter Defendants further object

1  to the definition as vague and ambiguous and because it calls for legal conclusions with respect to

2  the terms "predecessors," "successors," "subsidiaries," "affiliates," "divisions," "partnerships,"

3  "branches," and "any individual or entity under their direction or control."  The Underwriter

4  Defendants further object to the definition to the extent it calls for the identification of "any

5  present and former officers, directors, employees, agents, members of boards of directors,

6  investigators, accountants, advisors, and all other persons acting or purporting to act on their

7  behalf."  In responding to the Requests, the Underwriter Defendants will interpret the word

8  "LendingClub" to refer to LendingClub Corporation and any of its employees, officers, or

9  directors acting in their official capacities.

10    2.    The Underwriter Defendants object to the definition of the term "Cirrix" as defined

11  in Request No. 3 as overbroad and unduly burdensome to the extent it seeks information from

12  inaccessible or unknown parties and to the extent it seeks information that is not reasonably

13  known or obtainable by the Underwriter Defendants.  The Underwriter Defendants further object

14  to the definition as vague and ambiguous and because it calls for legal conclusions with respect to

15  the terms "any of its affiliated entities" and "any principals or employees thereof."  In responding

16  to the Requests, the Underwriter Defendants will interpret the word "Cirrix" to refer to Cirrix

17  Capital L.P., the specific purported affiliated persons and entities identified in Footnote 2 of the

18  Requests, and any employees, officers, or directors of those entities acting in their official

19  capacities.

20  **SPECIFIC OBJECTIONS AND RESPONSES**

21    The Underwriter Defendants set forth their specific objections to the individual Requests

22  below.  By setting forth such specific objections, the Underwriter Defendants do not in any way

23  limit or restrict the General Objections set forth above.

24  **REQUEST FOR PRODUCTION NO. 1**

25    Documents and communications concerning the First Defense [statutory due diligence

26  defense] asserted in the Underwriter Defendants' Amended Answer ("Underwriters' Answer") to

27  the Amended Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint"),

28  including, but not limited to:

(a) Documents and communications to, from, copying, or relating to all "accounting, financial, or other experts retained to assist in preparing the Offering Documents"; and

(b) Documents and communications reflecting or relating to "the use of experts and consultants to advise the Underwriter Defendants in connection with the IPO."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

In addition to the foregoing General Objections, which are incorporated by reference herein, the Underwriter Defendants object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.  The Underwriter Defendants further object to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, and based on the Underwriter Defendants' understanding and reasonable interpretation of the Request, the Underwriter Defendants state that they have already produced the entirety of their production in *In re LendingClub Corporation Shareholder Litigation* (Case No. CIV 537300, San Mateo County Superior Court) (the "State Court Action"), which production contains documents responsive to this Request.  The Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

**REQUEST FOR PRODUCTION NO. 2**

Documents identified in the Underwriter Defendants' Initial Disclosures that [each Underwriter Defendant] may use to support its claims or defenses, including documents and communications in the following categories identified in the Underwriter Defendants' Initial Disclosures:

(a) "[D]ocuments relating to the underwriting of the IPO";

(b) "[D]ocuments relating to due diligence investigations performed by the Underwriter Defendants in connection with their participation in the underwriting of the IPO";

(c) "[D]ocuments relating to the sale of shares in the IPO";

1    (d) "[D]ocuments relating to communications with other parties involved in the IPO";

2    (e) "[D]ocuments relating to general and industry-specific conditions that may have

3    impacted the value and performance of the shares in the IPO during the purported Class Period

4    defined in the Complaint"; and

5    (f) "[D]ocuments produced to plaintiffs in *In re LendingClub Corporation Shareholder*

6    *Litigation* (Case No. CIV 537300, San Mateo County Superior Court)."

7    **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

8    Subject to and without waiving the foregoing General Objections and Objections to

9    Definitions, and based on the Underwriter Defendants' understanding and reasonable

10   interpretation of the Request, the Underwriter Defendants state that they have already produced

11   the entirety of their production in the State Court Action, which production contains documents

12   responsive to this Request.  The Underwriter Defendants are willing to meet and confer with Lead

13   Plaintiff regarding the need for any additional production in response to this Request.

14   **REQUEST FOR PRODUCTION NO. 3**

15   Documents and communications concerning the following subject matter:

16   (a) LendingClub's[3] related-party transactions (actual or contemplated);

17   (b) Deficiencies or material weaknesses or deficiencies in LendingClub's financial

18   reporting;

19   (c) Deficiencies or material weaknesses in LendingClub's internal controls;

20   (d) The investigations of LendingClub's Board of Directors ("Board"), or any of the

21   Board's committees in connection with LendingClub's IPO;

22

23

24

---

25   [3]   "LendingClub" refers to LendingClub Corporation and any of its predecessors, successors,
26   affiliates, subsidiaries, divisions, partnerships, branches, any individual or entity under
     their direction or control, including, but expressly not limited to, LC Advisors ("LCA"),
27   and any present and former officers, directors, employees, agents, members of boards of
     directors, investigators, accountants, advisors, and all other persons acting or purporting to
28   act on their behalf.

UNDERWRITER DEFS.' R&OS TO FIRST RFPS                    CASE NO. 3:16-cv-02627-WHA

(e) The investigations of Deloitte & Touche LLP, KPMG LLP, Arnold & Porter Kaye Scholer LLP, Sidley Austin LLP, or any other entity conducting an investigation or review in connection with the LendingClub IPO and/or any subsequent matters alleged in the Complaint;

(f) Loans made by LendingClub in December 2009 to defendant Renaud Laplanche and three of his family members;

(g) All suspected or confirmed violations of Generally Accepted Accounting Principles ("GAAP") by LendingClub, including all related investigations and the results of such investigations;

(h) LendingClub's internal controls over financial reporting, including all reviews of their effectiveness and the results of such reviews;

(i) All suspected or confirmed acts of dishonesty (including a lack of candor) or self-dealing by Renaud Laplanche, John Mack or Carrie Dolan, including any inquiries related to such acts and the results of such inquiries;

(j) LendingClub's data integrity and security protocols, including any reviews of their adequacy and the results of such reviews;

(k) Any defendant's relationship, including transactions, agreements, and investments, with Cirrix,[4] including all investigations related to Cirrix and the results of such investigations;

(l) Internal investigations into weaknesses in LendingClub's internal controls over financial reporting, including the results of such investigations;

(m) External investigations into LendingClub's operations and/or financial reporting by governmental or regulatory agencies and departments;

(n) Each denial in the Underwriters' Answer; and

(o) Each defense asserted in the Underwriters' Answer.

---

[4] "Cirrix" refers to Cirrix Capital L.P. and any of its affiliated entities and any principals or employees thereof, including: Cirrix Management GP, LLC; Cirrix Investments, LLC; Cirrix Capital LLC; Cirrix Capital II LLC; Cirrix Capital III LLC; Mt. Whitney Securities LLC; Arcadia Funds, LLC; Andrew Hallowell; Brent Clark; Douglas Goodman; Jonathan Green; and Anson Stookey.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.  The Underwriter Defendants further object to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  The Underwriter Defendants further object to this Request as vague and ambiguous, including, but not limited to, the phrases "related-party transactions (actual or contemplated)," "[d]eficiencies or material weaknesses," "investigations," "subsequent matters alleged in the Complaint," "three of his family members," "internal controls over financial reporting," "[a]ll suspected or confirmed acts of dishonesty (including a lack of candor) or self-dealing," "data integrity and security protocols," "[a]ny defendant's relationship, including transactions, agreements, and investments [] with Cirrix," and "weaknesses in LendingClub's internal controls."

Subject to and without waiving the foregoing objections, and based on the Underwriter Defendants' understanding and reasonable interpretation of the Request, the Underwriter Defendants state that they have already produced the entirety of their production in the State Court Action, which production contains documents responsive to this Request.  The Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

**REQUEST FOR PRODUCTION NO. 4**

Documents that [each Underwriter Defendant] has produced to the U.S. Securities and Exchange Commission ("SEC"), U.S. Department of Justice ("DOJ"), or any other federal, state, or regulatory agency or entity, in response to any investigation, formal or informal inquiry, or request for information related to Cirrix, any potential self-dealing by any defendant, LendingClub's IPO, the Board Review (*see* LendingClub's Form 10-Q for the quarterly period

9

ended March 31, 2016 ("we conducted a review under the supervision of an independent sub-committee of the board of directors and with the assistance of independent outside counsel and other advisors")[)], material weaknesses in LendingClub's financial reporting, its internal controls, its improper "tone at the top," its data integrity practices, or its related-party transactions. This Request includes any third-party documents related to such investigations, and communications relating thereto, including, but not limited to, any subpoenas or *Wells* Notices received.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege. The Underwriter Defendants further object to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action. The Underwriter Defendants further object to this Request to the extent that it calls for information protected by third-party confidentiality restrictions or other third-party restrictions on production. The Underwriter Defendants further object to this Request to the extent that it purports to require disclosure of any information prohibited from disclosure by federal law. The Underwriter Defendants further object to this Request as vague and ambiguous, including, but not limited to, the phrases "any potential self-dealing," "material weaknesses," "internal controls, "improper 'tone at the top,'" "data integrity practices," and "related-party transactions."

Subject to and without waiving the foregoing objections, the Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding this Request.

**REQUEST FOR PRODUCTION NO. 5**

Documents and communications concerning any testimony or interview given to the SEC, DOJ, or any other federal, state, or regulatory agency or entity, including, but not limited to, deposition transcripts or interview statements, in response to any investigation, formal or informal

1   inquiry, or request for information related to related to Cirrix, any potential self-dealing by any

2   defendant, LendingClub's IPO, the Board Review, material weaknesses in LendingClub's

3   financial reporting, its internal controls, its improper "tone at the top," its data integrity practices,

4   or its related-party transactions.

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 5**

6        In addition to the foregoing General Objections and Objections to Definitions, which are

7   incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

8   unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

9   documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to

10  the discovery of admissible evidence, including in particular documents unrelated to the IPO that

11  is the subject of this action.  The Underwriter Defendants further object to this Request to the

12  extent that it calls for information protected by third-party confidentiality restrictions or other

13  third-party restrictions on production.  The Underwriter Defendants further object to this Request

14  to the extent that it purports to require disclosure of any information prohibited from disclosure by

15  federal law.  The Underwriter Defendants further object to this Request as vague and ambiguous,

16  including, but not limited to, the phrases "any potential self-dealing," "material weaknesses,"

17  "internal controls, "improper 'tone at the top,'" "data integrity practices," and "related-party

18  transactions."  The Underwriter Defendants further object to this Request to the extent that it seeks

19  information protected by the attorney-client privilege, the attorney work-product doctrine, or the

20  joint defense privilege.

21       Subject to and without waiving the foregoing objections, the Underwriter Defendants are

22  willing to meet and confer with Lead Plaintiff regarding this Request.

23  **REQUEST FOR PRODUCTION NO. 6**

24       Documents and communications concerning LendingClub's monthly and quarterly

25  financial results, including all draft and final versions thereof.

26  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6**

27       In addition to the foregoing General Objections and Objections to Definitions, which are

28  incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

1  unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

2  documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to

3  the discovery of admissible evidence, including in particular documents unrelated to the IPO that

4  is the subject of this action.  The Underwriter Defendants further object to this Request to the

5  extent that it seeks publicly available information.  The Underwriter Defendants further object to

6  this Request to the extent that it seeks information protected by the attorney-client privilege, the

7  attorney work-product doctrine, or the joint defense privilege.

8       Subject to and without waiving the foregoing objections, and based on the Underwriter

9  Defendants' understanding and reasonable interpretation of the Request, the Underwriter

10 Defendants state that they have already produced the entirety of their production in the State Court

11 Action, which production contains documents responsive to this Request.  The Underwriter

12 Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

13 additional production in response to this Request.

14 **REQUEST FOR PRODUCTION NO. 7**

15      Documents and communications, including any due diligence undertaken, concerning

16 LendingClub's IPO.

17 **RESPONSE TO REQUEST FOR PRODUCTION NO. 7**

18      In addition to the foregoing General Objections and Objections to Definitions, which are

19 incorporated by reference herein, the Underwriter Defendants object to this Request to the extent

20 that it seeks information protected by the attorney-client privilege, the attorney work-product

21 doctrine, or the joint defense privilege.  The Underwriter Defendants further object to this Request

22 as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it

23 seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to

24 lead to the discovery of admissible evidence.

25      Subject to and without waiving the foregoing objections, and based on the Underwriter

26 Defendants' understanding and reasonable interpretation of the Request, the Underwriter

27 Defendants state that they have already produced the entirety of their production in the State Court

28 Action, which production contains documents responsive to this Request.  The Underwriter

1   Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

2   additional production in response to this Request.

3   **REQUEST FOR PRODUCTION NO. 8**

4          Documents and communications, including any due diligence undertaken, concerning any

5   other securitizations or securities offerings (actual or contemplated), involving any of the

6   LendingClub Defendants, defendant Renaud Laplanche, defendant Carrie Dolan, or Cirrix.

7   **RESPONSE TO REQUEST FOR PRODUCTION NO. 8**

8          In addition to the foregoing General Objections and Objections to Definitions, which are

9   incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

10  unduly burdensome, and beyond the permissible scope of discovery because it seeks documents

11  that are neither relevant to any issue in this Action nor reasonably calculated to lead to the

12  discovery of admissible evidence, including in particular documents unrelated to the IPO that is

13  the subject of this action.  The Underwriter Defendants further object to this Request as vague and

14  ambiguous, including, but not limited to, the phrase "other securitizations or securities offerings

15  (actual or contemplated)."  The Underwriter Defendants further object to this Request to the extent

16  that it seeks information protected by the attorney-client privilege, the attorney work-product

17  doctrine, or the joint defense privilege.  The Underwriter Defendants further object to this Request

18  to the extent it calls for information protected by third-party confidentiality or privacy rights or

19  other restrictions on production.

20         Subject to and without waiving the foregoing objections, the Underwriter Defendants are

21  willing to meet and confer with Lead Plaintiff regarding this Request.

22  **REQUEST FOR PRODUCTION NO. 9**

23         Any comfort letters prepared or received by [each Underwriter Defendant] concerning

24  LendingClub or Cirrix.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9**

26         In addition to the foregoing General Objections and Objections to Definitions, which are

27  incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

28  unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

13

documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  The Underwriter Defendants further object to this Request as vague and ambiguous, including, but not limited to, the phrase "comfort letters."  The Underwriter Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.

Subject to and without waiving the foregoing objections, and based on the Underwriter Defendants' understanding and reasonable interpretation of the Request, the Underwriter Defendants state that they have already produced the entirety of their production in the State Court Action, which production contains documents responsive to this Request.  The Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

**REQUEST FOR PRODUCTION NO. 10**

Documents and communications concerning any meetings, conference calls, symposiums, or conferences at which LendingClub or Cirrix was discussed, including, but not limited to, any LendingClub Board meetings or LendingClub's Board's committee meetings. Responsive documents shall include, but not be limited to, materials distributed and notes or transcripts of any meetings and conference calls.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  The Underwriter Defendants further object to this Request as vague and ambiguous, including, but not limited to, the phrase "meetings, conference calls, symposiums, or conferences." The Underwriter Defendants further object to this Request to the extent that it

1   seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or

2   the joint defense privilege.

3          Subject to and without waiving the foregoing objections, and based on the Underwriter

4   Defendants' understanding and reasonable interpretation of the Request, the Underwriter

5   Defendants state that they have already produced the entirety of their production in the State Court

6   Action, which production contains documents responsive to this Request.  The Underwriter

7   Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

8   additional production in response to this Request.

9   **REQUEST FOR PRODUCTION NO. 11**

10         Documents and communications relating to presentations and reports [each Underwriter

11  Defendant] gave to or received from LendingClub or Cirrix.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

13         In addition to the foregoing General Objections and Objections to Definitions, which are

14  incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

15  unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

16  documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to

17  the discovery of admissible evidence, including in particular documents unrelated to the IPO that

18  is the subject of this action.  The Underwriter Defendants further object to this Request as vague

19  and ambiguous, including, but not limited to, the phrase "presentations and reports."  The

20  Underwriter Defendants further object to this Request to the extent that it seeks information

21  protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense

22  privilege.

23         Subject to and without waiving the foregoing objections, and based on the Underwriter

24  Defendants' understanding and reasonable interpretation of the Request, the Underwriter

25  Defendants state that they have already produced the entirety of their production in the State Court

26  Action, which production contains documents responsive to this Request.  The Underwriter

27  Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

28  additional production in response to this Request.

**REQUEST FOR PRODUCTION NO. 12**

Documents concerning any communication, presentation, or meeting (including any scripts, transcripts, tapes, or videos prepared in connection with or as a result of) with any potential purchasers of LendingClub securities, securities analysts, financial analysts, institutional investors, financial investors, news media, journalists, investment bankers, brokerage firms, market makers, money managers, commercial banks, rating agencies (such as Moody's Investors Service, Inc.), or stock markets or securities exchanges concerning LendingClub or Cirrix, including, but not limited to, roadshow presentations.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the claim against the Underwriter Defendants under § 11 of the Securities Act. The Underwriter Defendants further object to this Request as vague and ambiguous, including, but not limited to, the phrase "any communication, presentation, or meeting." The Underwriter Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege. The Underwriter Defendants further object to this Request to the extent it calls for information protected by third-party confidentiality or privacy rights or other restrictions on production.

Subject to and without waiving the foregoing objections, and based on the Underwriter Defendants' understanding and reasonable interpretation of the Request, the Underwriter Defendants state that they have already produced the entirety of their production in the State Court Action, which production contains documents responsive to this Request. The Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

UNDERWRITER DEFS.' R&OS TO FIRST RFPS                    CASE NO. 3:16-CV-02627-WHA

**REQUEST FOR PRODUCTION NO. 13**

Documents and communications concerning any press release, published article, financial analysts' report and/or rating agencies' report relating to or concerning LendingClub.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action. The Underwriter Defendants further object to this Request to the extent that it seeks publicly available information. The Underwriter Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.

