1  SIMONA G. STRAUSS (Bar No. 203062)
   sstrauss@stblaw.com
2  LEE BRAND (Bar No. 287110)
   lee.brand@stblaw.com
3  SIMPSON THACHER & BARTLETT LLP
   2475 Hanover Street
4  Palo Alto, California 94304
   Telephone:    (650) 251-5000
5  Facsimile:    (650) 251-5002

6  JONATHAN K. YOUNGWOOD (*pro hac vice*)
   jyoungwood@stblaw.com
7  SIMPSON THACHER & BARTLETT LLP
   425 Lexington Avenue
8  New York, New York 10017
   Telephone:    (212) 455-2000
9  Facsimile:    (212) 455-2502

10  *Attorneys for the Underwriter Defendants*

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13
    | In re LENDINGCLUB SECURITIES | Case No. 3:16-cv-02627-WHA |
14  | LITIGATION | |

15  | This Document Relates To: | CLASS ACTION |

16  |          ALL ACTIONS. | **UNDERWRITER DEFENDANTS'** |

In re LENDINGCLUB SECURITIES
LITIGATION

This Document Relates To:

          ALL ACTIONS.

Case No. 3:16-cv-02627-WHA

CLASS ACTION

**UNDERWRITER DEFENDANTS'
SUBMISSION WITH RESPECT TO
STATUTORY DUE DILIGENCE
DEFENSE PURSUANT TO DECEMBER
15, 2017 ORDER**

JUDGE: Hon. William H. Alsup
COURTROOM: 12, 19th Floor

Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC (formerly known as Goldman, Sachs & Co.) ("Goldman Sachs"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("Citi"), Allen & Company LLC ("Allen & Co."), Stifel, Nicolaus & Company, Incorporated ("Stifel"), BMO Capital Markets Corp. ("BMO"), William Blair & Company, L.L.C. ("William Blair"), and Wells Fargo Securities, LLC ("Wells Fargo") (collectively, the "Underwriter Defendants") hereby respectfully submit this offer of proof detailing the evidentiary facts they will present in support of their first affirmative defense, "due diligence," pursuant to the Court's Order of December 15, 2017 (Dkt. 301).

## INTRODUCTION

The Underwriter Defendants will prove their statutory due diligence defense under Section 11 of the Securities Act by detailing the reasonable and thorough investigation that ***they themselves*** conducted in connection with LendingClub's December 2014 IPO.  While deal counsel certainly participated in that process, the underwriters did not delegate their investigation to counsel, and the mere participation of counsel in non-privileged diligence calls and fact-gathering does not result in or implicate issues related to waiver of privilege.  As set forth below and in Appendix A hereto, the evidentiary facts the Underwriter Defendants will present to support their defense are not based on, and do not refer to, the role of counsel in any way, other than the fact that the underwriters' deal counsel participated with them during the arms' length and non-privileged portions of the due diligence process described herein (*e.g.*, attending sessions with the issuer or procuring information directly from the issuer).[1]  The retention of deal counsel and its mere participation in otherwise non-privileged due diligence interactions with the issuer are not privileged and, indeed, are referenced in the registration statement publicly filed with the SEC in connection with LendingClub's December 2014 IPO (the "Registration Statement").  Lead

---

[1]   In its Order, the Court instructed the Underwriter Defendants to identify "the full extent, if any, to which ***each evidentiary fact*** presented in service of this affirmative defense will refer to or implicate the role of counsel in the due diligence investigation at issue."  Dkt. 301 at 1 (emphasis added).  The Underwriter Defendants have done so in Appendix B.  Certain of the documents cited in Appendix B also reflect that counsel participated in the due diligence investigation, such as circulating invitations for, and joining, numerous conference calls, but the Underwriter Defendants are not relying on counsel's participation in support of their diligence defense, and Appendix B does not highlight those portions of the cited documents. All of the documents cited in Appendix B have been produced to Lead Plaintiff.

UNDERWRITER DEFS.' SUBMISSION RE: DUE DILIGENCE          CASE NO. 3:16-CV-02627-WHA

Plaintiff is well aware of, and is able to freely explore, this fact, just as it can explore the

Underwriter Defendants' diligence with respect to LendingClub and relevant third parties.

The evidence reflecting the Underwriter Defendants' investigative process satisfies the

factors courts consider when analyzing the due diligence defense, without implicating or relying

on any confidential advice of, or confidential communications with, deal counsel.  The

underwriters' investigation was conducted by experienced teams that included roughly two dozen

business professionals from Morgan Stanley and Goldman Sachs, the lead underwriters that

represented the rest of the underwriting syndicate generally, and with regard to diligence efforts

specifically.  The due diligence process included more than *40* separate diligence meetings and

calls on all aspects of LendingClub's business; wide-ranging document requests made to, and

review of responses provided by, LendingClub; interviews of significant LendingClub partners

and investors; a thorough review of the peer-to-peer ("P2P") lending industry; detailed follow-up

inquiries regarding any questions or areas of concern; and receipt of certifications, representations

and comfort letters from LendingClub's management, LendingClub's counsel, and four separate

independent audit firms that had audited LendingClub or a company acquired by LendingClub at

various times.  None of that involves or turns on, or is shielded by, advice of counsel.  The

Underwriter Defendants will also present expert witness testimony on the reasonableness of their

investigation.  The expert will not receive (and therefore cannot rely on) any of the underwriters'

privileged communications with deal counsel.

The overwhelming majority of documents setting forth the facts of the underwriters'

diligence process do not contain any privileged information.[2]  For example, the productions in this

case include the early planning documents for the IPO diligence process, documents listing the

questions that were asked during diligence calls, all notes and summaries of the diligence calls

---

[2]    As the Underwriter Defendants stated during the December 7, 2017 hearing on Lead
Plaintiff's motion to compel, they are in the process of "re-review[ing their] privilege log to
make sure that there were no documents withheld as privilege[d] that were not in fact
privileged."  Dkt. 299 (12/7/17 Hrg. Tr.) at 33:24-34:2.  They have already re-reviewed
every document cited herein as well as every document brought to their attention by Lead
Plaintiff and have re-produced and unredacted certain portions of those documents
determined not to be privileged.

2

1   (regardless of whether those notes were prepared by an underwriter or its counsel), and documents

2   the underwriters received from LendingClub and relevant third parties in response to diligence

3   requests.  In addition, all fact witnesses—including employees of the underwriters, deal counsel,

4   the investigative firm retained by the underwriters, employees and directors of LendingClub,

5   LendingClub's current and former auditors, and LendingClub's customers, partners (such as its

6   issuing bank, WebBank), and other third parties—are subject to subpoena and, if appropriate

7   based on burden considerations, deposition.[3]  They will be free to answer any questions Lead

8   Plaintiff may have about the scope of the underwriters' due diligence investigation, the factual

9   information that was obtained, and any witness's belief as to whether the Registration Statement

10   contained any false or misleading information at the time it became effective.

11         Finally, in order to satisfy the Court that no privileged information forms any basis for or

12   underlies their due diligence defense, the Underwriter Defendants are willing to make available for

13   the Court's *in camera* review ***any*** materials they have withheld or redacted as privileged.  The *in*

14   *camera* review, if conducted, will confirm that these communications contain legal advice that is

15   not part of (and that certainly does not undermine) the underwriters' due diligence defense or the

16   offer of proof set forth herein.

17   **DISCUSSION**

18         The securities offered in LendingClub's December 2014 IPO were underwritten by a

19   syndicate of nine underwriters.  Morgan Stanley was the lead underwriter and underwrote 29% of

20   the offering.  *See* Declaration of Kristopher Caldwell, Morgan Stanley, dated December 21, 2017

21   ("Caldwell Decl.") (submitted herewith) ¶ 3.  Goldman Sachs was the joint lead/active bookrunner

22   of the IPO and underwrote 24% of the offering.  *Id.* ¶ 6.  As provided in the Underwriting

23   Agreement, Morgan Stanley and Goldman Sachs (collectively, the "Lead Underwriters") were the

24   "Representatives" of the syndicate.  December 10, 2010 Underwriting Agreement,

25   GS_LC_00000175-228, at 1.

26         On June 15, 2017, Lead Plaintiff filed an Amended Complaint asserting a claim against the

27

28   [3]   Deloitte & Touche LLP ("Deloitte") and Cirrix Capital ("Cirrix") have already made substantial document productions in this action in response to Lead Plaintiff's subpoenas.

3

Underwriter Defendants for violation of Section 11 of the Securities Act. Dkt. 182 ¶¶ 126-37. In their Amended Answer, the Underwriter Defendants asserted an affirmative defense based on their "due diligence." Dkt. 201 at 15:5-25. Section 11 provides a defense to liability for non-expertised portions of the registration statement where underwriters "had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact." 15 U.S.C. § 77k(b)(3)(A). For portions of the registration statement prepared on the authority of an expert, underwriters may avoid liability if they "had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact" or that the statements "did not fairly represent the statement of the expert." *Id.* § 77k(b)(3)(C).[4] The statute does not refer to counsel's role in the investigation.[5]

Courts evaluating a due diligence defense consider whether defendants employed a reasonable process to familiarize themselves with the issuer's business, operations, and finances and to learn about matters covered in the registration statement. *See, e.g.*, *Weinberger v. Jackson*, No. C-89-2301-CAL, 1990 WL 260676, at *2-3 (N.D. Cal. Oct. 11, 1990); *Picard Chem. Inc. v. Perrigo Co.*, No. 1:95-CV-141, 1998 WL 513091, at *14-15 (W.D. Mich. June 15, 1998); *In re Int'l Rectifier Sec. Litig.*, No. CV91-3357-RMT (BQRX), 1997 WL 529600, at *7 (C.D. Cal. Mar. 31, 1997); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 318-19, 323 (S.D.N.Y. 1996).