Subject to and without waiving the foregoing objections, and based on the Underwriter Defendants' understanding and reasonable interpretation of the Request, the Underwriter Defendants state that they have already produced the entirety of their production in the State Court Action, which production contains documents responsive to this Request. The Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

**REQUEST FOR PRODUCTION NO. 14**

Documents that identify the personnel involved in the LendingClub IPO, whether contained in a "Working Group List" or any similar list, from any or all of the following entities: LendingClub[;] Deloitte & Touche LLP; the Underwriter Defendants; and any other entities or consultants involved in the offerings.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request as vague and ambiguous, including, but not limited to, the phrases "personnel involved in" and "any other entities or consultants involved in the offerings." The Underwriter Defendants further object to

17

1  this Request to the extent that it seeks information protected by the attorney-client privilege, the

2  attorney work-product doctrine, or the joint defense privilege.

3      Subject to and without waiving the foregoing objections, and based on the Underwriter

4  Defendants' understanding and reasonable interpretation of the Request, the Underwriter

5  Defendants state that they have already produced the entirety of their production in the State Court

6  Action, which production contains documents responsive to this Request.  The Underwriter

7  Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

8  additional production in response to this Request.

9  **REQUEST FOR PRODUCTION NO. 15**

10      Documents and communications concerning fees, expenses, reimbursements, costs,

11  compensation, or other remuneration received by [each Underwriter Defendant] for services

12  rendered relating to the IPO and/or any other services provided to or on behalf of LendingClub or

13  Cirrix.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15**

15      In addition to the foregoing General Objections and Objections to Definitions, which are

16  incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

17  unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

18  documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to

19  the discovery of admissible evidence, including in particular documents unrelated to the IPO that

20  is the subject of this action.  The Underwriter Defendants further object to this Request as vague

21  and ambiguous, including, but not limited to, the phrases "other remuneration" and "and/or any

22  other services provided to or on behalf of LendingClub or Cirrix."  The Underwriter Defendants

23  further object to this Request to the extent that it seeks information protected by the attorney-client

24  privilege, the attorney work-product doctrine, or the joint defense privilege.  The Underwriter

25  Defendants further object to this Request to the extent it calls for information protected by third-

26  party confidentiality or privacy rights or other restrictions on production.

27      Subject to and without waiving the foregoing objections, and based on the Underwriter

28  Defendants' understanding and reasonable interpretation of the Request, the Underwriter

Defendants state that they have already produced the entirety of their production in the State Court Action, which production contains documents responsive to this Request.  The Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

**REQUEST FOR PRODUCTION NO. 16**

Documents and communications concerning any investors in or purchasers of LendingClub's securities, including, but not limited to, any lists, trading records, or trade runs in [the Underwriter Defendants'] possession, custody, or control, and documents identifying any person or entity that purchased LendingClub's securities in the IPO.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  The Underwriter Defendants further object to this Request to the extent it seeks information already in the possession of Lead Plaintiff or its attorneys or that is readily available from LendingClub.  The Underwriter Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.  The Underwriter Defendants further object to this Request to the extent it calls for information protected by third-party confidentiality or privacy rights or other third-party restrictions on production.

Subject to and without waiving the foregoing objections, the Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding this Request.

**REQUEST FOR PRODUCTION NO. 17**

Documents and communications concerning any actual or contemplated financial services (including, but not limited to, providing lines of credit or lending lines), investment banking

1   services, or consulting services performed for or on behalf of LendingClub, any LendingClub

2   Defendant, defendant Renaud Laplanche, defendant Carrie Dolan, or Cirrix.

3   **RESPONSE TO REQUEST FOR PRODUCTION NO. 17**

4        In addition to the foregoing General Objections and Objections to Definitions, which are

5   incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

6   unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

7   documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to

8   the discovery of admissible evidence, including in particular documents unrelated to the IPO that

9   is the subject of this action.  The Underwriter Defendants further object to this Request as vague

10  and ambiguous, including, but not limited to, the phrase "any actual or contemplated financial

11  services."  The Underwriter Defendants further object to this Request to the extent that it seeks

12  information protected by the attorney-client privilege, the attorney work-product doctrine, or the

13  joint defense privilege.  The Underwriter Defendants further object to this Request to the extent it

14  calls for information protected by third-party confidentiality or privacy rights or other restrictions

15  on production.

16        Subject to and without waiving the foregoing objections, and based on the Underwriter

17  Defendants' understanding and reasonable interpretation of the Request, the Underwriter

18  Defendants state that they have already produced the entirety of their production in the State Court

19  Action, which production contains documents responsive to this Request.  The Underwriter

20  Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

21  additional production in response to this Request.

22  **REQUEST FOR PRODUCTION NO. 18**

23        Documents and communications concerning any Underwriter Defendant's ownership or

24  investment in LendingClub or Cirrix.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18**

26        In addition to the foregoing General Objections and Objections to Definitions, which are

27  incorporated by reference herein, the Underwriter Defendants object to this Request as overbroad,

28  unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks

1   documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to

2   the discovery of admissible evidence, including in particular documents unrelated to the IPO that

3   is the subject of this action.  The Underwriter Defendants further object to this Request as vague

4   and ambiguous, including, but not limited to, the phrase "ownership or investment in."  The

5   Underwriter Defendants further object to this Request to the extent that it seeks information

6   protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense

7   privilege.

8          Subject to and without waiving the foregoing objections, and based on the Underwriter

9   Defendants' understanding and reasonable interpretation of the Request, the Underwriter

10  Defendants state that they have already produced the entirety of their production in the State Court

11  Action, which production contains documents responsive to this Request.  The Underwriter

12  Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

13  additional production in response to this Request.

14  **REQUEST FOR PRODUCTION NO. 19**

15         Documents concerning the location and preservation of documents relevant to this

16  litigation.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19**

18         In addition to the foregoing General Objections, which are incorporated by reference

19  herein, the Underwriter Defendants object to this Request to the extent that it seeks information

20  protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense

21  privilege.  The Underwriter Defendants further object to this Request as vague and ambiguous,

22  including, but not limited to, the phrase "the location . . . of documents."

23         Subject to and without waiving the foregoing objections, the Underwriter Defendants are

24  willing to meet and confer with Lead Plaintiff regarding this Request.

25  **REQUEST FOR PRODUCTION NO. 20**

26         Documents and communications concerning [each Underwriter Defendant's] document

27  destruction policies and document retention policies, including documents concerning any

28  deviations therefrom or violations thereof.

21

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20**

In addition to the foregoing General Objections, which are incorporated by reference herein, the Underwriter Defendants to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  The Underwriter Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.

Subject to and without waiving the foregoing objections, the Underwriter Defendants are willing to meet and confer with Lead Plaintiff regarding this Request.

**REQUEST FOR PRODUCTION NO. 21**

Documents concerning, or constituting, any insurance policies, indemnification agreements, hold-harmless agreements, or by-laws under which any other Underwriter Defendant may claim coverage to satisfy part or all of any possible liabilities as a result of any of the claims asserted in this litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21**

In addition to the foregoing General Objections, which are incorporated by reference herein, the Underwriter Defendants to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence.  The Underwriter Defendants further object to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.

Subject to and without waiving the foregoing objections, and based on the Underwriter Defendants' understanding and reasonable interpretation of the Request, the Underwriter Defendants state that they have already produced the entirety of their production in the State Court Action, which production contains documents responsive to this Request.  The Underwriter

1   Defendants are willing to meet and confer with Lead Plaintiff regarding the need for any

2   additional production in response to this Request.

3   **REQUEST FOR PRODUCTION NO. 22**

4   All discovery (including privilege logs) produced or transmitted by [each Underwriter

5   Defendants] to any party (including to other defendants) in the litigation pending in the Superior

6   Court of the State of California, County of San Mateo, captioned *In re LendingClub Corporation*

7   *Shareholder Litigation*, No. CIV537300.

8   **RESPONSE TO REQUEST FOR PRODUCTION NO. 22**

9   In addition to the foregoing General Objections, and based on the Underwriter Defendants'

10  understanding and reasonable interpretation of the Request, the Underwriter Defendants object to

11  this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to

12  the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably

13  calculated to lead to the discovery of admissible evidence.  The Underwriter Defendants further

14  object to this Request to the extent that it seeks information protected by the attorney-client

15  privilege, the attorney work-product doctrine, or the joint defense privilege.  The Underwriter

16  Defendants further object to this Request as vague and ambiguous, including, but not limited to,

17  the term "transmitted."

18  Subject to and without waiving the foregoing objections, and based on the Underwriter

19  Defendants' understanding and reasonable interpretation of the Request, the Underwriter

20  Defendants state that they have already produced the entirety of their document production to date

21  in the State Court Action.

22  **REQUEST FOR PRODUCTION NO. 23 TO WELLS FARGO**

23  Documents and communications regarding the credit facility Wells Fargo provided to

24  Cirrix, including, but specifically not limited to: (i) documents and communications reflecting the

25  due diligence conducted in connection with the credit facility; (ii) documents and communications

26  reflecting Wells Fargo's decision to provide Cirrix with a credit facility; and (iii) documents and

27  communications regarding the credit facility referring or relating to LendingClub or Renaud

28  Laplanche. *See* LC_FEDERAL_441177.

23

**RESPONSE OF WELLS FARGO TO REQUEST FOR PRODUCTION NO. 23**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, Wells Fargo objects to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  Wells Fargo further objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.

Subject to and without waiving the foregoing objections, Wells Fargo is willing to meet and confer with Lead Plaintiff regarding this Request.

**REQUEST FOR PRODUCTION NO. 23 TO MORGAN STANLEY**

Communications between anyone employed by (or acting on behalf of) Morgan Stanley and defendant John Mack regarding LendingClub.

**RESPONSE OF MORGAN STANLEY TO REQUEST FOR PRODUCTION NO. 23**

In addition to the foregoing General Objections and Objections to Definitions, which are incorporated by reference herein, Morgan Stanley objects to this Request as overbroad, unduly burdensome, and beyond the permissible scope of discovery to the extent it seeks documents that are neither relevant to any issue in this Action nor reasonably calculated to lead to the discovery of admissible evidence, including in particular documents unrelated to the IPO that is the subject of this action.  Morgan Stanley further objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense privilege.

Subject to and without waiving the foregoing objections, and based on Morgan Stanley's understanding and reasonable interpretation of the Request, Morgan Stanley states that it has already produced the entirety of its production in the State Court Action, which production contains documents responsive to this Request.  Morgan Stanley is willing to meet and confer with Lead Plaintiff regarding the need for any additional production in response to this Request.

Dated: September 29, 2017

SIMPSON THACHER & BARTLETT LLP

By:   /s/ Simona G. Strauss
      SIMONA G. STRAUSS

*Attorneys for the Underwriter Defendants*

# CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to this action. My email address is nanderson@stblaw.com, and my business address is Simpson Thacher & Bartlett LLP, 2475 Hanover Street, Palo Alto, California 94304. I am employed in the office of a member of the bar of this Court at whose direction service of document was made. On September 29, 2017, I served the following document:

**UNDERWRITER DEFENDANTS' RESPONSES AND OBJECTIONS TO LEAD PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

by transmitting a true copy of the document listed above by electronic mail to the email addresses listed below:

| Party | Attorneys | Emails |
|---|---|---|
| Lead Plaintiff | Jason A. Forge<br>Scott H. Saham<br>Rachel L. Jensen<br>Michael Albert<br>Carissa J. Dolan | jforge@rgrdlaw.com<br>scotts@rgrdlaw.com<br>rachelj@rgrdlaw.com<br>malbert@rgrdlaw.com<br>cdolan@rgrdlaw.com |
| LendingClub Defendants | Diane M. Doolittle<br>John Potter<br>David M. Grable<br>Joseph Sarles<br>Valerie Lozano<br>Kyle Batter<br>Justin Griffin | dianedoolittle@quinnemanuel.com<br>johnpotter@quinnemanuel.com<br>davegrable@quinnemanuel.com<br>josephsarles@quinnemanuel.com<br>valerielozano@quinnemanuel.com<br>kylebatter@quinnemanuel.com<br>justingriffin@quinnemanuel.com<br>lendingclub@quinnemanuel.com |
| Defendant Carrie Dolan | Charlene S. Shimada<br>Susan D. Resley<br>Lucy Wang | charlene.shimada@morganlewis.com<br>susan.resley@morganlewis.com<br>lucy.wang@morganlewis.com |
| Defendant Renaud Laplanche | Robert J. Liubicic<br>Adam Fee<br>Scott A. Edelman | rliubicic@milbank.com<br>afee@milbank.com<br>sedelman@milbank.com |
| Underwriter Defendants | Simona G. Strauss<br>Lee Brand | sstrauss@stblaw.com<br>lee.brand@stblaw.com<br>List-LendingClub-eService@lists.stblaw.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2017, at Palo Alto, California.

Nancy A. Anderson

# EXHIBIT 4

| | |
|---|---|
| **From:** | Brand, Lee <Lee.Brand@stblaw.com> |
| **Sent:** | Friday, November 10, 2017 3:00 PM |
| **To:** | Michael Albert; Sanders, Jonathan |
| **Cc:** | Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G |
| **Subject:** | RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) |

Michael,

We never heard back from you about a time for a further meet and confer regarding discovery from the lead underwriters in response to Jonathan's November 3 email below.

So as not to waste time, we have begun reviewing documents hitting on your proposed search terms from our three existing Morgan Stanley custodians.  As previously discussed, these search terms alone have nearly tripled the review population compared to what was previously reviewed for these custodians based on the search terms agreed to with the state court plaintiffs (without even expanding the date ranges).  We plan to do the same with our Goldman Sachs custodian once the Morgan Stanley review is complete.  Further, mindful of your request below and on the telephone, we have now produced privilege logs in the state court action and provided you with copies thereof.

Best,
Lee

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Friday, November 03, 2017 11:19 AM
**To:** Sanders, Jonathan; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Jonathan, your email overlooks the very real possibility that immunizing junior underwriters from discovery will result in the suppression of documents that undermine one or more of their or the lead underwriters' affirmative defenses (or support one or more of our claims).  There is no point in continuing to debate whether the junior underwriters are immune from discovery.  We have met and conferred, and we are at an impasse.  Therefore, we will alert Judge Alsup to our disagreement.

**From:** Sanders, Jonathan [mailto:JSanders@stblaw.com]
**Sent:** Friday, November 03, 2017 10:44 AM
**To:** Michael Albert; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Michael:

Thank you for your email.  We are disappointed that you no longer appear willing even to consider potential language to resolve the junior underwriter document issue.  This appears to be a significant reversal from prior discussions in which plaintiffs indicated some openness to the idea.  We understand that you do not want to be in a position where defendants are advancing affirmative defenses based on documents you have not seen.  We have no intention of doing that.  As I had stated, we propose an agreement—subject to confirming the precise language—that no underwriter, including the junior underwriters, will base any of their affirmative defenses on documents that are not produced in this action by Morgan Stanley or Goldman Sachs.  As such, any agreement that the junior underwriters need not produce documents cannot even theoretically prejudice your assessment of those defenses, on which we bear the burden of

1

proof in any event.  Moreover, the enormous burden of collecting and reviewing documents from seven junior underwriter defendants far outweighs any marginal benefit to plaintiffs in that discovery.  Respectfully, this discovery is not proportional to the needs of this case, in violation of FRCP 26(b)(1), and is inconsistent with the approach taken in any prior underwriter case that we can recall.

That said, in the spirit of our last discussion about moving forward with additional underwriter discovery, while we work toward some resolution of this issue, we suggest that we will run your proposed search terms on the data previously collected for the custodians we used in the state court action for Morgan Stanley and Goldman Sachs and review those documents for production.  We have some thoughts on how best to proceed and can share those with you on our next call.  Would you please provide some available times on Monday, as Simona is out today?

Best,

Jonathan

_____

**Jonathan Sanders**
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5071
jsanders@stblaw.com

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Wednesday, November 01, 2017 5:03 PM
**To:** Brand, Lee; Sanders, Jonathan
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Lee and Jonathan,

We cannot agree to a stipulation that would allow the seven so-called "junior" underwriters to avoid producing documents in this litigation.  We have given it a lot of thought and considered the points that you and Simona raised, but we cannot agree to waive discovery against multiple defendants who are asserting multiple affirmative defenses.  Please give us a sense of the volume of non-duplicative documents that would be responsive to the ESI Parameters I proposed in last Friday's email; meanwhile we will review the custodians we proposed to see if there is any way we could reduce the burden on the Underwriter Defendants while still seeking the discovery we need to meaningfully probe the claims and defenses in this litigation.

We are generally available tomorrow most of the day or on Friday afternoon to continue our meet-and-confer regarding the scope of discovery.   Would tomorrow at 10:30am work?

Thanks,
Michael

---

**From:** Brand, Lee [mailto:Lee.Brand@stblaw.com]
**Sent:** Friday, October 27, 2017 4:16 PM
**To:** Michael Albert; Sanders, Jonathan
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Michael,

Monday at 11:45 works for us.  Speak to you then.

Best,
Lee

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Friday, October 27, 2017 2:32 PM
**To:** Brand, Lee; Sanders, Jonathan
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Hi Lee,

Monday at 11:45am (PT) would be optimal for us, but we will accommodate your availability so that we have at least 90 minutes to thoroughly go through these issues.  Please let us know today if 11:45am works or if another time on Monday would be better.   In advance of our call, I wanted to share with you some questions and topics that I would like to discuss (in addition to the previously-raised areas) so that you have enough time to consider them with your team:

(1) A mutually-agreeable deadline for completing the Underwriter Defendants' production of documents that may be used to support any Underwriter Defendant's due diligence defense.

(2) Existence and status of document and privilege log productions to the government.

(3) All documents listed in MS_LC_00000025 - please confirm that they have been produced.