"In determining whether an underwriter meets the due diligence test . . . 'the standard of reasonableness shall be that required of a prudent man in the management of his own property.'" *In re Software Toolworks Sec. Litig., Inc.*, 50 F.3d 615, 621 (9th Cir. 1994) (quoting 15 U.S.C.

---

[4]   The majority of Lead Plaintiff's substantive allegations implicate non-expertised portions of the Registration Statement.

[5]   While the Underwriter Defendants acknowledge the Court's prior *Charles Schwab* decision, they respectfully object to any ruling in this case that might embody the reasoning of that decision with respect to privilege waiver and reserve their rights to argue that any such ruling would be inconsistent with controlling law. The Underwriter Defendants should not be presented with the Hobson's choice of withholding to present evidence involving their deal counsel that should be admissible or potentially effecting a waiver of privilege.

§ 77k(c)). This "is, '[i]n effect . . . a negligence standard.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1975)). "[T]he diligence conducted must be reasonable, not perfect . . . . Without the benefit of hindsight, the Court must determine whether '[t]he overall investigation . . . was reasonable under the circumstances at the time of the investigation.'" *Rectifier*, 1997 WL 529600, at *7 (quoting *In re Software Toolworks, Inc. Sec. Litig.*, 789 F. Supp. 1489, 1498 n.14 (N.D. Cal. 1992)).

While there is no set checklist that courts must evaluate when considering the defense, courts have considered a number of factors to decide whether an investigation was reasonable under the circumstances, including whether the underwriters did the following:

1.       Employed experienced personnel (*see, e.g.*, *Weinberger*, 1990 WL 260676, at *3; *Rectifier*, 1997 WL 529600, at *8; *Picard*, 1998 WL 513091, at *15);

2.       Retained deal counsel (*see, e.g.*, *Weinberger*, 1990 WL 260676, at *3);

3.       Reviewed "the industry, the company, the company's management, and the company's past and projected . . . sales and financial performance" (*Weinberger*, 1990 WL 260676, at *3) and familiarized themselves with the company's "finances, management, and operations" (*Rectifier*, 1997 WL 529600, at *8);

4.       Conducted interviews of the issuer "covering all aspects of the company's business" (*Weinberger*, 1990 WL 260676, at *3; *accord Rectifier*, 1997 WL 529600, at *8; *Picard*, 1998 WL 513091, at *15);[6]

5.       Conducted interviews of customers, partners, or other relevant third parties (*Weinberger*, 1990 WL 260676, at *3; *Rectifier*, 1997 WL 529600, at *8; *Picard*, 1998 WL 513091, at *15);

6.       Reviewed company documents, including "operating plans, product literature, corporate records, financial statements, contracts, and lists of distributors and customers"

---

[6]    *See also* 17 C.F.R. § 230.176 ("Circumstances affecting the determination of what constitutes reasonable investigation and reasonable grounds for belief under Section 11 of the Securities Act"); *id.* § 230.176(f) (noting that relevant considerations in evaluating due diligence defense include "[r]easonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in the light of the functions and responsibilities of the particular person with respect to the issuer and the filing)").

5

1   (*Weinberger*, 1990 WL 260676, at *3; *accord Rectifier*, 1997 WL 529600, at *8; *Picard*, 1998

2   WL 513091, at *15);

3         7.      Reviewed trade and industry publications (*Weinberger*, 1990 WL 260676, at *3);

4         8.      Appropriately followed up on "any negative or questionable information" and

5   "arrived at informed decisions and opinions" (*id.*); and

6         9.      Obtained written representations regarding the accuracy of the statements in the

7   registration statement from the issuer and its auditors. *Weinberger*, 1990 WL 260676, at *3;

8   *Rectifier*, 1997 WL 529600, at *8; *see also* Gary M. Lawrence, Due Diligence, A Scholarly Study,

9   at 64-68 (2013) (summarizing relevant factors for purposes of due diligence defense).

10         Finally, in addition to showing that they conducted a reasonable investigation, the

11   underwriters must show they did in fact subjectively believe at the time of the IPO that the

12   statements in the registration statement were true. *See Weinberger*, 1990 WL 260676, at *3.  That

13   subjective belief can be established through witness testimony.

14   **SUMMARY OF EVIDENTIARY FACTS[7]**

15         The evidence will show that the Lead Underwriters represented all of the underwriters in

16   the syndicate in connection with their diligence efforts.  The Lead Underwriters' deal teams

17   included dozens of experienced professionals from all relevant specialty groups and with

18   familiarity with the peer-to-peer lending industry generally and LendingClub specifically.

19         The underwriters requested, and thereafter reviewed, a vast array of documents from

20   Lending Club, including LendingClub's detailed financial records, documents describing

21   LendingClub's business and operations, loan origination and borrower and investor packets, and

22   information regarding LendingClub's corporate structure and management.  In addition to

23   reviewing documents, the underwriters conducted extensive interviews with LendingClub's

24   management team, four different independent auditors, and relevant third parties, including

25   LendingClub's investors, customers, and business partners such as WebBank.  The underwriters

26   followed up on any questions raised by the documents or during diligence calls that required

27   _____

28   [7]    The evidentiary facts and the detailed record support for those facts are set forth in Appendix B.  For the Court's convenience, Appendix A sets forth only the evidentiary facts.

clarification.  The underwriters also actively participated in the drafting of LendingClub's Registration Statement over a period of months, carefully assessing the language proposed by the company or its counsel in the context of information learned during the diligence process.

Diligence did not reveal any concerns relating to the substantive issues raised in this case. Both LendingClub and its auditors represented that the company's internal controls were adequate and identified no concerns regarding significant control issues.  Nor were there any concerns about LendingClub's data integrity and security protocols.  LendingClub, certain individual members of its management team, and Deloitte expressly confirmed the absence of any undisclosed related-party transactions.  The underwriters obtained appropriate representations and comfort letters from LendingClub and its counsel and all four of the relevant auditors regarding the accuracy of the Registration Statement.  These representations reinforced the information independently learned by the underwriters during diligence.

By the time the Registration Statement went effective, each of the underwriters had a reasonable basis to believe, and subjectively believed, that the statements therein were true and correct in all material respects.

### NO RELIANCE ON COUNSEL OR "UNFAIRNESS" TO LEAD PLAINTIFF

The Underwriter Defendants will not seek to meet their burden of proving due diligence in whole or in part by relying on privileged communications with or advice provided by deal counsel, as shown above and by the evidentiary facts in Appendix A.  While defendants in some cases may choose to take a different approach and rely on counsel, the Underwriter Defendants need not and will not do so here.  The Underwriter Defendants will *not* offer evidence (whether documentary or testimonial) (i) that counsel advised them that their due diligence investigation was reasonable, (ii) that counsel told them additional disclosure was not legally required, or (iii) that their subjective belief that the Registration Statement was accurate in all material respects was based on counsel's opinion that it was.  They will not offer any legal analysis by counsel on any topic.[8]  By choosing not to waive privilege, of course, the Underwriter Defendants are unable

---

[8]   The Underwriter Defendants also will not be relying affirmatively on the standard negative assurance letter they received from their deal counsel as a condition of closing, in which

to rely on privileged communications with their counsel and advice of their counsel that is in fact

helpful to their diligence defense. The Court will have the opportunity to see, should it elect to

conduct an *in camera* review, that the withheld and redacted materials would support rather than

undermine the defense. *See, e.g.*, Ex. 4, November 20, 2014 Goldman Sachs Confidential

Commitments Committee Memo Addendum, GS_LC_00003430-51, at 5-6.[9]

    Counsel for Lead Plaintiff argued that "we really are having both hands tied behind our

backs" because underwriters are able to immunize their due diligence process from discovery by

virtue of retaining counsel. Dkt. 299 (12/7/17 Tr.) at 6:7-13. Counsel suggested that, as "a matter

of fairness," the underwriters should not be permitted to argue that they conducted a reasonable

investigation while withholding information their lawyers may have provided to them during due

diligence. *Id.* at 7:2-6; *see also, e.g., id.* at 36:15-22 ("[F]or them to stand up in front of a jury and

say, 'This was a reasonable investigation, we believed in the accuracy and completeness of that,'

but then prevent us from getting all of the information that they had from LendingClub, prevent us

from getting all the information that their lawyers provided them, all of the impressions their

---

counsel confirmed that "nothing came to our attention causing us to believe that . . . the Registration Statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." MS_LC_00071583-86, at 3. (Negative assurance letters are not statements of opinion by underwriter's counsel, but rather are factual (and non-privileged) statements of counsels' subjective belief that they are not aware of any inaccuracies in the registration statement. *See* American Bar Association, Negative Assurance in Securities Offerings, 59 The Business Lawyer 1513, 1514 (2004).) To be clear, the Underwriter Defendants do not plan to offer the negative assurance letter in the first instance as evidence in support of their due diligence defense because they will not be relying on any statement of counsel to support their belief that the Registration Statement was accurate. However, if Lead Plaintiff suggests that counsel may have learned information during diligence that could have led it to doubt the accuracy of statements in the Registration Statement, the Underwriter Defendants would introduce counsel's negative assurance letter as rebuttal evidence. The letter also addresses the Court's expressed concern over the "hypothetical [in which] . . . the investment bankers were on notice from the lawyers themselves that there's a problem." Dkt. 299 (12/7/17 Hrg. Tr.) at 14:18-20. For the reasons set forth in prior briefing in this case, however, even affirmative use of the negative assurance letter should not result in any waiver because it does not rely on or introduce any privileged advice of or communications with counsel. Nevertheless, the Underwriter Defendants seek to obviate any possible waiver argument by forgoing affirmative reliance on the negative assurance letter.

[9]    All citations herein are to documents produced in this action. For the convenience of the Court, the Underwriter Defendants have attached certain representative documents to the Declaration of Simona G. Strauss submitted herewith (as indicated by "Ex. ___" herein) and will provide copies of any other referenced materials at the Court's request.