(4)  Our proposed ESI Parameters for documents other than those that you may use to support any Underwriter Defendant's due diligence defense are set forth below.  We would like to get a sense of the volume of de-duplicated document discovery that would be responsive to these parameters:

Custodians
All persons affiliated with each Underwriter Defendant that conducted, independently verified or delegated any part of the due diligence process for the IPO. (We believe defendants are in the appropriate position to identify all such individuals, but at a minimum, should include: (1) the persons on the abbreviated working group lists for the IPO with respect to each of the co-managers (e.g. MS_LC_00013739); (2) working groups, in addition to relevant research analysts and others involved in conducting, verifying or delegating to OMM any part of the due diligence process with respect to the lead underwriters; and (3) other persons participating in the bring down due diligence call (GS_LC_00001335) or the investor due diligence call with Arcadia (GS_LC_00000831).

Relevant Time Periods
-Due diligence defense time period (April 4, 2014 – December 11, 2014)
-Initial time period for meet and confer purposes regarding good faith/no knowledge defense (January 1, 2014 – January 15, 2015)

Search Terms
(lendingclub OR "lending club" OR Laplanche OR Marina OR 52603a109 OR draftsman20141 OR Cirrix OR Arcadia OR (Andrew /2 (hallowell OR halowell OR hallowel OR halowel) OR SpringStone OR "LC Advisors"

We can use the following dial in on Monday:

Dial-in:  800-504-8071

3

Access Code: 7442688

Thanks,
Michael

---

**From:** Brand, Lee [mailto:Lee.Brand@stblaw.com]
**Sent:** Thursday, October 26, 2017 1:31 PM
**To:** Michael Albert; Sanders, Jonathan
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Michael,

We are happy to meet and confer on the issues below and think it makes sense to do so rather than have discussions by email, as there appears to be a misunderstanding about the status of the privilege log in the state court action and about our production in this action.

We are generally available on Monday morning. If that works on your end, please let us know what specific time would be best and send a dial in.

Best,
Lee

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Wednesday, October 25, 2017 2:28 PM
**To:** Sanders, Jonathan; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Thank you, Jonathan. We do have the custodians and search terms from State Case production, so no need to resend those.

With respect to the Court's Standing Order, we appear to be at an impasse as to what it means to assert a privilege. We believe that the Underwriter Defendants asserted privileges at the time withheld documents responsive to Lead Plaintiff's documents requests were due. Given the expedited discovery schedule in place in this Action – a schedule which the Underwriters Defendants sought to further accelerate, we cannot wait any longer for the information we need to understand and assess the Underwriters' basis for withholding such documents. If the Underwriters are unwilling to produce by Monday a privilege log with respect to the State Case production (which is presumably already compiled and already reviewed), we will have to seek relief from Judge Alsup.

In light of the Underwriter Defendants' failure to produce a privilege log while making clear that responsive documents have been withheld from their productions to date, we would also like to meet and confer to confirm your understanding as to the scope of the Court's September 8, 2017 Order regarding sword-and-shield affirmative defenses. Relatedly, the Court's Order on class certification has been entered and per our previous agreement, we would like to meet and confer on the Underwriter Defendants' responses as soon as possible. Please let us know your availability to discuss both issues tomorrow or Friday.

Thanks,
Michael

**Michael Albert**

4

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

**From:** Sanders, Jonathan [mailto:JSanders@stblaw.com]
**Sent:** Thursday, October 19, 2017 6:00 PM
**To:** Michael Albert; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Michael:

Thanks for your email.  I believe I referenced production of our custodians and search terms on the call, which we have provided.  Please let me know if you cannot locate them, and I will resend.  I do not recall whether we had produced the document requests and objections from the state court actions, but we are attaching them here so that you can see them.

With respect to the issue of privilege, yes, we do plan to provide you with a privilege log at the time that we assert the privilege as to any documents redacted or withheld from production in this action.  Further, as we understand that the LendingClub defendants are in the process of providing an updated privilege log following meet and confers with you regarding the log's contents, we believe it makes sense to conform our approach to that agreed to between you and the other defendants to avoid potential future revision.

We look forward to discussing these issues with you after we have the benefit of Judge Alsup's class certification order and after you have had the opportunity to review the scope of the state court requests and objections, as well as our production.

Feel free to contact me with any questions.

Best,

Jonathan

_____

Jonathan Sanders
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5071
jsanders@stblaw.com

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Wednesday, October 18, 2017 11:49 AM
**To:** Brand, Lee
**Cc:** Sanders, Jonathan; Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Lee:

I'd like to follow up on our call from Thursday.   You and Jonathan suggested that lead plaintiff consider the scope of the Underwriter Defendants' production in the State Case as a starting point for our upcoming meet and confer regarding the Underwriter Defendants' responses and objections to lead plaintiff's document requests in this action.   While we continue to believe that the Federal Rules and the Court's Standing Order require responses and disclosures specific to the discovery that has been or will be collected, produced and/or withheld in response to the specific document requests served in *this* Action, it would be helpful if you can direct us to the Underwriter Defendants' objections and responses to the document requests served in the State Case (as well as to the document requests themselves) so that we can assess in advance of our upcoming call the full extent to which documents responsive to our requests have been requested, produced and/or objected to (and the bases therefore).   I believe that you or Jonathan mentioned on our call that you had already produced these materials to us but I do not believe that we have received them.   Again, we are seeking these materials in addition to, not in lieu of, comprehensive responses to our requests.

Also, please confirm that the Underwriter Defendants are not withholding any documents responsive to our requests (based on the Underwriter Defendants' understanding and reasonable interpretation of the requests) on the basis of any privilege or protection in this Action.   As you know, the Court's Standing Order requires that a privilege log containing sufficient detail and information to justify the assertion of privilege be produced "at the time of assertion" and that "[f]ailure to furnish [such] information at the time of the assertion *will* be deemed a waiver of the privilege or protection." *See* Paragraph 18.    The Underwriter Defendants object to virtually all of our requests on the basis of  attorney-client privilege, the attorney work-product doctrine, the joint defense privilege,  "third-party confidentiality restrictions" and/or "other third-party restrictions on production," and we have not yet received any privilege or redaction logs prepared by the Underwriter Defendants (whether for this action,  the State Case, or to the government).   If you are indeed withholding documents on the basis of any privilege or protection in response to our document requests, please explain to us why you have not waived any privilege or protection in this Action under the Court's Standing Order.

Let me know if you would like to discuss any of these issues prior to our planned call.

Best,

Michael

---

**From:** Michael Albert
**Sent:** Thursday, October 12, 2017 2:52 PM
**To:** 'Strauss, Simona G'
**Cc:** Brand, Lee; Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Hi Simona,

We can use the following dial in at 4:00PM today.  I think that should be more than enough time for us to discuss lead plaintiff's overall position on the underwriters' responses (given your suggestion that we put off having a more in-depth, request-by-request, meet and confer until the Court enters an order on class certification).

Dial-in:  800-504-8071
Access Code: 7442688

Thanks,
Michael

**Michael Albert**

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

---

**From:** Strauss, Simona G [mailto:sstrauss@stblaw.com]
**Sent:** Wednesday, October 11, 2017 12:53 PM
**To:** Michael Albert
**Cc:** Brand, Lee; Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** Re: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

4 pm is fine depending on how long we need. I have to be off the call by 4:40. If that's enough time, please send a dial in. Thanks.

On Oct 11, 2017, at 10:07 AM, Michael Albert <MAlbert@rgrdlaw.com> wrote:

Sure, Simona. Let's plan on tomorrow late afternoon. Would 4:00 PM PDT work?  Thanks

**From:** Strauss, Simona G [mailto:sstrauss@stblaw.com]
**Sent:** Tuesday, October 10, 2017 2:57 PM
**To:** Michael Albert; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Hi Michael,

I wasn't able to make it in to the office again today, so let's reschedule, please.  Thursday late afternoon should work.  Otherwise, Monday and Tuesday are pretty open.

Best,
Simona

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Monday, October 09, 2017 5:15 PM
**To:** Strauss, Simona G; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Sounds good, lets plan to talk at 2PM on Wednesday.  If that time works on your end, we can use the below dial-in.  Hope you have a speedy recovery.

Dial-in:  800-504-8071
Access Code: 7442688

Best,
Michael

**From:** Strauss, Simona G [mailto:sstrauss@stblaw.com]
**Sent:** Monday, October 09, 2017 11:24 AM
**To:** Michael Albert; Brand, Lee

**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Hi Michael,

I am home sick today but let's go ahead and get something on calendar as a placeholder for now.  How does Wednesday afternoon look for you?

Best,
Simona
_____

**Simona Strauss**
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5203
sstrauss@stblaw.com

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Friday, October 06, 2017 9:51 AM
**To:** Strauss, Simona G; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Simona and Lee,

Regarding the Underwriter Defendants' responses and objections, we would like to meet and confer with you regarding what we see as a failure to meet the standards set forth in the Federal Rules of Civil Procedure and the Court's Standing Order.  Please let us know your availability to discuss this issue this afternoon or early next week.

Thank you,
Michael


**Michael Albert**

[ ]

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

[ ] [ ] [ ] [ ] [ ] [ ]

---

**From:** Anderson, Nancy [mailto:nanderson@stblaw.com]
**Sent:** Friday, September 29, 2017 4:27 PM
**To:** Jason Forge; Scott Saham; Rachel Jensen; Michael Albert; Carissa Dolan;
dianedoolittle@quinnemanuel.com; johnpotter@quinnemanuel.com; davegrable@quinnemanuel.com;
josephsarles@quinnemanuel.com; valerielozano@quinnemanuel.com; kylebatter@quinnemanuel.com;

justingriffin@quinnemanuel.com; lendingclub@quinnemanuel.com; charlene.shimada@morganlewis.com;
susan.resley@morganlewis.com; lucy.wang@morganlewis.com; rliubicic@milbank.com; afee@milbank.com;
Scott A. Edelman
**Cc:** Strauss, Simona G; Brand, Lee; List-LendingClub-eService
**Subject:** In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Counsel,

Attached please find the Underwriter Defendants' Responses and Objections to Lead Plaintiff's First Set
of Requests for Production of Documents.

Regards,
Nancy

_____

**Nancy Anderson**
Senior Paralegal

Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5041
nanderson@stblaw.com

CONFIDENTIALITY NOTE:
The information contained in this email message and any attachments is legally privileged and
confidential information intended only for the use of the individual or entity to whom it is
addressed.  If the reader of this message is not the intended recipient, you are hereby notified
that any dissemination, distribution or copy of this message or its attachments is strictly
prohibited.  If you have received this email in error, please immediately notify us by telephone,
fax, or email and delete the message.  Thank you.

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any**

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

# EXHIBITS 5-6
[Filed Conditionally Under Seal
Pursuant to Protective Order]

EXHIBIT 7

| | |
|---|---|
| **From:** | Sanders, Jonathan <JSanders@stblaw.com> |
| **Sent:** | Monday, November 13, 2017 5:00 PM |
| **To:** | Michael Albert; Brand, Lee |
| **Cc:** | Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G |
| **Subject:** | RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) |

Michael:

We have not been discussing this issue "for six weeks without agreement." You first contacted us regarding the underwriters' objections and responses to Plaintiff's document requests generally on October 6. We then held multiple telephonic meet and confers over the intervening weeks, during which you never once suggested that the underwriters had waived privilege, much less indicated that we had a dispute ripe for resolution by Judge Alsup. Your latest email appears to be an attempt to manufacture such a dispute when there is none. Indeed, we have repeatedly discussed the timing and contours of the underwriters' privilege log, during none of which discussions did you ever indicate that you believed any waiver had occurred. To the contrary, you repeatedly contacted us regarding the date for service of the underwriters' privilege log in the state court action, efforts that would have been nonsensical if you were taking the position that essentially all documents in this matter are non-privileged.

Substantively, we disagree with your position. We are aware of no authority suggesting that a waiver occurs when underwriters assert a due diligence defense that includes reliance on experts and advisors. The underwriter defendants did not plead an advice of counsel defense in their Answer. Moreover, we have represented to you that we will not rely on any documents in support of our affirmative defenses that have not been produced in this action. Finally, I note that, even if we had pled an advice of counsel defense (and we did not), suggesting that that alone creates a waiver of privilege is inconsistent not only with the authority of which we are aware—and that you and LendingClub previously briefed in connection with your parallel dispute—but with Judge Alsup's order instructing LendingClub to state by a date certain whether they were relying on the advice of counsel and whether they were waiving privilege. If you are aware of any case law to the contrary, please provide it.

Thanks,

Jonathan

---

Jonathan Sanders
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5071
jsanders@stblaw.com

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Saturday, November 11, 2017 11:14 AM
**To:** Sanders, Jonathan; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Jonathan and Lee,

The Underwriter Defendants' First Defense puts at issue their subjective state of mind as to the presence of misstatements and omissions in the offering materials at the time of the IPO and therefore all documents, *whether privileged or not*, received by the Underwriter Defendants at or before the time of the IPO are discoverable and need to be produced. This extends to all documents on the following subjects: (i) the due diligence process used to prepare the registration statement, including the scope of engagement, the qualifications and experience of those involved; (ii) the registration statement itself, and (iii) the specific topics challenged in this action.

The Underwriter Defendants must also produce communications from them to OMM or Fenwick made during or before the time of the IPO bearing upon the registration statement or the investigative process used to prepare it or the particular topics challenged as since these statements would or could reasonably be expected to have influenced or revealed the Underwriter Defendants' beliefs.

We have been discussing these issues for six weeks without agreement so unless by the COB Monday you commit to produce all of the above, we will alert the Court to our disagreement.

Thanks,
Michael

---

**From:** Sanders, Jonathan [mailto:JSanders@stblaw.com]
**Sent:** Tuesday, November 07, 2017 4:01 PM
**To:** Michael Albert; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Michael:

We are still on pace to produce the privilege log this week, although we do not yet know whether it will be before Friday.

Thanks,

Jonathan

_____

**Jonathan Sanders**
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5071
jsanders@stblaw.com

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Monday, November 06, 2017 3:09 PM
**To:** Sanders, Jonathan; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Hi Jonathan and Lee,

Are the Underwriter Defendants on pace to meet their goal of producing a privilege log to us today?  I know that we agreed that it would be produced no later than this Friday, but we wanted to get a sense of whether we can still expect to get it before then.

Thanks,
Michael

---

**From:** Sanders, Jonathan [mailto:JSanders@stblaw.com]
**Sent:** Thursday, October 19, 2017 6:00 PM
**To:** Michael Albert; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Michael:

Thanks for your email.  I believe I referenced production of our custodians and search terms on the call, which we have provided.  Please let me know if you cannot locate them, and I will resend.  I do not recall whether we had produced the document requests and objections from the state court actions, but we are attaching them here so that you can see them.

With respect to the issue of privilege, yes, we do plan to provide you with a privilege log at the time that we assert the privilege as to any documents redacted or withheld from production in this action.  Further, as we understand that the LendingClub defendants are in the process of providing an updated privilege log following meet and confers with you regarding the log's contents, we believe it makes sense to conform our approach to that agreed to between you and the other defendants to avoid potential future revision.

We look forward to discussing these issues with you after we have the benefit of Judge Alsup's class certification order and after you have had the opportunity to review the scope of the state court requests and objections, as well as our production.

Feel free to contact me with any questions.

Best,

Jonathan

_____

**Jonathan Sanders**
**Simpson Thacher & Bartlett LLP**
**2475 Hanover Street**
**Palo Alto, CA 94304**

**T: +1-650-251-5071**
jsanders@stblaw.com

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Wednesday, October 18, 2017 11:49 AM
**To:** Brand, Lee

**Cc:** Sanders, Jonathan; Rachel Jensen; Carissa Dolan; Jason Forge; Strauss, Simona G
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Lee:

I'd like to follow up on our call from Thursday.   You and Jonathan suggested that lead plaintiff consider the scope of the Underwriter Defendants' production in the State Case as a starting point for our upcoming meet and confer regarding the Underwriter Defendants' responses and objections to lead plaintiff's document requests in this action.  While we continue to believe that the Federal Rules and the Court's Standing Order require responses and disclosures specific to the discovery that has been or will be collected, produced and/or withheld in response to the specific document requests served in *this* Action, it would be helpful if you can direct us to the Underwriter Defendants' objections and responses to the document requests served in the State Case (as well as to the document requests themselves) so that we can assess in advance of our upcoming call the full extent to which documents responsive to our requests have been requested, produced and/or objected to (and the bases therefore).  I believe that you or Jonathan mentioned on our call that you had already produced these materials to us but I do not believe that we have received them.  Again, we are seeking these materials in addition to, not in lieu of, comprehensive responses to our requests.

Also, please confirm that the Underwriter Defendants are not withholding any documents responsive to our requests (based on the Underwriter Defendants' understanding and reasonable interpretation of the requests) on the basis of any privilege or protection in this Action.  As you know, the Court's Standing Order requires that a privilege log containing sufficient detail and information to justify the assertion of privilege be produced "at the time of assertion" and that "[f]ailure to furnish [such] information at the time of the assertion *will* be deemed a waiver of the privilege or protection." *See* Paragraph 18.   The Underwriter Defendants object to virtually all of our requests on the basis of attorney-client privilege, the attorney work-product doctrine, the joint defense privilege,  "third-party confidentiality restrictions" and/or "other third-party restrictions on production," and we have not yet received any privilege or redaction logs prepared by the Underwriter Defendants (whether for this action,  the State Case, or to the government).   If you are indeed withholding documents on the basis of any privilege or protection in response to our document requests, please explain to us why you have not waived any privilege or protection in this Action under the Court's Standing Order.

Let me know if you would like to discuss any of these issues prior to our planned call.

Best,

Michael

---

**From:** Michael Albert
**Sent:** Thursday, October 12, 2017 2:52 PM
**To:** 'Strauss, Simona G'
**Cc:** Brand, Lee; Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Hi Simona,

We can use the following dial in at 4:00PM today.  I think that should be more than enough time for us to discuss lead plaintiff's overall position on the underwriters' responses (given your suggestion that we put off having a more in-depth, request-by-request, meet and confer until the Court enters an order on class certification).

Dial-in:  800-504-8071
Access Code: 7442688

Thanks,
Michael

**Michael Albert**

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

---

**From:** Strauss, Simona G [mailto:sstrauss@stblaw.com]
**Sent:** Wednesday, October 11, 2017 12:53 PM
**To:** Michael Albert
**Cc:** Brand, Lee; Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** Re: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

4 pm is fine depending on how long we need. I have to be off the call by 4:40. If that's enough time, please send a dial in. Thanks.