UNDERWRITER DEFS.' SUBMISSION RE: DUE DILIGENCE          CASE NO. 3:16-cv-02627-WHA

1    lawyers gave them of these transactions, that is not fair.").

2         Precisely the opposite is true.  Lead Plaintiff will have access to **all** factual information

3    learned during due diligence (whether by the underwriters or by counsel) as well as facts reflecting

4    the diligence process itself.  Lead Plaintiff will not be deprived of any "information that [the

5    underwriters] had from LendingClub," *id.*, any answer given in response to questions during a due

6    diligence call, or any document provided in response to a diligence request, whether counsel was

7    involved or not.  To the extent counsel was involved in fact-gathering vis-à-vis the issuer and third

8    parties in connection with the due diligence process, that involvement—and all of the facts

9    gathered by counsel —are not privileged in the first place.  Lead Plaintiff will have a complete

10   factual record reflecting the diligence process and all facts uncovered during that process.

11        Thus, contrary to Lead Plaintiff's suggestion, there is no claim of any so-called "check box

12   form of immunity."  Dkt. 299 at 6:11-12.  The underwriters conducted the diligence investigation,

13   and deal counsel's participation in the process does nothing to shield any factual information from

14   discovery.  Lead Plaintiff's contention that counsel was "the center of the 'due-diligence'

15   universe," Dkt. 279 (Motion to Compel) at 7:8-9, is belied by the evidence the Underwriter

16   Defendants have produced already and will offer in support of their defense.[10]

17                              **CONCLUSION**

18        For the reasons set forth above, the Underwriter Defendants respectfully submit that Lead

19   Plaintiff's motion to compel the production of withheld materials (Dkt. 279) should be denied.

20   Dated: December 27, 2017                    SIMPSON THACHER & BARTLETT LLP

21

22                                 By:    /s/ Simona G. Strauss
                                          SIMONA G. STRAUSS

23                                        *Attorneys for the Underwriter Defendants*

24   _____

25   [10]  *See, e.g.*, Ex. 11, July 2014 Morgan Stanley and Goldman Sachs slide deck,
      MS_LC_00013195-98, at 3 (reflecting that "Morgan Stanley's equity research team will lead
      the discussions" with LendingClub partners about their experiences with LendingClub); *see
26    also* MS_LC_00013203-11 (same); MS_LC_00013187-90, at 3 ("Morgan Stanley's equity
      research team will lead the discussions" with LendingClub investors); MS_LC_00066564-
27    67, at 6565-66 (advising LendingClub that, generally, a Morgan Stanley "analyst runs a
      majority of the dialogue and the syndicate listens to the call to benefit from the diligence,"
28    but that these other call participants also may ask questions).

                                        9

<u>**APPENDIX A:**</u>

<u>**EVIDENTIARY FACTS IN SUPPORT OF STATUTORY DUE DILIGENCE DEFENSE**</u>

The Underwriter Defendants proffer the following evidentiary facts that will be at the core of their due diligence defense, none of which turns on advice of counsel.  Appendix B sets forth the documents and testimony, including declarations submitted herewith,[11] that the Underwriter Defendants expect to introduce to support those facts.[12]

**I.     The Lead Underwriters' Investigation in Connection with LendingClub's IPO Was Reasonable**

**A.     Overview of Diligence Process**

1.     Morgan Stanley and Goldman Sachs, the two active bookrunners for the LendingClub IPO, represented and acted on behalf of the entire underwriting syndicate during due diligence.

2.     The Lead Underwriters conducted their investigation using large, experienced teams of bankers with a reservoir of knowledge drawn from many decades of relevant experience, spanning a variety of specialties that included not only investment banking but also the technology sector, corporate finance, capital markets, financial institutions, and others.  The Lead Underwriters employed team members with skill sets appropriate to an offering of this type and staffed diligence calls and meetings with professionals knowledgeable about the subject matter being covered.

3.     The Lead Underwriter teams possessed deep familiarity even before the IPO process began both with LendingClub's industry generally (the P2P lending space) and with LendingClub specifically.

---

[11]     The Underwriter Defendants have submitted declarations from Kristopher Caldwell (from Morgan Stanley) and Gerry Walters (from Wells Fargo).  Mr. Walters was scheduled to be deposed before the offer of proof was due, but, because Lead Plaintiff stated that it wanted to see the offer of proof before taking the deposition, the Underwriter Defendants are unable to cite to a deposition transcript.

The Underwriter Defendants have provided citations to the current documentary record and have anticipated the key witness testimony that will be offered in support of their diligence defense.  Because document production in this action has not been completed, and no defendants have yet been deposed, the Underwriter Defendants expect that the record supporting their due diligence efforts will be augmented by the time fact discovery is completed on April 25, 2018.  In addition, the documents cited in support of any particular evidentiary fact are not an exhaustive list of documents that may be introduced to support that fact.

[12]     The Underwriter Defendants do not believe that introduction of any of the evidentiary facts herein supports a waiver of privilege.  To the extent the Court has concerns about any evidentiary fact, however, the Underwriter Defendants respectfully request the opportunity to discuss the matter with the Court or to forgo reliance on such fact.

4.     The Lead Underwriters performed an extensive review of industry literature, case studies, and internal resources on the P2P lending field even before the IPO process began and throughout the diligence process.

5.     The Underwriter Defendants retained O'Melveny & Myers ("OMM") as their IPO deal counsel.

6.     In coordination with Goldman Sachs, Morgan Stanley retained Kroll to conduct an investigation into LendingClub, its management, and its key partners, including its issuing bank, WebBank.  Kroll provided the Lead Underwriters with reports summarizing the results of its investigation.

7.     The Lead Underwriters developed a detailed, comprehensive due diligence plan tailored specifically to the IPO of a company in the P2P lending space that included interviews and meetings with senior LendingClub management, operating and financial personnel, and in-house and outside counsel; reviews of historical and projected financial and operating results; reviews of market research; legal/document/IP due diligence reviews; interviews with LendingClub's auditors; and interviews with key LendingClub customers and partners to verify information provided by LendingClub regarding the operation of its lending and investing platform.

8.     The Lead Underwriters submitted more than 200 detailed document requests to LendingClub covering all aspects of its business, including requests for corporate records, detailed financial reporting and accounting records, complete borrower and investor packages, partner agreements, sales and marketing documents, legal and regulatory information, and a broad array of other areas.

9.     LendingClub provided the underwriters with access to an extensive data room for the transaction and posted documents in response to the diligence requests set forth above.  The data room included organizational charts; documents concerning LendingClub's corporate structure and foundational corporate records; board and shareholder minutes; documents relating to securities issuances and stock sales; detailed financial and accounting statements showing LendingClub's historical and projected financial performance; comprehensive descriptions of LendingClub's business model, operations, and platform; examples of loan origination, loan sale, and transaction documents used by borrowers and investors on the platform; lists identifying and contracts with key LendingClub partners, customers, and investors; sales and marketing materials; third-party service provider agreements relating to, *inter alia*, fraud detection; documents pertaining to the model employed by LendingClub and its issuing bank, WebBank; litigation and audit records; regulatory filings; and extensive information and disclosures regarding LendingClub officers, directors, and key personnel.

10.    Before the registration statement was first filed in August 2014, and again before the Registration Statement went effective in December 2014, the underwriters prepared detailed committee memos summarizing the comprehensive due diligence conducted, their findings during diligence, and a thorough description of LendingClub's business, finances, platform, operations, and potential risk areas.  The committee approval process, which included specific follow-up questions from the committees and numerous calls and meetings to vet

the information obtained through due diligence, provided another level of scrutiny as to the offering and the diligence performed.

### B.   Detailed Summary of Due Diligence

### Organizational Meetings with LendingClub Management

11.   On May 29, 2014, the Lead Underwriters attended an all-day organizational meeting with LendingClub's senior management, during which they were presented with a comprehensive overview of the business, strategy, sales and marketing, technology, products and financials.

12.   On July 1, 2014, the full syndicate attended an all-day organizational meeting with LendingClub management that included a detailed, 85-page slide deck covering an overview of the company, credit decisioning and operations, borrower and investor strategies, legal, risk factors, the company's financials, and extensive other information about the company. The topics in the deck were discussed during the meeting.

### Audit-Related Diligence Calls

13.   On July 31, 2014, the underwriters participated in a diligence call with Armanino LLP ("Armanino"), LendingClub's auditors for FY 2009-11.  Questions discussed during that call included the following: "Were there any concerns regarding your access to all necessary information, management personnel or timeliness of requested information/access?"  "Were any limitations or restrictions imposed on the scope of your prior reviews/audit?"  "Discuss any deficiencies, material issues or reportable conditions of which you are aware that were raised in management letters or reports by your accounting firm or prior accounting firms."  "Do you anticipate being able to deliver, in a timely manner, the draft comfort letter to the underwriters at the time of the initial filing of the S-1 and in connection with the pricing of this offering?"

14.   On August 13, 2014, the underwriters conducted follow-up diligence with Armanino to clarify information regarding the firm's qualifications, its experience in the P2P lending space, and the process by which LendingClub transitioned to a new audit firm, Grant Thornton, for FY 2012.

15.   On July 31, 2014, the underwriters participated in a diligence call with Auerr, Zajac & Associates, LLP ("Auerr Zajac"), the auditors for Springstone, a company acquired by LendingClub in early 2014.  Questions discussed during that call included many of those posed to Armanino, but also included the following:  "Are you aware of any significant deficiencies in the design or operation of Springstone's internal controls which could adversely affect the ability to record, process, summarize and report financial and other data?"  "Are you aware of any misconduct, whether or not material, that involves management or Springstone employees who have a significant role in internal controls?"

16.   On August 13, 2014, the underwriters held a follow-up due diligence call with Auerr Zajac to discuss any historical audit risks or deficiencies it had identified for Springstone.