On Oct 11, 2017, at 10:07 AM, Michael Albert <MAlbert@rgrdlaw.com> wrote:

> Sure, Simona. Let's plan on tomorrow late afternoon. Would 4:00 PM PDT work?  Thanks
>
> ---
>
> **From:** Strauss, Simona G [mailto:sstrauss@stblaw.com]
> **Sent:** Tuesday, October 10, 2017 2:57 PM
> **To:** Michael Albert; Brand, Lee
> **Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
> **Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)
>
> Hi Michael,
>
> I wasn't able to make it in to the office again today, so let's reschedule, please.  Thursday late afternoon should work.  Otherwise, Monday and Tuesday are pretty open.
>
> Best,
> Simona
>
> ---
>
> **From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
> **Sent:** Monday, October 09, 2017 5:15 PM
> **To:** Strauss, Simona G; Brand, Lee
> **Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
> **Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]
>
> Sounds good, lets plan to talk at 2PM on Wednesday.  If that time works on your end, we can use the below dial-in.  Hope you have a speedy recovery.
>
> Dial-in:  800-504-8071
> Access Code: 7442688
>
> Best,
> Michael

5

**From:** Strauss, Simona G [mailto:sstrauss@stblaw.com]
**Sent:** Monday, October 09, 2017 11:24 AM
**To:** Michael Albert; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Hi Michael,

I am home sick today but let's go ahead and get something on calendar as a placeholder for now.  How does Wednesday afternoon look for you?

Best,
Simona

_____

**Simona Strauss**

Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5203
sstrauss@stblaw.com

---

**From:** Michael Albert [mailto:MAlbert@rgrdlaw.com]
**Sent:** Friday, October 06, 2017 9:51 AM
**To:** Strauss, Simona G; Brand, Lee
**Cc:** Rachel Jensen; Carissa Dolan; Jason Forge
**Subject:** RE: In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.) [EXT]

Simona and Lee,

Regarding the Underwriter Defendants' responses and objections, we would like to meet and confer with you regarding what we see as a failure to meet the standards set forth in the Federal Rules of Civil Procedure and the Court's Standing Order.  Please let us know your availability to discuss this issue this afternoon or early next week.

Thank you,
Michael

**Michael Albert**

655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

**From:** Anderson, Nancy [mailto:nanderson@stblaw.com]
**Sent:** Friday, September 29, 2017 4:27 PM
**To:** Jason Forge; Scott Saham; Rachel Jensen; Michael Albert; Carissa Dolan; dianedoolittle@quinnemanuel.com; johnpotter@quinnemanuel.com; davegrable@quinnemanuel.com; josephsarles@quinnemanuel.com; valerielozano@quinnemanuel.com; kylebatter@quinnemanuel.com; justingriffin@quinnemanuel.com; lendingclub@quinnemanuel.com; charlene.shimada@morganlewis.com; susan.resley@morganlewis.com; lucy.wang@morganlewis.com; rliubicic@milbank.com; afee@milbank.com; Scott A. Edelman
**Cc:** Strauss, Simona G; Brand, Lee; List-LendingClub-eService
**Subject:** In re LendingClub Securities Litigation, Case No. 3:16-cv-02627-WHA (N.D. Cal.)

Counsel,

Attached please find the Underwriter Defendants' Responses and Objections to Lead Plaintiff's First Set of Requests for Production of Documents.

Regards,
Nancy

_____

**Nancy Anderson**
Senior Paralegal

Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, CA 94304

T: +1-650-251-5041
nanderson@stblaw.com

CONFIDENTIALITY NOTE:
The information contained in this email message and any attachments is legally privileged and confidential information intended only for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message or its attachments is strictly prohibited. If you have received this email in error, please immediately notify us by telephone, fax, or email and delete the message. Thank you.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited.

**If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

EXHIBIT 8

**United States District Court**
For the Northern District of California

1
2
3
4
5
6             IN THE UNITED STATES DISTRICT COURT

7             FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10    IN RE

11    CHARLES SCHWAB CORPORATION              No. C 08-01510 WHA
      SECURITIES LITIGATION.
12
                                              _____/            **ORDER RE WAIVER OF**
13                                                                     **ATTORNEY-CLIENT**
                                                                       **AND WORK-PRODUCT**
14    This Document Relates To All Cases.                              **PRIVILEGES**

15                                            _____/

16            Section 11 allows defendants to avoid liability by proving that they "had, after reasonable

17    investigation, reasonable ground to believe and did believe that the registration statement was

18    not materially misleading."  This is an affirmative defense and the burden of proof rests on

19    defendants.  The key inquiry focuses on a defendant's belief at the time in question and

20    specifically whether he had reasonable belief in the accuracy of the registration statement.

21    A similar affirmative defense is afforded by Sections 12 and 15.

22            When a defendant asserts the affirmative defense, he places in issue his subjective state

23    of mind as to the contested disclosures at the time in question and therefore *all* information,

24    whether privileged or not, received by him on those matters during or before the time in question

25    are discoverable.  This is because all information received by him on those matters would have,

26    or at least arguably should have, informed his belief as to the reasonableness of the investigation

27    and the accuracy of the registration statement.  The waiver extends to all relevant

28    communications received by said defendant on or before the time in question, whether or not said

United States District Court

For the Northern District of California

1  defendant now remembers those communications.  It does not, however, waive any privilege as to

2  communications received only *by others*, for those communications could not have influenced

3  the state of mind of the defendant in question.  This means that those defendants who merely

4  testify at trial that they believed competent counsel had been employed to investigate and to

5  prepare the registration statement in compliance with regulations and that they otherwise had

6  nothing to do with their preparation will waive no privilege *so long as they had no relevant*

7  *privileged communications*.

8       If the defendant is a corporation rather than an individual, then the communications that

9  matter are all those received by all officers, directors and any managing agents responsible for the

10  registration statements, for their state of mind would be at issue, they being the ones through

11  whom the corporation must have acted.  Therefore, in the case of a corporation asserting the

12  defense, the waiver must extend to all officers, directors and any managing agents responsible for

13  the registration statements and the relevant communications received by them up to the time in

14  question.  Again, the waiver occurs even if one or more of the officers, directors and managing

15  agents have now forgotten the communications, for those communications would have helped

16  inform their beliefs at the time in question, regardless of their present-day memories.

17       As to such communications, the waiver extends to the following subjects:  (i) the

18  investigative process used to prepare the registration statement, including the scope of

19  engagement, the qualifications and experience of those involved; (ii) the registration statement

20  itself, and (iii) the specific topics (such as the duration issue) challenged in this action.

21  An example of the latter would be communications regarding the duration question whether

22  or not the communication came upon in the specific context of the registration statement.

23       Also waived are any communications *from* said defendant *to* counsel made during

24  or before the time in question bearing upon the registration statement or the investigative process

25  used to prepare it or the particular topics challenged as misleading (such as the duration question)

26  since these statements would or could reasonably be expected to have influenced or revealed said

27  defendant's beliefs.  And, the adequacy of the client disclosure to counsel may be a factor in

28  evaluating the reasonableness of reliance on counsel's response or investigation.

**United States District Court**
For the Northern District of California

Assuming, therefore, that the documents were requested and that the requests were otherwise unobjectionable, this order holds that, as to each defendant asserting said defense, any privilege assertable by said defendant must be deemed waived and the requested communications must be turned over under Rule 34.  As stated, there is no waiver as to communications received only by others.  Nor is there any waiver as to the actual propriety of compliance counsel's vetting process except to the extent of actual communications on that subject to or from those defendants invoking the defense.

Each defendant may have until **MARCH 1 AT NOON** to file an election whether to withdraw the affirmative defense.  Some may choose to do so and others may not.  But on that date, defense counsel must produce for inspection and copying all documents previously withheld from production on account of privilege which were directed to or from any defendant persisting in the defense, at least for documents prepared during or before the time in question on the subject of the registration statement, the investigative process and to prepare them, and any of the particular topics challenged herein as misleading (such as the duration question), whether or not said defendant now remembers the communication, keeping in mind that for any corporate defendant the waiver will extend to all officers, directors and any managing agents responsible for the registration statements.

The Court has read the declarations of Darryl P. Rains and David B. Bayless submitted yesterday.  Those declarations plainly indicate that there are documents that should be produced under this ruling.  The exact extent of the required production depends on facts in the possession of counsel and so the Court hereby **ORDERS** Attorneys Rains and Bayless to produce unredacted copies of all previously withheld materials as to those defendants who persist in these affirmative defenses, as set forth above.  The declarations do not reveal enough information for the Court to identify all documents that should be produced, so the Court will not pick some and thereby imply that others need not be produced.  Counsel will understand this ruling and knowing all of

the facts will proceed honorably. Depositions of counsel and those involved in the process will

not be ordered at this time.

**IT IS SO ORDERED.**

Dated: February 23, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

# EXHIBIT 9

EX-1.1 2 d766811dex11.htm FORM OF UNDERWRITING AGREEMENT

**Exhibit 1.1**

**[—] Shares**

**LENDINGCLUB CORPORATION**

**[—] COMMON STOCK**

**$0.01 PAR VALUE PER SHARE**

**UNDERWRITING AGREEMENT**

[—], 2014

[—], 2014

Morgan Stanley & Co. LLC
Goldman, Sachs & Co.

    as Representatives of the several Underwriters

c/o Morgan Stanley & Co. LLC
    1585 Broadway
    New York, New York 10036

c/o Goldman, Sachs & Co.
    200 West Street
    New York, New York 10282

Ladies and Gentlemen:

    LendingClub Corporation, a Delaware corporation (the "**Company**"), proposes to issue and sell to the several Underwriters named in Schedule II hereto (the "**Underwriters**"), for which Morgan Stanley & Co. LLC ("**Morgan Stanley**") and Goldman, Sachs & Co. are acting as representatives (in such capacity, the "**Representatives**") and certain stockholders of the Company (the "**Selling Stockholders**") named in Schedule I hereto severally propose to sell to the several Underwriters, an aggregate of [—] shares of the common stock, par value $0.01 per share of the Company (the "**Firm Shares**"), of which [—] shares are to be issued and sold by the Company and [—] shares are to be sold by the Selling Stockholders, each Selling Stockholder selling the amount set forth opposite such Selling Stockholder's name in Schedule I hereto.

    The Company also proposes to issue and sell to the several Underwriters not more than an additional [—] shares of its common stock, par value $0.01 per share (the "**Additional Shares**") if and to the extent that you, as Representatives of the offering, shall have determined to exercise, on behalf of the Underwriters, the right to purchase such shares of common stock granted to the Underwriters in Section 3 hereof. The Firm Shares and the Additional Shares are hereinafter collectively referred to as the "**Shares**." The shares of common stock, par value $0.01 per share of the Company to be outstanding after giving effect to the sales contemplated hereby are hereinafter referred to as the "**Common Stock**." The Company and the Selling Stockholders are hereinafter sometimes collectively referred to as the "**Sellers**."

    The Company has filed with the Securities and Exchange Commission (the "**Commission**") a registration statement, including a prospectus, relating to the Shares. The registration statement as amended at the time it becomes effective, including the information (if any) deemed to be part of the registration statement at the time of

effectiveness pursuant to Rule 430A under the Securities Act of 1933, as amended (the "**Securities Act**"), is hereinafter referred to as the "**Registration Statement**"; the prospectus in the form first used to confirm sales of Shares (or in the form first made available to the Underwriters by the Company to meet requests of purchasers pursuant to Rule 173 under the Securities Act) is hereinafter referred to as the "**Prospectus**." If the Company has filed an abbreviated registration statement to register additional shares of Common Stock pursuant to Rule 462(b) under the Securities Act (the "**Rule 462 Registration Statement**"), then any reference herein to the term "**Registration Statement**" shall be deemed to include such Rule 462 Registration Statement.

For purposes of this Agreement, "**free writing prospectus**" has the meaning set forth in Rule 405 under the Securities Act, "**Time of Sale Prospectus**" means the preliminary prospectus together with the documents, pricing information and free writing prospectuses, if any, set forth in Schedule III hereto, and "**broadly available road show**" means a "bona fide electronic road show" as defined in Rule 433(h)(5) under the Securities Act that has been made available without restriction to any person. As used herein, the terms "Registration Statement," "preliminary prospectus," "Time of Sale Prospectus" and "Prospectus" shall include the documents, if any, incorporated by reference therein as of the date hereof.

The Representatives agree that up to [—] of the Shares to be purchased by the Underwriters under this Agreement shall be reserved for sale to certain of the Company's directors, officers, employees, investors that have invested through its marketplace as of September 30, 2014 and other individuals related to the Company (collectively, "**Participants**"), as set forth in the Prospectus under the heading "Underwriters" (the "**Directed Share Program**"). The Directed Share Program shall be administered by Fidelity Capital Markets, a division of National Financial Services LLC ("**Fidelity**"). The Shares to be sold by Fidelity and its affiliates pursuant to the Directed Share Program are referred to hereinafter as the "**Directed Shares**". Any Directed Shares not confirmed for purchase by any Participant by the end of the business day on which this Agreement is executed will be offered to the public by the Underwriters as set forth in the Prospectus.

1. *Representations and Warranties of the Company*. The Company represents and warrants to and agrees with each of the Underwriters that:

(a) The Registration Statement has become effective; no stop order suspending the effectiveness of the Registration Statement is in effect, and no proceedings for such purpose are pending before or, to the Company's knowledge, threatened by the Commission.

(b) (i) The Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, will not contain, as of the date of such amendment or supplement, any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Registration Statement and the Prospectus comply and, as amended or supplemented after the effective time of this Agreement, if applicable, will as of the

2

date of such amendment or supplement comply in all material respects with the Securities Act and the applicable rules and regulations of the Commission thereunder, (iii) the Time of Sale Prospectus does not, and at the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers and at the Closing Date (as defined in Section 5), the Time of Sale Prospectus, as then amended or supplemented by the Company, if applicable, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, (iv) each broadly available road show, if any, when considered together with the Time of Sale Prospectus, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (v) the Prospectus does not contain and, as amended or supplemented, if applicable, will not contain, as of its date and as of the Closing Date and any Option Closing Date any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that the representations and warranties set forth in this paragraph do not apply to statements or omissions in the Registration Statement, the Time of Sale Prospectus or the Prospectus based upon information relating to any Underwriter furnished to the Company in writing by such Underwriter through you expressly for use therein.

(c) The Company is not an "ineligible issuer" in connection with the offering pursuant to Rules 164, 405 and 433 under the Securities Act. Any free writing prospectus that the Company is required to file pursuant to Rule 433(d) under the Securities Act has been, or will be, filed with the Commission in accordance with the requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder. Each free writing prospectus that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act or that was prepared by or on behalf of or used or referred to by the Company complies or, if filed after the effective time of this Agreement, will comply as of the date of such filing in all material respects with the requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder. Except for the free writing prospectuses, if any, identified in <u>Schedule III</u> hereto, and electronic road shows, if any, each furnished to you before first use, the Company has not prepared, used or referred to, and will not, without your prior consent, prepare, use or refer to, any free writing prospectus.

(d) The Company has been duly incorporated, is validly existing as a corporation in good standing under the laws of Delaware, has the corporate power and authority to own its property and to conduct its business as described in the Time of Sale Prospectus and is duly qualified to transact business and is in good standing (to the extent the concept of good standing is applicable in such jurisdiction) in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (to the extent the concept of good standing or an equivalent concept is applicable under the laws of such jurisdiction) would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole. The terms "subsidiary" and "subsidiaries" as used throughout this Agreement shall be deemed to include LC Trust I (the "**Trust**") solely for the purposes of this Agreement.

3

(e) Each subsidiary of the Company has been duly organized, is validly existing as a corporation, limited liability company, limited liability partnership, limited partnership or statutory trust, as the case may be, in good standing under the laws of the jurisdiction of its organization (to the extent the concept of good standing or an equivalent concept is applicable under the laws of such jurisdiction), has the corporate power and authority to own its property and to conduct its business as described in the Time of Sale Prospectus and is duly qualified to transact business and is in good standing in each jurisdiction (to the extent the concept of good standing or an equivalent concept is applicable under the laws of such jurisdiction) in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing would not have a material adverse effect on the Company and its subsidiaries, taken as a whole; all of the issued shares of capital stock of each such subsidiary of the Company have been duly and validly authorized and issued, are fully paid and non-assessable and are owned directly by the Company or one of its wholly owned subsidiaries (except for directors' qualifying or substantially similar shares), free and clear of all material liens, encumbrances, equities or claims, except as described in the Time of Sale Prospectus and Prospectus. The trustee of the Trust is duly authorized to act as trustee of the Trust pursuant to the trust agreement for the Trust.

(f) This Agreement has been duly authorized, executed and delivered by the Company.

(g) At the Closing Date, the authorized capital stock of the Company will conform as to legal matters in all material respects to the description thereof contained in each of the Time of Sale Prospectus and the Prospectus.

(h) The shares of Common Stock (including the Shares to be sold by the Selling Stockholders) outstanding prior to the issuance of the Shares to be sold by the Company have been duly authorized and are validly issued, fully paid and non-assessable, and except as described in the Time of Sale Prospectus and Prospectus, have been issued in compliance with all federal and state securities laws.

(i) The Shares to be sold by the Company have been duly authorized and, when issued, delivered and paid for in accordance with the terms of this Agreement, will be validly issued, fully paid and non-assessable, and the issuance of such Shares will not be subject to any preemptive or similar rights.

(j) The execution and delivery by the Company of, and the performance by the Company of its obligations under, this Agreement will not contravene any provision of (i) applicable law or (ii) the certificate of incorporation or by-laws of the Company or (iii) any agreement or other instrument binding upon the Company or any of its subsidiaries that is material to the Company and its subsidiaries, taken as a whole, or (iv) any judgment, order or decree of any governmental body, agency or court having

4

jurisdiction over the Company or any subsidiary, except in the case of clauses (i), (iii) and (iv) for such contraventions as would not reasonably be expected to, individually or in the aggregate, have a material adverse effect or adversely affect the ability of the Company to perform its obligations under this Agreement, and no consent, approval, authorization or order of, or qualification with, any governmental body or agency is required for the performance by the Company of its obligations under this Agreement, except such as may have been previously obtained or may be required by the securities or Blue Sky laws of the various states or the rules and regulations of the Financial Industry Regulatory Authority, Inc. ("**FINRA**") in connection with the offer and sale of the Shares.