17.   On August 1, 2014, the underwriters participated in a diligence call with Grant Thornton LLP ("Grant Thornton"), LendingClub's auditors for FY2012. The questions discussed during this call were similar to the questions for Armanino.

18.   On August 1, 2014, the underwriters attended a diligence call with Deloitte, LendingClub's auditors beginning in FY 2013 and at the time of the IPO. They discussed questions similar to those set forth above for Armanino and Grant Thornton, including whether Deloitte anticipated being able to deliver a timely comfort letter.

19.   On October 3, 2014, the underwriters conducted a follow-up diligence call with Deloitte regarding issues surrounding the Springstone acquisition, including Deloitte's diligence conducted in connection with the acquisition, Deloitte's areas of focus in reviewing Springstone's financials, and the process of integrating Springstone's financials and accounting processes post-acquisition.

20.   On August 1, 2014, the underwriters participated in a diligence call with Hans Morris, LendingClub's Audit Committee Chair. Among the questions they discussed were the following: "How adequate are the Company's controls and procedures relative to any prior experiences you may have been involved with?" "How adequate are the Company's auditors? Do you have any issues or concerns with their work performance to date?" "Please discuss any significant disagreement between the Company and/or the Audit Committee and the auditors during the process of auditing the Company's financial statements and explain how such disagreement was resolved."

### Partner, Customer, and Investor Diligence Calls

21.   The underwriters conducted diligence with respect to LendingClub investors, partners, and customers to obtain independent verification regarding the operation and effectiveness of LendingClub's platform.

22.   On August 7, 2014, the underwriters conducted a diligence call with Jonathan Morris, the Director of Titan Bank, one of LendingClub's top investors.

23.   On November 14, 2014, the underwriters conducted a diligence call with Stefan Clulow, the Managing Director of Thomvest, another significant investor in LendingClub.

24.   On July 31, 2014 and November 18, 2014, the underwriters conducted partner due diligence calls with Jim Jackson and others at WebBank, which covered the relationship between LendingClub and WebBank and the regulatory framework governing this relationship.

25.   On November 18, 2014, the underwriters conducted a diligence call with Andrew Hallowell, the founder and CEO of Arcadia Funds (the company that manages Cirrix), in which Hallowell described Arcadia's history with LendingClub and experience investing on the LendingClub platform.

**Additional Diligence Calls**

26. The underwriters conducted extensive diligence into LendingClub's historical and projected financial performance and other areas, including the Investment Company Act, data privacy, Consumer Financial Protection Board regulatory issues, anti-money laundering and FCPA questions, other legal and regulatory issues, and LendingClub's loan collections processes.

**Bring-Down Calls**

27. On August 26, 2014, one day before the filing of LendingClub's initial registration statement, the underwriters held a comprehensive "bring-down call" with LendingClub and Deloitte covering any material developments since the July 1, 2014 organizational meeting.

28. On November 30, 2014, the underwriters held another comprehensive "pre-launch bring-down diligence call with the Company" covering any material developments since the August 26, 2014 bring-down call.

### C. The Lead Underwriters Followed Up on Any Questions or Areas of Concern

29. The Lead Underwriters did not simply rely on and accept without question representations by LendingClub management.  Instead, the Lead Underwriters carefully assessed information received from management in light of other interviews conducted and documents reviewed during diligence.  The Lead Underwriters repeatedly followed up with LendingClub and its auditors on any questions raised during diligence, any areas that required clarification, and any topics that were not fully covered in the first round of diligence calls.

30. As an example of the underwriters' follow-up efforts, on October 9, 2014, the underwriters held a follow-up diligence call with LendingClub regarding a small set of loans LendingClub had mischaracterized in October 2014 before the problem was corrected a week later.  The underwriters scheduled this supplemental call to gather additional facts surrounding the error and its magnitude, clarify how it occurred, and gain a better understanding of the corrective measures the company had adopted in response to the problem.

### D. The Lead Underwriters Actively Participated in the Registration Statement Drafting Process

31. The Lead Underwriters actively participated in the preparation of LendingClub's Registration Statement over a period spanning several months.  The Lead Underwriters prepared initial drafts of certain sections, carefully reviewed initial drafts of other sections prepared by the company and its counsel, and compared the statements in all initial and subsequent drafts to the results of the underwriters' own diligence, offering significant comments and proposed revisions throughout the process.

## II.   Diligence Did Not Reveal Any Concerns as to Any Substantive Issue in This Case

32. In response to their diligence requests, the Underwriter Defendants did not receive any information from any sources that raised concerns about the central substantive issues in the case, including the adequacy of LendingClub's internal financial controls, LendingClub's

relationship with Cirrix, or the adequacy of LendingClub's data integrity and security protocols.

## III.   The Junior Underwriters Reasonably Relied on the Lead Underwriters to Conduct the Due Diligence Process

33.   Credit Suisse, Citi, Allen & Co., Stifel, BMO, William Blair, and Wells Fargo, the seven junior underwriters in the syndicate (the "Junior Underwriters"), relied on the due diligence conducted by the Lead Underwriters as representatives of the underwriting syndicate.

34.   Before agreeing to enter into the syndicate, the Junior Underwriters were aware that Morgan Stanley and Goldman Sachs were the Lead Underwriters for this offering.  Based on their familiarity and prior experiences with the Lead Underwriters, the Junior Underwriters believed the Lead Underwriters to be seasoned, experienced, and capable in conducting the due diligence process on behalf of the syndicate.

35.   The Junior Underwriters were aware and took reasonable steps to confirm that the Lead Underwriters were conducting a diligent investigation, including receiving calendar invitations to diligence calls and lists of questions before the calls, participating in the calls themselves and thus independently verifying the questions asked and the answers received, and following up with the Lead Underwriters regarding the diligence.

36.   The fact that the Junior Underwriters largely delegated due diligence efforts to the Lead Underwriters was appropriate under the circumstances.[13]

## IV.   The Underwriters Received Appropriate Representations, Warranties, Certifications, and Comfort Letters Regarding the Information Contained in the Registration Statement

37.   On December 10, 2014, LendingClub represented to the underwriters that "the Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, will not contain, as of the date of such amendment or supplement, any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

38.   In connection with the closing of the IPO, the Underwriter Defendants received a certificate from LendingClub's CFO and comfort letters from Grant Thornton, Armanino, Auerr Zajac, and Deloitte, the four audit firms that had audited LendingClub or Springstone for the five years before the IPO.  Collectively, these documents represented that the consolidated financial statements included in the Registration Statement were accurate and complied with all applicable accounting and regulatory requirements.

39.   In connection with the closing, the Underwriter Defendants received a certification from LendingClub's CEO that the representations and warranties in the Underwriting Agreement are true and correct.  The Underwriter Defendants also received opinion letters from

---

[13]   *See also* 17 C.F.R. § 230.176(g) (noting that relevant considerations in evaluating an underwriter's due diligence defense include "the type of underwriting arrangement" and "the role of the particular person as an underwriter").

Fenwick & West (LendingClub's deal counsel), Arnold & Porter (LendingClub's special regulatory counsel), and K&L Gates (LendingClub's special counsel with respect to the Investment Company Act of 1940) as to the accuracy of statements in the Registration Statement.

**V.     The Underwriter Defendants Believed That the Statements in the Registration Statement Were True and Complete**

40.   The Underwriter Defendants subjectively believed as a result of their investigation that, at the time the Registration Statement became effective, the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements not misleading.

Underwriter Defs.' Submission re: Due Diligence          Case No. 3:16-cv-02627-WHA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX B:**

**RECORD CITES IN SUPPORT OF EVIDENTIARY FACTS[14]**

| | |
|---|---|
| **Evidentiary Fact 1:** Morgan Stanley and Goldman Sachs, the two active bookrunners for the LendingClub IPO, represented and acted on behalf of the entire underwriting syndicate during due diligence. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | <ul><li>December 10, 2014 Underwriting Agreement, GS_LC_00000175-228, at 1 (providing that Morgan Stanley and Goldman Sachs are "Representatives" of the syndicate).</li><li>Master Agreement Among Underwriters, GS_LC_00000237-69 (terms of syndicate).</li><li>Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 2 (setting forth underwriter allocations).</li><li>Testimony of witnesses from the Lead Underwriters, including Kristopher Caldwell of Morgan Stanley and Ryan Nolan of Goldman Sachs, and witnesses from some or all of the seven junior underwriters.[15]</li></ul> |

---

[14]   Fact discovery in this action is not yet complete, and the Underwriter Defendants had less than two weeks to prepare this offer of proof. The Underwriter Defendants therefore may identify additional evidence that has not been cited herein to support the evidentiary facts showing their due diligence. Any such evidence will not rely on or incorporate the advice of counsel.

[15]   The Underwriter Defendants have identified in good faith two witnesses for the Lead Underwriters who will likely testify on the matters set forth herein, without prejudice to a later determination that other or additional witnesses would be called. Any additional witnesses would be expected to offer testimony similar in kind to that described here.