(k) There has not occurred any material adverse change, or any development involving a prospective material adverse change, in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Time of Sale Prospectus.

(l) There are no legal or governmental proceedings pending or, to the Company's knowledge threatened to which the Company or any of its subsidiaries is a party or to which any of the properties of the Company or any of its subsidiaries is subject (i) other than proceedings accurately described in all material respects in the Time of Sale Prospectus and proceedings that would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, or on the power or ability of the Company to perform its obligations under this Agreement or to consummate the transactions contemplated by the Time of Sale Prospectus or (ii) that are required to be described in the Registration Statement, the Time of Sale Prospectus or the Prospectus and are not so described in all material respects; and there are no statutes, regulations, contracts or other documents that are required to be described in the Registration Statement, the Time of Sale Prospectus or the Prospectus or to be filed as exhibits to the Registration Statement that are not described in all material respects or filed as required.

(m) Each preliminary prospectus filed as part of the Registration Statement as originally filed or as part of any amendment thereto, or filed pursuant to Rule 424 under the Securities Act, complied when so filed in all material respects with the Securities Act and the applicable rules and regulations of the Commission thereunder.

(n) The Company is not, and after giving effect to the offering and sale of the Shares and the application of the proceeds thereof as described in the Prospectus will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(o) The Company and its subsidiaries (i) are in compliance with any and all applicable foreign, federal, state and local laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("**Environmental Laws**"), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and

5

conditions of any such permit, license or approval, except where such noncompliance with Environmental Laws, failure to receive required permits, licenses or other approvals or failure to comply with the terms and conditions of such permits, licenses or approvals would not, singly or in the aggregate, reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(p) There are no costs or liabilities associated with Environmental Laws (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with Environmental Laws or any permit, license or approval, any related constraints on operating activities and any potential liabilities to third parties) which would, singly or in the aggregate, reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(q) There are no contracts, agreements or understandings between the Company and any person granting such person the right to require the Company to file a registration statement under the Securities Act with respect to any securities of the Company or to require the Company to include such securities with the Shares registered pursuant to the Registration Statement except such as have been duly waived or complied with in connection with the issuance of the Shares contemplated hereby.

(r) Neither the Company nor any of its subsidiaries or controlled affiliates, nor any director, or officer, nor, to the Company's knowledge, any other employee, agent or representative of the Company or of any of its subsidiaries or controlled affiliates, has taken any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage; and the Company and its subsidiaries and controlled affiliates have conducted their businesses in compliance with applicable anti-corruption laws, including the Foreign Corrupt Practices Act of 1977 and the Bribery Act 2010 of the United Kingdom, and have instituted and maintain and will continue to maintain policies and procedures designed to promote and achieve compliance with such laws.

(s) The operations of the Company and its subsidiaries, and, to the actual knowledge of the Company, WebBank (solely with respect to its operations relating to the loan program with the Company), are and have been conducted at all times in material compliance with all applicable financial recordkeeping and reporting requirements, including those of the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), and the applicable anti-money laundering statutes of jurisdictions where the Company and its subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency

6

(collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(t) (i) Neither the Company nor any of its subsidiaries, nor any director or officer thereof, nor, to the Company's knowledge, any employee, agent, controlled affiliate or representative of the Company or any of its subsidiaries, is an individual or entity ("**Person**") that is, or is owned or controlled by a Person that is:

(A) the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**"), the United Nations Security Council ("**UNSC**"), the European Union ("**EU**"), Her Majesty's Treasury ("**HMT**"), or other relevant sanctions authority (collectively, "**Sanctions**"), nor

(B) located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, Cuba, Iran, North Korea, Sudan and Syria).

(ii) The Company will not, directly or indirectly, use the proceeds of the offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(A) to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions; or

(B) in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the offering, whether as underwriter, advisor, investor or otherwise).

(iii) For the past 5 years, the Company and its subsidiaries have not knowingly engaged in, are not now knowingly engaged in, and will not knowingly engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.

(u) Subsequent to the respective dates as of which information is given in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, (i) the Company and its subsidiaries have not incurred any material liability or obligation, direct or contingent, nor entered into any material transaction; (ii) the Company has not purchased any of its outstanding capital stock other than repurchases of outstanding equity awards granted pursuant to the terms of the equity compensation plans described in the Time of Sale Prospectus, nor declared, paid or otherwise made any dividend or distribution of any kind on its capital stock other than ordinary and customary dividends; and (iii) there has not been any material change in the capital stock (other than the exercise of equity awards or grants of equity awards or forfeiture of equity awards

7

outstanding as of such respective dates as of which information is given in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, in each case granted pursuant to the equity compensation plans described in the Time of Sale Prospectus), short-term debt or long-term debt of the Company and its subsidiaries, except in each case as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, respectively.

(v) The Company and its subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its subsidiaries, taken as a whole, in each case free and clear of all liens, encumbrances and defects except such as are described in the Time of Sale Prospectus and Prospectus or such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and its subsidiaries in any material respect; and any real property and buildings held under lease by the Company and its subsidiaries are held by them under valid, subsisting and, to the Company's knowledge, enforceable leases with such exceptions as are not material and do not materially interfere with the use made and proposed to be made of such property and buildings by the Company and its subsidiaries, in each case except as described in the Time of Sale Prospectus.

(w) The Company and its subsidiaries own or possess, or can acquire on commercially reasonable terms, all material patents, patent rights, licenses, inventions, copyrights, know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), trademarks, service marks and trade names currently employed by them in connection with the business now operated by them except where the failure to own, possess or acquire any of the foregoing would not reasonably be expected to result in a material adverse effect, and neither the Company nor any of its subsidiaries has received any written notice of infringement of or conflict with asserted rights of others with respect to any of the foregoing which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(x) No material labor dispute with the employees of the Company or any of its subsidiaries exists, except as described in the Time of Sale Prospectus, or, to the knowledge of the Company, is imminent; and the Company is not aware of any existing, threatened or imminent labor disturbance by the employees of any of its principal issuing banks, service providers, suppliers or contractors that could reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(y) The Company and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are, in the Company's reasonable judgment, prudent and customary in the businesses in which they are engaged; neither the Company nor any of its subsidiaries has been refused any insurance coverage sought or applied for; and neither the Company nor any

8

of its subsidiaries has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, except as described in the Time of Sale Prospectus.

(z) The Company and its subsidiaries possess all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses as currently conducted, and neither the Company nor any of its subsidiaries has received any written notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a material adverse effect on the Company and its subsidiaries, taken as a whole, except as described in the Time of Sale Prospectus.

(aa) The Company and each of its subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Except as described in the Time of Sale Prospectus, since the end of the Company's most recent audited fiscal year, there has been (i) no material weakness in the Company's internal control over financial reporting (whether or not remediated) and (ii) no adverse change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(bb) Except as described in the Time of Sale Prospectus or in the Registration Statement, the Company has not sold, issued or distributed any shares of Common Stock during the six-month period preceding the date hereof, including any sales pursuant to Rule 144A under, or Regulation D or S of, the Securities Act, other than shares issued pursuant to employee benefit plans, qualified stock option plans or other employee compensation plans or pursuant to outstanding options, rights or warrants.

(cc) The Registration Statement, the Prospectus, the Time of Sale Prospectus and any preliminary prospectus comply, and any amendments or supplements thereto will comply, with any applicable laws or regulations of foreign jurisdictions in which the Prospectus, the Time of Sale Prospectus or any preliminary prospectus, as amended or supplemented, if applicable, are distributed in connection with the Directed Share Program.

(dd) No consent, approval, authorization or order of, or qualification with, any governmental body or agency, other than those obtained, is required in connection with the offering of the Directed Shares in any jurisdiction where the Directed Shares are being offered.

9

(ee) The Company has not offered, or caused Fidelity or any Underwriter to offer, Shares to any person pursuant to the Directed Share Program with the specific intent to unlawfully influence (i) a customer or supplier of the Company to alter the customer's or supplier's level or type of business with the Company, or (ii) a trade journalist or publication to write or publish favorable information about the Company or its products.

(ff) The Company and each of its subsidiaries have filed all federal, state, local and foreign tax returns required to be filed through the date of this Agreement or have requested extensions thereof (except where the failure to file would not, individually or in the aggregate, reasonably be expected to have a material adverse effect) and have paid all taxes required to be paid thereon (except for cases in which the failure to file or pay would not reasonably be expected to have a material adverse effect, or, except as currently being contested in good faith and for which reserves required by U.S. GAAP have been created in the financial statements of the Company), and no tax deficiency has been determined adversely to the Company or any of its subsidiaries which has had (nor does the Company nor any of its subsidiaries have any notice or knowledge of any tax deficiency which could reasonably be expected to be determined adversely to the Company or its subsidiaries and which could reasonably be expected to have) a material adverse effect.

(gg) The interactive data in eXtensible Business Reporting Language included in the Registration Statement fairly presents the information called for in all material respects and has been prepared in accordance with the Commission's rules and guidelines applicable thereto.

(hh) The statements in any free writing prospectus and Time of Sale Prospectus under the headings "Material U.S. Federal Tax Consequences for Non-U.S. Holders of Our Common Stock," "Description of Capital Stock," "Certain Relationships and Related Party Transactions," "Business—Regulations and Licensing," "Risk Factors—Risks Related to Our Business and Industry" and "Risk Factors—Risks Related to Compliance and Regulation," insofar as such statements summarize legal matters, agreements, documents or proceedings discussed therein, are accurate and fair summaries of such legal matters, agreements, documents or proceedings.

(ii) Except as described in the Time of Sale Prospectus and Prospectus, the Company and its subsidiaries and, to the actual knowledge of the Company, WebBank (solely with respect to its operations relating to the loan program with the Company), (A) are in compliance with any and all applicable laws, rules, regulations, and regulatory capital requirements or court decrees relating to the business of banking, money-lending, servicing, consumer finance, purchase finance, medical finance, consumer protection, the business of money transmission or other regulations applicable to the business of the Company as currently conducted or contemplated to be conducted, including, but not limited to, rules and regulations promulgated by the Consumer Financial Protection

10

Bureau (the "**CFPB**") , the Utah Department of Financial Institutions, the Equal Credit Opportunity Act, the Truth in Lending Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Consumer Protection Act, the Servicemembers Civil Relief Act, the Electronic Signatures in Global and National Commerce Act, the Uniform Electronic Transactions Act, the Gramm-Leach-Bliley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act and the Federal Deposit Insurance Corporation (the "**FDIC**") and all other applicable fair lending and fair housing laws or other laws relating to discrimination (including, without limitation, anti-redlining, equal credit opportunity and fair credit reporting), truth-in-lending, real estate settlement procedures or consumer credit except to the extent that the failure to comply would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, or WebBank (such laws, rules and regulations, the "**Regulatory Laws**"), (B) have received all federal and state permits, licenses and other approvals required of them under applicable Regulatory Laws to conduct their respective businesses, except where the failure to receive such permits, licenses and other approvals would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, or WebBank and (C) are in compliance with all terms and conditions of any such permit, license or approval, except where such noncompliance with Regulatory Laws (i) could not reasonably be expected to have a material adverse effect on the performance of this Agreement or the consummation of any of the transactions contemplated hereby or (ii) could not reasonably be expected to have a material adverse effect, except as set forth in or contemplated in the Time of Sale Prospectus (exclusive of any supplement or amendment thereto); and except as described in the Time of Sale Prospectus, the Company is not aware of any material changes proposed or contemplated to be made to any of the Regulatory Laws that could reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(jj) Except as described in the Time of Sale Prospectus, none of the Company or its subsidiaries is subject to any order or action, and to the Company's knowledge none has been threatened with any action by any federal or state regulatory authority concerning its compliance with applicable Regulatory Laws (including, but not limited to, the failure to obtain any permit, license or approval, or to comply with the terms thereof), except for any such order, action or noncompliance that would not singly or in the aggregate (i) reasonably be expected to have a material adverse effect on the performance of this Agreement or the consummation of any of the transactions contemplated hereby or (ii) reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, except as set forth in or contemplated in the Prospectus (exclusive of any supplement or amendment thereto).

(kk) There are no legal or governmental proceedings, under the Regulatory Laws or otherwise, pending or, to the Company's knowledge, threatened to which the Company or any of its subsidiaries is a party or to which any of the properties of the Company or any of its subsidiaries is subject that are required to be described in the Registration Statement or the Time of Sale Prospectus and are not so described or of any Regulatory Laws that are required to be described in the Registration Statement or the Time of Sale Prospectus that are not described as required.

11

(ll) None of the transactions contemplated hereby, including the offer and sale of the Shares, will (i) result in a breach or violation of any of the Regulatory Laws or (ii) require any consent, approval, authorization, order, registration or qualification of, or filing with, any governmental agency, regulatory body, including, but not limited to, the CFPB and the FDIC, or court overseeing the Regulatory Laws, except for (A) the approval by FINRA of the underwriting terms and arrangements, and such consents, approvals, authorizations, orders, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the Shares by the Underwriters; (B) such consents as have been obtained by the Company and are in full force and effect or (C) the failure of which to obtain would not reasonably be expected to have a material adverse effect on the ability of the Company to perform its obligations under this Agreement. The Company and its subsidiaries are in material compliance with the Regulatory Laws.

(mm) Neither the Company nor any of its subsidiaries (A) is required to be registered, licensed or qualified as a "broker" or "dealer" in accordance with the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and the rules and regulations of the Commission under the Exchange Act or the laws of any state or (B) directly, or indirectly through one or more intermediaries, controls or has any other association (within the meaning of Article I of the By-Laws of FINRA) with any member firm of FINRA, except in the case of (B) as described in the Time of Sale Prospectus and Prospectus.

(nn) LC Advisors, LLC ("**LC Advisors**") (A) has duly registered with the Commission as an "investment adviser" as such term is defined in the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), (B) that registration is in effect and no order or other regulatory action has been threatened by the Commission that concerns the effectiveness of that registration or LC Advisors' compliance with the Advisers Act or applicable regulations thereunder and (C) LC Advisor has taken all actions required to maintain the effectiveness of that registration.

(oo) Assuming the competency and capacity of a potential borrower, a loan agreement entered into through the Company's marketplace in the form of promissory notes, constitutes a valid and binding obligation of the borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally and to general equitable principles, (whether considered in a proceeding in equity or at law) except to the extent that the failure to comply would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries taken as a whole.

2. *Representations and Warranties of the Selling Stockholders*. Each Selling Stockholder severally and not jointly represents and warrants to and agrees with each of the Underwriters that:

(a) This Agreement has been duly authorized, executed and delivered by or on behalf of such Selling Stockholder.

12

(b) The execution and delivery by such Selling Stockholder of, and the performance by such Selling Stockholder of its obligations under, this Agreement, the Custody Agreement signed by such Selling Stockholder and American Stock Transfer & Trust Company, LLC, as Custodian, relating to the deposit of the Shares to be sold by such Selling Stockholder (the "**Custody Agreement**") and the Power of Attorney appointing certain individuals as such Selling Stockholder's attorneys-in-fact to the extent set forth therein, relating to the transactions contemplated hereby and by the Registration Statement (the "**Power of Attorney**") will not contravene (i) any provision of applicable law, (ii) the certificate of incorporation or by-laws of such Selling Stockholder (if such Selling Stockholder is a corporation), or equivalent organizational or formation documents, as applicable, (iii) any agreement or other instrument binding upon such Selling Stockholder or (iv) any judgment, order or decree of any governmental body, agency or court having jurisdiction over such Selling Stockholder, except in the case of clauses (i), (iii) and (iv) as would not, individually or in the aggregate, have a material adverse effect on the ability of the Selling Stockholder to consummate the transactions contemplated by this Agreement, the Custody Agreement and the Power of Attorney, and no consent, approval, authorization or order of, or qualification with, any governmental body or agency is required for the performance by such Selling Stockholder of its obligations under this Agreement or the Custody Agreement or Power of Attorney of such Selling Stockholder, except such as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Shares.

(c) Such Selling Stockholder has, and on the Closing Date will have, valid title to, or a valid "security entitlement" within the meaning of Section 8-501 of the New York Uniform Commercial Code (the "**UCC**") in respect of, the Shares to be sold by such Selling Stockholder free and clear of all security interests, claims, liens, equities or other encumbrances and the legal right and power, and all authorization and approval required by law, to enter into this Agreement, the Custody Agreement and the Power of Attorney and to sell, transfer and deliver the Shares to be sold by such Selling Stockholder or a security entitlement in respect of such Shares.

(d) The Custody Agreement and the Power of Attorney have been duly authorized, executed and delivered by such Selling Stockholder and are valid and binding agreements of such Selling Stockholder, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(e) Upon payment for the Shares to be sold by such Selling Stockholder pursuant to this Agreement, delivery of such Shares, as directed by the Underwriters, to Cede & Co. ("**Cede**") or such other nominee as may be designated by the Depository Trust Company ("**DTC**"), registration of such Shares in the name of Cede or such other nominee and the crediting of such Shares on the books of DTC to securities accounts of the Underwriters (assuming that neither DTC nor any such Underwriter has notice of any adverse claim (within the meaning of Section 8-105 of the UCC to such Shares), (A) DTC shall be a "protected purchaser" of such Shares within the meaning of Section 8-303 of the UCC, (B) under Section 8-501 of the UCC, the Underwriters will

13

acquire a valid security entitlement in respect of such Shares and (C) no action based on any "adverse claim", within the meaning of Section 8-102 of the UCC, to such Shares may be asserted against the Underwriters with respect to such security entitlement; for purposes of this representation, such Selling Stockholder may assume that when such payment, delivery and crediting occur, (x) such Shares will have been registered in the name of Cede or another nominee designated by DTC, in each case on the Company's share registry in accordance with its certificate of incorporation, bylaws and applicable law, (y) DTC will be registered as a "clearing corporation" within the meaning of Section 8-102 of the UCC and (z) appropriate entries to the accounts of the several Underwriters on the records of DTC will have been made pursuant to the UCC.