UNDERWRITER DEFS.' SUBMISSION RE: DUE DILIGENCE          CASE NO. 3:16-CV-02627-WHA

***Evidentiary Fact 2:***  The Lead Underwriters conducted their investigation using large, experienced teams of bankers with a reservoir of knowledge drawn from many decades of relevant experience, spanning a variety of specialties that included not only investment banking but also the technology sector, corporate finance, capital markets, financial institutions, and others.  The Lead Underwriters employed team members with skill sets appropriate to an offering of this type and staffed diligence calls and meetings with professionals knowledgeable about the subject matter being covered.

| | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Ex. 1, Working Group List ("WGL"), MS_LC_00000001-24, at 3-5 (14 different non-legal Morgan Stanley employees at multiple levels of seniority in five different specialty areas); *id.* at 6-7 (9 different non-legal Goldman Sachs employees at several levels of seniority).<br><br>• August 4, 2014 internal Goldman Sachs email, GS_LC_00009464 (email from member of Goldman Sachs IPO deal team to Managing Director of Financial Institutions Group at Goldman Sachs with experience at FDIC, soliciting expertise on WebBank and certain banking regulations that deal team should be considering as part of IPO).<br><br>• Ex. 2, August 6, 2014 internal Goldman Sachs email, GS_LC_00001360 (email involving Goldman Sachs deal team reflecting team's leverage of expertise of more than seven internal specialists "to make sure that we understand all of these issues [associated with LendingClub's business and highly-regulated industry] and have a view of all of the companies").<br><br>• Ex. 3, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo, GS_LC_00011324-83, at 3 ("Significant time spent with internal experts in [Financial Institutions Group] and compliance to supplement the deal team").<br><br>• Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 7-8 (summarizing meeting between Goldman Sachs FIG Managing Director and LendingClub CEO Laplanche).<br><br>• Caldwell Decl. ¶ 5.<br><br>• Testimony of witnesses for the Lead Underwriters. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| **Evidentiary Fact 3:** The Lead Underwriter teams possessed deep familiarity even before the IPO process began both with LendingClub's industry generally (the P2P lending space) and with LendingClub specifically. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Ex. 3, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo, GS_LC_00011324-83, at 3, 5-6 (describing industry experience of Goldman Sachs team and noting that key members of team had conducted due diligence on LendingClub as early as 2013).<br><br>• Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 2 (noting industry knowledge of Morgan Stanley team, which had engaged in "continuous coverage efforts" with respect to LendingClub well before IPO).<br><br>• Testimony of witnesses for the Lead Underwriters. |

| | |
|---|---|
| **Evidentiary Fact 4:** The Lead Underwriters performed an extensive review of industry literature, case studies, and internal resources on the P2P lending field even before the IPO process began and throughout the diligence process. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Celent, Celent Model Bank 2013 (February 26, 2013), MS_LC_00008774-869 (case studies on effective use of technology in banking). <br><br> • Corporate Insight, Inc., Peer-to-Peer Lending: Examining the Industry and the Borrower Experience (October 2013), MS_LC_00008907-32 (overview and study of P2P lending industry). <br><br> • Pepper Hamilton, Crowdfunding and Peer-to-Peer Lending: Legal Framework and Risks (December 18, 2013), MS_LC_00008706-31 (legal symposium overview materials). <br><br> • Grant Thornton, Alternative Lending: A Regulatory Approach to Peer-to-Peer Lending (2014), MS_LC_00009020-31 (overview of regulatory framework for P2P lending). <br><br> • Liberium Capital Limited, P2P Lending: Opportunity and How to Invest (March 11, 2014), MS_LC_00008870-904 (materials on P2P investment structure). <br><br> • Chapman and Cutler LLP, The Regulation of Peer-to-Peer Lending (April 2014), MS_LC_00009161-204 (summary of principal issues concerning regulation of P2P lending industry). <br><br> • Testimony of witnesses for the Lead Underwriters. |

| **Evidentiary Fact 5:** The Underwriter Defendants retained OMM as their IPO deal counsel. | |
|---|---|
| **Role of counsel implicated or referenced?** | Yes.  The fact that OMM was retained as deal counsel is not privileged and has been disclosed.  The Underwriter Defendants will refer to the (non-privileged) fact that OMM assisted in the due diligence process by drafting diligence questions and coordinating diligence meetings (*e.g.*, sending calendar invites). |
| **Record cites to support evidentiary fact:** | • Ex. 1, WGL, MS_LC_00000001-24, at 23 (listing OMM team members).<br><br>• Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 3.<br><br>• Testimony of witnesses for the Lead Underwriters. |

| **Evidentiary Fact 6:** In coordination with Goldman Sachs, Morgan Stanley retained Kroll to conduct an investigation into LendingClub, its management, and its key partners, including its issuing bank, WebBank.  Kroll provided the Lead Underwriters with reports summarizing the results of its investigation. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • July 11, 2014 Kroll Screening Level Review, MS_LC_00010841-952 (report covering LendingClub management and Board).<br><br>• September 23, 2014 Kroll Screening Level Review, MS_LC_00011147-244 (supplemental report covering Springstone Financial (acquired by LendingClub in April 2014), WebBank, FOLIOfn (LendingClub's investment platform), and other LendingClub affiliates and partners).<br><br>• Testimony of witnesses for the Lead Underwriters. |

App. B-3

Underwriter Defs.' Submission re: Due Diligence          Case No. 3:16-cv-02627-WHA

***Evidentiary Fact 7:*** The Lead Underwriters developed a detailed, comprehensive due diligence plan tailored specifically to the IPO of a company in the P2P lending space that included interviews and meetings with senior LendingClub management, operating and financial personnel, and in-house and outside counsel; reviews of historical and projected financial and operating results; reviews of market research; legal/document/IP due diligence reviews; interviews with LendingClub's auditors; and interviews with key LendingClub customers and partners to verify information provided by LendingClub regarding the operation of its lending and investing platform.

| Role of counsel implicated or referenced? | No.[16] |
|---|---|
| **Record cites to support evidentiary fact:** | <ul><li>May 29, 2014 Project Marina: IPO Preparation and Process, MS_LC_00013348-61 (reflecting IPO timeline, workstreams, and due diligence procedures).</li><li>July 2014 Initial Filing Workstreams and Timeline, GS_LC_00001860-64, at 3-5 (describing "Business," "Financial," "Legal," "Customer," "Analyst Organizational Meeting," and "Auditor" diligence).</li><li>Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 3.</li><li>Caldwell Decl. ¶ 9.</li><li>Testimony of witnesses for the Lead Underwriters.</li></ul> |

---

[16] As reflected herein, very few of the evidentiary ***facts*** supporting the Underwriter Defendants' due diligence defense – as presented by the Underwriter Defendants – implicate the role of counsel in any way. For example, that the Lead Underwriters attended a diligence call, asked questions on the call, and took notes does not implicate OMM or even reference its participation during diligence. This is true ***even if*** OMM sent the calendar invitation for the call, participated on the call, or drafted the questions that were raised on the call. To the extent Lead Plaintiff chooses to elicit testimony about OMM's non-privileged participation during diligence, it may do so. But Lead Plaintiff cannot force waiver of privilege by the Underwriter Defendants by asking about activities of OMM that do not form the basis for the underwriters' diligence defense. *See, e.g., In re Method of Processing Ethanol Byproducts & Related Subsystems ('858) Patent Litig*, No. 1:10-ml-2181-LJM-DML, 2014 WL 2938183, at *3 (S.D. Ind. June 30, 2014) (noting in patent action that party could not "force" opponent to waive privilege by "eliciting testimony" regarding advice of counsel in connection with patent prosecution issues).

| | |
|---|---|
| ***Evidentiary Fact 8:*** The Lead Underwriters submitted more than 200 detailed document requests to LendingClub covering all aspects of its business, including requests for corporate records, detailed financial reporting and accounting records, complete borrower and investor packages, partner agreements, sales and marketing documents, legal and regulatory information, and a broad array of other areas. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | <ul><li>Ex. 6, June 23, 2014 Due Diligence Request List for IPO, GS_LC_00011909-24.</li><li>June 23, 2014 Appendix to IPO Due Diligence Request List, GS_LC_00011949-55.</li><li>Testimony of witnesses for the Lead Underwriters and LendingClub.</li></ul> |

1
2
3
4
5
6
7
8
9

| | |
|---|---|
| ***Evidentiary Fact 9:*** LendingClub provided the underwriters with access to an extensive data room for the transaction and posted documents in response to the diligence requests set forth above. The data room included organizational charts; documents concerning LendingClub's corporate structure and foundational corporate records; board and shareholder minutes; documents relating to securities issuances and stock sales; detailed financial and accounting statements showing LendingClub's historical and projected financial performance; comprehensive descriptions of LendingClub's business model, operations, and platform; examples of loan origination, loan sale, and transaction documents used by borrowers and investors on the platform; lists identifying and contracts with key LendingClub partners, customers, and investors; sales and marketing materials; third-party service provider agreements relating to, *inter alia*, fraud detection; documents pertaining to the model employed by LendingClub and its issuing bank, WebBank; litigation and audit records; regulatory filings; and extensive information and disclosures regarding LendingClub officers, directors, and key personnel. | |

10
11
12

| **Role of counsel implicated or referenced?** | No. |
|---|---|

13
14
15
16
17

| **Record cites to support evidentiary fact:** | • Ex. 7, July 23, 2014 Document Index for LendingClub data room, MS_LC_00071308-34 (27-page interim summary of documents contained in data room at that time).<br><br>• Caldwell Decl. ¶¶ 12-13.<br><br>• Testimony of witnesses for the Lead Underwriters and LendingClub. |
|---|---|

18
19
20
21
22
23
24
25
26
27
28

***Evidentiary Fact 10:***  Before the registration statement was first filed in August 2014, and again before the Registration Statement went effective in December 2014, the underwriters prepared detailed committee memos summarizing the comprehensive due diligence conducted, their findings during diligence, and a thorough description of LendingClub's business, finances, platform, operations, and potential risk areas.  The committee approval process, which included specific follow-up questions from the committees and numerous calls and meetings to vet the information obtained through due diligence, provided another level of scrutiny as to the offering and the diligence performed.

| | |
|---|---|
| **Role of counsel implicated or referenced?** | No.[17] |
| **Record cites to support evidentiary fact:** | • Ex. 3, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo, GS_LC_00011324-83 (60-page memo setting forth summary of due diligence efforts, risk factors and potential mitigating factors, and explication of LendingClub business). <br><br> • Ex. 8, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00008733-38. <br><br> • August 10, 2014 Morgan Stanley EUC Memo, MS_LC_00066115-60 (46-page memo). <br><br> • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 2-13 (describing "respon[ses] to the Committee's specific follow-up items" and new matters since August memo). <br><br> • Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012 (59-page memo updating August memo). <br><br> • Testimony of witnesses for the Lead Underwriters and LendingClub. |