(f) Such Selling Stockholder is not prompted by any information concerning the Company or its subsidiaries which is not set forth in the Time of Sale Prospectus to sell its Shares pursuant to this Agreement.

(g) (i) The Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Time of Sale Prospectus does not, and at the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers and at the Closing Date (as defined in Section 5), the Time of Sale Prospectus, as then amended or supplemented by the Company, if applicable, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, (iii) each broadly available road show, if any, when considered together with the Time of Sale Prospectus, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (iv) the Prospectus does not contain and, as amended or supplemented, if applicable, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that the representations and warranties set forth in this paragraph 2(h) (A) do not apply to statements or omissions in the Registration Statement, the Time of Sale Prospectus or the Prospectus based upon information relating to any Underwriter furnished to the Company in writing by such Underwriter through you expressly for use therein and (B) are limited in all respects to statements or omissions made in reliance upon and in conformity with information relating to such Selling Stockholder furnished to the Company in writing by such Selling Stockholder expressly for use in the Registration Statement, the Time of Sale Prospectus, the road show, the Prospectus or any amendments or supplements thereto, it being understood and agreed that the only information furnished by such Selling Stockholder consists of the name of such Selling Stockholder, the number of offered shares and the address and other information with respect to such Selling Stockholder (excluding percentages) which appear in the Time of Sale Prospectus in the table (and corresponding footnotes) under the caption "Principal and Selling Stockholders" (with respect to each Selling Stockholder, the "**Selling Stockholder Information**").

14

3. *Agreements to Sell and Purchase*. Each Seller, severally and not jointly, hereby agrees to sell to the several Underwriters, and each Underwriter, upon the basis of the representations and warranties herein contained, but subject to the conditions hereinafter stated, agrees, severally and not jointly, to purchase from such Seller at $[—] a share (the "**Purchase Price**") the number of Firm Shares (subject to such adjustments to eliminate fractional shares as you may determine) that bears the same proportion to the number of Firm Shares to be sold by such Seller as the number of Firm Shares set forth in <u>Schedule II</u> hereto opposite the name of such Underwriter bears to the total number of Firm Shares.

On the basis of the representations and warranties contained in this Agreement, and subject to its terms and conditions, the Company agrees to sell to the Underwriters the Additional Shares, and the Underwriters shall have the right to purchase, severally and not jointly, up to [—] Additional Shares at the Purchase Price, *provided, however*, that the amount paid by the Underwriters for any Additional Shares shall be reduced by an amount per share equal to any dividends declared by the Company and payable on the Firm Shares but not payable on such Additional Shares. The Representatives may exercise this right on behalf of the Underwriters in whole or from time to time in part by giving written notice not later than 30 days after the date of this Agreement. Any exercise notice shall specify the number of Additional Shares to be purchased by the Underwriters and the date on which such shares are to be purchased. Each purchase date must be at least one business day after the written notice is given and may not be earlier than the closing date for the Firm Shares nor later than ten business days after the date of such notice. Additional Shares may be purchased as provided in Section 5 hereof solely for the purpose of covering over-allotments made in connection with the offering of the Firm Shares. On each day, if any, that Additional Shares are to be purchased (an "**Option Closing Date**"), each Underwriter agrees, severally and not jointly, to purchase the number of Additional Shares (subject to such adjustments to eliminate fractional shares as you may determine) that bears the same proportion to the total number of Additional Shares to be purchased on such Option Closing Date as the number of Firm Shares set forth in <u>Schedule II</u> hereto opposite the name of such Underwriter bears to the total number of Firm Shares.

The Company hereby agrees that, without the prior written consent of Morgan Stanley on behalf of the Underwriters, it will not, during the period ending 180 days after the date of the Prospectus (the "**Restricted Period**"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock beneficially owned (as such term is used in Rule 13d-3 of the Securities Exchange Act or any other securities so owned convertible into or exercisable or exchangeable for Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise or (3) file any registration statement with the Commission relating to the offering of any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock.

15

The restrictions contained in the preceding paragraph shall not apply to (a) the Shares to be sold hereunder, (b) the issuance by the Company of shares of Common Stock upon the exercise of an option or warrant or the conversion of a security outstanding on the date hereof of which the Underwriters have been advised in writing, (c) the issuance of shares of Common Stock by the Company in connection with the Company's acquisition of one or more businesses, products or technologies, joint ventures, commercial relationships or other strategic corporate transactions, *provided,* that the aggregate number of shares of Common Stock that the Company may issue or agree to issue pursuant to this clause (c) does not exceed 5% of the total number of shares of Common Stock issued and outstanding immediately following the completion of the transactions contemplated by this Agreement, and *provided, further*, that all such recipients of shares of Common Stock shall execute and deliver to you, on or prior to such issuance, a "lock-up" agreement, substantially in the form of <u>Exhibit A</u> hereto or (d) the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Common Stock, *provided* that (i) such plan does not provide for the transfer of Common Stock during the Restricted Period and (ii) no public announcement or filing under the Exchange Act, if any, is required or voluntarily made by or on behalf of the Company regarding the establishment of such plan.

Notwithstanding the foregoing, if (1) during the last 17 days of the Restricted Period the Company issues an earnings release or material news or a material event relating to the Company occurs; or (2) prior to the expiration of the Restricted Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the Restricted Period, the restrictions imposed by this agreement shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. The Company shall provide Morgan Stanley and each individual subject to the Restricted Period pursuant to the lock-up letters described in Section 6(m) with prior notice of any such announcement that gives rise to an extension of the initial Restricted Period.

If Morgan Stanley, in its sole discretion, agrees to release or waive the restrictions set forth in a lock-up letter described in Section 6(m) hereof for an officer or director of the Company and provides the Company with notice of the impending release or waiver at least three business days before the effective date of the release or waiver, the Company agrees to announce the impending release or waiver by (i) a press release substantially in the form of <u>Exhibit B</u> hereto through a major news service or (ii) any other method that satisfies the obligations described in FINRA Rule 5131(d)(2) and approved by Morgan Stanley at least two business days before the effective date of the release or waiver.

4. *Terms of Public Offering*. The Sellers are advised by you that the Underwriters propose to make a public offering of their respective portions of the Shares as soon after the Registration Statement and this Agreement have become effective as in your judgment is advisable. The Sellers are further advised by you that the Shares are to be offered to the public initially at $[—] a share (the "**Public Offering Price**") and to certain dealers selected by you at a price that represents a concession not in excess of $[—] a share under the Public Offering Price, and that any Underwriter may allow, and such dealers may reallow, a concession, not in excess of $[—] a share, to any Underwriter or to certain other dealers.

16

Form of Underwriting Agreement

5. *Payment and Delivery*. Payment for the Firm Shares to be sold by each Seller shall be made to such Seller in Federal or other funds immediately available in New York City against delivery of such Firm Shares for the respective accounts of the several Underwriters at approximately 10:00 a.m., New York City time, on [—], 2014, or at such other time on the same or such other date, not later than [—], 2014, as shall be designated in writing by you. The time and date of such payment are hereinafter referred to as the "**Closing Date**."

Payment for any Additional Shares shall be made to the Company in Federal or other funds immediately available in New York City against delivery of such Additional Shares for the respective accounts of the several Underwriters at 10:00 a.m., New York City time, on the date specified in the corresponding notice described in Section 3 or at such other time on the same or on such other date, in any event not later than [—], 2014, as shall be designated in writing by you.

The Firm Shares and Additional Shares shall be registered in such names and in such denominations as you shall request in writing not later than one full business day prior to the Closing Date or the applicable Option Closing Date, as the case may be. The Firm Shares and Additional Shares shall be delivered to you on the Closing Date or the applicable Option Closing Date, as the case may be, for the respective accounts of the several Underwriters. The Purchase Price payable by the Underwriters shall be reduced by (i) any transfer taxes paid by, or on behalf of, the Underwriters in connection with the transfer of the Shares to the Underwriters duly paid and (ii) subject to any withholding required by law.

6. *Conditions to the Underwriters' Obligations*. The obligations of the Sellers to sell the Shares to the Underwriters and the several obligations of the Underwriters to purchase and pay for the Shares on each of the Closing Date or the applicable Option Closing Date, as the case may be, are subject to the condition that the Registration Statement shall have become effective not later than [—] (New York City time) on the date hereof.

The several obligations of the Underwriters are subject to the following further conditions:

(a) Subsequent to the execution and delivery of this Agreement and prior to the Closing Date or the applicable Option Closing Date, as the case may be:

(i) there shall not have occurred any downgrading, nor shall any notice have been given of any intended or potential downgrading or of any review for a possible change that does not indicate the direction of the possible change, in the rating accorded any of the securities of the Company or any of its subsidiaries by any "nationally recognized statistical rating organization," as such term is defined in Section 3(a)(62) of the Exchange Act; and

17

(ii) there shall not have occurred any change, or any development involving a prospective change, in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Time of Sale Prospectus that, in your judgment, is material and adverse and that makes it, in your judgment, impracticable to market the Shares on the terms and in the manner contemplated in the Time of Sale Prospectus.

(b) The Underwriters shall have received on the Closing Date or the applicable Option Closing Date, as the case may be, a certificate, dated the Closing Date or the applicable Option Closing Date, as the case may be, and signed on behalf of the Company by an executive officer of the Company, to the effect set forth in Section 6(a)(i) above and to the effect that the representations and warranties of the Company contained in this Agreement are true and correct as of the Closing Date or the applicable Option Closing Date, as the case may be, and that the Company has complied with all of the agreements and satisfied all of the conditions on its part to be performed or satisfied hereunder on or before the Closing Date or the applicable Option Closing Date, as the case may be.

The officer signing and delivering such certificate may rely upon his or her knowledge as to proceedings threatened.

(c) The Underwriters shall have received on the Closing Date or the applicable Option Closing Date, as the case may be, an opinion of Fenwick & West LLP, outside counsel for the Company, dated the Closing Date or the applicable Option Closing Date, as the case may be, in the form and substance satisfactory to the Representatives.

(d) The Underwriters shall have received on the Closing Date or the applicable Option Closing Date, as the case may be, opinions of each of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP and Goodwin Procter LLP, counsel for the Selling Stockholders, each dated the Closing Date or the applicable Option Closing Date, as the case may be, in the form and substance satisfactory to the Representatives.

(e) The Underwriters shall have received on the Closing Date or the applicable Option Closing Date, as the case may be, an opinion of O'Melveny & Myers LLP, counsel for the Underwriters, dated the Closing Date or the applicable Option Closing Date, as the case may be, covering such matters as the Underwriters may reasonably request.

With respect to certain provisions included in the opinions to be delivered pursuant to Section 6(c) above, Fenwick & West LLP, with respect to certain provisions included in the opinions to be delivered pursuant to Section 6(e) above, O'Melveny &

18

Myers LLP and with respect to certain provisions included in the opinions to be delivered pursuant to Section 6(d) above, Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP and Goodwin Procter LLP, may state that their opinions and beliefs are based upon their participation in the preparation of the Registration Statement, the Time of Sale Prospectus and the Prospectus and any amendments or supplements thereto and review and discussion of the contents thereof, but are without independent check or verification, except as specified. With respect to Section 6(d) above, any counsel for the Selling Stockholders may rely upon an opinion or opinions of counsel for any Selling Stockholders and, with respect to factual matters and to the extent such counsel deems appropriate, upon the representations of each Selling Stockholder contained herein and in the Custody Agreement and Power of Attorney of such Selling Stockholder and in other documents and instruments; *provided* that (A) each such counsel for the Selling Stockholders is satisfactory to your counsel, (B) a copy of each opinion so relied upon is delivered to you and is in form and substance satisfactory to your counsel, (C) copies of such Custody Agreements and Powers of Attorney and of any such other documents and instruments shall be delivered to you and shall be in form and substance satisfactory to your counsel and (D) such counsel for such Selling Stockholder shall state in their opinion that they are justified in relying on each such other opinion.

The opinions of Fenwick & West LLP and the counsel for the Selling Stockholders described in Sections 6(c) and 6(d) above (and any opinions of counsel for any Selling Stockholder referred to in the immediately preceding paragraph) shall be rendered to the Underwriters at the request of the Company or one or more of the Selling Stockholders, as the case may be, and shall so state therein.

(f) The Underwriters shall have received on the Closing Date or the applicable Option Closing Date, as the case may be, an opinion of Arnold & Porter LLP, regulatory counsel for the Company, dated the Closing Date or the applicable Option Closing Date, as the case may be, in the form and substance satisfactory to the Representatives.

(g) The Underwriters shall have received on the Closing Date or the applicable Option Closing Date, as the case may be, an opinion of K&L Gates LLP, special counsel for the Company, dated the Closing Date or the applicable Option Closing Date, as the case may be, in the form and substance satisfactory to the Representatives.

(h) The Underwriters shall have received, on each of the date hereof and the Closing Date, and as of the applicable Option Closing Date, as the case may be, a letter dated the date hereof, the Closing Date or the applicable Option Closing Date, as the case may be, in form and substance satisfactory to the Representatives, from Deloitte & Touche LLP, independent public accountants, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus; *provided* that the letter delivered on the Closing Date or the applicable Option Closing Date, as the case may be, shall use a "cut-off date" not earlier than the date hereof.

19

(i) The Underwriters shall have received, on each of the date hereof and the Closing Date, and as of the applicable Option Closing Date, as the case may be, a letter dated the date hereof, the Closing Date or the applicable Option Closing Date, as the case may be, in form and substance satisfactory to the Representatives, from Grant Thornton LLP, independent public accountants, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus.

(j) The Underwriters shall have received, on each of the date hereof and the Closing Date, and as of the applicable Option Closing Date, as the case may be, a letter dated the date hereof, the Closing Date or the applicable Option Closing Date, as the case may be, in form and substance satisfactory to the Representatives, from Armanino LLP, independent public accountants, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus.

(k) The Underwriters shall have received, on each of the date hereof and the Closing Date, and as of the applicable Option Closing Date, as the case may be, a letter dated the date hereof, the Closing Date or the applicable Option Closing Date, as the case may be, in form and substance satisfactory to the Representatives, from Auerr, Zajac & Associates, LLP, independent public accountants, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus.

(l) The Underwriters shall have received on the date hereof a certificate of the Chief Financial Officer of the Company, in the form and substance satisfactory to the Representatives, with respect to certain information contained in the Time of Sale Prospectus and the Prospectus.

(m) The "lock-up" agreements, each substantially in the form of Exhibit A hereto, between you and certain stockholders, officers and directors of the Company relating to sales and certain other dispositions of shares of Common Stock or certain other securities, delivered to you on or before the date hereof, shall be in full force and effect on the Closing Date.

7. *Covenants of the Company.* The Company covenants with each Underwriter as follows:

(a) To furnish to you, without charge, [          ] signed copies of the Registration Statement (including exhibits thereto) and for delivery to each other Underwriter a conformed copy of the Registration Statement (without exhibits thereto) and to furnish to you in New York City, without charge, prior to 10:00 a.m. New York City time on the business day next succeeding the date of this Agreement and during the period mentioned in Section 7(e) or 7(f) below, as many copies of the Time of Sale Prospectus, the Prospectus and any supplements and amendments thereto or to the Registration Statement as you may reasonably request.

20

(b) Before amending or supplementing the Registration Statement, the Time of Sale Prospectus or the Prospectus, to furnish to you a copy of each such proposed amendment or supplement and not to file any such proposed amendment or supplement to which you reasonably object, and to file with the Commission within the applicable period specified in Rule 424(b) under the Securities Act any prospectus required to be filed pursuant to such Rule.

(c) To furnish to you a copy of each proposed free writing prospectus to be prepared by or on behalf of, used by, or referred to by the Company and not to use or refer to any proposed free writing prospectus to which you reasonably object.

(d) Not to take any action that would result in an Underwriter or the Company being required to file with the Commission pursuant to Rule 433(d) under the Securities Act a free writing prospectus prepared by or on behalf of the Underwriter that the Underwriter otherwise would not have been required to file thereunder.

(e) If the Time of Sale Prospectus is being used to solicit offers to buy the Shares at a time when the Prospectus is not yet available to prospective purchasers and any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Time of Sale Prospectus in order to make the statements therein, in the light of the circumstances, not misleading, or if any event shall occur or condition exist as a result of which the Time of Sale Prospectus conflicts with the information contained in the Registration Statement then on file, or if, in the reasonable opinion of counsel for the Underwriters, it is necessary to amend or supplement the Time of Sale Prospectus to comply with applicable law, forthwith to prepare, file with the Commission and furnish, at its own expense, to the Underwriters and to any dealer upon request, either amendments or supplements to the Time of Sale Prospectus so that the statements in the Time of Sale Prospectus as so amended or supplemented will not, in the light of the circumstances when the Time of Sale Prospectus is delivered to a prospective purchaser, be misleading or so that the Time of Sale Prospectus, as amended or supplemented, will no longer conflict with the Registration Statement, or so that the Time of Sale Prospectus, as amended or supplemented, will comply with applicable law.

(f) If, during such period after the first date of the public offering of the Shares as in the reasonable opinion of counsel for the Underwriters the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is required by law to be delivered in connection with sales by an Underwriter or dealer, any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Prospectus in order to make the statements therein, in the light of the circumstances when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is delivered to a purchaser, not misleading, or if, in the reasonable opinion of counsel for the Underwriters, it is necessary to amend or supplement the Prospectus to comply with applicable law, forthwith to prepare, file with the Commission and furnish, at its own expense, to the Underwriters and to the dealers

21

(whose names and addresses you will furnish to the Company) to which Shares may have been sold by you on behalf of the Underwriters and to any other dealers upon request, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is delivered to a purchaser, be misleading or so that the Prospectus, as amended or supplemented, will comply with applicable law.

(g) To endeavor to qualify the Shares for offer and sale under the securities or Blue Sky laws of such jurisdictions as you shall reasonably request, *provided*, *however*, that nothing contained herein shall require the Company to qualify to do business in any jurisdiction, execute a general consent to service of process in any jurisdiction or to subject itself to taxation in any jurisdiction in which it is not otherwise subject.