---

[17] The few redacted portions of the committee memos that reflect legal advice (all in areas that are unrelated to the due diligence defense or any issue in this case) are available for the Court's *in camera* review.  *See, e.g.*, Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 23 (issue relating to LendingClub option issuances); *id.* at 24 (issue concerning Investment Company Act).

| | |
|---|---|
| ***Evidentiary Fact 11:***  On May 29, 2014, the Lead Underwriters attended an all-day organizational meeting with LendingClub's senior management, during which they were presented with a comprehensive overview of the business, strategy, sales and marketing, technology, products and financials. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • May 7, 2014 Organizational Meeting Topics, MS_LC_00031886-89 (summarizing topics discussed, including company overview and strategy, operations and marketing, risk management, technology, legal, and historical and projected financial performance).<br><br>• Ex. 3, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo, GS_LC_00011324-83, at 6 (summarizing organizational meeting).<br><br>• Testimony of witnesses for the Lead Underwriters and LendingClub. |

| | |
|---|---|
| ***Evidentiary Fact 12:***  On July 1, 2014, the full syndicate attended an all-day organizational meeting with LendingClub management that included a detailed, 85-page slide deck covering an overview of the company, credit decisioning and operations, borrower and investor strategies, legal, risk factors, the company's financials, and extensive other information about the company.  The topics in the deck were discussed during the meeting. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • July 1, 2014 Discussion Materials, GS_LC_00007501-85.<br><br>• July 10, 2014 internal Wells Fargo email, WF_LC_00001724-1809 (enclosing slide deck with notes).<br><br>• Testimony of witnesses from the Lead Underwriters, the Junior Underwriters and LendingClub. |

| | |
|---|---|
| **Evidentiary Fact 13:**  On July 31, 2014, the underwriters participated in a diligence call with Armanino, LendingClub's auditors for FY 2009-11.  Questions discussed during that call included the following: "Were there any concerns regarding your access to all necessary information, management personnel or timeliness of requested information/access?"  "Were any limitations or restrictions imposed on the scope of your prior reviews/audit?"  "Discuss any deficiencies, material issues or reportable conditions of which you are aware that were raised in management letters or reports by your accounting firm or prior accounting firms."  "Do you anticipate being able to deliver, in a timely manner, the draft comfort letter to the underwriters at the time of the initial filing of the S-1 and in connection with the pricing of this offering?" | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • July 29, 2014 call invite, GS_LC_00001737-38.<br><br>• July 29, 2014 Accounting Due Diligence Questions for Armanino, GS_LC_00001739-40 (setting out 15 detailed questions, including those excerpted above).<br><br>• August 7, 2014 Goldman Sachs Project Marina Due Diligence Call Notes ("GS Due Diligence Call Notes"), GS_LC_00007931-58, at 7935 (providing detailed summary of diligence call with Armanino).<br><br>• Testimony of witnesses for the Lead Underwriters and a representative of Armanino who attended the diligence call.[18] |

---

[18]   Although the Underwriter Defendants have not yet decided whether they will call any non-parties as witnesses, Lead Plaintiff is free to depose any of those third parties and ask about their interactions with the underwriters.

| | |
|---|---|
| ***Evidentiary Fact 14:***  On August 13, 2014, the underwriters conducted follow-up diligence with Armanino to clarify information regarding the firm's qualifications, its experience in the P2P lending space, and the process by which LendingClub transitioned to a new audit firm, Grant Thornton, for FY 2012. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 13, 2014 call invite, MS_LC_00065782. <br><br> • August 13, 2014 Morgan Stanley call notes, MS_LC_00068579-81 (detailed notes for supplemental Armanino call). <br><br> • Testimony of witnesses for the Lead Underwriters and a representative of Armanino who attended the diligence call. |

| | |
|---|---|
| ***Evidentiary Fact 15:***  On July 31, 2014, the underwriters participated in a diligence call with Auerr Zajac, the auditors for Springstone, a company acquired by LendingClub in early 2014. Questions discussed during that call included many of those posed to Armanino, but also included the following:  "Are you aware of any significant deficiencies in the design or operation of Springstone's internal controls which could adversely affect the ability to record, process, summarize and report financial and other data?"  "Are you aware of any misconduct, whether or not material, that involves management or Springstone employees who have a significant role in internal controls?" | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | <ul><li>July 31, 2014 call invite, GS_LC_00001698-99.</li><li>July 31, 2014 Accounting Due Diligence Questions for Auerr Zajac, MS_LC_00069792-93.</li><li>August 7, 2014 GS Due Diligence Call Notes, GS_LC_00007931-58, at 7944 (summarizing Auerr Zajac diligence call).</li><li>Testimony of witnesses for the Lead Underwriters and a representative of Auerr Zajac who attended the diligence call.</li></ul> |

| | |
|---|---|
| **Evidentiary Fact 16:** On August 13, 2014, the underwriters held a follow-up due diligence call with Auerr Zajac to discuss any historical audit risks or deficiencies it had identified for Springstone. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 13, 2014 call invite, MS_LC_00066170.<br><br>• August 13, 2014 Morgan Stanley call notes, MS_LC_00068585-87, at 1 (noting that underwriters requested Auerr Zajac follow-up call to "review [certain] statement[s] for accuracy/clarification/completion").<br><br>• Testimony of witnesses for the Lead Underwriters and a representative of Auerr Zajac who attended the diligence call. |

| | |
|---|---|
| **Evidentiary Fact 17:** On August 1, 2014, the underwriters participated in a diligence call with Grant Thornton, LendingClub's auditors for FY2012. The questions discussed during this call were similar to the questions for Armanino. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 1, 2014 call invite, GS_LC_00001728-29.<br><br>• August 1, 2014 Accounting Due Diligence Questions for Grant Thornton, GS_LC_00001730-31.<br><br>• August 7, 2014 GS Due Diligence Call Notes, GS_LC_00007931-58, at 7948.<br><br>• Testimony of witnesses for the Lead Underwriters and a representative of Grant Thornton who attended the diligence call. |

| | |
|---|---|
| **Evidentiary Fact 18:**  On August 1, 2014, the underwriters attended a diligence call with Deloitte, LendingClub's auditors beginning in FY 2013 and at the time of the IPO.  They discussed questions similar to those set forth above for Armanino and Grant Thornton, including whether Deloitte anticipated being able to deliver a timely comfort letter. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Ex. 9, August 1, 2014 call invite, GS_LC_00001382-83. <br><br> • Ex. 10, August 1, 2014 Accounting Due Diligence Questions for Deloitte, GS_LC_00001725-27. <br><br> • August 7, 2014 GS Due Diligence Call Notes, GS_LC_00007931-58, at 7949-50. <br><br> • Testimony of witnesses for the Lead Underwriters and a representative of Deloitte who attended the diligence call. |

| | |
|---|---|
| **Evidentiary Fact 19:**  On October 3, 2014, the underwriters conducted a follow-up diligence call with Deloitte regarding issues surrounding the Springstone acquisition, including Deloitte's diligence conducted in connection with the acquisition, Deloitte's areas of focus in reviewing Springstone's financials, and the process of integrating Springstone's financials and accounting processes post-acquisition. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • October 3, 2014 call invite, GS_LC_00002917-18 (invite for follow-up call with Deloitte regarding Springstone). <br><br> • October 3, 2014 Morgan Stanley call notes, MS_LC_00062873-75 (summary of follow-up call with Deloitte). <br><br> • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 4 (update regarding issues covered in follow-up Deloitte call). <br><br> • Testimony of witnesses for the Lead Underwriters and a representative of Deloitte who attended the diligence call. |

| | |
|---|---|
| ***Evidentiary Fact 20:***  On August 1, 2014, the underwriters participated in a diligence call with Hans Morris, LendingClub's Audit Committee Chair.  Among the questions they discussed were the following: "How adequate are the Company's controls and procedures relative to any prior experiences you may have been involved with?"  "How adequate are the Company's auditors?  Do you have any issues or concerns with their work performance to date?"  "Please discuss any significant disagreement between the Company and/or the Audit Committee and the auditors during the process of auditing the Company's financial statements and explain how such disagreement was resolved." | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | <ul><li>July 31, 2014 call invite MS_LC_00067994.</li><li>July 31, 2014 Audit Committee Chair Due Diligence Questions, MS_LC_00067995-96.</li><li>August 7, 2014 GS Due Diligence Call Notes, GS_LC_00007931-58, at 7946-47.</li><li>Testimony of witnesses for the Lead Underwriters and Hans Morris.</li></ul> |

| | |
|---|---|
| **Evidentiary Fact 21:**  The underwriters conducted diligence with respect to LendingClub investors, partners, and customers to obtain independent verification regarding the operation and effectiveness of LendingClub's platform. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Ex. 11, July 2014 Partner Due Diligence slide deck, MS_LC_00013195-98 (including illustrative interview questions regarding third-party experiences with LendingClub's platform).<br><br>• July 2014 Customer/Partner Due Diligence slide deck, MS_LC_00013203-11.<br><br>• July 2014 Investor Diligence slide deck, MS_LC_00013187-90 (including illustrative interview questions concerning investors' feedback regarding the platform).<br><br>• July 29, 2014 email from Kristopher Caldwell of Morgan Stanley to LendingClub CFO Dolan and LendingClub GC Altieri, MS_LC_00066564-67, at 6565-66 (requesting "analyst calls with 3-5 institutional investors," as well as WebBank).<br><br>• Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 5 ("We have completed our investor / partner diligence with all requested parties").<br><br>• Caldwell Decl. ¶ 11.<br><br>• Testimony of witnesses for the Lead Underwriters. |