(h) To make generally available to the Company's security holders and to you as soon as practicable an earnings statement covering a period of at least twelve months beginning with the first fiscal quarter of the Company occurring after the date of this Agreement which shall satisfy the provisions of Section 11(a) of the Securities Act and the rules and regulations of the Commission thereunder.

(i) To comply with all applicable securities and other laws, rules and regulations in each jurisdiction in which the Directed Shares are offered in connection with the Directed Share Program.

(j) If any Seller is not a U.S. person for U.S. federal income tax purposes, the Company will deliver to each Underwriter (or its agent), on or before the Closing Date, (i) a certificate with respect to the Company's status as a "United States real property holding corporation," dated not more than thirty (30) days prior to the Closing Date, as described in Treasury Regulations Sections 1.897-2(h) and 1.1445-2(c)(3), and (ii) proof of delivery to the IRS of the required notice, as described in Treasury Regulations 1.897-2(h)(2).

8. *Covenants of the Sellers*. Each Seller, severally and not jointly, covenants with each Underwriter as follows:

(a) Each Seller, severally and not jointly, covenants with each Underwriter to deliver to each Underwriter (or its agent), prior to or at the Closing Date, a properly completed and executed Internal Revenue Service ("**IRS**") Form W-9 or an IRS Form W-8, as appropriate, together with all required attachments to such form.

9. *Expenses*. Whether or not the transactions contemplated in this Agreement are consummated or this Agreement is terminated, the Sellers agree to pay or cause to be paid all expenses incident to the performance of their obligations under this Agreement, including: (i) the fees, disbursements and expenses of the Company's counsel, the Company's accountants and one counsel for the Selling Stockholders in connection with the registration and delivery of the Shares under the Securities Act and all other fees or expenses in connection with the preparation and filing of the Registration

22

Statement, any preliminary prospectus, the Time of Sale Prospectus, the Prospectus, any free writing prospectus prepared by or on behalf of, used by, or referred to by the Company and amendments and supplements to any of the foregoing, including all printing costs associated therewith, and the mailing and delivering of copies thereof to the Underwriters and dealers, in the quantities hereinabove specified, (ii) all costs and expenses related to the transfer and delivery of the Shares to the Underwriters, including any transfer or other taxes payable thereon, (iii) the cost of printing or producing any Blue Sky or Legal Investment memorandum in connection with the offer and sale of the Shares under state securities laws and all expenses in connection with the qualification of the Shares for offer and sale under state securities laws as provided in Section 7(g) hereof, including filing fees and the reasonable fees and disbursements of counsel for the Underwriters in connection with such qualification and in connection with the Blue Sky or Legal Investment memorandum, if any, (iv) all filing fees and the reasonable fees and disbursements of counsel to the Underwriters incurred in connection with the review and qualification of the offering of the Shares by the Financial Industry Regulatory Authority, Inc., (v) all fees and expenses in connection with the preparation and filing of the registration statement on Form 8-A relating to the Common Stock and all costs and expenses incident to listing the Shares on the NYSE and other national securities exchanges and foreign stock exchanges, (vi) the cost of printing certificates, if any, representing the Shares, (vii) the costs and charges of any transfer agent, registrar or depositary, (viii) the costs and expenses of the Company relating to investor presentations on any "road show" undertaken in connection with the marketing of the offering of the Shares, including, without limitation, expenses associated with the preparation or dissemination of any electronic road show, expenses associated with the production of road show slides and graphics, fees and expenses of any consultants engaged in connection with the road show presentations with the prior approval of the Company, travel and lodging expenses of the representatives and officers of the Company and any such consultants, and one-half of the cost of any aircraft chartered in connection with the road show (the remaining half of the cost to be paid by the Underwriters), (ix) the document production charges and expenses associated with printing this Agreement, (x) all fees and disbursements of counsel incurred by the Underwriters in connection with the Directed Share Program and stamp duties, similar taxes or duties or other taxes, if any, incurred by the Underwriters in connection with the Directed Share Program (*provided* that the aggregate amount payable by the Company pursuant to subsections (iii), (iv) and (x) shall not exceed $50,000) and (xi) all other costs and expenses incident to the performance of the obligations of the Company hereunder for which provision is not otherwise made in this Section. It is understood, however, that except as provided in this Section, Section 11 entitled "Indemnity and Contribution," Section 12 entitled "Directed Share Program Indemnification" and the last paragraph of Section 14 below, the Underwriters will pay all of their costs and expenses, including fees and disbursements of their counsel, stock transfer taxes payable on resale of any of the Shares by them and any advertising expenses connected with any offers they may make.

The provisions of this Section shall not supersede or otherwise affect any agreement that the Sellers may otherwise have for the allocation of such expenses among themselves.

23

10. *Covenants of the Underwriters*. Each Underwriter severally covenants with the Company not to take any action that would result in the Company being required to file with the Commission under Rule 433(d) a free writing prospectus prepared by or on behalf of such Underwriter that otherwise would not be required to be filed by the Company thereunder, but for the action of the Underwriter.

11. *Indemnity and Contribution*. (a) The Company agrees to indemnify and hold harmless each Underwriter, each person, if any, who controls any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any "road show" as defined in Rule 433(h) under the Securities Act (a "road show"), or the Prospectus or any amendment or supplement thereto or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon information relating to any Underwriter furnished to the Company in writing by such Underwriter through you expressly for use therein. The Company agrees and confirms that references to "affiliates" of Morgan Stanley that appear in this Agreement shall be understood to include Mitsubishi UFJ Morgan Stanley Securities Co., Ltd.

(b) Each Underwriter agrees, severally and not jointly, to indemnify and hold harmless the Company, the Selling Stockholders, the directors of the Company, the officers of the Company who sign the Registration Statement and each person, if any, who controls the Company or any Selling Stockholder within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any road show or the Prospectus or any amendment or supplement thereto, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, but only with reference to information relating to such Underwriter furnished to the Company in writing by such Underwriter through you expressly for use in the Registration Statement, any preliminary prospectus, the Time of Sale Prospectus, any issuer free writing prospectus, road show, or the Prospectus or any amendment or supplement thereto.

24

(c) Each Selling Stockholder agrees, severally and not jointly to indemnify and hold harmless each Underwriter, each person, if any, who controls any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any "road show" as defined in Rule 433(h) under the Securities Act (a "road show"), or the Prospectus or any amendment or supplement thereto or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, *provided* that the losses, claims, damages or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon Selling Stockholder Information and *provided, further*, that the liability of the Selling Stockholder pursuant to this subsection (b) shall be limited to the aggregate Public Offering Price, less underwriting discounts and commissions, of Shares sold by such Selling Stockholder hereunder. The Selling Stockholders agrees and confirms that references to "affiliates" of Morgan Stanley that appear in this Agreement shall be understood to include Mitsubishi UFJ Morgan Stanley Securities Co., Ltd.

(d) In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to Sections 11(a), 11(b) or 11(c), such person (the "**indemnified party**") shall promptly notify the person against whom such indemnity may be sought (the "**indemnifying party**") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonably incurred fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed in writing to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential conflict of interests between them. It is understood that the indemnifying party shall not, in respect of the legal expenses of any indemnified party in connection with any proceeding or related proceedings in the same jurisdiction, be liable for (i) the fees and expenses of more than one separate firm (in addition to any local counsel) for all

25

Underwriters and all persons, if any, who control any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act or who are affiliates of any Underwriter within the meaning of Rule 405 under the Securities Act, (ii) the fees and expenses of more than one separate firm (in addition to any local counsel) for the Company, its directors, its officers who sign the Registration Statement and each person, if any, who controls the Company within the meaning of either such Section and (iii) the fees and expenses of more than one separate firm (in addition to any local counsel) for all Selling Stockholders and all persons, if any, who control any Selling Stockholder within the meaning of either such Section, and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Underwriters and such control persons and affiliates of any Underwriters, such firm shall be designated in writing by the Representatives. In the case of any such separate firm for the Company, and such directors, officers and control persons of the Company, such firm shall be designated in writing by the Company. In the case of any such separate firm for the Selling Stockholders and such control persons of any Selling Stockholders, such firm shall be designated in writing by the persons named as attorneys-in-fact for the Selling Stockholders under the Powers of Attorney. The indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel as contemplated by the second and third sentences of this paragraph, the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 60 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement (i) includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(e) To the extent the indemnification provided for in Section 11(a), 11(b) or 11(c) is unavailable to an indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party or parties on the one hand and the indemnified party or parties on the other hand from the offering of the Shares or (ii) if the allocation provided by clause 11(e)(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in

26

clause 11(e)(i) above but also the relative fault of the indemnifying party or parties on the one hand and of the indemnified party or parties on the other hand in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Sellers on the one hand and the Underwriters on the other hand in connection with the offering of the Shares shall be deemed to be in the same respective proportions as the net proceeds from the offering of the Shares (before deducting expenses) received by each Seller and the total underwriting discounts and commissions received by the Underwriters, in each case as set forth in the table on the cover of the Prospectus, bear to the aggregate Public Offering Price of the Shares. The relative fault of the Sellers on the one hand and the Underwriters on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Sellers or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Underwriters' respective obligations to contribute pursuant to this Section 11 are several in proportion to the respective number of Shares they have purchased hereunder, and not joint.

(f) The Sellers and the Underwriters agree that it would not be just or equitable if contribution pursuant to this Section 11 were determined by *pro rata* allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 11(e). The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in Section 11(e) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 11, no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Shares underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages that such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission and (ii) no Selling Stockholder shall be required to contribute an amount in excess of the amount by which the aggregate Public Offering Price, less underwriting discounts and commissions, of Shares sold by such Selling Stockholder exceeds the amount of any damages that such Selling Stockholder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The remedies provided for in this Section 11 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(g) The indemnity and contribution provisions contained in this Section 11 and the representations, warranties and other statements of the Company and the Selling Stockholders contained in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by

27

or on behalf of any Underwriter, any person controlling any Underwriter or any affiliate of any Underwriter, any Selling Stockholder or any person controlling any Selling Stockholder, or the Company, its officers or directors or any person controlling the Company and (iii) acceptance of and payment for any of the Shares.

12. *Directed Share Program Indemnification.* (a) The Company agrees to indemnify and hold harmless each Underwriter, each person, if any, who controls any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act and each affiliate of an Underwriter within the meaning of Rule 405 of the Securities Act ("**Underwriter Entities**") from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) (i) caused by any untrue statement or alleged untrue statement of a material fact contained in any material prepared by or with the consent of the Company for distribution to Participants in connection with the Directed Share Program or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; (ii) caused by the failure of any Participant to pay for and accept delivery of Directed Shares that the Participant agreed to purchase; or (iii) related to, arising out of, or in connection with the Directed Share Program, other than losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined to have resulted from the bad faith or gross negligence of Underwriter Entities.

(b) In case any proceeding (including any governmental investigation) shall be instituted involving any Underwriter Entity in respect of which indemnity may be sought pursuant to Section 12(a), the Underwriter Entity seeking indemnity, shall promptly notify the Company in writing and the Company, upon request of the Underwriter Entity, shall retain counsel reasonably satisfactory to the Underwriter Entity to represent the Underwriter Entity and any others the Company may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Underwriter Entity shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Underwriter Entity unless (i) the Company shall have agreed in writing to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the Underwriter Entity and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Company shall not, in respect of the legal expenses of the Underwriter Entities in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Underwriter Entities. Any such separate firm for the Underwriter Entities shall be designated in writing by the Representatives. The Company shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Company agrees to indemnify the Underwriter Entities from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an Underwriter Entity shall have requested the Company to reimburse it for fees and expenses of counsel as contemplated

28

by the second and third sentences of this paragraph, the Company agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 60 days after receipt by the Company of the aforesaid request and (ii) the Company shall not have reimbursed the Underwriter Entity in accordance with such request prior to the date of such settlement. The Company shall not, without the prior written consent of the Representatives, effect any settlement of any pending or threatened proceeding in respect of which any Underwriter Entity is or could have been a party and indemnity could have been sought hereunder by such Underwriter Entity, unless such settlement (i) includes an unconditional release of the Underwriter Entities from all liability on claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of the Company.

      (c) To the extent the indemnification provided for in Section 12(a) is unavailable to an Underwriter Entity or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the Company in lieu of indemnifying the Underwriter Entity thereunder, shall contribute to the amount paid or payable by the Underwriter Entity as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Underwriter Entities on the other hand from the offering of the Directed Shares or (ii) if the allocation provided by clause 12(c)(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause 12(c)(i) above but also the relative fault of the Company on the one hand and of the Underwriter Entities on the other hand in connection with any statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the Underwriter Entities on the other hand in connection with the offering of the Directed Shares shall be deemed to be in the same respective proportions as the net proceeds from the offering of the Directed Shares (before deducting expenses) and the total underwriting discounts and commissions received by the Underwriter Entities for the Directed Shares, bear to the aggregate Public Offering Price of the Directed Shares. If the loss, claim, damage or liability is caused by an untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact, the relative fault of the Company on the one hand and the Underwriter Entities on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement or the omission or alleged omission relates to information supplied by the Company or by the Underwriter Entities and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

      (d) The Company and the Underwriter Entities agree that it would not be just or equitable if contribution pursuant to this Section 12 were determined by *pro rata* allocation (even if the Underwriter Entities were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 12(c). The amount paid or payable by the Underwriter Entities as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the

29

limitations set forth above, any legal or other expenses reasonably incurred by the Underwriter Entities in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 12, no Underwriter Entity shall be required to contribute any amount in excess of the amount by which the total price at which the Directed Shares distributed to the public were offered to the public exceeds the amount of any damages that such Underwriter Entity has otherwise been required to pay. The remedies provided for in this Section 12 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(e) The indemnity and contribution provisions contained in this Section 12 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Underwriter Entity or the Company, its officers or directors or any person controlling the Company and (iii) acceptance of and payment for any of the Directed Shares.

13. *Termination*. The Underwriters may terminate this Agreement by notice given by you to the Company, if after the execution and delivery of this Agreement and prior to the Closing Date (i) trading generally shall have been suspended or materially limited on, or by, as the case may be, any of the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Market, the Chicago Board of Options Exchange, the Chicago Mercantile Exchange or the Chicago Board of Trade or other relevant exchanges, (ii) trading of any securities of the Company shall have been suspended on any exchange or in any over-the-counter market, (iii) a material disruption in securities settlement, payment or clearance services in the United States shall have occurred, (iv) any moratorium on commercial banking activities shall have been declared by Federal or New York State authorities or (v) there shall have occurred any outbreak or escalation of hostilities, or any change in financial markets or any calamity or crisis that, in your judgment, is material and adverse and which, singly or together with any other event specified in this clause (v), makes it, in your judgment, impracticable or inadvisable to proceed with the offer, sale or delivery of the Shares on the terms and in the manner contemplated in the Time of Sale Prospectus or the Prospectus.

14. *Effectiveness; Defaulting Underwriters*. This Agreement shall become effective upon the execution and delivery hereof by the parties hereto.

If, on the Closing Date or an Option Closing Date, as the case may be, any one or more of the Underwriters shall fail or refuse to purchase Shares that it has or they have agreed to purchase hereunder on such date, and the aggregate number of Shares which such defaulting Underwriter or Underwriters agreed but failed or refused to purchase is not more than one-tenth of the aggregate number of the Shares to be purchased on such date, the other Underwriters shall be obligated severally in the proportions that the number of Firm Shares set forth opposite their respective names in <u>Schedule II</u> bears to the aggregate number of Firm Shares set forth opposite the names of all such non-defaulting Underwriters, or in such other proportions as you may specify, to purchase the Shares which such defaulting Underwriter or Underwriters agreed but failed or refused to purchase on such date; *provided* that in no event shall the number of Shares

30

that any Underwriter has agreed to purchase pursuant to this Agreement be increased pursuant to this Section 14 by an amount in excess of one-ninth of such number of Shares without the written consent of such Underwriter. If, on the Closing Date, any Underwriter or Underwriters shall fail or refuse to purchase Firm Shares and the aggregate number of Firm Shares with respect to which such default occurs is more than one-tenth of the aggregate number of Firm Shares to be purchased on such date, and arrangements satisfactory to you, the Company and the Selling Stockholders for the purchase of such Firm Shares are not made within 36 hours after such default, this Agreement shall terminate without liability on the part of any non-defaulting Underwriter, the Company or the Selling Stockholders. In any such case either you or the relevant Sellers shall have the right to postpone the Closing Date, but in no event for longer than seven days, in order that the required changes, if any, in the Registration Statement, in the Time of Sale Prospectus, in the Prospectus or in any other documents or arrangements may be effected. If, on an Option Closing Date, any Underwriter or Underwriters shall fail or refuse to purchase Additional Shares and the aggregate number of Additional Shares with respect to which such default occurs is more than one-tenth of the aggregate number of Additional Shares to be purchased on such Option Closing Date, the non-defaulting Underwriters shall have the option to (i) terminate their obligation hereunder to purchase the Additional Shares to be sold on such Option Closing Date or (ii) purchase not less than the number of Additional Shares that such non-defaulting Underwriters would have been obligated to purchase in the absence of such default. Any action taken under this paragraph shall not relieve any defaulting Underwriter from liability in respect of any default of such Underwriter under this Agreement.

If this Agreement shall be terminated by the Underwriters, or any of them, because of any failure or refusal on the part of any Seller to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason any Seller shall be unable to perform its obligations under this Agreement (other than for failure or non-performance by a Seller resulting from circumstances not specifically related to the Sellers due to the events described in sub-clauses (i), (iii), (iv) or (v) of Section 13), any such Seller will reimburse the Underwriters or such Underwriters as have so terminated this Agreement with respect to themselves, severally, for all out-of-pocket expenses (including the fees and disbursements of their counsel) reasonably incurred by such Underwriters in connection with this Agreement or the offering contemplated hereunder.