| | |
|---|---|
| **Evidentiary Fact 22:** On August 7, 2014, the underwriters conducted a diligence call with Jonathan Morris, the Director of Titan Bank, one of LendingClub's top investors. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 6, 2014 email from Kristopher Caldwell of Morgan Stanley to underwriting syndicate providing call information, MS_LC_00070251-52. <br><br> • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 20 (summarizing Titan Bank diligence call). <br><br> • Testimony of witnesses for the Lead Underwriters and Jonathan Morris. |

| | |
|---|---|
| **Evidentiary Fact 23:** On November 14, 2014, the underwriters conducted a diligence call with Stefan Clulow, the Managing Director of Thomvest, another significant investor in LendingClub. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • November 14, 2014 call invite, GS_LC_00000404. <br><br> • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 19 (summarizing Thomvest diligence call). <br><br> • Testimony of witnesses for the Lead Underwriters and Stefan Clulow. |

| **Evidentiary Fact 24:** On July 31, 2014 and November 18, 2014, the underwriters conducted partner due diligence calls with Jim Jackson and others at WebBank, which covered the relationship between LendingClub and WebBank and the regulatory framework governing this relationship. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • July 31, 2014 call invite, GS_LC_00001377. <br><br> • July 31, 2014 WebBank Regulatory Diligence Call question list, GS_LC_00001712-19 (list of approximately 70 questions for WebBank). <br><br> • November 18, 2014 call invite, GS_LC_00000402-03. <br><br> • Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 5 ("Completed regulatory on 7/31/14 and commercial on 11/18/14"). <br><br> • Testimony of witnesses for the Lead Underwriters and Jim Jackson. |

| **Evidentiary Fact 25:** On November 18, 2014, the underwriters conducted a diligence call with Andrew Hallowell, the founder and CEO of Arcadia Funds (the company that manages Cirrix), in which Hallowell described Arcadia's history with LendingClub and experience investing on the LendingClub platform. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • November 18, 2014 call invite, GS_LC_00000831-32. <br><br> • Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 5 ("Arcadia Funds – Completed on 11/18/14"). <br><br> • Testimony of witnesses for the Lead Underwriters and Andrew Hallowell. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Evidentiary Fact 26:***  The underwriters conducted extensive diligence into LendingClub's historical and projected financial performance and other areas, including the Investment Company Act, data privacy, Consumer Financial Protection Board regulatory issues, anti-money laundering and FCPA questions, other legal and regulatory issues, and LendingClub's loan collections processes.

| **Role of counsel implicated or referenced?** | No. |
|---|---|
| **Record cites to support evidentiary fact:** | • Ex. 3, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo, GS_LC_00011324-83, at 6 (providing comprehensive summary of 15 separate diligence calls held in July and August 2014 regarding financial, legal, and regulatory diligence).<br><br>• August 7, 2014 GS Due Diligence Call Notes, GS_LC_00007931-58, at 7936-37 (notes for July 29, 2014 call regarding Investment Company Act issues).<br><br>• *Id.* at 7938 (notes for July 31, 2014 call regarding bankruptcy issues).<br><br>• *Id.* at 7939 (notes for July 31, 2014 call regarding privacy issues).<br><br>• *Id.* at 7940-41 (notes for July 31, 2014 call about Consumer Financial Protection Board inquiries of Springstone).<br><br>• Ex. 8, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00008733-38, at 2, 3, 5.<br><br>• July 31, 2014 call invite, MS_LC_00067035 (invite for anti-money laundering/FCPA diligence call with LendingClub).<br><br>• July 31, 2014 Economic Sanctions, Anti-Money Laundering, FCPA, and Antiboycott Laws Regulatory Diligence Call question list, GS_LC_00010204-06 (list of questions covering LendingClub's policies and procedures with respect to FCPA and AML issues).<br><br>• July 31, 2014 call invite, MS_LC_00066110-11 (invite for legal and regulatory due diligence call).<br><br>• July 31, 2014 Morgan Stanley call notes, |

|  | MS_LC_00071265-69 (detailed notes on legal and regulatory call). |
|--|--|
|  | • August 5, 2014 call invite, MS_LC_00071078 (invite for diligence call regarding Consumer Financial Protection Board issues). |
|  | • August 5, 2014 Consumer Protection Related Questions for Regulatory Diligence Call, MS_LC_00071079-86 (list of approximately 75 detailed consumer protection-related questions). |
|  | • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 8 (summarizing October 22, 2014 diligence call regarding LendingClub's collections process). |
|  | • Testimony of witnesses for the Lead Underwriters, Carrie Dolan and Jason Altieri. |

| **Evidentiary Fact 27:**  On August 26, 2014, one day before the filing of LendingClub's initial registration statement, the underwriters held a comprehensive "bring-down call" with LendingClub and Deloitte covering any material developments since the July 1, 2014 organizational meeting. ||
|--|--|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 26, 2014 call invite, GS_LC_00001335-36. |
|  | • August 26, 2014 Bring-Down Diligence Question, MS_LC_00063018-20 (covering topics including significant changes in the company's operations, key partner relationships, material negative financial information, and "any updates to your internal controls, significant deficiencies or material weaknesses"). |
|  | • Testimony of witnesses for the Lead Underwriters, LendingClub and Deloitte who attended the diligence call. |

| | |
|---|---|
| ***Evidentiary Fact 28:***  On November 30, 2014, the underwriters held another comprehensive "pre-launch bring-down diligence call with the Company" covering any material developments since the August 26, 2014 bring-down call. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • November 30, 2014 call invite, WF_LC_00004559-60.<br><br>• Testimony of witnesses for the Lead Underwriters and LendingClub who attended the diligence call. |

| | |
|---|---|
| ***Evidentiary Fact 29:***  The Lead Underwriters did not simply rely on and accept without question representations by LendingClub management.  Instead, the Lead Underwriters carefully assessed information received from management in light of other interviews conducted and documents reviewed during diligence.  The Lead Underwriters repeatedly followed up with LendingClub and its auditors on any questions raised during diligence, any areas that required clarification, and any topics that were not fully covered in the first round of diligence calls. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 13, 2014 call invite, MS_LC_00066170 (invite for follow-up call with Auerr Zajac regarding Springstone issues).<br><br>• August 13, 2014 Morgan Stanley call notes, MS_LC_00068585-87, at 1 (summary of supplemental Auerr Zajac call).<br><br>• August 13, 2014 call invite, MS_LC_00065782 (invite for follow-up call with Armanino regarding transition between auditors).<br><br>• August 13, 2014 Morgan Stanley call notes, MS_LC_00068579-81 (summarizing supplemental Armanino call).<br><br>• October 3, 2014 call invite, GS_LC_00002917-18 (invite for |

|  | follow-up call with Deloitte regarding Springstone). |
|---|---|
|  | • October 3, 2014 Morgan Stanley call notes, MS_LC_00062873-75 (summary of follow-up Deloitte call). |
|  | • Ex. 8, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00008733-38, at 5 (setting forth "Key Diligence Confirmations"). |
|  | • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 2 ("Over the past three months, we have continued our diligence on the Company to follow-up on all committee questions as well as to review . . . additional developments."). |
|  | • Caldwell Decl. ¶ 14. |
|  | • Testimony of witnesses for the Lead Underwriters, LendingClub and representatives of auditors who attended the diligence calls. |

**Evidentiary Fact 30:**  As an example of the underwriters' follow-up efforts, on October 9, 2014, the underwriters held a follow-up diligence call with LendingClub regarding a small set of loans LendingClub had mischaracterized in October 2014 before the problem was corrected a week later.  The underwriters scheduled this supplemental call to gather additional facts surrounding the error and its magnitude, clarify how it occurred, and gain a better understanding of the corrective measures the company had adopted in response to the problem.

| **Role of counsel implicated or referenced?** | No. |
|---|---|
| **Record cites to support evidentiary fact:** | • October 9, 2014 call invite, GS_LC_00000576. |
|  | • Ex. 4, November 20, 2014 Goldman Sachs Confidential Commitments Committee Memo Addendum, GS_LC_00003430-51, at 3-4 (call notes). |
|  | • Testimony of witnesses for the Lead Underwriters and LendingClub who attended the diligence call. |

| | |
|---|---|
| **_Evidentiary Fact 31:_**  The Lead Underwriters actively participated in the preparation of LendingClub's Registration Statement over a period spanning several months.  The Lead Underwriters prepared initial drafts of certain sections, carefully reviewed initial drafts of other sections prepared by the company and its counsel, and compared the statements in all initial and subsequent drafts to the results of the underwriters' own diligence, offering significant comments and proposed revisions throughout the process. | |
| Role of counsel implicated or referenced? | OMM proposed edits to and attended non-privileged drafting sessions with the underwriters, LendingClub, and LendingClub's counsel in preparing the Registration Statement. |
| Record cites to support evidentiary fact: | • June 5, 2014 email from Brandon Watkins of Goldman Sachs to Greg Mrva of Morgan Stanley, GS_LC_00002420-21 (circulating revision to initial outline of business overview section of registration statement "to [be] present[ed] as joint work product and framework" to LendingClub).<br><br>• June 20, 2014 email from Kristopher Caldwell of Morgan Stanley to Greg Mrva and Ali Esfahani of Morgan Stanley, MS_LC_00058546-60 (circulating extensive handwritten notes on proposed revisions to business overview section from latest drafting session with the company).<br><br>• June 24, 2014 email from Ryan Nolan of Goldman Sachs to Kristopher Caldwell of Morgan Stanley, MS_LC_00058567-90 (circulating substantial combined proposed edits to latest draft of business overview, platform description, and loan processes).<br><br>• July 23, 2014 email exchange between Kristopher Caldwell and Nicole Irvin of Morgan Stanley, MS_LC_00058144-48, at 58147 (noting "major surgery on Bus and MD[&]A" completed by July 2014 as drafting process moved to next stage).<br><br>• October 14, 2014 email exchange between Kristopher Caldwell of Morgan Stanley and Beth Haiken of LendingClub, MS_LC_00026443-46 (discussing revisions to registration statement).<br><br>• Testimony of witnesses for the Lead Underwriters and LendingClub. |