15. *Entire Agreement.* (a) This Agreement, together with any contemporaneous written agreements and any prior written agreements (to the extent not superseded by this Agreement) that relate to the offering of the Shares, represents the entire agreement between the Company and the Selling Stockholders, on the one hand, and the Underwriters, on the other, with respect to the preparation of any preliminary prospectus, the Time of Sale Prospectus, the Prospectus, the conduct of the offering, and the purchase and sale of the Shares.

(b) The Company acknowledges that in connection with the offering of the Shares: (i) the Underwriters have acted at arm's-length, are not agents of, and owe no fiduciary duties to, the Company or any other person, (ii) the Underwriters owe the Company only those duties and obligations set forth in this Agreement and prior written

31

agreements (to the extent not superseded by this Agreement), if any, and (iii) the Underwriters may have interests that differ from those of the Company. The Company waives to the full extent permitted by applicable law any claims it may have against the Underwriters arising from an alleged breach of fiduciary duty in connection with the offering of the Shares.

16. *Counterparts*. This Agreement may be signed in two or more counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

17. *Applicable Law*. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

18. *Headings*. The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed a part of this Agreement.

19. *Notices*. All communications hereunder shall be in writing and effective only upon receipt and if to the Underwriters shall be delivered, mailed or sent to you in care of Morgan Stanley & Co. LLC, 1585 Broadway, New York, New York 10036, Attention: Equity Syndicate Desk, with a copy to the Legal Department and Goldman, Sachs & Co., 200 West Street, New York, New York 10282, Attention: Registration Department with a copy to O'Melveny & Myers LLP, 2 Embarcadero Center, 28th Floor, San Francisco, California 94111, Attention: Kurt J. Berney, Esq. and Eric Sibbitt, Esq.; if to the Company shall be delivered, mailed or sent to LendingClub Corporation, 71 Stevenson St., Suite 300, San Francisco, California 94105, Attention: Renaud Laplanche with a copy to Fenwick & West LLP, Silicon Valley Center, 801 California Street, Mountain View, California 94041, Attention: Jeffrey R. Vetter, Esq.; and if to the Selling Stockholders shall be delivered, mailed or sent to Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attention: Thomas Beaudoin, Esq. and Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP, 1200 Seaport Boulevard, Redwood City, CA 94063, Attention: Richard C. Blake, Esq.

[*Signature Pages Follow*]

32

Very truly yours,

LENDINGCLUB CORPORATION

By: _____

Name:

Title:

[Signature Page to Underwriting Agreement]

The Selling Stockholders named in Schedule I hereto,
  acting severally

By: _____
Name:  Renaud Laplanche
Title:    Chief Executive Officer

As Attorney-in-Fact acting on behalf of each of the
Selling Stockholders named in Schedule I hereto.

[Signature Page to Underwriting Agreement]

Accepted as of the date hereof

Morgan Stanley & Co. LLC
Goldman, Sachs & Co.

Acting severally on behalf of themselves and as
   Representatives of the several Underwriters
   named in Schedule II hereto

By:     Morgan Stanley & Co. LLC

By:    _____
Name:
Title:

By:     Goldman, Sachs & Co.

By:    _____
Name:
Title:

[Signature Page to Underwriting Agreement]

**SCHEDULE I**

| Selling Stockholder | Number of Firm Shares To Be Sold |
| --- | --- |
| Canaan VII L.P. | |
| KPCB Holdings, Inc., as nominee | |
| Union Square Ventures Opportunity Fund, L.P. | |
| | |
| Total: | |

I-1

**SCHEDULE II**

| Underwriter | Number of Firm Shares To Be Purchased |
|---|---|
| Morgan Stanley & Co. LLC | |
| Goldman, Sachs & Co. | |
| Credit Suisse Securities (USA) LLC | |
| Citigroup Global Markets Inc. | |
| Allen & Company LLC | |
| Stifel, Nicolaus & Company, Incorporated | |
| BMO Capital Markets Corp. | |
| William Blair & Company, L.L.C. | |
| Wells Fargo Securities, LLC | |
| Total: | |

II-1

**SCHEDULE III**

**Time of Sale Prospectus**

1.  Preliminary Prospectus issued [—], 2014

2.  [identify all free writing prospectuses filed by the Company under Rule 433(d) of the Securities Act]

3.  [free writing prospectus containing a description of terms that does not reflect final terms, if the Time of Sale Prospectus does not include a final term sheet]

4.  [orally communicated pricing information such as price per share and size of offering if a Rule 134 pricing term sheet is used at the time of sale instead of a pricing term sheet filed by the Company under Rule 433(d) as a free writing prospectus]

III-1

**EXHIBIT A**

**FORM OF LOCK-UP LETTER**

[Attached.]

A-1

**LOCK-UP LETTER**

, 2014

Morgan Stanley & Co. LLC
Goldman, Sachs & Co.

      as Representatives of the several Underwriters

c/o Morgan Stanley & Co. LLC
      1585 Broadway
      New York, New York 10036

c/o Goldman, Sachs & Co.
      200 West Street
      New York, New York 10282

Ladies and Gentlemen:

      The undersigned understands that Morgan Stanley & Co. LLC ("**Morgan Stanley**") and Goldman, Sachs & Co. (together with Morgan Stanley, the "**Representatives**") propose to enter into an Underwriting Agreement (the "**Underwriting Agreement**") with LendingClub Corporation, a Delaware corporation (the "**Company**"), providing for the public offering (the "**Public Offering**") by the several Underwriters, including the Representatives (the "**Underwriters**"), of shares (the "**Shares**") of the common stock, par value $0.01 per share of the Company (the "**Common Stock**").

      To induce the Underwriters that may participate in the Public Offering to continue their efforts in connection with the Public Offering, the undersigned hereby agrees that, without the prior written consent of Morgan Stanley on behalf of the Underwriters, it will not, during the period commencing on the date hereof and ending 180 days after the date of the final prospectus (the "**Restricted Period**") relating to the Public Offering (the "**Prospectus**"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock beneficially owned (as such term is used in Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), by the undersigned or any other securities so owned convertible into or exercisable or exchangeable for Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise. The foregoing sentence shall not apply to:

(a) transactions relating to shares of Common Stock or other securities acquired in the Public Offering (other than issuer-directed Shares acquired by a director or officer of the Company in or in connection with the Public Offering) or acquired in open market transactions after the completion of the Public Offering, *provided* that no filing under Section 16(a) of the Exchange Act shall be required or shall be voluntarily made in connection with subsequent sales of Common Stock or other securities acquired in such open market transactions;

(b) transfers of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock (i) as a bona fide gift or gifts, (ii) by will or intestacy, (iii) to the spouse, domestic partner, parent, child or grandchild (each, an "immediate family member") of the undersigned or to a trust formed for the benefit of one or more immediate family members, or (iv) if the undersigned is a trust, to a trustee or beneficiary of the trust, provided that in the case of any transfer pursuant to this clause, each transferee, donee, distributee shall execute and deliver to Morgan Stanley a lock-up letter substantially in the form of this Letter Agreement, and provided, further, that no filing under Section 16(a) of the Exchange Act reporting a reduction in beneficial ownership of shares of Common Stock shall be required or shall be voluntarily made during the Restricted Period other than any required Form 5 Annual Statement of Changes in Beneficial Ownership of Securities;

(c) transfers or distributions of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock by a (i) stockholder that is a corporation, partnership or other business entity, either (A) to another corporation, partnership or other business entity that controls, is controlled by or managed by or is under common control with such stockholder or (B) as part of a distribution to an equity holder of such stockholder or to the estate of any such equity holder, or (ii) stockholder that is a trust to a trustor or beneficiary of the trust or to the estate of a beneficiary of such trust; provided that in each case (i) each donee or distributee shall sign and deliver a lock-up letter substantially in the form of this Letter Agreement and (ii) no filing under Section 16(a) of the Exchange Act reporting a reduction in beneficial ownership of shares of Common Stock shall be required or shall be voluntarily made during the Restricted Period;

(d) the exercise of options granted under a stock incentive plan described in the Prospectus, provided that the underlying shares of Common Stock continue to be subject to the restrictions set forth in this Letter Agreement;

(e) the exercise of warrants outstanding and which are described in the Prospectus related to the Public Offering, provided that the shares of Common Stock delivered upon such exercise are subject to the restrictions set forth in this Letter Agreement and that no filing under Section 16(a) of the Exchange Act shall be required or shall be voluntarily made during the Restricted Period;

(f) transfers of shares of Common Stock to the Company or any other securities convertible into Common Stock to the Company upon a vesting event of the Company's securities or upon the exercise of options or warrants to purchase the Company's securities that would otherwise expire during the Restricted Period, in each case on a "cashless" or "net exercise" basis or to cover tax withholding obligations of the

undersigned in connection with such vesting or exercise, provided that the underlying shares of Common Stock continue to be subject to the restrictions set forth in this Letter Agreement and that any filing under Section 16(a) of the Exchange Act shall clearly indicate in the footnotes thereto that the filing relates to the circumstances described in this clause (f);

(g) the exercise or surrender of options to purchase Common Stock granted under a stock incentive plan described in the Prospectus in connection with a rescission offer conducted by the Company or the sale, surrender or other transfer of Common Stock issued or issuable upon exercise of options granted under a stock incentive plan described in the Prospectus to the Company in connection with a rescission offer by the Company;

(h) the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Common Stock, provided that (i) such plan does not provide for the transfer of Common Stock during the Restricted Period, and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the undersigned or the Company regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of Common Stock may be made under such plan during the Restricted Period;

(i) the conversion of the outstanding preferred stock of the Company into shares of Common Stock, provided that such shares of Common Stock remain subject to the terms of this Letter Agreement;

(j) the transfer of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock to the Company, pursuant to agreements under which the Company has the option to repurchase such shares or a right of first refusal with respect to transfers of such shares, provided that any filing under Section 16(a) of the Exchange Act shall clearly indicate in the footnotes thereto that the filing relates to the circumstances described in this clause (j);

(k) the transfer of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock that occurs by operation of law, pursuant to a qualified domestic order or in connection with a divorce settlement; provided that (i) with respect to any such transfer, each transferee shall execute and deliver to the Representatives a lock-up letter substantially in the form of this Letter Agreement and (ii) to the extent a public announcement or filing under the Exchange Act regarding the transfer is required of or is voluntarily made by or on behalf of the undersigned or the Company, such announcement or filing shall include a statement to the effect that the transfer was made by operation of law and, if applicable, pursuant to a qualified domestic order or in connection with a divorce settlement, as applicable; or

(l) the transfer of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock pursuant to a bona fide third party tender offer, merger, consolidation or other similar transaction made to all holders of the Common Stock involving a change of control of the Company after the completion of the

Public Offering and that has been approved by the board of directors of the Company, provided that if the tender offer, merger, consolidation or other such transaction is not completed, the Common Stock owned by the undersigned shall remain subject to the restrictions contained in this Letter Agreement.

For the purposes of clause (l), a "**change of control**" means the transfer (whether by tender offer, merger, consolidation or other similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than the Underwriters pursuant to the Public Offering), of shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock if, after such transfer, the stockholders of the Company immediately prior to such transfer do not own more than 50% of the outstanding voting securities of the Company (or the surviving entity).

In addition, the undersigned agrees that, without the prior written consent of Morgan Stanley on behalf of the Underwriters, it will not, during the Restricted Period, make any demand for or exercise any right with respect to, the registration of any shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock. The undersigned also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the undersigned's shares of Common Stock except in compliance with the foregoing restrictions.

If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing provisions shall be equally applicable to any issuer-directed Shares the undersigned may purchase in or in connection with the Public Offering.

If the undersigned is an officer or director of the Company, (i) Morgan Stanley agrees that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of shares of Common Stock, Morgan Stanley will notify the Company of the impending release or waiver, and (ii) the Company has agreed in the Underwriting Agreement to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by Morgan Stanley hereunder to any such officer or director shall only be effective two business days after the publication date of such press release. The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration and (b) the transferee has agreed in writing to be bound by the same terms described in this Letter Agreement to the extent and for the duration that such terms remain in effect at the time of the transfer.

If:

(1) during the last 17 days of the Restricted Period the Company issues an earnings release or material news or a material event relating to the Company occurs; or

(2) prior to the expiration of the Restricted Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the Restricted Period;

the restrictions imposed by this Letter Agreement shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. The undersigned hereby acknowledges that the Company has agreed in the Underwriting Agreement to provide written notice of any event that would result in an extension of the initial Restricted Period and agrees that any such notice properly delivered will be deemed to have been given to, and received by, the undersigned.

The undersigned shall not engage in any transaction that may be restricted by this Letter Agreement during the 34-day period beginning on the last day of the initial Restricted Period unless the undersigned requests and receives prior written confirmation from the Company or Morgan Stanley that the restrictions imposed by this Letter Agreement have expired.

The undersigned understands that the Company and the Underwriters are relying upon this Letter Agreement in proceeding toward consummation of the Public Offering. The undersigned further understands that this Letter Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

Whether or not the Public Offering actually occurs depends on a number of factors, including market conditions. Any Public Offering will only be made pursuant to an Underwriting Agreement, the terms of which are subject to negotiation between the Company and the Underwriters.

This Letter Agreement shall automatically terminate upon the earliest to occur, if any, of (a) the date that the Company advises Morgan Stanley, in writing, prior to the execution of the Underwriting Agreement, that it has determined not to proceed with the Public Offering, (b) the date the Underwriting Agreement is terminated (without regard to any provisions thereof that survive termination) if prior to the closing of the Public Offering or (c) January 31, 2015 if the Public Offering of the Shares has not been completed by such date. This Letter Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

*[Signature Page Follows]*

Very truly yours,

_____

(Name)

_____

_____

(Address)

[Signature Page to Lock-up Agreement]

**EXHIBIT B**

## FORM OF WAIVER OF LOCK-UP

, 20

[Name and Address of
Officer or Director
Requesting Waiver]

Dear Mr./Ms. [Name]:

This letter is being delivered to you in connection with the offering by LendingClub Corporation (the "**Company**") of [—] shares of common stock, $0.01 par value (the "**Common Stock**"), of the Company and the lock-up letter dated [—], 2014 (the "**Lock-up Letter**"), executed by you in connection with such offering, and your request for a [waiver] [release] dated [—], 2014, with respect to [—] shares of Common Stock (the "**Shares**").

Morgan Stanley & Co. LLC hereby agrees to [waive] [release] the transfer restrictions set forth in the Lock-up Letter, but only with respect to the Shares, effective [—] 2014; *provided*, *however*, that such [waiver] [release] is conditioned on the Company announcing the impending [waiver] [release] by press release through a major news service at least two business days before effectiveness of such [waiver] [release]. This letter will serve as notice to the Company of the impending [waiver] [release].

Except as expressly [waived] [released] hereby, the Lock-up Letter shall remain in full force and effect.

B-1

Very truly yours,

Morgan Stanley & Co. LLC

Acting severally on behalf of themselves and the
several Underwriters named in Schedule I hereto

By:    Morgan Stanley & Co. LLC

By:    _____
Name:
Title:

cc: Company

B-2

**FORM OF PRESS RELEASE**

LendingClub Corporation
[Date]

LendingClub Corporation (the "**Company**") announced today that Morgan Stanley & Co. LLC, a lead book-running manager in the Company's recent public sale of [—] shares of common stock is [waiving][releasing] a lock-up restriction with respect to [—] shares of the Company's common stock held by [certain officers or directors] [an officer or director] of the Company. The [waiver][release] will take effect on         , 20   , and the shares may be sold on or after such date.

**This press release is not an offer for sale of the securities in the United States or in any other jurisdiction where such offer is prohibited, and such securities may not be offered or sold in the United States absent registration or an exemption from registration under the United States Securities Act of 1933, as amended.**

B-3

# EXHIBITS 10-16
[Filed Conditionally Under Seal
Pursuant to Protective Order]

# EXHIBIT 17

# Simpson Thacher & Bartlett LLP

2475 HANOVER STREET
PALO ALTO, CA 94304

───────────

TELEPHONE: +1-650-251-5000
FACSIMILE: +1-650-251-5002

Direct Dial Number
+1-650-251-5203

E-mail Address
sstrauss@stblaw.com

BY E-MAIL

November 10, 2017

Re: *In re LendingClub Securities Litigation*,
Case No. 3:16-cv-02627 (N.D. Cal.)

Jason A. Forge
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, California 92101
jforge@rgrdlaw.com

Dear Mr. Forge:

I write on behalf of Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC (formerly known as Goldman, Sachs & Co.) ("Goldman Sachs"), Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Allen & Company LLC, Stifel, Nicolaus & Company, Incorporated, BMO Capital Markets Corp., William Blair & Company, L.L.C., and Wells Fargo Securities, LLC (collectively, the "Underwriter Defendants") in the above-captioned matter.

The Underwriter Defendants are voluntarily producing correspondence, documents, and privilege logs recently produced in the state court action in order to facilitate coordination between the two actions. Documents recently produced by Morgan Stanley are bates labeled MS_LC_00071262 to MS_LC_00071307; documents produced by Goldman Sachs are bates labeled GS_LC_00011620 to GS_LC_00015160. Many or all of these documents are also responsive to Lead Plaintiff's First Set of Requests for Production of Documents to the Underwriter Defendants.

Morgan Stanley is also producing replacement versions of 32 documents that were previously redacted based on third party confidentiality obligations. These replacement versions no longer bear any redactions and fall nonconsecutively within the bates range MS_LC_00010773 to MS_LC_00070332.

Simpson Thacher & Bartlett LLP

November 10, 2017                                                    Jason A. Forge

      Please note the confidentiality designations that were included on these documents and privilege logs pursuant to the Stipulation and Order Regarding Confidential Information entered in the state action on August 5, 2016, which also constitute designations of protected material under the Stipulated Protective Order entered in this action on July 13, 2017.

      The materials are available via a secure FTP site, as specified in the cover email.  The password necessary to open the uploaded files will follow in a separate email.

      This production is subject to and does not waive the Underwriter Defendants' objections to Lead Plaintiff's Requests, served on September 29, 2017.  The Underwriter Defendants expressly reserve all rights and privileges with respect to the documents, including the extent to which any documents may contain inadvertently produced information protected by the attorney-client privilege, work product doctrine or other applicable privilege or protection.

Very truly yours,

Simona G. Strauss

2