| | |
|---|---|
| ***Evidentiary Fact 32:*** In response to their diligence requests, the Underwriter Defendants did not receive any information from any sources that raised concerns about the central substantive issues in the case, including the adequacy of LendingClub's internal financial controls, LendingClub's relationship with Cirrix, or the adequacy of LendingClub's data integrity and security protocols. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • August 7, 2014 GS Due Diligence Call Notes, GS_LC_00007931-58, at 7935-37, 7944, 7946-50 (summarizing auditor and Audit Chair calls). <br><br> • Ex. 3, August 7, 2014 Goldman Sachs Confidential Commitments Committee Memo, GS_LC_00011324-83, at 6, 10-11 (summarizing auditor and Audit Chair calls). <br><br> • July 27, 2012 Credit Support Agreement Between LendingClub and Cirrix, LC_FEDERAL_431389-406 (credit support agreement providing that LendingClub would cover certain Cirrix losses from loan purchases on the LendingClub platform pursuant to an agreed-upon formula). <br><br> • August 6, 2014 D&O Questionnaire for LendingClub CEO Laplanche, LC_FEDERAL_292201-28, at App. A, p. A-1 (providing required certifications with respect to, *inter alia*, related-party transactions). <br><br> • August 6, 2014 Laplanche D&O Questionnaire Supplement, LC_FEDERAL_292274-84, at App. A, p. B-1 (same). <br><br> • December 10, 2014 Underwriting Agreement, GS_LC_00000175-228, at 2, 10 (including representation by LendingClub that its disclosure in the Registration Statement regarding related-party transactions was "accurate and fair"). <br><br> • Testimony of witnesses for the Lead Underwriters. |

| **Evidentiary Fact 33:** The Junior Underwriters relied on the due diligence conducted by the Lead Underwriters as representatives of the underwriting syndicate. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | <ul><li>December 10, 2014 Underwriting Agreement, GS_LC_00000175-228, at 1 (defining Lead Underwriters as "Representatives" of the syndicate).</li><li>Ex. 5, November 25, 2014 Morgan Stanley EUC Memo, MS_LC_00062954-012, at 2 (setting forth underwriter allocations).</li><li>Caldwell Decl. ¶ 7.</li><li>Declaration of Gerry Walters, Wells Fargo Managing Director ("Walters Decl.") (submitted herewith) ¶¶ 6-8.</li><li>Testimony of witnesses for the Junior Underwriters.</li></ul> |

| | |
|---|---|
| **Evidentiary Fact 34:** Before agreeing to enter into the syndicate, the Junior Underwriters were aware that Morgan Stanley and Goldman Sachs were the Lead Underwriters for this offering. Based on their familiarity and prior experiences with the Lead Underwriters, the Junior Underwriters believed the Lead Underwriters to be seasoned, experienced, and capable in conducting the due diligence process on behalf of the syndicate. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Walters Decl. ¶ 6 ("Before Wells Fargo agreed to participate in the underwriting syndicate, it was aware that Morgan [Stanley] and Goldman Sachs were the two lead active bookrunners and that [they] would represent the entire underwriting syndicate for the IPO.").<br><br>• *Id.* ¶¶ 7-8 ("I have worked with both Morgan Stanley and Goldman Sachs on a number of public offerings since before 2000, both when I was at Wells Fargo and previously when I worked at other financial institutions. I had worked in the past on various transactions with several of the team members from Morgan Stanley and Goldman Sachs that were involved in the LendingClub IPO . . . . Based on my prior experience with Morgan Stanley and Goldman Sachs, and with the specific individuals with whom I had worked in the past, I believed that these two banks were experienced, capable, and well aware of the diligence process that needed to be performed in connection with the LendingClub IPO.").<br><br>• Testimony of witnesses for the Junior Underwriters. |

| | |
|---|---|
| ***Evidentiary Fact 35:***  The Junior Underwriters were aware and took reasonable steps to confirm that the Lead Underwriters were conducting a diligent investigation, including receiving calendar invitations to diligence calls and lists of questions before the calls, participating in the calls themselves and thus independently verifying the questions asked and the answers received, and following up with the Lead Underwriters regarding the diligence. | |
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • July 1, 2014 Discussion Materials, GS_LC_00007501-85 (detailed overview of LendingClub's business and operations in connection with introductory organizational meeting attended by full syndicate).<br><br>• July 29, 2014 call invite, GS_LC_00001737-78 (invite circulated for diligence call with Armanino).<br><br>• July 29, 2014 Accounting Due Diligence Questions for Armanino, GS_LC_00001739-40 (question list circulated prior to call).<br><br>• July 31, 2014 call invite, GS_LC_00001698-99 (invite circulated for diligence call with Auerr Zajac).<br><br>• July 31, 2014 Accounting Due Diligence Questions for Auerr Zajac, MS_LC_00069792-93 (question list circulated prior to call).<br><br>• August 1, 2014 call invite, GS_LC_00001728-29 (invite circulated for diligence call with Grant Thornton).<br><br>• August 1, 2014 Accounting Due Diligence Questions for Grant Thornton, GS_LC_00001730-31 (question list circulated prior to call).<br><br>• Ex. 9, August 1, 2014 call invite, GS_LC_00001382-83 (invite circulated for diligence call with Deloitte).<br><br>• Ex. 10, August 1, 2014 Accounting Due Diligence Questions for Deloitte, GS_LC_00001725-27 (question list circulated prior to call).<br><br>• July 31, 2014 call invite, MS_LC_00067994 (invite circulated for diligence call with LendingClub Audit Chair). |

App. B-26

Underwriter Defs.' Submission re: Due Diligence          Case No. 3:16-cv-02627-WHA

| | • July 31, 2014 Audit Committee Chair Due Diligence Questions, MS_LC_00067995-96 (question list circulated prior to call).<br><br>• Walters Decl. ¶¶ 9-10.<br><br>• Testimony of witnesses for the Lead Underwriters and Junior Underwriters. |
|---|---|

| **Evidentiary Fact 36:**  The fact that the Junior Underwriters largely delegated due diligence efforts to the Lead Underwriters was appropriate under the circumstances. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Testimony of expert witness. |

| **Evidentiary Fact 37:**  On December 10, 2014, LendingClub represented to the underwriters that "the Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, will not contain, as of the date of such amendment or supplement, any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading." | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • December 10, 2014 Underwriting Agreement, GS_LC_00000175-228, at § 1(b)(i).<br><br>• Testimony of witnesses for the Lead Underwriters and LendingClub. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Evidentiary Fact 38:** In connection with the closing of the IPO, the Underwriter Defendants received a certificate from LendingClub's CFO and comfort letters from Grant Thornton, Armanino, Auerr Zajac, and Deloitte, the four audit firms that had audited LendingClub or Springstone for the five years before the IPO. Collectively, these documents represented that the consolidated financial statements included in the Registration Statement were accurate and complied with all applicable accounting and regulatory requirements.

| | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • December 10, 2014 Officer's Certificate from Carrie Dolan, LendingClub's CFO, MS_LC_00071335-43.<br><br>• December 10, 2014 comfort letter from Grant Thornton, MS_LC_00071344-81.<br><br>• December 10, 2014 comfort letter from Deloitte, MS_LC_00071382-466.<br><br>• December 10, 2014 comfort letter from Armanino, MS_LC_00071467-76.<br><br>• December 10, 2014 comfort letter from Auerr Zajac, MS_LC_00071477-80.<br><br>• December 16, 2014 bring-down comfort letter from Grant Thornton, MS_LC_00071481.<br><br>• December 16, 2014 bring-down comfort letter from Deloitte, MS_LC_00071482-563.<br><br>• December 16, 2014 bring-down comfort letter from Armanino, MS_LC_00071564.<br><br>• December 16, 2014 bring-down comfort letter from Auerr Zajac, MS_LC_00071565.<br><br>• Testimony of witnesses for the Lead Underwriters, Carrie Dolan and representatives from Grant Thornton, Armanino, Auerr Zajac, and Deloitte. |

1
2
3
4
5

| **Evidentiary Fact 39:** In connection with the closing, the Underwriter Defendants received a certification from LendingClub's CEO that the representations and warranties in the Underwriting Agreement are true and correct. The Underwriter Defendants also received opinion letters from Fenwick & West (LendingClub's deal counsel), Arnold & Porter (LendingClub's special regulatory counsel), and K&L Gates (LendingClub's special counsel with respect to the Investment Company Act of 1940) as to the accuracy of statements in the Registration Statement. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • December 16, 2014 Executive Officer's Certificate, MS_LC_00071566-67, at 1.<br><br>• December 16, 2014 opinion letter from Fenwick & West to the syndicate, MS_LC_00071568-76, at 8.<br><br>• December 16, 2014 opinion letter from Arnold & Porter to the syndicate, MS_LC_00071577-80.<br><br>• December 16, 2014 opinion letter from K&L Gates to the syndicate, MS_LC_00071581-82.<br><br>• Testimony of witnesses for the Lead Underwriters. |

6
7
8
9
10
11
12
13
14
15
16
17

| **Evidentiary Fact 40:** The Underwriter Defendants subjectively believed as a result of their investigation that, at the time the Registration Statement became effective, the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements not misleading. | |
|---|---|
| **Role of counsel implicated or referenced?** | No. |
| **Record cites to support evidentiary fact:** | • Caldwell Decl. ¶ 17.<br><br>• Walters Decl. ¶ 12.<br><br>• Testimony of witnesses for the Lead Underwriters and the Junior Underwriters. |

18
19
20
21
22
23
24
25
26
27
28

UNDERWRITER DEFS.' SUBMISSION RE: DUE DILIGENCE          CASE NO. 3:16-cv-02627-WHA